Michael Delikat (MD-1165)
James H. McQuade (JM-0788)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 506-5000

Attorneys for Wyeth Pharmaceuticals, a Division
of Wyeth, Walter Wardrop, and Michael McDermott

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOWARD HENRY,

               Plaintiff,

   -against-

WYETH PHARMACEUTCALS, INC., WALTER
WARDROP, ANDREW SCHACHL, AND
MICHAEL MCDERMOTT,

               Defendants.

05 Civ. 8106 (RCC) (DFE)

**DEFENDANTS' RULE 56.1
STATEMENT**

     Defendants Wyeth Pharmaceuticals, a Division of Wyeth ("Wyeth"), Walter Wardrop, and Michael McDermott (together, "Defendants"), by their attorneys, Orrick, Herrington & Sutcliffe LLP, as and for their statement of material facts as to which there is no genuine issue to be tried, state as follows:

**Background**

     1.     Wyeth is a company engaged in the development and manufacture of pharmaceutical consumer healthcare, and animal health products. Declaration of Max Katz ("Katz Decl."), ¶ 2. Wyeth operates a pharmaceutical manufacturing facility in Pearl River, New York. *Id.* As a pharmaceutical manufacturing facility, Wyeth must comply with certain Good Manufacturing Practices ("GMPs"), which are set forth in regulations issued by the Food and Drug Administration ("FDA"). *Id.*

2.     Michael McDermott was the Managing Director of Wyeth's Pearl River facility from 2002 through February 2004. Declaration of James H. McQuade ("McQuade Decl."), Ex. 5, 26-27. In February 2004, McDermott moved to Wyeth's Vaccine Division, and therefore, no longer had responsibility over the division in which Plaintiff Howard Henry worked. McQuade Decl. Ex. 5, 59-60. McDermott never directly supervised Henry's work and never directly participated in the preparation of Henry's performance reviews. McQuade Decl. Ex. 5, 31-32.

3.     In 1990, Henry received a Bachelors Degree in Physical Science, and, in 1997, Henry received his second Bachelor Degree in Chemical Engineering. McQuade Decl. Ex. 1, 17-18, Exs. 1-2.

4.     In 1993, Henry began working for one of Wyeth's predecessors as a Chemist at a salary level of 4. McQuade Decl. Ex. 1, 24-25, 30 & Ex. 3.

5.     In 1997, Henry was promoted to the position of Science II Chemist at a salary level of 7. McQuade Decl. Ex. 1, 30-31 & Ex. 3.

6.     In all but one of his year-end performance reviews from 1993 through 2000, Henry's overall performance rating fell directly in the middle of the rating scale. Declaration of Joanne Rose ("Rose Decl."), ¶ 9 & Exs. 10-17.

7.     In August 2000, Henry was promoted to the position of Production Engineer at a salary level of 9 and began reporting to Walter Wardrop. McQuade Decl. Ex. 1, 32-33; Ex. 2, 14-16, 19. Wardrop made the decision to hire Henry after interviewing him for the position. McQuade Decl. Ex. 1, 32-33; Ex. 2, 19-20, 67-68. Henry's job responsibilities included maintaining the equipment, conducting Preventive Maintenance Orders ("PMOs"),

responding to maintenance concerns, and acting as a liaison between the operating department and maintenance department. McQuade Decl. Ex. 2, 20.

8.    Wardrop prepared Henry's performance rating for 2000 and gave him an overall performance rating of 3. McQuade Decl. Ex. 1, 130-34 & Ex. 10; Ex. 2, 21-22. Henry had no disagreement with this performance review and viewed it as "extremely positive." McQuade Decl. Ex. 1, 134; Ex. 6, ¶ 4.

9.    Wardrop prepared Henry's performance rating for 2001 and gave him an overall rating of 4. McQuade Decl. Ex. 1, 135 & Ex. 11; Ex. 2, 23. Henry did not disagree with anything in this review and viewed it as extremely positive. McQuade Decl. Ex. 1, 138; Ex. 6, ¶ 4. Henry and Wardrop got along with each other and worked well together. McQuade Decl. Ex. 1, 136, Ex. 2, 24-25.

10.    Wardrop prepared Henry's performance rating for 2002 and gave him an overall rating of 4, which he viewed as "extremely positive." McQuade Decl. Ex. 1, 138-39 & Ex. 12; Ex. 2, 23; Ex. 6, ¶ 4.

**Project Engineer Position**

11.    In order to fill vacant job positions, Wyeth posts job openings on a bulletin board and on its intranet site, and employees who are interested in a posted position may submit their resumes, or "bid," on the position. McQuade Decl. Ex. 1, 35-36.

12.    In December 2001, Henry applied for a position as a Project Engineer through Wyeth's bid process. McQuade Decl. Ex. 1, 42-45.

13.    Several other individuals in addition to Henry applied for the position. Declaration of Kevin Costello ("Costello Decl), ¶ 3. Kevin Costello, the hiring manager for this

position, hired Cara Muscolo for the position because he felt that she was the best candidate for the position. Costello Decl. ¶ 3; McQuade Decl. Ex. 1, 46-48.

    14.    Based on Costello's prior experience with Muscolo, he had confidence that she would perform the job well. Costello Decl. ¶ 3. Muscolo had worked for Costello at Wyeth in the past and they had worked well together. *Id.* Muscolo had done her job well for Costello in the past. *Id.* In addition, Costello believed that Muscolo had significant experience in the packaging area, which was something Costello felt was important for this particular position. *Id.* Muscolo previously had held positions as a Packaging and Manufacturing Supervisor at Wyeth. *Id.* Henry himself admits that Muscolo was qualified for this position. McQuade Decl. Ex. 1, 49-51.

    15.    In contrast to Muscolo, Henry had no packaging experience and had not gained Costello's confidence as Muscolo had. Costello Decl. ¶ 4. In fact, Costello believed that Henry had difficulties multi-tasking, and Costello was not impressed with his overall job performance. *Id.*

    16.    Henry testified that he has no basis for believing that he was not selected for this position because of his race or color, other than the fact that he had been denied promotions to other decisions involving different decision makers at later dates in his career at Wyeth. McQuade Decl. Ex. 1, 52-57.

**Production Coordinator Position**

    17.    In July 2002, Wyeth posted a vacant position as a Production Coordinator. Declaration of Andrew Schaschl ("Schaschl Decl."), ¶ 2; McQuade Decl. Ex. 1, 58-59. The Production Coordinator was to report to Andrew Schaschl, a Director, who was responsible for making the hiring decision for this position. Schaschl Decl. ¶ 2; McQuade Decl. Ex. 1, 59-60.

18.    The Production Coordinator was responsible for planning the manufacturing process for three different departments as the product passed through four primary production areas. Schaschl Decl. ¶ 2 & Ex. 1. Schaschl believed that it was extremely important that the Production Coordinator have strong multi-tasking skills and a good cross-functional background. Schaschl Decl. ¶ 2.

19.    Several people bid on this position, including Chris DeFeciani and Howard Henry. Schaschl Decl. ¶ 3. Schaschl decided to hire Chris DeFeciani for the position because he believed that he was the most qualified for the position for a number of reasons. Schaschl Decl. ¶ 3; McQuade Decl. Ex. 1, 62-63, 67.

20.    First, Schaschl felt that DeFeciani had excellent multi-tasking skills. Schaschl Decl. ¶ 3. Second, at the time DeFeciani was hired, he had either completed his APICS certification in logistic planning or was close to completing his APICS certification for logistic planning. *Id.* Third, Schaschl felt that DeFeciani had a very good cross-functional background and excellent knowledge of manufacturing operations, which he believed were important for this position. *Id.* Fourth, DeFeciani had proven himself to Schaschl as an excellent performer and a very capable employee. *Id.* Schaschl had hired DeFeciani into another position in the organization for which Schaschl was responsible, and Schaschl had the opportunity to work with DeFeciani in this position. *Id.* Finally, DeFeciani had filled in as the Production Coordinator at times in the past when his predecessor was absent from the job. *Id.*; McQuade Decl. Ex. 1, 64, 69-70. DeFeciani had received the highest overall rating of 5 in each his performance reviews for 2000 through 2002. Rose Decl. ¶ 7 & Exs. 4-6. Schaschl believed that DeFeciani had performed the Production Coordinator job responsibilities very well on these occasions.

Schaschl Decl. ¶ 3. For these reasons, Schaschl believed DeFeciani was the best choice for the Production Coordinator position, and he hired him for that position. *Id.*

21. Schaschl, who headed up the organizational unit in which Henry was working, had worked with Henry and was familiar with his performance. Schaschl Decl. ¶ 4. Schaschl did not believe that Henry had a full breadth of knowledge and experience in the manufacturing operations, as DeFeciani had. *Id.* In addition, based on Schaschl's experiences with Henry, Schaschl believed that Henry had problems multi-tasking, which would have made it difficult for him to succeed in the Production Coordinator position. *Id.*

22. Henry admits that he has no reason to believe that DeFeciani was unqualified for the Production Coordinator position. McQuade Decl. Ex. 1, 77.

23. Henry admits that he has no basis for believing that he was not selected for the Production Coordinator position because of his race or color. McQuade Decl. Ex. 1, 77-78.

**Performing Production Coordinator Duties on a Temporary Basis**

24. In April 2003, DeFeciani took a medical leave of absence, and Schaschl asked another employee, Richard Morgan, to perform the Production Coordinator job responsibilities on a temporary basis during DeFeciani's absence. Schaschl Decl. ¶ 5; McQuade Decl. Ex. 1, 70-73, 76, 81-82.

25. Even before DeFeciani's medical leave, Morgan had been filling in for DeFeciani and had been performing the Production Coordinator job responsibilities in DeFeciani's routine absences from work. Schaschl Decl. ¶ 5. Morgan had performed this job well in the past, had a good breadth of knowledge of the manufacturing operations, and, in general, was an excellent performer. Schaschl Decl. ¶ 5. Indeed, Morgan received the highest overall rating of five in each of his performance reviews for 2002 – 2004. Rose Decl. ¶ 8 &

Exs. 7-9. For these reasons, Schaschl asked Morgan to perform the Production Coordinator job responsibilities while DeFeciani was on his medical leave. Schaschl Decl. ¶ 5.

26.    DeFeciani's medical leave did not create an opening for this position, and Morgan was not formally placed into this position during DeFeciani's medical leave. Schaschl Decl. ¶ 6; McQuade Decl. Ex. 1, 79-80.

27.    Henry never asked Schaschl if he could perform the Production Coordinator position during DeFeciani's medical leave. Schaschl Decl. ¶ 6; McQuade Decl. Ex. 1, 73-74.

28.    Even if Henry had specifically requested to perform the Production Coordinator duties during DeFeciani's absence, Schaschl still would have asked Morgan to perform these duties for the reasons stated above. Schaschl Decl. ¶ 6.

29.    Henry admits that he has no reason to believe that Morgan was unqualified to perform DeFeciani's duties during his medical absence. McQuade Decl. Ex. 1, 80.

30.    Henry admits that he has no basis for believing that he was not selected to fill in for DeFeciani because of his race or color. McQuade Decl. Ex. 1, 80-81.

**Process Engineer Position**

31.    In November 2003, Kirit Rokad, then an Associate Director, Manufacturing Engineering, sought to hire an individual for a Process Engineer position through Wyeth's job posting system. Declaration of Kirit Rokad ("Rokad Decl."), ¶ 2; McQuade Decl. Ex. 1, 83-88, Ex. 5. This position was in the Vaccine Division, which is a separate and distinct division from the division in which Henry had applied for the Project Engineer and Production Coordinator positions. McQuade Decl. Ex. 1, 83-84.

32.    The job responsibilities for this position included providing prompt and essential engineering and technical support through the Wyeth Vaccine Manufacturing Engineer Group for Wyeth's Vaccine Division and Quality Control Departments. Rokad Decl. ¶ 3 & Ex. 1.

33.    In hiring for this position, Rokad was seeking an individual who had, among other things, a degree in chemical engineering and who had significant relevant experience, including experience in aseptic processing. Rokad Decl. ¶ 4.

34.    Several individuals, including Henry and Angel Montanez, applied for this position. Rokad Decl. ¶ 5; McQuade Decl. Ex. 1, 84-87, Ex. 5. Rokad and three other individuals interviewed the candidates for this position, including Henry, and they ultimately selected Montanez for the position because they believed that he was the most qualified candidate. Rokad Decl. ¶ 5.

35.    Rokad believed Montanez was the most qualified candidate for this position for several reasons. Rokad Decl. ¶ 6. First, Montanez had worked for Wyeth's Vaccine Division in the past, and Rokad felt that there was a benefit to selecting someone who had worked in the Vaccine Division because that person would be familiar with manufacturing processes employed in that Division. *Id.* Henry admits that he had never worked in the Vaccine Division and that it would be an advantage to hire someone who had experience in that division. McQuade Decl. Ex. 1, 90. Second, Montanez had significant experience with aseptic processing, as he had worked for Pfizer as an Aseptic Manufacturing Technical Specialist, where he received septic processing experience. Rokad Decl. ¶ 6. Finally, Montanez had a Bachelor of Engineering in Chemical Engineering and was working towards a Masters of Science in

Chemical Engineering. *Id.* Rokad felt that Mr. Montanez was more qualified than Henry for this particular position. Rokad Decl. ¶ 7.

36.    Henry did not have the same experience in aseptic processing as Montanez had, and Rokad felt that this was an important distinction for this position. *Id.* In addition, unlike Montanez, Henry had not worked in the Vaccines Division, and therefore, Rokad believed that he would be far less familiar with the processes employed in the Vaccine Division. *Id.* Finally, unlike Montanez, Henry had not begun course work for his Masters Degree in Chemical Engineering. *Id.*

37.    Henry admits that he does not believe that he was denied this Process Engineer position because of his race. McQuade Decl. Ex. 1, 91.

**Staff Engineer I**

38.    In January 2004, Henry applied through the formal bidding process for a position as a Staff Engineer I in the Bioprocess Department, which was a different department from the departments in which Henry had applied for the Production Coordinator and Project Engineer Position. McQuade Decl. Ex. 1, 91-92.

39.    John Simpson was the hiring manager for this position. McQuade Decl. 94-95, 97; Declaration of John Simpson ("Simpson Decl."), ¶ 2. In hiring for this position, Simpson was seeking an individual who had a Ph.D. in chemical engineering or an individual who had a B.S. or M.S. degree in chemical engineering and substantial relevant experience, including experience in bioprocess downstream operations. Simpson Decl. ¶ 3.

40.    A number of individuals, in addition to Henry, applied for this position. Simpson Decl. ¶ 4. Simpson selected Beelin Cheang for the position because he felt she was the most qualified for the position. *Id.* Unlike Henry who only had a B.S. in Chemical Engineering

and who did not have heavy bioprocess development experience, Cheang had a Ph.D. in Chemical Engineering. Cheang ultimately rejected the offer of employment in or about June 2004. *Id.*

41.    Thereafter, Simpson decided to hire James Patch, who also was more qualified than Henry because he had a Ph.D. in Chemical and Biological Engineering. *Id.* Patch accepted the offer of employment in December 2004. *Id.*

42.    Henry never applied for any other Staff Engineer position in Simpson's area of responsibility. *Id.* ¶ 5; Rose Decl. ¶ 6.

43.    At his deposition, Henry admitted that even he does not believe that he was denied this position because of his race:

Q:    Now, do you believe you were denied this position because of your race?

A.    . . . . I have to say no.

McQuade Decl. Ex. 1, 99.

**2003 Performance Review**

44.    Wardrop believed that Henry's performance began to slide in 2003. McQuade Decl. Ex. 2, 26.  In 2003, he often completed tasks and projects on the last day they were due or completely missed the deadline for the task or project.  On other occasions he would simply fail to complete projects or tasks all together.  Declaration of Walter Wardrop ("Wardrop Decl."), ¶ 2.  This was a major problem for Wardrop and the other managers who depended upon him to complete tasks on time. *Id.*

45.    Throughout 2003, Wardrop received complaints from Henry's co-workers and other managers that Henry was not getting work done on a timely bases, was missing

deadlines, needed to receive a great deal of follow-up in order to complete tasks, and needed intervention from managers to get things accomplished. Wardrop Decl. ¶ 3.

46.    On at least two occasions in 1993, Wardrop's boss, Andrew Schaschl instructed Wardrop to intervene on two projects that Henry was leading because the projects were falling behind schedule and instructed Wardrop to get involved with the projects to make sure they got done on time. McQuade Decl. Ex. 2, 26-27; Wardrop Decl. ¶ 4.

47.    Other managers also had advised Wardrop in 2003 that they were concerned that Henry was not responding to his pager. McQuade Decl. Ex. 2, 27-28. In addition, another engineer, Jean Colas, had complained that he was getting paged for areas outside of his responsibility and areas inside Henry's responsibility because Henry had not been responding to pages. *Id.;* Wardrop Decl. ¶ 6.

48.    On September 3, 2003, Wardrop gave Henry a mid-year review and discussed with Henry the performance issues identified in the review. McQuade Decl. Ex. 1, 145-48 & Ex. 13; McQuade Decl. Ex. 2, 30, 33, 39; Wardrop Decl. ¶ 5. The mid-year review for 2003 identified a number of "positives" and several areas to focus on for the remainder of 2003, including completing certain projects by year-end and improving attendance. McQuade Decl. Ex. 1, Ex. 13.

49.    The mid-year review also directed Henry that, when he was preparing his Self Appraisal and Goals and Objectives (the "Self Appraisal"), he should quantify and be specific with his accomplishments and he should provide a summary of work performed and value-added to the business. McQuade Decl. Ex. 1, Ex. 13; Wardrop Decl. ¶ 7.

50.    The mid-year review also urged Henry to take a leadership role in the special project he was working on. McQuade Decl. Ex. 1, Ex. 13.

51.     The review also confirms that Wardrop had received reports that Henry was observed doing nothing at work and that Henry had failed to respond to pages. McQuade Decl. Ex. 1, Ex. 13; Wardrop Decl. ¶ 6.

52.     Despite these issues identified in the mid-year review, the mid-year review stated that, "overall, Howard is a 'Solid Performer.'" McQuade Decl. Ex. 1, Ex. 13.

53.     Wyeth encouraged all managers to provide employees with mid-year reviews, McQuade Decl. Ex. 5, 46-47, and they do not have to be in writing. McQuade Decl. Ex. 3, 45.

54.     On September 8, 2003, Henry received an email from Wardrop advising him that his Self Appraisal must be turned in by October 1, 2003. McQuade Decl. Ex. 1, 162-63 & Ex. 15. The Self Appraisal is a tracking system that used to determine whether an individual is achieving his goals that are established at the beginning of the year. McQuade Decl. Ex. 1, 164. Wardrop needed to have the Self Appraisal form for each employee he supervised before October 1, 2003, so that he would have sufficient time to review these documents and determine the employees' performance ratings for their annual performance reviews before October 10, 2003, the date managers conducted their rating review meeting. Wardrop Decl. ¶ 7. At the rating review meetings, the managers meet to discuss the performance of all the employees they supervise and to assign performance ratings to each of the employees. *Id.* Once ratings are assigned at this meeting, they are not changed. *Id.*

55.     On October 2, 2003, Henry received another email from Wardrop advising him that his Self Appraisal must be turned in, stressing that "it is important that you complete this and submit it on time." McQuade Decl. Ex. 1, 163 & Ex. 15.

56.     On October 10, 2003, as part of a Rating Review Meeting, Wardrop received input from other managers, and Henry had his overall 2003 performance review assigned to him. McQuade Decl. Ex. 3, 23, 41-42; Wardrop Decl. ¶ 7.

57.     Henry did not turn in his Self Appraisal to Wardrop until January 5, 2004. McQuade Decl. Ex. 1, 163 & Ex. 16.

**The Organizational Cascade**

58.     In 2003, Wyeth's Pearl River facility initiated a massive corporate restructuring referred to as the Organizational Cascade. Schaschl Decl. ¶ 7; McQuade Decl. Ex. 5, 32-33. As part of the Organization Cascade, the highest level managers at the Pearl River facility, created a new corporate structure and a new organizational chart at the Pearl River facility. *Id.* At this stage in the Organizational Cascade, no individuals were assigned to positions in the new organizational structure. *Id.* In essence, every employee was removed from their position and placed in a pool of people available for hire for a position in the new organizational structure. *Id.* Positions in the new organizational structure then were filled from the top down, in a cascading manner. *Id.*

59.     First, Michael McDermott, Managing Director, selected individuals to fill the Director level positions and the positions that reported directly to him. Schaschl Decl. ¶ 8. Next, those that had been selected for these Director level positions in the new organizational structure selected individuals to fill the positions that were the next level down and that reported directly to them (Associate Directors and Managers). *Id.* Next, those that had been selected for these Associate Director and Manager positions filled the remainder of the positions in the new organizational structure by selecting the individuals who would report to them. *Id.* This was done as part of a group meeting of Associate Directors and Managers, who utilized a

collaborative approach and reached a consensus of opinion. *Id.* The primary considerations in placing these individuals were matching an individual's skills to the skills required by the position, potential for a developmental opportunity for the individual, and an individual's performance. *Id.*

60.    The Organizational Cascade affected all people in the organization. Schaschl Decl. ¶ 9. One of the purposes of the Organizational Cascade, and the job rotation that it produced, was to ensure that employees develop a well-rounded and diverse background in the manufacturing process. *Id.*

61.    McDermott's only involvement with the Organizational Cascade was final, administrative approval over all assignments as part of the Organizational Cascade. McQuade Decl. Ex. 5, 33-34.

62.    As part of the Organizational Cascade, Wardrop was assigned to a new position and had the opportunity to select an individual for an engineer position reporting to him. McQuade Decl. Ex. 2, 68. Wardrop selected Jean Colas, whose race is black, because Wardrop believed he was a highly qualified engineer and a high performer. *Id.* 69.

63.    In addition, as part of the Organizational Cascade, Espejo was selected for a new position as Associate Director of Manufacturing for Centrum operations and had an opportunity to hire an engineer. Espejo Decl. ¶ 2. Espejo selected Honario Ordenez based on the recommendation of the other Associate Directors and Managers participating in this process, who believed that Mr. Ordenez would perform well in this position. *Id.*

64.    As part of the Organization Cascade, Henry was selected to fill a position as Packaging Supervisor. McQuade Decl. Ex. 4, 44.

65.    The assignment to the Packaging Supervisor position was a transfer, not a demotion.  McQuade Decl. Ex. 4, 43.  It was a lateral move, with no change in money or grade.  McQuade Decl. Ex. 3,  40-41; Ex. 1, 170.

66.    Wyeth's managers believed that the Packaging Supervisor position would be an excellent opportunity for Henry because he would be a team leader; he would have direct supervisory responsibilities for a number of employees, which could lead to future management opportunities; he would get exposure to the packaging operations, which could help him obtain other positions in the future; he could learn new skills; and he could use his engineering background to make improvements in the packaging area.  Rose Decl. ¶ 2; Espejo Decl. ¶ 3; Schaschl Decl. ¶ 10; McQuade Decl. Ex. 5, 56-57; Wardrop Decl. ¶ 13.

67.    A number of other chemical engineers had held the Packaging Supervisor position in the past, including Cara Muscolo and Heidi Zeck.  McQuade Decl. Ex. 5, 58; Ex. 3, 42-43.

## Meeting with Wardrop Regarding the Performance Review and Organizational Cascade

68.    On December 17, 2003, Wardrop met with Henry to give him his 2003 performance review and to advise him of his assignment as part of the Organizational Cascade.  McQuade Decl. Ex. 1, 38 & Exs. 14 & 17; Wardrop Decl. ¶ 12¶ 6.  The 2003 review gave Henry an overall rating of 3 or "solid performer" and pointed out some of the strengths and weaknesses of his performance.  McQuade Decl. Ex. 1, Ex. 14.  The review pointed out that:  "The timeliness of completing assignments still needs improvement.  For example, [Henry] did not submit his Self-Appraisal or 2003 Goals for consideration in this review – even after 2 written requests.  Howard was a 'Solid Performer' who is a valued member of my team and would benefit from better reporting, attention to deadlines.  *Id*  Wardop had received significant adverse feedback

from other workers and managers in manufacturing throughout the year about the timeliness of Henry's work, the follow-up required to get information and to complete tasks, and the need for management intervention to get things done. Wardrop Decl. ¶¶ 3-11. In addition, due to ongoing delays, unresolved problems, and a lack of confidence from upper management that Henry could successfully complete projects on time, Schaschl had to instruct Wardrop on at least two occasions to complete two projects for which Henry was responsible. *Id.*

69. Again, on or about January 6, 2004, Henry had a meeting with Wardrop regarding his performance review and his assignment as part of the Organizational Cascade. McQuade Decl. Ex. 1, 173-74. During this meeting, Henry submitted his Self Appraisal to Wardrop. McQuade Decl. Ex. 1, 174-75. Even if Henry had submitted his Self Appraisal on time so that Wardrop could have considered it in preparing his performance review, it would not have changed the overall rating that Wardrop gave Henry. Wardrop Decl. ¶ 14.

**Henry's January 9 Meeting with Schaschl**

70. On January 9, 2004, Henry met with Schaschl to express his opposition to job assignment as part of the Organizational Cascade and his overall rating on his 2003 Performance Review. Schaschl Decl. ¶ 10. Schaschl explained to Henry that the Packaging Supervisor position would be a good developmental opportunity for him, as it would provide him with direct supervisory experience and would give him exposure to the packaging operation, which could help him obtain other positions in the future. *Id.*

71. Henry also complained that he should have been rated a 5 or at least a 4 in his 2003 Performance Review. Schaschl Decl. ¶ 11. Schaschl explained to Henry that he felt that he had problems with overall project management and driving multi-tasked, cross functional projects to completion. *Id.* Schaschl gave Henry two examples of projects (the CTC Cleaning

Verification and the CTC Weigh Belt) that were completed well beyond an acceptable time frame. *Id.* Henry was responsible for leading both of these projects. *Id.* However, because the projects were taking so long to complete, Schaschl had to ask Wardrop to intervene to get the projects completed on a timely basis. *Id.* Wardrop, rather than Henry, then was forced to lead this project and to see that the projects were completed. *Id.* Schaschl explained to Henry that he required too much attention from his managers to ensure tasks like this were completed and that one of the expectations of the position was that assignments were to be completed with minimal supervision. *Id.*

**Henry's January 12 Meeting with Rose**

72.     On January 12, 2004, Henry met with Joanne Rose, Associate Director of Human Resources, about his assignment to the Packaging Supervisor position and his 2003 performance review. Rose Decl. ¶¶ 1-2. Rose advised Henry that she thought that the Packaging Supervisor position would be a good option for him because it would give him an opportunity to learn new skills, to have direct supervisory responsibility over employees, and to use his engineering background to make improvements in the packaging area. Rose Decl. ¶ 2 & Ex. 1. Rose recommended that she and Henry meet with Wardrop to discuss the review to see if the language of the review could be changed, but she explained that the overall rating in the review could not be changed because it already had been entered into the HR system. Rose Decl. ¶ 2.

73.     After her meeting with Henry, Rose looked for other job vacancies that would match Henry's qualifications. Rose Decl. ¶ 3. In addition, McDermott asked her to look into other vacancies that might exist and that might be an appropriate match for Henry. *Id.*

**January 13 and 22 Meetings with McDermott**

74.    On January 13, 2004, Henry went to meet with Michael McDermott about his assignment as part of the Organizational Cascade and his 2003 Performance Evaluation. McQuade Decl. Ex. 1, Ex. 4, ¶ 37; Ex. 5, 36-37. McDermott told Henry that the position was an important part of his development at Wyeth because it would enable him to get direct supervisor experience.  McQuade Decl. Ex. 5, 39. McDermott explained to Henry that as a Production Engineer, he was not formally in a management or supervisory position, and that the packaging supervisory experience would give him formal supervisory experience, including employee performance management, employee development plans, and salary, which would benefit his career. *Id.* 56-57. McDermott told Henry that, if he disagreed with the performance rating, he could provide his written disagreements in writing. *Id.* 48.

75.    During the meeting, Henry stated that he believed that, as an African-American, he would have a difficult time explaining the transfer on his resume. McDermott told Henry that, given that Wyeth is a very diverse site, he would be concerned if that was an issue, and if Henry had an issue regarding race, Henry should share it with him. McQuade Decl. Ex. 5, ¶¶ 40-42. McDermott did not interpret Henry's vague comment about being an African-American as a complaint of racial discrimination, but in any event, invited Henry to make such a complaint if that is what Henry believed. McQuade Decl. Ex. 5, 40-41. Henry did not raise any concerns about race at this meeting. McQuade Decl. Ex. 5, 40.

76.    At Henry's request, McDermott reviewed Henry's recent performance reviews and concluded that Henry's performance review was fair and reasonable given the fact that Henry had received a mid-year review identifying projects that needed to be completed by

year end and that Henry had not completed those projects or satisfied his supervisor's expectations. McQuade Decl. Ex. 5, 43-44.

**Henry's January 16 Meeting with Rose and Wardrop**

77.    Wardrop decided to remove some of the language from Henry's 2003 performance review, because he felt that Henry had heard about the areas of his performance that needed to be improved upon, and he chose not to make these needs for improvement part of Henry's record. McQuade Decl. Ex. 2, 54-55; Ex. 3, 32-33.  Once a performance rating is assigned, as it was with Henry, it cannot be changed, but the wording of a performance review may change after it is assigned.  McQuade Decl. Ex. 3, 32-33; Ex. 5, 50; Wardrop Decl. ¶ 15.

78.    Prior to January 16, Wardrop was not aware of the fact that Henry had complained of discrimination.  McQuade Decl. Ex. 2, 45.

79.    On January 16, 2004, at a meeting with Rose, Wardrop, and Henry, Wardrop presented Henry with an amended 2003 performance review.  Rose Decl. ¶ 5; McQuade Decl. Ex. 1, 178-81 & Ex. 17; McQuade Decl. Ex. 2, 54.  After Henry refused to sign the review, Rose advised him that, if he was still unhappy with the review, he could write a rebuttal to the review, which could be attached to and incorporated in the review.  Rose Decl. ¶ 5.  Rose also asked Henry for his resume so she could use it to try to place him in other positions as vacancies arose, and she told Henry she could provide him with a list of job vacancies.  *Id.*  Henry, however, refused Rose's help, explaining that he could handle it himself. *Id.*  Rose asked Henry what he wanted done, and Henry replied that he would pray on it. McQuade Decl. Ex. 3, 31-32.

**Meetings with Peter Bigelow**

80.    On January 26, 2004, Peter Bigelow had a meeting with Henry who came to speak to him because he was unhappy with the rating he received in his 2003 performance evaluation and because he was unhappy with his assignment to a Packaging Supervisor position as part of the Organizational Cascade.  Declaration of Peter Bigelow ("Bigelow Decl"), ¶ 2; McQuade Decl. Ex. 4, 22, 25-26, 43; McQuade Decl. Ex. 1.  Henry advised Bigelow that he wished to be re-evaluated and he wished to remain in his current position, rather than move to the Packaging Supervisor position.  Bigelow Decl. ¶ 2.  Bigelow told Henry he would look into the matter and speak with Henry's supervisors.  McQuade Decl. Ex. 4, 30.

81.    Bigelow then spoke to McDermott and Schaschl, who informed Bigelow that Henry's performance was "not stellar," and that he had done well in some areas, but not so well in some areas.  McQuade Decl. Ex. 4, 32; ¶¶ 3.

82.    Bigelow decided to delay Henry's transfer to the Packaging Supervisor position until after he could review his performance reviews for the previous few years and until after he could speak to Henry again.  Bigelow Decl. ¶ 3.  Bigelow advised Henry of this in an email dated January 27, 2003.  Bigelow Decl. ¶ 3 & Ex. 1.

83.    On February 25, 2004, Bigelow advised Henry that he had reviewed Henry's performance documents and he found them to be clear and objective.  McQuade Decl. Ex. 4, 204-05 & Ex. 19.

84.    Bigelow communicated with Henry on several occasions over the next several weeks, and Henry continued to insist that he should be re-evaluated and that he should remain in his current position instead of transferring to the Packaging Supervisor position.  Bigelow Decl. ¶ 4.

85.    On April 21, 2004, Bigelow met with Henry and presented him with two options for different positions within the Company: (1) the Packaging Supervisor position that he had been assigned to as part of the Organizational Cascade; or (2) a Senior Validation Specialist position within the Vaccines Division.  Bigelow Decl. ¶ 5; McQuade Decl. Ex. 1, 123-26, 209 & Ex. 9.  In an email dated April 26, 2006, Henry rejected both of these options and suggested that, rather than moving to the Packaging Supervisor position or moving to a position in the Vaccines Division, he would be willing to assume the role of Consumer Health Project Engineer, which would have been a lateral move, not a promotion.  Bigelow Decl. ¶ 5; McQuade Decl. Ex. 1, 123-26, 127-28, 209 & Ex. 9.  Henry never bid on this position, never applied for this position, and never spoke to the hiring manager about this position.  McQuade Decl. Ex. 1, 125-27.

86.    Bigelow decided to grant Henry's wish and to permit him to remain in his position as a Production Engineer.  Bigelow Decl. ¶ 6.  Henry had been insisting all along that he wished to remain in his position as a Production Engineer.  *Id.*  Ultimately, Bigelow felt that it did not make sense to transfer an employee, such as Henry, to a position he so emphatically did not want to have.  *Id.*  In any event, Bigelow thought that this Production Engineer position would be a better position than the other option Mr. Henry had suggested – the Project Engineer position – because Mr. Henry had difficulty completing projects on time when he worked as an engineer on projects, and we thought this difficulties completing projects would have created more problems if Henry were working in a Project Engineer position.  *Id.*

87.    Henry first complained that he believed that he had been treated unfairly because of his race in an email to Peter Bigelow dated February 16, 2004.  McQuade Decl. Ex. 1, 198-99 & Ex. 18; McQuade Decl. Ex. 4, 28-29, 32-33 & Ex. 32-33.

88.    After receiving Henry's February 16, 2004 email, Bigelow contacted members of the human resources department to conduct an investigation of Henry's claims. McQuade Decl. Ex. 4, 33-37.    Eugene Sacket, who worked for the Human Resources Department at Wyeth's corporate headquarters, conducted an investigation of Henry's claims. *Id.*

89.    Sacket spoke to a number of individuals, including Henry, regarding Henry's claims and concluded that there was no evidence of discrimination.  McQuade Decl. Ex 1, 206-08, Ex. 2, 35-37; Ex. 4, 38-39.

90.    In May 2004, Henry began reporting to Espejo, who had been assigned to the position that Wardrop held as part of the organizational cascade.  McQuade Decl. Ex. 1, 39-41.

91.    On May 6, 2004, Henry was advised that he would remain in his position as the Production Engineer in Centrum production and would continue to report to Andrew Espejo.  McQuade Decl. Ex. 1, 210-11 & Ex. 20.  Henry never in fact was placed in the Packaging Supervisor position.  McQuade Decl. Ex. 1, 171.

**Henry's 2004 Mid Year Review**

92.    In the first half of 2004, Henry missed several deadlines for projects he was working on.  Espejo Decl. ¶ 5.  Espejo felt that Henry needed to improve his follow-up on pending issues, management completion of tasks to meet due dates, breadth of knowledge on department equipment, and development and implementation of project timelines. *Id.*

93.    On July 9, 2004, Espejo met with Henry and gave him his mid-year performance review.  Espejo Decl. ¶ 5; McQuade Decl. Ex. 1, 215-18 & Ex. 22.

94.    The one-page review listed three items: (a) the projects Henry was working on and the progress Espejo felt Henry had made on those projects; (b) Henry's areas of strength, and (c) Henry's areas of improvement. Espejo Decl. ¶ 5 & Ex. 1. The purpose of this mid-year review was to help Henry meet the expectations of his positions and to continue to improve and develop as an employee. Espejo Decl. ¶ 5.

95.    Henry told Espejo that he disagreed with the areas of improvement identified in the mid year review, and he refused to sign the review. McQuade Decl. Ex. 1, 218.

**Manager Manufacturing Support Position**

96.    In September 2004, a new position, Manager Manufacturing Support, was created to handle, among other things, production engineering, compliance, and training issues in the Centrum unit. Espejo Decl. ¶ 7 & Ex. 2. The person in this new position would report directly to Espejo. Espejo Decl. ¶ 7; McQuade Decl., Ex. 1, 102-03.

97.    Nearly thirty people applied for this position, and Espejo selected ten individuals to be interviewed, including Max Katz and Henry. Espejo Decl. ¶ 8. These ten applicants were then each individually interviewed by a panel of five managers. *Id.* The panel asked each of the ten candidates the exact same pre-determined questions and gave them a numerical score in eight different categories based on their responses. *Id.* ¶ 8 & Ex. 3; McQuade Decl. Ex. 1, 104-06. These questions were designed to assess the candidates' core competencies and skills relevant for the job and were designed to help the panel find the most competent candidate for the position. *Id.* ¶ 8.

98.    Katz received the highest overall score in this competency based interview process, and the panel unanimously selected Katz for this position. Espejo Decl. ¶ 8 & Ex. 4.

99.    Katz also stood out to Espejo because of his significant project management experience, which was very important for this position. Espejo Decl. ¶ 9.

100.    Katz had both a Bachelor of Science degree in Computer-based Management Systems and a Master of Engineering degree in Environmental Engineering. Katz Decl. ¶ 3.

101.    Espejo also felt Katz had a diverse background. Espejo Decl. ¶ 9 & Ex. 5. Katz had held a number of different positions within Wyeth. *Id*; Katz Decl. ¶ 4. In 1995, he accepted a position as a Production Engineer, working in the Branded Products area, where he was responsible for, among other things, continuous operation of manufacturing equipment, working with vendors, maintenance staff, and pharmaceutical operators to diagnose equipment problems, and performing various investigations on multiple products. Katz Decl. ¶ 4. Thereafter, Katz joined the Environmental Technology group, where he worked as an Environmental Engineer and eventually a Senior Environmental Engineer, responsible for site-wide compliance for Hazardous Waste, Solid Waste and Regulated Medical Waste and management of employees. *Id.* Katz managed environmental projects dealing with remediation and RCRA Corrective Action with budgets up to $2 million. *Id.* In 2003, Katz joined the Safety Department as a Senior Engineer, where he was responsible for all areas of safety. *Id.*

102.    Because Espejo felt Katz was the best candidate for the position, Espejo decided to hire Katz for the position. Espejo Decl. ¶ 9.

103.    Henry did not distinguish himself in any way during the interviewing process and ended up with one of the lower scores from the panel. Espejo Decl. ¶ 9.

104.    This position was three salary grade levels above Henry's position. *Id.*, McQuade Decl. Ex. 1, 116-17 & Ex. 8.

**Henry's 2004 Performance Review**

105.    In 2004, Henry continued to have difficulty setting commitment dates and meeting those commitment dates. Espejo Decl. ¶ 11.  On January 12, 2005, Espejo met with Henry and gave him his 2004 performance review, providing an overall rating of 3, which indicated that Mr. Henry met the objectives, responsibilities, and expectations of his position. Espejo Decl. ¶ 11; McQuade Decl. Ex. 1, 221-25 & Ex. 23.  The review noted a number of Henry's strengths and accomplishments: (a) "He has collaborated well with his team members in achieving stated goals"; (b) "Howard has made consistent strives to produce quality work"; and (c) "By communicating, leading by example, and trying to perform consistently, he improves the efforts of the colleagues around him."  McQuade Decl. Ex. 1, Ex. 23.  The review also noted some of the areas that Henry needed to improve: (a) "Howard does need to improve on setting objective dates and meeting those commitments consistently;" and (b) "Overdue SOPs have been revised and approved however are not all [sic] made effective by the end of the year."  *Id.*  The review rated Henry a "4" in three of nine categories in the review, and rated Henry a "3" in the six of the nine categories of the review. *Id.*

**Henry's Performance Issues in 2005**

106.    After receiving his 2004 performance review, Henry continued to miss a number of deadlines, and Espejo began to receive complaints from others about Henry's delay in completing assignments. Espejo Decl. ¶ 12.

107.    Katz, who became Henry's direct supervisor in January 2005, had difficulties with Henry from the outset. Katz Decl. ¶¶ 5-6.

108.    On a number of occasions, Katz received complaints from others that Henry had failed to meet a deadline or complete a task in a timely manner. Katz Decl. ¶ 6.  In

addition, Katz felt that Henry frequently failed to communicate with him, often failing to return his phone calls or his emails or taking days to respond. Katz Decl. ¶¶ 6 & 15. Henry also was frequently absent from work or failed to provide adequate notice. *Id.* at 6.

109. For example, in an email dated February 3, 2005, Grant Livermore, a Computer Validation Consultant, asked Espejo to intervene to try to get Henry to complete a long delayed project. Espejo Decl. ¶ 12. On that same day, February 3, 2005, Katz asked Henry to prepare a timeline for the completion of the project and to forward the timeline to Livermore. *Id.* On February 16, 2005, Livermore, advised Espejo that he still had not received a timeline for the completion of the requested work. Espejo asked Henry, once again, to provide a timeline or date of completion to Livermore "ASAP" on this "critical item." *Id.* Katz never received a response or timeline from Henry. Katz Decl. ¶ 7.

110. On February 9, 2005, Katz sent Henry an email requesting that, by February 16, 2005, he prepare a timeline of the steps he was taking to resolve issues regarding certain Maintenance Investigation Reports ("MIRs"). Katz Decl. ¶ 8. Henry did not provide Katz with a response or timeline. *Id.* ¶ 8 & Ex. 3.

111. On another occasion in February 2005, Henry arrived late, without giving any notice, for an important meeting he had scheduled with outside vendors and managers from another Wyeth facility. Katz Decl. ¶ 9. Katz went to speak with Henry in his office to let him know that, if he was going to be significantly late to an important meeting like this in the future, he must contact him and give him notice. *Id.* Henry interrupted Katz and told him that they should go to a nearby empty conference room. *Id.* When they reached the room, Henry told Katz to sit down, which he did, and Henry proceed to pace back and forth telling Katz that he

was not a child and that Katz was treating him like a child by discussing this issue. *Id.* Henry told Katz that he might not be able to contact him all the time. *Id.*

112.    As part of an effort to comply with Wyeth's SOPs and with GMPs required by the FDA, Espejo established certain procedures for supervisors to conduct maintenance audits of their assigned zones. Espejo Decl. ¶ 13. As part of this plan, Espejo assigned to Henry the responsibility of reviewing and signing the Weekly Maintenance Zone Checklists prepared by the supervisors. *Id.* Espejo advised Henry and the others of this procedure on February 18, 2005. *Id.* ¶ 13 & Ex. 7. Almost immediately, Henry fell behind on this project, failing to review and approve the Weekly Maintenance Zone Checklists. Espejo Decl. ¶ 13.

113.    Concerned that Henry's failure to timely process these Weekly Maintenance Zone Checklists could lead to compliance issues, on March 15, 2005, Espejo advised Henry that he needed to address the Checklist issue. Espejo Decl. ¶ 13 & Ex. 7. The following day Henry advised Espejo that the overdue Weekly Maintenance Zone Checklists would be submitted by March 25, 2005 or sooner. *Id.*

114.    In late March 2005, Espejo was informed that Henry had fallen far behind on completing PMOs. Espejo Decl. ¶ 14. Concerned that Henry's failure to complete the PMOs could lead to serious regulatory compliance issues and concerned about Henry's failure to complete the Weekly Maintenance Zone Checklists in a timely manner, Espejo suggested initiating a formal Performance Improvement Plan ("PIP") to improve Henry's performance. Espejo Decl. ¶ 14 & Ex. 8.

115.    On March 30, 2005, Katz spoke to Henry about his failure to sign off on PMOs in a timely manner. Katz Decl. ¶ 12. When Katz notified Henry that someone had

notified Katz of the problem caused by Henry's failure to approve the PMO's in a timely manner, Henry expressed his annoyance that someone would notify Katz of this problem. Katz Decl. ¶ 12 & Ex. 5.

116.    In addition, in March 2005, Cara Muscolo, a Wyeth manager, complained to Katz that Henry failed to fulfill many of his responsibilities on a project he was working on with her. Katz Decl. ¶ 13.

117.    Although Henry had promised to provide Espejo with the overdue Weekly Maintenance Zone Checklists by March 25, 2005 or sooner, Henry did not provide them to Espejo until April 5, 2005. Espejo Decl. ¶ 16. Upon review of these Checklists, for which Henry had been responsible for reviewing and approving, it was discovered that Checklists for certain areas had not been completed since February 5, 2005, in violation of Wyeth's SOPS and GMPs. *Id.* This was a serious compliance issue. *Id.* As a result of this failure, a formal compliance investigation was initiated and a formal Event Report Form ("ERF") had to be prepared. *Id.* Wyeth is obligated to make these ERFs available to the FDA for review, if requested. *Id.*

118.    On May 19, 2005, Katz sent Henry a "red" high priority email with three high priority items. Katz Decl. ¶ 16 & Ex. 7. Henry did not open the email until the following day, after Katz went to talk to him about the email. *Id.*, ¶ 6. One of the tasks assigned to Henry in the email had a June 3, 2005 commitment date, and several people, including Espejo had to stay late on June 3, 2005 to complete this assignment on time. *Id.*

**The PIP**

119.    Because Henry's performance had not been improving, Katz decided to place Henry on a Performance Improvement Plan (the "PIP") in an attempt to help improve his performance. Katz Decl. ¶ 17.

120.    On June 24, 2005, Stacey Marroso, a Human Resources employee, and Katz met with Henry to give him his mid-year performance review and to give him a copy of his PIP. Katz Decl. ¶ 18; McQuade Decl. Ex. 1, 226-36, 238-52 & Ex. 24 - 26.

121.    Marroso advised Henry that the PIP was not a disciplinary tool, but rather a tool to help an employee take corrective action and improve his performance. McQuade Decl. Ex. 1, 261.

122.    The PIP stated Katz's concern that Henry had repeatedly failed to meet deadlines and complete tasks in a timely manner and provided seven examples. McQuade Decl. Ex. 1, Ex, 26.  The PIP also stated that Henry had an unacceptable number of absences, quadruple the number of absences (not including vacation days) than any other employee in the department and [Henry] would often call out with little notice, which greatly impacts the business's ability to operate smoothly.  *Id.*  The PIP provided four specific improvement expectations. *Id.*

123.    The mid-year performance review provided feedback on Henry's progress in 25 categories and, with respect to each category, advised Henry whether he was "on pace," "behind pace," or "unacceptable." McQuade Decl. Ex. 1, Ex. 24.  Henry was advised that he was "on pace" in 11 categories, "behind pace" in nine categories, and "unacceptable" in five categories.  *Id.*  The performance review noted a number of specific instances when Henry missed important deadlines or failed to complete a project. *Id.*

124.    Katz gave all of the full-time employees reporting to him mid-year performance reviews in 2005. Katz Decl. ¶ 19.

125.    On July 6, 2005, Katz and Marroso met with Henry to coach him on his performance. Katz Decl. ¶ 20. Katz told Henry that he wanted him to be successful and that he wanted him with the company. *Id.* Henry's work performance improved after he was issued the PIP. *Id.*

126.    On July 25, 2005, Espejo, Marroso, and Katz met with Henry for his final PIP status discussion. Katz Decl. ¶ 21. At this meeting, Henry was advised that the PIP was being closed out and that he had successfully completed the program. *Id.* Espejo told Henry that he respected him and that he wanted to see him succeed in his job. Espejo Decl. ¶ 17.

127.    On July 28, 2005, Henry was advised in writing that he had satisfied the PIP and had been removed from the PIP. McQuade Decl. ¶ 264-65 & Ex. 29.

128.    On August 5, 2005, Henry stopped coming to work and sought to take a medical leave of absence. McQuade Decl. Ex. 1, 270-72. When Henry advised Espejo that he was taking a medical leave of absence, Espejo wished Henry well and that he hoped he got better and returned to work soon. Espejo Decl. ¶ 18.

129.    The individual that Katz hired to replace Henry is an African American. Katz Decl. ¶ 22.

130.    On January 10, 2006, Wyeth advised Henry that, "[u]nless you submit appropriate medical documentation indicating your ability to return to work within a reasonable and defined period of time, your employment will be terminated effective February 6, 2006." McQuade Decl. Ex. 1, 279-80 & Ex. 34.

131.    On February 7, 2006, Wyeth advised Henry that it still had not received any medical documentation from him, and therefore, consistent with standard Wyeth practices, Henry's employment was terminated effective February 6, 2006.  McQuade Decl. 280-81 & Ex. 35.

132.    Henry claims he chose not to submit medical documentation to Wyeth because he did not wish to return to work at Wyeth.  McQuade Decl. Ex. 1, 281.

133.    Henry reviewed and signed Wyeth's unlawful harassment policies during his employment at Wyeth.  McQuade Decl. Ex. 1, 301-04 & Exs. 39 & 40.

**Procedural History**

134.    On or about September 24, 2004, Henry filed a charge of discrimination with the New York State Division of Human Rights, alleging that he had been denied certain promotions and had received a transfer to the Packaging Department because of his race. McQuade Decl. Ex. 6.

135.    On or about October 15, 2005, Henry filed a second charge of discrimination with the EEOC, alleging that he had been retaliated against for filing his first charge of discrimination.  McQuade Decl. Ex. 7.

136.    On September 20, 2005, Henry filed his complaint in this action. McQuade Decl. Ex. 1, Ex. 4.

137.    By Stipulation and Order entered on February 8, 2006, Defendant Andrew

Schaschl was dismissed from this case.  McQuade Decl. ¶ 9.


Dated: New York, New York
       October 30, 2006

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: _____*James H. McQuade*_____
    Michael Delikat (MD-1165)
    James H. McQuade (JM-0788)
    666 Fifth Avenue
    New York, New York 10103
    (212) 506-5000

Attorneys for Wyeth Pharmaceuticals, a Division
of Wyeth, Walter Wardrop, and Michael McDermott