1        HOWARD A. HENRY

12:14:12  2        Q.    And those are the two

12:14:17  3   degrees that you described earlier

12:14:19  4   today, correct?

12:14:20  5        A.    Correct.

12:14:21  6        Q.    If we can move forward

12:14:29  7   chronologically and if you could tell

12:14:31  8   me what the next position is that you

12:14:35  9   applied for at Wyeth and that you were

12:14:39 10   denied.

12:14:40 11        A.    It would have to be maybe

12:14:58 12   the manager's position that was made

12:15:02 13   available in 2004.

12:15:10 14        Q.    And what position was that?

12:15:12 15   What group was that with?

12:15:13 16        A.    That was in the group I was

12:15:15 17   working with.  They changed the title

12:15:19 18   from train to PPU which is primary

12:15:21 19   processing unit, so the position was

12:15:24 20   reporting to the person who I reported

12:15:26 21   to at the time which was Andrew Espejo.

12:15:32 22        Q.    So this was a new position,

12:15:36 23   did not previously exist?

12:15:37 24        A.    Basically there was a

12:15:43 25   supervisor lead position that they

HOWARD A. HENRY

1

12:15:47 2 changed the title to to a manager's

12:15:50 3 position, and the supervisor lead

12:15:54 4 position became what was now called the

12:15:56 5 manager of PPU 1. It was a manager's

12:16:04 6 position that was created.

12:16:05 7      Q.    So no one held this position

12:16:07 8 previously?

12:16:08 9      A.    Yes.

12:16:08 10      Q.    Is that fair to say?

12:16:10 11      A.    Well, the title, no one held

12:16:12 12 the title previously but the position

12:16:15 13 itself was just transposed into a

12:16:18 14 title.

12:16:18 15      Q.    And who held the --

12:16:20 16      A.    Michael Collaraffi, and

12:16:23 17 prior to that -- well, excuse me, let

12:16:25 18 me rephrase that. Joe Torres, he did

12:16:29 19 it on an interim basis. Prior to that

12:16:31 20 was Mike Collaraffi, and before that it

12:16:34 21 was Todd Davenport.

12:16:46 22      Q.    How did you learn about this

12:16:48 23 position?

12:16:48 24      A.    They had mentioned it

12:16:49 25 through discussions within the area and

HOWARD A. HENRY

12:16:51 2    then it became officially document --

12:16:56 3    posted I think in September/October of

12:16:59 4    2004 I think.

12:17:09 5        Q.    And did you submit a bid for

12:17:11 6    this position?

12:17:11 7        A.    Yes.

12:17:11 8        Q.    Were you interviewed for the

12:17:13 9    position?

12:17:13 10       A.    Yes.

12:17:14 11       Q.    Who were you interviewed by?

12:17:15 12       A.    There was a panel consisting

12:17:17 13   of Derek Burt, Cara Muscolo, Andrew

12:17:22 14   Espejo, and I think Chris DeFeciani.

12:17:27 15       Q.    So you interviewed with them

12:17:30 16   simultaneously?

12:17:30 17       A.    Yes.

12:17:37 18       Q.    What do you recall from the

12:17:39 19   interview?

12:17:39 20       A.    They asked a series of

12:17:41 21   questions, it was structured and the

12:17:42 22   interview was based -- the interview

12:17:44 23   was based on a series of questions each

12:17:46 24   of the panelists had.

12:17:48 25       Q.    Did you get the sense it was

HOWARD A. HENRY

12:17:49  2    a series of predetermined questions?

12:17:51  3        A.    Yes.

12:17:56  4        Q.    Did you talk to any other

12:17:57  5    people that interviewed for the same

12:17:59  6    position?

12:17:59  7        A.    Yes.

12:18:02  8        Q.    Who was that that you spoke

12:18:03  9    to?

12:18:04  10        A.    I spoke to Joe Torres.

12:18:12  11    That's all I can recall at this time.

12:18:13  12        Q.    Did Mr. Torres tell you

12:18:15  13    about his interview?

12:18:16  14        A.    Yes.

12:18:16  15        Q.    Did he tell you he was asked

12:18:18  16    the same series of questions?

12:18:19  17        A.    Yes.

12:18:21  18        Q.    Do you know who else applied

12:18:24  19    for this position besides yourself and

12:18:27  20    Mr. Torres?

12:18:28  21        A.    I know they went around

12:18:30  22    asking people to interview.

12:18:32  23        Q.    Who's they?  Who asked

12:18:34  24    people to interview?

12:18:35  25        A.    Andrew Espejo was asking

HOWARD A. HENRY

certain people to interview for the
position.

    Q.    Did he ask you to interview?

    A.    No.

    Q.    Did you discuss interviewing
with him at all?

    A.    Yes.

    Q.    And what did you discuss
with him, could you tell me about those
conversations?

    A.    I said basically the duties
that are described here and that were
done by the previous individuals they
came to me to understand about the
position and to make their job easier
and I helped them out and I definitely
feel that I definitely qualify for this
position.  He said let's see what the
interview brings up and let's see what
happens.

    Q.    Do you know who the
ultimate -- you've explained to me who
interviewed, who the individuals were
who conducted the interview.  Do you

HOWARD A. HENRY

12:28:51   A.    No.

12:29:56   MR. McQUADE:  Can you mark

12:29:57   this, please.

               (Henry Exhibit 8 for

          identification, Bates stamped 1531,

12:30:08   1526 and 1524.)

12:30:08   Q.    Mr. Henry, I've handed you a

12:30:09   document which we've marked as Exhibit

12:30:11   8.  It looks like a series of three

12:30:16   separate emails which we've stapled

12:30:18   together.  Looking at the first page

12:30:20   can you tell me what this is?

12:30:24   A.    The first page seems to be a

12:30:26   formal email stating that they received

12:30:33   my bid.

12:30:36   Q.    And the email, whoever wrote

12:30:38   this email is also advising you that

12:30:40   the position you're applying for is

12:30:42   three grade levels -- or more than two

12:30:44   grade levels above your current

12:30:46   position; is that correct?

12:30:46   A.    Correct.

12:30:47   Q.    Were you aware of the fact

12:30:53   that this position was three grade

HOWARD A. HENRY

12:30:55 2  levels above your current position when

12:31:01 3  you were applying for the position?

12:31:02 4      A.    No.

12:31:04 5      Q.    Do you believe you were

12:31:13 6  denied this position because of your

12:31:16 7  race or because you were being

12:31:20 8  discriminated against or retaliated

12:31:22 9  against in any way?

12:31:23 10     A.    Yes.

12:31:23 11     Q.    Can you explain that for me,

12:31:27 12 please?

12:31:27 13     A.    Basically I qualified for

12:31:31 14 the position.  Individuals who held

12:31:34 15 this position I helped guide and give

12:31:38 16 advice to and helped do duties

12:31:42 17 associated with the position.  Most

12:31:44 18 managers who interviewed me were

12:31:47 19 appointed their position.  They didn't

12:31:48 20 have to interview for them.  They were

12:31:51 21 given those positions.

12:31:52 22         This position was made a

12:31:54 23 formal bid to sort of make a structure

12:31:57 24 around it and it was -- it was kind of

12:32:03 25 formalized when as far as other

HOWARD A. HENRY

12:32:06 positions that were available for other

12:32:07 managers, they didn't have a formal

12:32:10 bidding structure like this.  It was

12:32:12 restructured so they can actually be

12:32:14 given this position.

12:32:18      The title was changed from

12:32:20 senior supervisor to manufacturing

12:32:22 support with exactly the same duties.

12:32:26 I qualified for it, I applied for it, I

12:32:29 was the most qualified at the time for

12:32:31 it in terms of the duties, in terms of

12:32:34 track record, in terms of years of

12:32:36 service in the department, and I

12:32:39 definitely felt that I was

12:32:40 discriminated against when it came to

12:32:42 this position.

12:32:44      Q.    And your basis for that

12:32:52 belief is as you just described,

12:32:54 correct?

12:32:54      A.    Yes.

12:32:55      Q.    Is there any other basis for

12:32:56 that belief?

12:32:57      A.    No.

12:33:03      Q.    Do you have any reason to

                        HOWARD A. HENRY

              A F T E R N O O N     S E S S I O N

13:43:59                    1:44 p.m.

13:43:59          THE VIDEO OPERATOR:  Returning

13:44:14   to the record at 1:44 from 12:45.

           H O W A R D   A.   H E N R Y,

           resumed, having been previously duly

           sworn, was examined and testified further

           as follows:

                        (Henry Exhibit 10 for

           identification, Bates stamped 4330

13:44:39   through 4334.)

13:44:39          EXAMINATION BY MR. McQUADE:

13:44:41      Q.    Mr. Henry, I'm handing you a

13:44:46   document that's been marked Exhibit 10,

13:44:48   I believe, yes, Exhibit 10.  Do you

13:44:49   recognize this document?

13:44:50      A.    Yes.

13:44:51      Q.    And what is it?

13:44:52      A.    It's my performance planning

13:44:56   and appraisal of 2000.

13:44:58      Q.    Do you typically, or during

13:45:03   your employment at Wyeth did you

13:45:05   typically receive such a performance

13:45:08   planning and appraisal each year?

HOWARD A. HENRY

A.    They changed the structure from time to time.  They changed the criteria from time to time, how they did it.  But you got appraised every year.

Q.    And how did that appraisal process work?

A.    Depending on the year, your supervisor would discuss your achievements and goals at the end of a particular year.  So in this case, it went from January 2000 to December of 2000.

Q.    And did you typically meet with the manager or supervisor who completed the performance evaluation for you?

A.    Yes.

Q.    And who was the supervisor that performed this performance evaluation?

A.    Walter Wardrop.

Q.    And did you meet with Mr. Wardrop regarding this performance

HOWARD A. HENRY

13:46:07 2    evaluation?

13:46:07 3        A.    Yes.

13:46:08 4        Q.    Do you recall anything about

13:46:11 5    that meeting in particular, what he

13:46:15 6    said, what you said, what was

13:46:16 7    discussed?

13:46:17 8        A.    He asked, he said that he

13:46:22 9    got feedback from my previous

13:46:24 10   supervisor based on my performance in

13:46:27 11   that area, because I was new to the

13:46:29 12   area.  So basically he only had a few

13:46:32 13   months to evaluate me.

13:46:38 14            So we discussed my role in

13:46:40 15   the area, how he saw the role and how I

13:46:46 16   can -- I told him about my desires to

13:46:49 17   grow within the area, learn my duties

13:46:52 18   and do them well, and to just continue

13:46:56 19   to grow as an engineer, as an

13:46:59 20   individual in the organization.

13:47:01 21       Q.    If you'd turn to Page 4 of

13:47:05 22   this performance review, it provides a

13:47:08 23   summary of the performance and there's

13:47:11 24   an overall rating that is provided.  Do

13:47:14 25   you see that?

HOWARD A. HENRY

13:47:14  2    A.    Yes.

13:47:15  3    Q.    And what is your overall

13:47:17  4  rating for this year?

13:47:19  5    A.    It said solid performer,

13:47:21  6  which is a three.

13:47:22  7    Q.    And there are four different

13:47:24  8  rating categories -- I'm sorry, five

13:47:26  9  different rating categories on this

13:47:28 10  particular form; is that correct?

13:47:29 11    A.    Correct.

13:47:30 12    Q.    A solid performer falling

13:47:35 13  right in the middle, correct?

13:47:36 14    A.    Correct.

13:47:37 15    Q.    If you turn the page to Page

13:47:39 16  5, you see under section 5 there's a

13:47:43 17  section for employee comments?

13:47:47 18    A.    Right.

13:47:47 19    Q.    You didn't provide any

13:47:49 20  comment, did you?

13:47:50 21    A.    No.

13:47:51 22    Q.    And you signed this

13:47:54 23  agreement.  Is that your signature

13:47:55 24  there?

13:47:55 25    A.    Yes.

HOWARD A. HENRY

13:47:56  2    Q.    And then under yours is

13:47:59  3  Walter Wardrop's signature?

13:48:00  4    A.    Yes.

13:48:00  5    Q.    And then do you recognize

13:48:02  6  the signature under Mr. Wardrop's

13:48:04  7  signature?

13:48:05  8    A.    I believe that's Jack

13:48:06  9  Riley's.

13:48:07 10    Q.    And who is Jack Riley?

13:48:08 11    A.    He was the director in the

13:48:10 12  area at that time.

13:48:17 13    Q.    Did you have any

13:48:18 14  disagreement with anything written in

13:48:19 15  this performance evaluation?  I'll

13:49:15 16  rephrase the question for you.  Do you

13:49:16 17  recall having any disagreement with

13:49:18 18  this performance review?

13:49:19 19    A.    No.

13:49:19 20    Q.    Okay.  Do you recall

13:49:26 21  thinking whether it was a -- whether

13:49:27 22  you thought it was a good review?

13:49:32 23    A.    No.

13:49:33 24    Q.    You have no recollection?

13:49:34 25    A.    I felt -- I felt that I was

HOWARD A. HENRY

13:49:38 2 new to the area so there was not much I

13:49:42 3 could have, you know -- at that time, I

13:49:47 4 was rather green to the area, so. Just

13:49:54 5 getting -- I was getting to know just

13:49:55 6 some of the duties in the area, so. I

13:50:01 7 was -- I was -- at that time I was

13:50:04 8 accepting of it.

13:50:06 9      Q.    Had you received ratings

13:50:12 10 of -- well strike that.

11                      (Henry Exhibit 11 for

12 identification, Bates stamped 4020

13:50:15 13 through 4025.)

13:50:15 14      Q.    I'm going to hand you

13:50:16 15 another document which has been marked

13:50:18 16 Exhibit 11.  Do you recognize this

13:50:31 17 document?

13:50:31 18      A.    Yes.

13:50:32 19      Q.    And what is this?

13:50:33 20      A.    My performance evaluation

13:50:35 21 for 2001.

13:50:36 22      Q.    And who completed this

13:50:38 23 evaluation for you?

13:50:38 24      A.    Walter Wardrop.

13:50:40 25      Q.    Did you meet with Mr.

HOWARD A. HENRY

Wardrop about this evaluation?

    A.    Yes.

    Q.    And what did you discuss?

    A.    He was pleased with my performance. He was happy of the strides that I made. He liked the fact that I got along with people, my leadership qualities, the type of individual I was, how I was a leader in my department when it came to a lot of issues, and how I've grown as a person, as an engineer, my respect for people, how I collaborate well, the quality of work I produced, my integrity.

    Q.    Did Mr. Wardrop have any criticism that you recall of your performance, constructive or otherwise?

    A.    I can't recall.

    Q.    How was your relationship with Mr. Wardrop at this time?

    A.    I felt it was good, very good I felt at the time.

    Q.    Again I notice that on Page 5 employee comments there's -- you

HOWARD A. HENRY

13:53:02  2    Q.    And he'd give you -- in

13:53:04  3  addition, he'd give you a copy?

13:53:06  4    A.    Sometimes you'd get the copy

13:53:08  5  afterwards.  Like I didn't get a copy

13:53:09  6  of this until I requested it later on.

13:53:12  7  So I didn't have a copy.

13:53:14  8    Q.    Do you recall having -- do

13:53:23  9  you recall disagreeing with anything

13:53:24 10  written in this particular performance

13:53:25 11  review?

13:53:26 12    A.    No, I don't recall I

13:53:27 13  disagreed with anything.

14               (Henry Exhibit 12 for

15  identification, Bates stamped 4015

13:53:35 16  through 4019.)

13:53:35 17    Q.    I'm handing you a document

13:53:36 18  that's been marked Henry Exhibit 12.

13:53:52 19  Do you recognize this?

13:53:53 20    A.    Yes.

13:53:56 21    Q.    And what is it?

13:53:57 22    A.    My performance evaluation

13:53:59 23  for 2002.

13:54:01 24    Q.    And at this time Mr. Wardrop

13:54:03 25  was still your supervisor?

HOWARD A. HENRY

A.    Yes.

Q.    Do you recall your meeting -- did you have a meeting with Mr. Wardrop --

A.    Yes.

Q.    -- about this performance review?

A.    Yes.

Q.    Do you remember anything from that meeting?

A.    I remember that I felt that I should have been rated higher for some of the things I was able to accomplish that were critical in the group.  I remember when he gave me the line item 2 for the special project that I told him that I did do it, but I didn't have a chance to give it to him and he understood that.

But other than that, I told him that, you know, I want to continue to grow, and I asked him what would it take for me to be a five because I was a four twice, I always want to improve,

HOWARD A. HENRY

doing inspections I would be down there. That's a supervisory function. I would supervise the operators and the supervisors and tell them exactly what they should do. That's outside of my job function. So there's a lot of things that are not captured here that are outside of my job function that I performed.

Q.    Did you explain these items to Mr. Wardrop at the time of the performance review?

A.    I did. I did.

Q.    What was his response?

A.    He shook his head, he understood, he respected the fact. I said to him, you know, as far as I'm concerned, next year I'm going to do everything I can to be rated five. He said okay.

(Henry Exhibit 13 for identification, Bates stamped D 00176 and 177.)

Q.    I hand you a document that's

HOWARD A. HENRY

1

14:00:50  2   been marked Exhibit 13.  Can you tell

14:01:05  3   me what this document is?

14:01:07  4         MR. MORELLI:  Do you have

14:01:08  5   another one?

14:01:10  6         MR. McQUADE:  Oh, sorry,

14:01:11  7   yes.

14:01:13  8         MR. MORELLI:  Thank you.

14:01:19  9      A.    This is a midyear review.

14:01:22 10      Q.    Have you seen this document

14:01:24 11   before?

14:01:24 12      A.    Yes.

14:01:25 13      Q.    Did you meet with Mr.

14:01:31 14   Wardrop regarding this document?

14:01:33 15      A.    Yes.

14:01:33 16      Q.    Was that in September 2003?

14:01:36 17      A.    This was not in September

14:01:37 18   2003.  Well, I mean -- this -- this was

14:01:43 19   not, from what I recall, this did not

14:01:46 20   occur on September 3rd, 2003.  From

14:01:52 21   what I -- from what I recall.  I don't

14:01:54 22   remember -- I don't remember it being

14:01:55 23   that time.

14:01:58 24      Q.    Okay.  Other than the timing

14:02:01 25   of this document, do you recall seeing

HOWARD A. HENRY

14:02:05  2  this document in --

14:02:08  3      A.    I recall some of the things

14:02:09  4  on this document.

14:02:10  5      Q.    Okay.  And did you sit

14:02:12  6  down -- did you sit down with Mr.

14:02:14  7  Wardrop and discuss this document as

14:02:16  8  part of a midyear review?

14:02:17  9      A.    Yes.

14:02:18  10     Q.    Okay.  So you're telling me

14:02:20  11  you're not sure --

14:02:22  12     A.    Of the exact date.  I don't

14:02:23  13  think it was conducted on September

14:02:25  14  3rd.

14:02:25  15     Q.    Okay.  When do you think it

14:02:27  16  was conducted?

14:02:28  17     A.    I remember something around

14:02:30  18  April/May, around that time, something

14:02:34  19  closer to that range.  I don't remember

14:02:38  20  anything like this happening in

14:02:39  21  September.  We were too busy.

14:02:50  22     Q.    Okay.  So I'd like you to

14:02:51  23  take a close look at the document and

14:02:53  24  tell me -- well let me focus you --

14:03:01  25  under the heading "Areas to focus for

HOWARD A. HENRY

14:03:04  2  remainder of 2003"?

14:03:12  3    A.    Right.

14:03:13  4    Q.    It lists a number of

14:03:14  5  projects that are in process,

14:03:17  6  establishing goals that need to be

14:03:19  7  completed by year's end.  Goals is

14:03:22  8  capitalized.  Do you know what that is

14:03:24  9  referring to?

14:03:24  10    A.    These are things that he --

14:03:28  11  that we discussed, that he would like

14:03:29  12  to see if possible completed by the end

14:03:33  13  of the year.

14:03:42  14    Q.    Okay.  The second bullet

14:03:44  15  point there talks about improved

14:03:45  16  attendance.  Did you discuss attendance

14:03:48  17  with Mr. Wardrop?

14:03:50  18    A.    Briefly.

14:03:53  19    Q.    What did he say about

14:03:56  20  attendance?

14:03:56  21    A.    I don't recall exact, his

14:04:00  22  exact words.  I don't recall his exact

14:04:05  23  words.

14:04:06  24    Q.    Does that appear to be

14:04:07  25  accurate?  This indicates that as of

HOWARD A. HENRY

(Henry Exhibit 16 for
identification, Bates stamped D 00273
through 294.)

14:18:59    Q.   I'm going to hand you two
documents here, one marked 15 and one
marked 16.  If you'd turn your
attention to the document marked Henry
Exhibit 15, please.

A.   Yes.

Q.   Do you recall receiving this
email from Mr. Wardrop?

A.   I think I opened it when I
came back from my honeymoon, this
particular one dated the 10th of
October.

Q.   Okay.  In this email he
states "The following email was sent on
September 8th."

A.   Right.

Q.   "The self-appraisal must be
completed and turned into me by October
1st."

A.   Right.

Q.   Do you remember receiving

HOWARD A. HENRY

14:20:08  2  that email on October 8th?

14:20:09  3      A.    Right, right.

14:20:10  4      Q.    And then on this date,

14:20:14  5  October 2nd, you're receiving a second

14:20:16  6  email from Mr. Wardrop?

14:20:17  7      A.    Right.

14:20:18  8      Q.    Saying he didn't receive

14:20:19  9  your self-appraisal and goals?

14:20:21 10      A.    Right.

14:20:21 11      Q.    If you'd turn to Exhibit 16.

14:20:34 12      A.    Yes.

14:20:35 13      Q.    This is the goals and

14:20:36 14  self-appraisal that Mr. Wardrop was

14:20:39 15  referring to?

14:20:39 16      A.    Without reading the whole

14:21:03 17  entire document, it seems like it.

14:21:05 18      Q.    Okay.  And the date you

14:21:07 19  submitted these to Mr. Wardrop are

14:21:10 20  January 5th, 2004?

14:21:12 21      A.    Right.

14:21:13 22      Q.    This was after you had your

14:21:17 23  meeting with Mr. Wardrop regarding your

14:21:19 24  performance review?

14:21:20 25      A.    Right.

HOWARD A. HENRY

14:21:21 2        Q.    Can you tell me in your own

14:21:36 3    words what this Exhibit 16 is, the

14:21:40 4    goals and self-appraisal?

14:21:42 5        A.    The whole thing is a

14:21:44 6    tracking system that's used to

14:21:47 7    determine whether or not you're

14:21:51 8    achieving goals set forth at the

14:21:53 9    beginning of the year.  We use it to

14:21:56 10    determine whether or not we should

14:21:58 11    continue in a certain direction,

14:22:00 12    whether we should concentrate on one

14:22:04 13    particular item and leave another item

14:22:06 14    for a later date.

14:22:10 15        Q.    Don't you think it would be

14:22:12 16    helpful to have this document for a

14:22:14 17    manager in preparing a performance

14:22:15 18    review?

14:22:21 19            MR. MORELLI:  If you can

14:22:22 20    answer.  Objection.  Can you answer

14:22:23 21    that?

14:22:25 22        A.    I felt that the relationship

14:22:29 23    Walter and -- Walter and I had and what

14:22:31 24    we were corresponding to throughout the

14:22:33 25    year was sufficient.  In other words,

HOWARD A. HENRY

14:27:48  2    degrees.  And we interact with each

14:27:53  3    other a lot, you know, and I see what

14:28:00  4    they do.  Other engineers from that

14:28:03  5    area told me what they do.  So we

14:28:05  6    interact a lot.  So we know what the

14:28:09  7    job requires.  So I know the capacity

14:28:15  8    one has to have to perform those

14:28:16  9    functions.  And the requirement itself

14:28:21  10   tells one that this is a -- this is a

14:28:24  11   position for someone who's possibly

14:28:26  12   getting their foot in the door but not

14:28:28  13   somebody at that time who had seven,

14:28:30  14   eight, nine years of experience that I

14:28:31  15   had, and the track record I had.

14:28:33  16       Q.    The position had the same,

14:28:35  17   carried the same salary grade level?

14:28:37  18       A.    Yes, for me, yes.

14:28:42  19       Q.    So you would not, presumably

14:28:44  20   not, if you had been put in this

14:28:46  21   position you would not have received

14:28:47  22   any change in salary or level, correct?

14:28:49  23       A.    No.

14:28:50  24       Q.    Did Mr. Wardrop tell you it

14:28:59  25   was a demotion?

HOWARD A. HENRY

14:31:41  2   that they're currently doing, and I

14:31:43  3   decided that I need to meet with him

14:31:46  4   regarding this decision.  I didn't

14:31:47  5   agree with this decision.  I didn't

14:31:49  6   agree with being appointed to this

14:31:53  7   area.  I didn't agree how I was

14:31:55  8   evaluated.  And I felt that I needed to

14:31:59  9   let him know that out of respect

14:32:02 10   because at this point I was saying to

14:32:04 11   myself perhaps we miscommunicated,

14:32:06 12   perhaps we didn't really talk to each

14:32:10 13   other the way we should have and

14:32:11 14   expressed everything we should have.

14:32:13 15   So I said let me just talk to him, and

14:32:16 16   I did.  And that was on January 5th.

14:32:22 17        Q.    Who requested that meeting?

14:32:23 18   Was that you?

14:32:24 19        A.    It wasn't a request.  It was

14:32:25 20   just that, you know, we interacted and

14:32:27 21   I said Walter, I need to speak to you,

14:32:29 22   and he said well, I have interviews

14:32:31 23   throughout the day.  I said whenever

14:32:33 24   you have some time I really would like

14:32:35 25   to.  So there was some time available.

HOWARD A. HENRY

14:32:37   I went to his office and we spoke.

14:32:40       Q.    And what did you tell him?

14:32:43       A.    I said you -- the reason

14:32:48 why -- I said I don't understand this

14:32:50 decision, I don't -- I don't really

14:32:54 respect the fact that I'm being

14:32:57 evaluated the way I was evaluated and I

14:33:00 need for you to give me some

14:33:02 clarification. He said that, you know,

14:33:04 he's not going to give me anything. I

14:33:06 said I need to be reconsidered, I need

14:33:09 to be reevaluated because I don't think

14:33:12 the procedure was fair, I don't believe

14:33:14 that I was evaluated fairly.

14:33:16       He said -- and I said I have

14:33:19 these documents here, you didn't -- you

14:33:21 said you didn't need them, you said you

14:33:23 didn't want them, but I have them here,

14:33:26 and I presented them with the

14:33:28 engineering status report, with another

14:33:32 document that tracks the goals, with --

14:33:38 I think with another document. I can't

14:33:41 remember the three that I gave him,

14:33:44 but...

HOWARD A. HENRY

14:33:44   Q.   Is that Exhibit 16 or some

14:33:46 portion of Exhibit 16?

14:33:47   A.   Yes, right.

14:33:48   Q.   Okay.

14:33:51   A.   And I told him I followed

14:33:53 the company values, I did achieve the

14:33:55 goals that we discussed.  If there was

14:33:58 any goal that couldn't be achieved I

14:34:00 explained to him what I did in the

14:34:03 past.  Nothing changed to me from what

14:34:05 we had in the past.  The relationship I

14:34:08 thought we had was if I didn't achieve

14:34:10 something I told him why, I told him

14:34:12 that it probably is going to take a

14:34:15 collaboration, a collaborative effort

14:34:17 between technology or QA and other

14:34:19 people, they have to be pulled off

14:34:20 their projects in order for us to get

14:34:22 this done, what would you like for me

14:34:24 to do.  So I let him know, he said he

14:34:26 wasn't going to do anything.

14:34:29     He said at this point he's

14:34:31 not going to reevaluate me.  He's not

14:34:33 going to take my documents.  As a

HOWARD A. HENRY

14:36:31 2  Q. Do you remember when that

14:36:37 3 meeting occurred?

14:36:38 4  A. Sometime in January.  Could

14:36:40 5 have been a couple of days after, maybe

14:36:41 6 the seventh.

14:36:43 7  Q. Did he show you the revised

14:36:45 8 performance appraisal at that time?

14:36:46 9  A. I don't recall if he showed

14:36:48 10 it to me.  I can't recall.  But he said

14:36:52 11 that, you know, he made some changes

14:36:58 12 and the changes still weren't

14:36:59 13 satisfactory, they still didn't capture

14:37:04 14 everything that I did.  So I told him

14:37:06 15 that, you know, I have to continue to

14:37:08 16 move on.

14:37:10 17  He said that -- I can't

14:37:16 18 remember the exact things that he said

14:37:18 19 at this point.  I don't want to

14:37:19 20 speculate.

14:37:43 21  Q. Okay.  If you could turn

14:37:44 22 your attention to Exhibit 17.

14:37:46 23  A. Okay.

14:37:47 24  Q. Final page, Page 4.

14:38:04 25  MR. MORELLI:  For the

HOWARD A. HENRY

14:38:05  2  record, the exhibit has an additional

14:38:07  3  page after Page 4, in what you gave me,

14:38:15  4  anyway.

14:38:17  5        MR. McQUADE:  Right.

14:38:18  6        Q.    On Page 4, under section 4,

14:38:21  7  "Employee comments," it says "This

14:38:28  8  performance review was conducted with

14:38:29  9  Mr. Henry on December 17th, 2003.  Mr.

14:38:32  10  Henry disagreed with his ratings, chose

14:38:34  11  not to sign it and has submitted a

14:38:37  12  rebuttal."  Are you with me?

14:38:39  13        A.    Oh, I see it.  I thought you

14:38:41  14  were looking at the bottom, I'm sorry.

14:38:43  15        Q.    I'm looking at the top,

14:38:45  16  under section 4, employee comments.

14:38:47  17        A.    Right.

14:38:47  18        Q.    This says that you submitted

14:38:48  19  a rebuttal.  Did you ever submit any

14:38:51  20  type of --

14:38:52  21        A.    Not that I --

14:38:53  22        Q.    -- written rebuttal?

14:38:54  23        A.    Not that I recall.

14:38:55  24        Q.    It says "He has not

14:38:56  25  submitted his 2003 goals and objectives

HOWARD A. HENRY

14:38:59   or his self-appraisal for inclusion in

14:39:02   this review." And it's signed by it

14:39:05   looks like Mr. Wardrop and Mr.

14:39:09   Schaschl?

14:39:09       A.    Yes.

14:39:10       Q.    And then on the bottom it

14:39:11   says, "The review was given to Howard

14:39:13   during a meeting in my office on

14:39:14   January 16th, 2004. Howard refused to

14:39:17   sign and did not take the document."

14:39:19       A.    I don't recall these

14:39:24   employee comments.

14:39:25       Q.    Okay.

14:39:25       A.    I don't recall those.

14:39:27       Q.    Do you recall seeing this

14:39:29   revised review?

14:39:42       A.    Yes.

14:39:43       Q.    Do you remember how the

14:39:44   review changed?

14:39:45       A.    I don't remember exactly how

14:39:50   the review changed.

14:39:51       Q.    Do you remember anyone

14:39:52   telling you how the review changed?

14:39:54       A.    I remember Walter and Joanne

HOWARD A. HENRY

14:39:58  2  explaining to me some of the things

14:40:01  3  that they felt they added in addition

14:40:04  4  and some of the wording they felt was

14:40:06  5  changed.  It was explained to me.

14:40:13  6       Q.    So this was a meeting

14:40:15  7  between Joanne?

14:40:16  8       A.    Ms. Joanne Rose and Mr.

14:40:19  9  Walter Wardrop.

14:40:21  10      Q.    And who is Joanne --

14:40:22  11      A.    And myself.

14:40:23  12      Q.    And who is Joanne Rose?

14:40:25  13      A.    She's a human resources

14:40:26  14  representative.

14:40:27  15      Q.    Can you tell me whatever

14:40:29  16  else you recall about this meeting?

14:40:36  17      A.    I explained to them that,

14:40:38  18  you know, this review didn't really

14:40:41  19  reflect the work that I did and that I

14:40:46  20  really need to -- I still haven't

14:40:48  21  gotten an answer as to why this is

14:40:54  22  occurring, and I just wanted -- I just

14:40:59  23  wanted honest answers and that if I

14:41:01  24  can't get them from Walter or I can't

14:41:04  25  get them from Andy that I need to go

HOWARD A. HENRY

1

12:37:45  2    other positions that you feel you were

12:37:47  3    denied based on your race or based on

12:37:51  4    complaints that you made or for any

12:37:54  5    other reason that was improper?

12:37:57  6        A.    There's another position

12:38:10  7    that I talked to Mr. Bigelow -- well, I

12:38:16  8    emailed to Mr. Bigelow about and it was

12:38:19  9    the position of project engineer.

12:38:21 10        Q.    Okay.  If I can stop you

12:38:23 11    there.  Is there any other position

12:38:25 12    that you can think of other than the

12:38:27 13    project engineer position?

12:38:32 14        A.    I mean it's a second project

12:38:34 15    engineer position in 2004.

12:38:35 16        Q.    Okay.

12:38:36 17        A.    There was two.  There was

12:38:37 18    one that Cara got and there was one

12:38:38 19    that was appointed to a gentleman by

12:38:40 20    the name of Jun Ordonez.  So there was

12:38:46 21    another one that came up in 2004.  A

12:38:48 22    gentleman by the name of Aladdin

12:38:51 23    Alkawham left the company.  I had

12:38:53 24    helped Aladdin with that position.  I

12:38:55 25    was previously a project engineer.  I

HOWARD A. HENRY

definitely qualified for it.  I

definitely successfully helped the

organization in that role previously,

and I wasn't afforded that opportunity.

Q.     Was this the position in the

consumer health care group as the

project manager?

A.     As the -- no.  When they

restructured the consumer health area

there was a position of project

engineer that was awarded to Aladdin

Alkawham.  He left the organization.  I

explained to Mr. Bigelow in an email

that he had given me two options,

either to take a position available in

vaccines or go down to packaging.  I

explained to him that vaccines was an

option for me at this time.  Michael

McDermott was the head of vaccines, I

wasn't comfortable with that.  Because

the project engineer position was

available.  At this time I was in

limbo.  I wasn't told where I would be,

who I would be reporting to.  The

HOWARD A. HENRY

12:39:57 project engineer position was

12:40:00 available.  I performed it successfully

12:40:02 in the past.  I qualified for it.  I

12:40:03 trained and I spoke to Aladdin Alkawham

12:40:07 about a lot of his duties.  He got most

12:40:09 if not all of the materials from me and

12:40:11 I was not given the position.  And I

12:40:15 feel that's because I complained.

12:40:29          MR. McQUADE:  Could you mark

12:40:30 that, please.

               (Henry Exhibit 9 for

12:40:52 identification, Bates stamped 1407.)

12:40:52     Q.    Mr. Henry, I've placed in

12:40:56 front of you a document marked Exhibit

12:41:01 11 -- excuse me, Exhibit 9.  Can you

12:41:05 tell me what this document is?

12:41:06     A.    This is an email addressed

12:41:08 to Peter Bigelow complaining of

12:41:11 discrimination.

12:41:12     Q.    If you'd look at the second

12:41:14 paragraph of this email, does this

12:41:22 refer to the position you were just

12:41:24 describing?

12:41:26     A.    Yes.

HOWARD A. HENRY

12:41:27  2      Q.    Is this how you expressed
12:41:29  3    interest in this position, through this
12:41:31  4    email?
12:41:31  5      A.    Yes.
12:41:32  6      Q.    Did you express any interest
12:41:34  7    in this position other than what's in
12:41:36  8    this email?
12:41:39  9      A.    Yes.
12:41:39 10      Q.    How so?
12:41:40 11      A.    I spoke to individuals in
12:41:44 12    the area.
12:41:49 13      Q.    Who did you speak to?
12:41:50 14      A.    I can't recall everyone I
12:41:51 15    spoke to.
12:41:52 16      Q.    Did you speak to anyone who
12:41:53 17    had authority to hire for this
12:41:55 18    position?
12:41:55 19      A.    I can't recall.
12:42:00 20      Q.    Anyone else you spoke to
12:42:01 21    that you can recall?
12:42:03 22      A.    Not at this time.
12:42:08 23      Q.    And is there any other way
12:42:13 24    you expressed interest in this position
12:42:19 25    that you can recall at this time?

HOWARD A. HENRY

12:42:19  A.    No.

12:42:25  Q.    Do you know who made the

12:42:27  decision with respect to this position?

12:42:34  A.    No.

12:42:35  Q.    And who received -- who was

12:42:39  hired into this position?

12:42:41  A.    It was awarded to Jun

12:42:52  Ordonez.

12:42:52  Q.    Do you know what Jun

12:42:54  Ordonez's race is?

12:42:55  A.    Philippino.

12:42:57  Q.    Do you know anything about

12:42:58  Mr. Ordonez's qualifications for this

12:43:05  position?

12:43:05  A.    He worked as a supervisor in

12:43:09  packaging prior to that.  And I believe

12:43:10  he has a degree in engineering, I

12:43:13  believe mechanical.

12:43:14  Q.    Do you believe he was

12:43:15  qualified for this position?

12:43:16  A.    I can't say whether he was

12:43:17  or whether he wasn't.

12:43:21  Q.    Would this position have

12:43:23  been a promotion for you?

HOWARD A. HENRY

12:43:25  2       A.     On paper, no.  Career-wise,

12:43:31  3  yes.

12:43:31  4       Q.     Can you explain that?

12:43:32  5       A.     On paper, because they

12:43:34  6  wouldn't officially give you a title

12:43:35  7  change, but as far as title, you would

12:43:39  8  officially receive the title and this

12:43:41  9  gives you more exposure and more

12:43:44  10  opportunity if you decided to look

12:43:46  11  within the company or without the

12:43:47  12  confines of the company.  So the title

12:43:50  13  itself affords you a lot more exposure

12:43:55  14  and a lot more opportunities.

12:43:58  15       Q.    It was a lateral move,

12:44:01  16  wasn't it?

12:44:01  17       A.    It could have been

12:44:02  18  considered that, sure.

12:44:03  19       Q.    Okay.  Are there any other

12:44:14  20  positions that you believe you were

12:44:15  21  denied for retaliatory purposes or

12:44:21  22  discriminatory purposes?  You're

12:44:52  23  looking at the complaint; is that

12:44:54  24  correct?

12:44:54  25       A.    Yes.  Just to make sure I

1          HOWARD A. HENRY

15:05:41  2   and a half later.

15:05:42  3        Q.    And what happened?

15:05:43  4        A.    He said he wanted to conduct

15:05:46  5   an investigation.

15:05:52  6        Q.    Were you involved in any

15:05:53  7   sort of investigation?

15:05:54  8        A.    Yes.

15:05:55  9        Q.    How so?

15:05:56  10       A.    I was asked by a gentleman

15:05:59  11  by the name of Gene Sackett a series of

15:06:04  12  questions regarding my statement.

15:06:14  13       Q.    This was a meeting between

15:06:15  14  you and Mr. Sackett?

15:06:19  15       A.    Yes.

15:06:20  16       Q.    Do you remember when this

15:06:21  17  meeting occurred?

15:06:21  18       A.    It could have been April of

15:06:28  19  2004, April.

15:06:30  20       Q.    Was there anyone else

15:06:32  21  present during this meeting?

15:06:33  22       A.    Not at that meeting, no.

15:06:35  23       Q.    And can you tell me what you

15:06:37  24  remember telling Mr. Sackett at this

15:06:40  25  meeting?

HOWARD A. HENRY

15:06:41  2    A.    I told him that I felt

15:06:55  3  that -- (telephone interruption) excuse

15:06:58  4  me, I beg your pardon.  My apologies.

15:07:01  5    Q.    That's okay.

15:07:01  6    A.    Basically we discussed the

15:07:08  7  organizational cascade and I presented

15:07:12  8  him with the documents, my goals and

15:07:15  9  objectives for 2003.  We discussed my

15:07:20 10  feelings of why I felt that I was

15:07:28 11  allege -- I was talking about racial

15:07:31 12  discrimination.  And I don't recall

15:07:32 13  everything that was said at that kind

15:07:36 14  -- that kind of thing, but that was the

15:07:37 15  general gist of the conversation.

15:07:43 16    Q.    What did he tell you, if

15:07:45 17  anything?  Do you remember him telling

15:07:46 18  you anything, or did he just ask

15:07:48 19  questions?

15:07:48 20    A.    He asked questions.  He did

15:07:49 21  tell me that there are packages

15:07:56 22  available, you know.  He mentioned

15:07:59 23  something about a package, about

15:08:04 24  something about three months or some

15:08:06 25  kind of salary based on for every

HOWARD A. HENRY

year's service you get two weeks so in

my case it could be about six months.

He mentioned -- he read some

of the reviews, these are good reviews,

he said these are -- these are very,

very good, the past reviews. I didn't

have -- I don't think I had a 2003 at

the time. I think he made copies of

everything and said he would get back

to me.

Q.    And what happened next?

A.    That was it.  And I didn't

hear from him from the date he said he

would get back to me. So I emailed him

and said you said you were going to get

back to me at a certain date, you never

did. And he emailed me back stating

sorry for any confusion that he may

have caused, but basically he's still

summing up -- summarizing his findings

and he'll give them over to Mr.

Bigelow. And I think at the time it

was Donna Grantland and they would

discuss with me my options.

HOWARD A. HENRY

15:09:20    2    Q.    When were you advised that

15:09:28    3  you would not have to move into the

15:09:29    4  packaging supervisor position?

15:09:33    5    A.    It had to be April/May of

15:09:37    6  2004 I was -- I was -- I was sent an

15:09:42    7  email -- I sent the email -- after I

15:09:44    8  spent -- after I met with Mr. Bigelow

15:09:48    9  and Ms. Grantland I was given an

15:09:52    10  email -- I responded to an email what

15:09:54    11  was discussed and what was discussed is

15:09:58    12  that there was a vaccines position they

15:10:03    13  was going to give me and that there was

15:10:05    14  the packaging supervisor position that

15:10:07    15  they were going to give me.  And at

15:10:09    16  that time I emailed him and said these

15:10:14    17  weren't viable options that I mentioned

15:10:16    18  earlier and there was a project

15:10:18    19  engineer position that was available

15:10:19    20  that was a viable option.

15:10:21    21    THE VIDEO OPERATOR:  Mr.

15:10:22    22  McQuade, I need to change the tape.

15:10:24    23    MR. McQUADE:  Okay.  We'll

15:10:26    24  go off the record.

15:10:27    25    THE VIDEO OPERATOR:  Going

HOWARD A. HENRY

15:10:27  off the record at 3:10.  This is the

15:10:29  end of tape number 2.

15:10:55        (A recess was taken.)

15:21:27        THE VIDEO OPERATOR:  Beginning

15:21:45  tape number 3 and returning to the record

15:21:46  at 3:21 from 3:10.

                        (Henry Exhibit 20 for

15:21:53  identification, Bates stamped 3996.)

15:21:53    Q.    Mr. Henry, before the break

15:21:54  you were describing an email that you

15:21:55  had written to Mr. Bigelow.  I put in

15:22:05  front of you a document marked Exhibit

15:22:06  20.  There's an email here and then

15:22:08  there's a response to that email.  If

15:22:10  you look to the email on the lower half

15:22:12  of the page, does this appear to be the

15:22:19  email that you were referring to before

15:22:20  the break?

          A.    Yes.

15:22:30    Q.    It refers to the senior

15:22:31  validation specialist role.  What

15:22:33  position was that?  That was the

15:22:34  position within the vaccine

15:22:37  organization?

HOWARD A. HENRY

15:22:38   A.    Yes.

15:22:39   Q.    Okay.  If you'd look at the

15:22:43 top of the page, is this the email you

15:22:46 received and were informed that you

15:22:52 would in fact remain in the position

15:22:57 that you were in and would not change

15:23:00 to the packaging supervisor position?

15:23:03   A.    Yes.

15:23:04   Q.    In the packaging supervisor

15:23:14 position you would be managing people,

15:23:17 wouldn't you?

15:23:18   A.    Operators.

15:23:19   Q.    But you'd be supervising

15:23:21 people?

15:23:22   A.    I'd -- yes.

15:23:23   Q.    So it would be an

15:23:24 opportunity to get some experience

15:23:28 managing people?

15:23:28   A.    I did that as an engineer

15:23:30 though.

15:23:31   Q.    But this would give you

15:23:33 additional experience doing that; is

15:23:35 that correct?

15:23:35   A.    Perhaps.

HOWARD A. HENRY

14:28:59  2  A.  Not in those words.

14:29:08  3  Q.  Did anyone tell you it was a

14:29:10  4  demotion?

14:29:10  5  A.  Yes.

14:29:10  6  Q.  Who told you it was a

14:29:12  7  demotion?

14:29:12  8  A.  Not -- not to use the exact

14:29:15  9  words, but individuals who work at the

14:29:18  10  site know what it means to go from an

14:29:22  11  engineer to a packaging supervisor.

14:29:23  12  They know what it implies, they know

14:29:25  13  what it means.  Everyone knows that

14:29:29  14  that means that this person really

14:29:31  15  doesn't know what he's doing, he's

14:29:33  16  incompetent.

14:29:35  17  Q.  You were never in fact

14:29:56  18  placed in that position?  You never

14:29:57  19  assumed those job responsibilities or

14:29:59  20  that position?

14:29:59  21  A.  No.

14:29:59  22  Q.  Okay.  Going back to

14:30:29  23  Exhibit -- I don't have the exhibit

14:30:30  24  number, but it's the performance

14:30:31  25  evaluation, Bates number EEOC 0051 in

HOWARD A. HENRY

15:26:54  2    A.    About this, no.

3                    (Henry Exhibit 22 for

4    identification, Bates stamped 1494 and

15:27:05  5    1495.)

15:27:05  6    Q.    Handing you a document

15:27:06  7    that's marked Henry Exhibit 22.  Can

15:27:37  8    you tell me what this document is?

15:27:38  9    A.    It's a midyear review.

15:27:43  10    Q.    And who put this midyear

15:27:46  11    review together?

15:27:47  12    A.    Andrew Espejo.

15:27:50  13    Q.    Did you meet with him?

15:27:52  14    A.    Yes.

15:27:52  15    Q.    At about July 9th, 2004

15:27:56  16    about this review?

15:27:57  17    A.    I think so, yes.

15:27:58  18    Q.    What do you recall from that

15:28:02  19    meeting?

15:28:02  20    A.    I recall that he was trying

15:28:05  21    to allege and trying to develop an

15:28:10  22    ideology that I was not doing things on

15:28:14  23    time.  So he developed what I -- and I

15:28:18  24    explained to him, I said, you know, it

15:28:21  25    seems to me that all of a sudden

HOWARD A. HENRY

15:28:22  2    there's a pattern here that people are

15:28:25  3    accusing me of being late.  All of a

15:28:28  4    sudden now.  I said, you know, I've

15:28:31  5    been working for this company almost

15:28:33  6    nine, ten years at this juncture and

15:28:38  7    I've never been accused of any of these

15:28:41  8    things, now all of a sudden I want to

15:28:43  9    move up and everybody seems to accuse

15:28:46  10   me, there seems to be a pattern going

15:28:47  11   on.  He said no, no, no, no, these are

15:28:50  12   just things that I feel that -- I said

15:28:52  13   I'm not signing this, it does not

15:28:54  14   reflect the truth.  So I didn't sign

15:28:56  15   it.

15:28:57  16        Q.    If you look at the first

15:28:59  17   solid bullet point at the top there are

15:29:01  18   two bullet points under that.  One of

15:29:04  19   them says "Missed target date of June

15:29:06  20   25th, 2004, to schedule meeting with

15:29:08  21   maintenance."  Is that true?

15:29:10  22        A.    He didn't make himself clear

15:29:13  23   as to exactly what he wanted.

15:29:15  24        Q.    Did you miss the target date

15:29:17  25   of June 25, 2004?

HOWARD A. HENRY

A.    He didn't make himself clear about the target date on any of this, that's why I didn't sign it.  He didn't make it clear.

Q.    But did you miss a date of June 25th, 2004, to schedule the meeting?

A.    He didn't make it clear this date of June 25th, 2004.  That's why I didn't sign it.

Q.    So it's your position --

A.    I can't say I missed the date because he didn't make it clear of any date like that.

Q.    You're telling me you weren't aware of the fact that June 25th, 2004 was --

A.    I'm telling you that when we had discussions about these maintenance plans, he came from a maintenance area, he wanted me to focus on maintenance things.  I said I don't understand because as engineers we're not -- we're not responsible for the actual

HOWARD A. HENRY

maintenance. We contact -- we contact

maintenance for them to take care of

the equipment. We tell them what's

wrong and they take care of it, but

we're not responsible for no

maintenance plan and no all these

plans, that maintenance takes care of

all the planning. I told him that.

And you know, when I got --

when I got to this midyear review I

explained to him, I said you didn't

really make it clear, he said you

didn't really ask. I said well I

didn't understand and I asked you, hey,

you didn't make this clear to me. So

that's why I said I can't sign this

because this isn't going to reflect

exactly how you disseminated the

information.

Q.    So you had no knowledge,

you're telling me you had no knowledge

that your supervisor, Mr. Espejo, had

asked you to meet certain, this June

25th, 2004 target date with respect to

HOWARD A. HENRY

A.    I remember we discussed about Microsoft Project and I said I would take it, I took the course.

Q.    Do you remember anything else that you discussed with Mr. Espejo about this?

A.    I told him that I couldn't sign the document because I didn't agree with it.

Q.    What was his response?

A.    Okay.

(Henry Exhibit 23 for identification, Bates stamped D 00170 through 173.)

Q.    I pass you a document that's been marked Henry Exhibit 23.  This document is a performance appraisal, it looks like it's covering the time January 1, 2004 through December 31st, 2004; is that correct?

A.    Yes.

Q.    And this was prepared by your supervisor, Andrew Espejo; is that correct?

HOWARD A. HENRY

15:34:31 2     A.     Yes.

15:34:32 3     Q.     Did you meet with Mr.

15:34:34 4 Espejo --

15:34:35 5     A.     Yes.

15:34:35 6     Q.     -- in connection with this

15:34:36 7 performance review?

15:34:38 8            Were you provided a copy of

15:34:39 9 the performance review during that

15:34:40 10 meeting?

15:34:41 11    A.     I don't recall.

15:34:42 12    Q.     Did you discuss -- did Mr.

15:34:46 13 Espejo read this performance review to

15:34:48 14 you?

15:34:48 15    A.     I think so.

15:34:52 16    Q.     Did you have any discussion

15:34:55 17 with him about any of the information

15:34:58 18 provided in this performance review?

15:35:00 19    A.     Can you repeat that for me,

15:35:06 20 I'm sorry.  I was just focusing on

15:35:09 21 something.

15:35:09 22    Q.     Did you have any discussions

15:35:10 23 with him about any of the information

15:35:12 24 provided in this performance review?

15:35:14 25    A.     Yes.

HOWARD A. HENRY

Q.    What did you discuss?

A.    I said that he didn't capture a key element, something that occurred during that year.

Q.    And what was that?

A.    The continuous coater single pass project leadership that I provided that year.

Q.    And what was that?

A.    They couldn't -- they had a tremendous amount of trouble getting Centrum to -- how shall I say? -- to be coated in a single pass application. They had tremendous amount of trouble. They couldn't get it done for approximately nine or ten months.  Our technical service department tried and they had vendors try and no one can do it.  And corporate was looking specifically at us because part of the reason why they approved this instrument is to have it perform this particular function, and I was instrumental on making that happen.

HOWARD A. HENRY

Q.    And you felt it should have been reflected or stated in this review?

A.    Yes.

Q.    And it wasn't?

A.    Not to the level that it needed to be, no.

Q.    Do you recall Mr. Espejo discussing anything about you needing to improve setting objective dates for commitments and meeting those commitments on a consistent basis?

A.    Yes.

Q.    What did he tell you about that?

A.    He just said that, you know, as far as he's concerned that, you know, I need to firm up certain dates, and I told him, I said when you collaborate with people there are a lot of issues that occur for one not to -- to have -- to afford an extension, and he said, you're right, I have extensions myself and, you know, but I

HOWARD A. HENRY

15:37:29  2   would like for you -- do your best to

15:37:31  3   firm up certain dates.  I said I'll do

15:37:34  4   my best.

15:37:35  5        Q.    Did you have any

15:37:36  6   disagreement with this review?

15:37:37  7        A.    Yes.

15:37:37  8        Q.    What were your

15:37:39  9   disagreements?

15:37:40 10        A.    He didn't capture a lot of

15:37:41 11   the things that I did during the course

15:37:43 12   of that year.

15:37:44 13        Q.    Anything else you disagreed

15:37:46 14   about?

15:37:48 15        A.    I mean I told him that I

15:37:50 16   couldn't sign it because, you know, I

15:37:53 17   just didn't agree.  You know, I felt

15:37:57 18   that the work that I did was critical

15:37:59 19   to the organization and that it

15:38:01 20   warranted a five because if it didn't

15:38:03 21   get done we couldn't coat Centrum at

15:38:09 22   the rate, at the speed that we were

15:38:11 23   coating Centrum and probably we would

15:38:13 24   be held, you know, accountable for that

15:38:15 25   as a site.  So I was key to making sure

HOWARD A. HENRY

that that occurred, that it happened.

Q.    Is there anything else you recall about your conversation with Mr. Espejo in connection with this review?

A.    Not at this time.

Q.    Okay.

(Henry Exhibit 24 for identification, Bates stamped 3765 through 3768.)

Q.    Mr. Henry, I've handed you a document that's marked Henry Exhibit 24.  Have you seen this document before?

A.    Yes.

Q.    What is it?

A.    It's some feedback that I got, the performance, 2005 performance feedback.

Q.    And who provided you this feedback?

A.    Max Katz.

Q.    Who was Max Katz, can you tell me again?

A.    He was the person I reported

HOWARD A. HENRY

15:40:07  2  to at the time.

15:40:08  3       Q.    So at this point your

15:40:10  4  reporting line had changed, you were no

15:40:12  5  longer reporting to Mr. Espejo, but

15:40:14  6  instead at this time, May 31st, 2005,

15:40:19  7  you're reporting to Mr. Katz?

15:40:20  8       A.    Right.

15:40:20  9       Q.    How long had you been

15:40:31 10  reporting to Mr. Katz as of this date?

15:40:35 11       A.    A full five -- according to

15:40:38 12  this, a full five months.

15:40:40 13       Q.    Okay. So that's the January

15:40:42 14  3, 2005 through June 14th, 2005 review

15:40:47 15  period?

15:40:50 16       A.    Rights.

15:40:51 17       Q.    Did you meet with Mr. Katz

15:41:02 18  in connection with this review?

15:41:03 19       A.    Yes.

15:41:04 20       Q.    Did he give you a copy of

15:41:06 21  the review at the meeting?

15:41:08 22       A.    I don't recall.

15:41:08 23       Q.    Did he read the review to

15:41:11 24  you?

15:41:11 25       A.    I believe so.

HOWARD A. HENRY

15:41:14  2      Q.     Did he give you a copy at

15:41:15  3  the end of the meeting?

15:41:16  4      A.    I don't recall.  He may

15:41:21  5  have.  I don't remember.

15:41:22  6      Q.    Well I can represent to you

15:41:26  7  that your attorney produced this

15:41:29  8  document to us.

15:41:30  9      A.    Right.

15:41:31  10     Q.    If that --

15:41:32  11     A.    He may not have given it to

15:41:34  12  me at the meeting, he may have given it

15:41:37  13  to me later on.  I don't remember the

15:41:39  14  exact way I got it.

15:41:41  15     Q.    Okay.  This review form

15:41:45  16  appears a little different than the

15:41:47  17  other ones we have reviewed today.

15:41:49  18     A.    Yes.

15:41:50  19     Q.    Do you have any idea -- do

15:41:56  20  you know why this performance feedback

15:41:58  21  document is slightly different than the

15:41:59  22  others?

15:41:59  23     A.    I guess they just changed

15:42:01  24  the structure of it.

15:42:02  25     Q.    Okay.  What was your general

HOWARD A. HENRY

15:42:11 2   impression of this feedback contained

15:42:12 3   in this performance feedback document?

15:42:15 4       A.    It just tried -- it tried to

15:42:19 5   paint me as a person who didn't do

15:42:20 6   things in a timely fashion, didn't do

15:42:22 7   things on time.

15:42:25 8       Q.    And you believed that was

15:42:28 9   not accurate?

15:42:29 10      A.    Not a hundred percent.

15:42:31 11      Q.    Not a hundred percent.  So

15:42:32 12  you believe it's somewhat accurate?

15:42:34 13      A.    I mean I wouldn't say -- I

15:42:37 14  don't think it was accurate.  That's

15:42:39 15  why I didn't sign it.

15:42:40 16      Q.    Well let's go through item

15:42:42 17  by item.

15:42:42 18      A.    Sure.

15:42:43 19      Q.    The first item, "Provide the

15:42:49 20  necessary support to the conversion

15:42:50 21  cost reduction project to ensure an 8

15:42:54 22  percent reduction."  The "Behind pace

15:42:59 23  needs improvement" box is checked

15:43:01 24  there.  And there's a comment "Provide

15:43:03 25  a project timeline for improvement

|  |  |
|---|---|
| | 1 |
| 15:43:08 | 2 |
| 15:43:10 | 3 |
| 15:43:15 | 4 |
| 15:43:17 | 5 |
| 15:43:19 | 6 |
| 15:43:19 | 7 |
| 15:43:29 | 8 |
| 15:43:34 | 9 |
| 15:43:36 | 10 |
| 15:43:40 | 11 |
| 15:43:45 | 12 |
| 15:43:45 | 13 |
| 15:43:46 | 14 |
| 15:43:56 | 15 |
| 15:44:00 | 16 |
| 15:44:04 | 17 |
| 15:44:07 | 18 |
| 15:44:10 | 19 |
| 15:44:15 | 20 |
| 15:44:18 | 21 |
| 15:44:20 | 22 |
| 15:44:21 | 23 |
| 15:44:22 | 24 |
| 15:44:23 | 25 |

HOWARD A. HENRY

projects to manager by July 29th, 2005." Did you do that, did you submit the project timeline for improvement projects by July 29th, 2005?

A.    Yes.

Q.    Okay.  Manufacture variances in the left-hand column, the review indicates that you had unacceptable results and that corrective action is required.  Do you remember discussing this with Mr. Katz?

A.    No.

Q.    A few lines down under the box "Quality mindset," to the far right there's the comment "PMO turnaround as discussed earlier on March 30th, 2005. PMOs from November and December were not signed off on until March."  Is that accurate, that the PMOs from November and December were not signed off on until March?

A.    Right.

Q.    And would you agree with the statement that this put the department

1

HOWARD A. HENRY

15:44:25  2  at serious compliance risk with

15:44:28  3  conformance standard 12-4-3-1?

15:44:33  4       A.    I didn't understand that

15:44:35  5  statement a hundred percent at the

15:44:37  6  time.

15:44:37  7       Q.    What did you think it meant

15:44:41  8  at the time, or now?

15:44:42  9       A.    Well he explained to me that

15:44:45  10  PMOs not being signed off put the

15:44:48  11  department at compliance risk and I

15:44:49  12  said well part of the reason why

15:44:51  13  they're not signed off is because I'm

15:44:54  14  given them late or they're not given to

15:44:56  15  me in my box at a certain time, and I

15:44:59  16  find errors on the documents that need

15:45:01  17  to be reviewed with the individual who

15:45:03  18  gave them to me, and sometimes these

15:45:05  19  people are not available.  He said

15:45:07  20  okay, what we're going to do, we're

15:45:09  21  going to create a spreadsheet so that

15:45:12  22  we can track when you get them, who

15:45:14  23  gives them to you and when they're

15:45:16  24  signed.  I said okay.

15:45:18  25            Because I told him in the

HOWARD A. HENRY

15:45:19  2    past this is something that occurs, has

15:45:24  3    occurred in the past and that usually,

15:45:26  4    you know, to help maintenance I

15:45:27  5    wouldn't say anything, but I would

15:45:29  6    review them as quickly as I could so

15:45:31  7    that we could, you know, have the

15:45:34  8    documents back to them.

15:45:35  9            So in essence, I created the

15:45:40 10    spreadsheet and we were able to track

15:45:42 11    it better.

15:45:43 12        Q.    A couple of boxes down,

15:45:47 13    "Weekly zone checklists were not

15:45:49 14    submitted in a timely fashion.  No

15:45:51 15    follow-up on missing zone checklists,

15:45:53 16    resulting in ERF."  What does ERF stand

15:45:57 17    for?

15:45:57 18        A.    Error -- error reduction

15:46:00 19    form or error recording form, I think.

15:46:02 20        Q.    Is that accurate, that the

15:46:04 21    weekly zone checklists were not being

15:46:06 22    submitted in a timely fashion?

15:46:07 23        A.    Right.

15:46:08 24        Q.    That is accurate?

15:46:08 25        A.    Yes.

HOWARD A. HENRY

Q.    So you would agree that corrective action was required with respect to the weekly zone checklists, would you not?

A.    Well we discussed that the supervisors needed to fill out the documents better and that the department as a whole needed to have a better way of handling these zone checklists because other trains had the same problem too.  So it was a departmental problem.

Q.    On the second page of this document under Wyeth, the heading "Wyeth values, quality," if you look to the far right it says "PMO turnaround as discussed earlier.  PMOs from November and December were not signed off on until March."

A.    I don't know where you are. What page, sorry?  Is it the second page?

Q.    Yes, the second page.

A.    The quality box?

HOWARD A. HENRY

15:47:25  Q.    Yes.

15:47:25  A.    Okay.

15:47:26  Q.    To the far right?

15:47:27  A.    Yes.

15:47:27  Q.    There's a discussion there
15:47:29  again about PMOs and the weekly zone
15:47:32  checklists again.

15:47:36  A.    Yes, same response as I gave
15:47:37  earlier.  We discussed it and I said I
15:47:39  would start tracking it so you can see
15:47:42  where the source of the problem is
15:47:44  coming from.  Because I explained to
15:47:45  him my position.

15:47:47  Q.    If you look at the next box
15:47:49  down under "Respect for people," "Your
15:47:53  reaction and responses to receiving
15:47:55  constructive criticism from your
15:47:57  manager have not demonstrated Wyeth's
15:48:00  quality of respect for people."  Did
15:48:08  you have a discussion about that?

15:48:09  A.    No.  I mean not that I can
15:48:11  recall.

15:48:22  Q.    Did Mr. Katz discuss with
15:48:26  you your reactions to his constructive

HOWARD A. HENRY

15:48:28    2    criticism of you?

15:48:30    3        A.    Yes.    I mean he just

15:48:36    4    basically said that -- I'm trying to

15:48:41    5    recall.

15:48:43    6        Q.    Were you finding it

15:48:44    7    difficult reporting to Mr. Katz?

15:48:45    8        A.    At times.

15:48:47    9        Q.    Did that have anything to do

15:48:48    10    with the fact that Mr. Katz was promoted

15:48:51    11    to that position --

15:48:55    12        A.    I think --

15:48:56    13        Q.    The position you had applied

15:48:57    14    for?

15:48:57    15        A.    I really think that he was

15:48:58    16    real green in the position, and he was,

15:49:05    17    he explained to me he was new at it and

15:49:09    18    he needed to do some maturing himself

15:49:11    19    within the position.    So he said he

15:49:13    20    doesn't know whether it's him or

15:49:14    21    whether it's me, but I said I think

15:49:18    22    that, you know, we just need to just

15:49:20    23    treat each other cordially.

15:49:24    24        Q.    Did you do that, did you

15:49:26    25    have a cordial relationship with Mr.

HOWARD A. HENRY

Katz?

A.    I tried to.  I tried to.

Q.    Do you think he tried as well?

A.    As far as I can see.  As far as I can see.  I don't think anything -- I don't think that, you know, I can say anything otherwise at this point ostensibly.

Q.    And you refused to sign this review; is that right?

A.    Right.

Q.    Did you state your reason why you didn't want to sign the review?

A.    I don't know if I did at that time.  But I just felt like they were trying to paint me in a way that was not accurate.

Q.    Who's they?  You say they.

A.    Upper management.

Q.    Well it was Mr. Katz that --

A.    But he got a lot -- he got feedback from Mr. Espejo too.

Q.    So when you say they, you're

HOWARD A. HENRY

If we could start with
Exhibit 25.

A.    Okay.

Q.    Was this document presented
to you at a meeting on June 24th, 2005?

A.    Yes.

Q.    And who was at that meeting?

A.    Stacey Marasco, she's a
human resources person, and Max Katz.

Q.    Can you tell me what
happened at that meeting?

A.    Succinctly stated, I was
being placed in the PIP. Didn't
understand why, explained my concern
and explained my disagreement with it.
They read to me the statement of
concerns and I said that I would have
to read it and respond, but I
definitely didn't agree with how it was
being conducted.

Q.    Was the document read to you
at this meeting?

A.    Yes.

Q.    And then you were provided a

239

HOWARD A. HENRY

15:54:54  2   copy?

15:54:55  3       A.    Yes.

15:54:55  4       Q.    Were you asked to sign it at

15:54:57  5   the meeting?

15:54:57  6       A.    I don't recall whether I was

15:55:01  7   asked to sign it at the meeting.  I

15:55:06  8   don't think I was asked.

15:55:06  9       Q.    Okay.  If you look at Page 3

15:55:08 10   under "Employee comments," is that,

15:55:17 11   under employee's signature, is that

15:55:19 12   your signature?

15:55:24 13       A.    Which document are you

15:55:25 14   looking at, 25 you said?

15:55:27 15       Q.    Exhibit 25, the first page

15:55:28 16   of it is Bates stamped 3720.

15:55:32 17       A.    Yes.

15:55:35 18       Q.    And looking at the bottom of

15:55:37 19   Page 3, which is Bates stamped 3722

15:55:39 20   there's a line for employee's

15:55:41 21   signature?

15:55:42 22       A.    Yes.

15:55:42 23       Q.    Is that your signature?

15:55:43 24       A.    Yes.

15:55:44 25       Q.    And it's dated June 27th,

HOWARD A. HENRY

2005?

A.    Yes.  So I think I may have signed it soon thereafter, I think.

Q.    Okay.  Do you remember anything else that occurred during the meeting?  This document was read to you, you said you disagreed, anything else?

A.    I was told that with a PIP, I was told by Ms. Stacey Marasco that I couldn't bid on a job for a year.

Q.    She told you that at this meeting?

A.    Yes.

Q.    Anything else you remember?

A.    That if my performance doesn't improve I can be placed on probation which can lead -- up to and including termination.

Q.    Anything else you can recall?

A.    Not at this time.

Q.    Okay.  Looking at the statement of concerns.

HOWARD A. HENRY

15:57:04    A.    On 25?

15:57:05    Q.    Yes, Exhibit 25. The first
sentence says, "My concern is that
you've repeatedly failed to meet
deadlines and complete tasks in a
timely manner"; isn't that correct?
And then it lists seven items. The
first item is the PMO reviews. These
PMO reviews had been previously
discussed with you; isn't that correct?

15:57:35    A.    Yes.

15:57:36    Q.    They were the subject of
that May 2004 performance feedback
document that we discussed earlier;
isn't that correct?

   A.    Yes.

15:57:54    Q.    Jumping down to item number
3, it says, "On February 3rd, 2005, I
sent you an email asking you to prepare
and submit a timeline for completion of
work regarding continuous coaters. I
did not receive a response or timeline
from you." Is that accurate?

15:58:11    A.    No.

HOWARD A. HENRY

15:58:15 2    Q.    How is it not accurate?

15:58:17 3    A.    Sometimes we would have

15:58:19 4 conversations, and you couldn't --

15:58:20 5 sometimes you wouldn't respond to every

15:58:21 6 email, you would have conversations.

15:58:23 7 So most of the communication that

15:58:31 8 occurs due to the nature of the area

15:58:33 9 occurs in verbal discussions.

15:58:40 10    Q.    Okay.  As of June 24th,

15:58:43 11 2005, had you submitted to Mr. Katz a

15:58:46 12 timeline for completion of work

15:58:48 13 regarding continuous coaters?  Yes or

15:58:50 14 no?

15:58:51 15    A.    I don't recall.

15:58:54 16    Q.    Okay.  Moving down to number

15:58:56 17 4, "On February 9th, 2005, I sent you

15:59:01 18 an email requesting you to provide me a

15:59:03 19 timeline by February 16th, 2005 of

15:59:07 20 steps you were taking to resolve an

15:59:08 21 issue regarding percent loss/percent

15:59:11 22 gain, MIRs.  I did not receive a

15:59:15 23 response or timeline from you."  Is it

15:59:22 24 true you did not submit a timeline to

15:59:25 25 Mr. Katz?

HOWARD A. HENRY

15:59:25  A.    I don't recall.  I mean I

15:59:34 believe that we had a discussion and I

15:59:36 explained to him discussion what was

15:59:38 going to take place.

15:59:40  Q.    And what was the discussion

15:59:42 about the timeline?

15:59:44  A.    You know, I told him, I

15:59:46 said, you know, basically, it was

15:59:49 either in an email or discussion where

15:59:51 I told him that these are the steps

15:59:52 that we're going to take, this is what

15:59:54 we're working on now.  So I didn't know

15:59:57 that I was being scrutinized like this

15:59:59 until I received this document.

16:00:02       So he made me aware this way

16:00:07 that he was scrutinizing me and wanted

16:00:10 me to answer and respond to each

16:00:13 individual email in a formal manner.

16:00:16 And there's a lot of informal

16:00:18 conversations that occurred to answer a

16:00:20 lot of these questions on this

16:00:21 document.

16:00:25  Q.    A timeline is a fairly

16:00:27 formal thing though, correct?

HOWARD A. HENRY

16:00:29    2       A.     Not in our area.

16:00:30    3       Q.     It contemplates a written

16:00:33    4   product?

16:00:34    5       A.     Not in our area it doesn't

16:00:35    6   mean that, not necessarily.

16:00:36    7       Q.     Well did you interpret it to

16:00:38    8   mean anything other than a written

16:00:40    9   timeline?

16:00:40   10       A.     I interpreted it to mean

16:00:42   11   that I need to discuss with him a

16:00:43   12   timeline, a time frame, if you will.

16:00:47   13   So we discussed it.  I mean to me he

16:00:55   14   didn't explain to me where's the

16:00:57   15   timeline, Howard, where's the timeline.

16:00:59   16   It didn't go like that.  I told him, he

16:01:01   17   said oh, okay, I got you.

16:01:03   18       Q.     He said he asked you to

16:01:04   19   prepare and submit which suggests --

16:01:09   20       A.     It suggests --

16:01:10   21       Q.     That would be a written

16:01:12   22   product, to prepare and submit a

16:01:16   23   written timeline?

16:01:16   24       A.     To me, like we give each

16:01:19   25   other, we have conversations and we

HOWARD A. HENRY

16:01:22  2  discuss things that, due dates on

16:01:25  3  things, and we discuss things.  And

16:01:27  4  sometimes timelines are established

16:01:30  5  through conversation.  I say I

16:01:33  6  contacted the vendor this day, he

16:01:35  7  should be coming on Monday, it should

16:01:37  8  be done by the 21st, you got any other

16:01:40  9  questions, no; moving right along.

16:01:46  10       Q.    Item number 6, do you recall

16:02:07  11  discussing item number 6?

16:02:08  12       A.    Yes.

16:02:09  13       Q.    Is there anything in this

16:02:12  14  item 6 that is not accurate?

16:02:15  15       A.    The part where it says, "It

16:02:32  16  was your responsibility to get the

16:02:33  17  document into GX Pharma in time for the

16:02:36  18  item to be completed by the deadline."

16:02:45  19       Q.    What's inaccurate about that

16:02:47  20  statement?

16:02:47  21       A.    When this particular item

16:02:48  22  was introduced it wasn't given to me as

16:02:50  23  an item that was my responsibility, it

16:02:52  24  was someone else's responsibility.  So

16:02:57  25  at the eleventh hour it was given to

HOWARD A. HENRY

16:02:59  2    me.

16:03:00  3         Q.    The eleventh hour being May

16:03:01  4    19th, 2005?

16:03:02  5         A.    Meaning May 19th and it was

16:03:04  6    due June 3rd.  So this actual item was

16:03:08  7    created early part of May and it was

16:03:13  8    given to me to complete within a week.

16:03:15  9         Q.    So this --

16:03:16 10         A.    Or two.

16:03:17 11         Q.    So this statement, "It was

16:03:19 12    your responsibility to get the document

16:03:21 13    into GX Pharma in time for the item to

16:03:24 14    be completed by the deadline" --

16:03:26 15         A.    Was not true at the initial

16:03:28 16    start of the item.

16:03:29 17         Q.    But it's true as of May

16:03:30 18    19th?

16:03:30 19         A.    May 19.

16:03:31 20         Q.    -- 2005 it was your

16:03:33 21    responsibility?

16:03:34 22         A.    Correct.

16:03:34 23         Q.    Okay.  Item number 7, "On

16:03:37 24    June 6th, 2005, I sent you an email to

16:03:40 25    proceduralize the occurrence of a

HOWARD A. HENRY

broken tool in an effort to reduce MIRs
with a due date of June 27th, 2005.  As
of June 21st, 2005 you haven't opened
the email."  Is there anything that is
not accurate about this statement?

    A.    I don't -- I don't know.  I
mean I don't know if I opened it the
early -- the day before June or the day
of June 21st, I'm not sure.

    Q.    The final sentence on the
page reads "You have quadrupled the
number of absences, not including
vacation days taken, than any other
employee in the department and you
often call out with very little or no
notice which greatly impacts the
business's ability to operate
smoothly."  Is there anything
inaccurate about that statement?

    A.    I always give notice, so
that's not true.  I've always given
notice.

    Q.    Anything else?

    A.    Not that I can see at this

HOWARD A. HENRY

1

16:05:28  2    time.

16:05:28  3         Q.    Okay.  If you turn the page

16:05:30  4    to Page 2, dates of previous

16:05:33  5    discussions, January 12th, 2005, it

16:05:45  6    talks about the performance appraisal.

16:05:47  7    It also talks about a March -- it also

16:05:49  8    refers to a March 15th, 2005 email from

16:05:53  9    Andrew Espejo and a March 30th, 2005

16:05:59 10    discussion regarding PMOs.  Do you see

16:06:03 11    that?

16:06:03 12         A.    Yes.

16:06:04 13         Q.    Did each of those

16:06:09 14    discussions in fact occur?

16:06:11 15         A.    We discussed items but not

16:06:15 16    exactly the way in which this alludes

16:06:18 17    to.

16:06:20 18         Q.    Can you elaborate on that?

16:06:22 19         A.    I discussed a progress

16:06:25 20    review with Andrew Espejo on January

16:06:28 21    12th but I did not agree with the

16:06:31 22    assessment about the objective and how

16:06:35 23    he came to his conclusion.  I did

16:06:38 24    discuss zone checklists with Andrew

16:06:43 25    Espejo on March 15th, and I explained

HOWARD A. HENRY

to him that there were some issues
regarding with the supervisors and some
issues with the zone checklists. And
that train, the other train next to
ours, PPU 2, had the same issues. So
that singling me out was not -- and he
didn't -- he didn't present to me that
this particular problem would issue and
warrant a PIP.

And finally as far as
discussion regarding the PMO process
and Max Katz and I ended it with the
decision to track PMO signing off and
that all these discussions were
innocuous as far as I was concerned and
didn't -- I didn't foresee them
bringing a culmination to this
particular PIP document.

Q.    The improvement expectations
listed, down below there are four
items. Did you believe that each of
these items was attainable by you?

A.    No.

Q.    Which item did you think was

HOWARD A. HENRY

not attainable?

A.    Properly respond to PMOs
within two business days of receipt.
Sometimes when you get a PMO the PMO
may be a real thick document that must
be gone through line by line with the
mechanic.  So sometimes that can't be
done within two days of receipt.  And
if you get it late in the day that's
considered a full day and then the next
day you only have one day to review it,
so.

The zone checklist, that was
contingent upon the supervisors and I
explained to them that the supervisor
have to be on board because they're
responsible for getting to me at a
certain time.  I told him I would send
out emails to remind people but I can't
be held accountable for these zone
checklists and when people go on
vacation they don't let me know.

As far as completing all the
signings in a timely manner, I've done

HOWARD A. HENRY

16:09:01  2  that and I've continued to do that.  I

16:09:04  3  didn't agree with that particular

16:09:05  4  aspect of the review.

16:09:06  5          And as far as unscheduled

16:09:09  6  absences, I told him that the

16:09:12  7  specifitudes of life warrant one to

16:09:14  8  take time and accidents do happen and

16:09:16  9  things happen and come up at the last

16:09:19 10  minute, and as professionals we're

16:09:21 11  afforded this leeway, and throughout my

16:09:23 12  career I've never taken advantage of

16:09:26 13  it, but I've had to use it and we're

16:09:29 14  afforded the opportunity to use it, so

16:09:31 15  I've expressed that to them.

16:09:44 16          Q.    Okay.  If you look at the

16:09:45 17  bottom of that page, review sessions,

16:09:51 18  it indicates that there would be review

16:09:54 19  dates on July 6th, July 14th and July

16:09:57 20  25th, 2005.  Did those meetings or

16:10:06 21  review sessions in fact occur?

16:10:09 22          A.    I recall two review sessions

16:10:16 23  after that first meeting on June 24th.

16:10:19 24          Q.    Okay.  If you could turn

16:10:20 25  your attention to Exhibit 26, Page 3.

HOWARD A. HENRY

16:10:38 2  If you look under employee comments it

16:10:40 3  looks like on this document we now have

16:10:43 4  signatures all the way around dated

16:10:45 5  June 29th except under employee's

16:10:49 6  signature.  If I can read this writing

16:10:57 7  properly it says "Howard did not want

16:10:59 8  to sign and asked for a couple days to

16:11:02 9  have it reviewed.  As of July 29th,

16:11:05 10 2005 he responded he's drafting a

16:11:07 11 response to be submitted by July 1st,

16:11:11 12 2005."  Do you recall saying that you

16:11:16 13 wouldn't be signing this document but

16:11:18 14 instead would be submitting some type

16:11:19 15 of response?

16:11:20 16      A.    I recall saying that I need

16:11:23 17 time -- I didn't say that I would not

16:11:25 18 sign, I don't recall saying I did

16:11:27 19 not -- I would not sign.  I recall

16:11:29 20 saying that I need to review it and I

16:11:34 21 remember submitting the other document,

16:11:36 22 Exhibit 25, and signing that and

16:11:38 23 putting that comment on there.  But I

16:11:44 24 don't remember stating exactly how it

16:11:46 25 said here.  But I did -- I didn't -- I

HOWARD A. HENRY

1

16:11:48  2  don't remember saying that I wouldn't

16:11:49  3  sign it.  I remember saying that I

16:11:56  4  needed time to draft a response.

5                    (Henry Exhibit 27 for

6  identification, Bates stamped 3772 and

7  3773.)

8                    (Henry Exhibit 28 for

9  identification, Bates stamped 3724 and

16:12:46 10  3726.)

16:12:46 11       Q.    Mr. Henry, I've put in front

16:12:47 12  of you two documents.  One is marked

16:12:49 13  Exhibit 28.  Exhibit 28 will be coming

16:13:01 14  momentarily.  There you go.  If you can

16:13:03 15  turn your attention to Exhibit 27,

16:13:04 16  which is Bates stamped 3772, it's dated

16:13:13 17  June 27th, 2005, and the subject line

16:13:15 18  is "Rebuttal to PIP program presented

16:13:18 19  on June 24th, 2005."  This document is

16:13:25 20  not signed.  It was not produced to us

16:13:30 21  on letterhead as was Exhibit 28.  Do

16:13:33 22  you know what this document is?  Is

16:13:35 23  this the final document or was this a

16:13:37 24  draft, do you know?

16:13:38 25       A.    I don't -- I don't -- could

HOWARD A. HENRY

16:22:50    2   Andrew in a specific time, I told them

16:22:53    3   yes.  Max said he would set up a

16:22:55    4   meeting between maintenance about how

16:22:57    5   to best handle the PMOs because he

16:22:59    6   wanted to stamp them and I told him you

16:23:02    7   can't stamp an official company

16:23:04    8   document like that without the first

16:23:05    9   approval of maintenance.  He said he

16:23:07   10   would -- he would make up -- he would

16:23:09   11   make sure he would set up a meeting.

16:23:13   12          And it was a very brief

16:23:14   13   meeting.  I expressed again that this

16:23:17   14   PIP was unwarranted.

16:23:20   15          And that was about all I

16:23:24   16   could remember at this time.

16:23:25   17       Q.    Did Ms. Marasco tell you

16:23:30   18   that the PIP was not a disciplinary

16:23:36   19   tool, but instead a tool for corrective

16:23:40   20   action?

16:23:42   21       A.    She did say that.

16:23:44   22       Q.    When was -- and then you had

16:23:51   23   another meeting, correct, regarding the

16:23:54   24   PIP, in this PIP review process?

16:23:57   25       A.    Yes.

HOWARD A. HENRY

1

16:26:02  2  person from now on.

16:26:04  3      Q.   Were you told at this

16:26:05  4  meeting that you'd satisfied the

16:26:07  5  requirements of the PIP?

16:26:07  6      A.   Yes.

16:26:08  7      Q.   Were you told that you'd be

16:26:09  8  removed from the PIP?

16:26:10  9      A.   Yes.

16:26:10 10      Q.   Were you told that -- do you

16:26:21 11  remember being told anything else?

16:26:22 12      A.   That I'd have to sustain a

16:26:25 13  certain level of compliance, if you

16:26:28 14  will, certain level of performance or I

16:26:33 15  can be placed back on it, and it can

16:26:36 16  lead to termination.

17              (Henry Exhibit 29 for

16:27:15 18  identification, Bates stamped 3727.)

16:27:15 19      Q.   Mr. Henry, I've put in front

16:27:17 20  of you a document that's been marked

16:27:19 21  Henry Exhibit 29.  It appears to be a

16:27:25 22  letter from Mr. Katz dated July 28th,

16:27:27 23  2005.  Do you recall receiving this

16:27:29 24  letter?

16:27:29 25      A.   Yes.

1          HOWARD A. HENRY

16:27:30  2          Q.    And this letter notified you

16:27:31  3     that you'd been removed from the PIP?

16:27:33  4          A.    Yes.

16:27:34  5          Q.    Did you have any further

16:27:44  6     discussions with Mr. Katz, Mr. Espejo

16:27:47  7     or Mr. -- or Ms. Marasco regarding the

16:27:53  8     PIP?

16:27:53  9          A.    Not that I can recall.

16:27:54 10          Q.    Did you have any discussions

16:27:55 11     with anyone else other than your

16:27:57 12     counsel regarding the PIP?

16:27:59 13          A.    I mentioned two individuals

16:28:03 14     before.

16:28:04 15          Q.    Right.  Other than those

16:28:06 16     individuals?

16:28:06 17          A.    Not that I can recall.

16:28:07 18          Q.    Okay.

16:28:12 19          A.    If you wouldn't mind, may I

16:28:16 20     use the bathroom, is that all right?

16:28:20 21          MR. McQUADE:  Sure, we'll

16:28:21 22     take a break.

16:28:23 23          THE VIDEO OPERATOR:  Going

16:28:23 24     off the record at 4:28.

16:28:25 25          (A recess was taken.)

HOWARD A. HENRY

1

16:44:35 2    A.    At times.

16:44:37 3    Q.    And I think you told me in

16:44:39 4 2004 you believed that you should have

16:44:43 5 received a five rating?

16:44:46 6    A.    In 2004, yes.

16:44:50 7    Q.    So these symptoms you were

16:44:53 8 experiencing didn't affect your work

16:44:55 9 performance in any way, did they?

16:44:57 10    A.    It affected, you know, what

16:45:02 11 I felt was my comfort level and my

16:45:09 12 ability but I worked through them, I

16:45:13 13 worked through it.

16:45:14 14    Q.    2005, what type of symptoms

16:45:18 15 were you experiencing?

16:45:21 16    A.    Just real depressed, you

16:45:25 17 know, I just felt like there was

16:45:27 18 nothing -- no matter what I did it

16:45:29 19 wasn't good -- it wouldn't be good

16:45:31 20 enough.  So it just got real, real bad

16:45:34 21 after that.

16:45:37 22    Q.    Anything else in 2005?

16:45:39 23    A.    Everything just escalated.

16:45:42 24 Everything just got --

16:45:43 25    Q.    When did you -- when was

```
              1          HOWARD A. HENRY
16:45:45      2   your last day at work at Wyeth?
16:45:48      3          A.    August 2005.
16:45:53      4          Q.    And --
16:45:54      5          A.    I believe it was the 5th of
16:45:56      6   August actual physical work.
16:45:57      7          Q.    At that time you submitted a
16:45:59      8   request for disability benefits?
16:46:03      9          A.    Right, for leave.
16:46:10     10          Q.    And why did you want to take
16:46:12     11   a leave?
16:46:12     12          A.    Because things had taken its
16:46:14     13   toll.
16:46:14     14          Q.    What had taken its toll?
16:46:16     15          A.    What I had been going
16:46:17     16   through at Wyeth.
16:46:18     17          Q.    And what was the toll?  Can
16:46:21     18   you be more specific?
16:46:23     19          A.    The overall physical
16:46:26     20   condition -- condition I was in.  I
16:46:29     21   mean I didn't -- I just was severely
16:46:32     22   depressed.  I had irritable bowel
16:46:35     23   syndrome.  My heart at sometimes I felt
16:46:37     24   like it was racing, you know,
16:46:40     25   uncontrollably at times.  I mean I
```

HOWARD A. HENRY

16:46:44  2  would sit at my desk and my palms would

16:46:46  3  get all sweaty, I would just break out

16:46:48  4  in sweats and chills.  I mean there

16:46:50  5  was -- there was a lot of things that

16:46:52  6  started happening to me that didn't

16:46:54  7  happen before.

16:46:58  8     Q.    Is there anything else, any

16:47:00  9  other symptoms?

16:47:00  10    A.    I had severe anxiety, like

16:47:04  11  it was like I wanted to do everything

16:47:06  12  perfect and I -- and I didn't want to

16:47:08  13  fail at anything, so I got hyper just

16:47:10  14  in terms of just preparing documents

16:47:11  15  and getting this done and trying to do

16:47:14  16  -- being three places at one time and I

16:47:16  17  couldn't keep up with that pace and it

16:47:19  18  took its toll.

16:47:20  19    Q.    So you decided to take a

16:47:22  20  disability leave?

16:47:23  21    A.    Well, it was recommended by,

16:47:30  22  you know, the individual, the doctor

16:47:32  23  was talking to me and the health care

16:47:33  24  provider was talking to me, I told them

16:47:36  25  what I was going through.  I explained

HOWARD A. HENRY

16:54:39  2    Q.    Do you know if benefits were

16:54:40  3    denied?

16:54:41  4    A.    For Workmen's Comp?

16:54:44  5    Q.    Yes.

16:54:46  6    A.    They were pending at this

16:54:48  7    point.

8              (Henry Exhibit 34 for

9    identification, Bates stamped D 00571

16:54:58 10    and 572.)

16:54:58 11    Q.    I'll show you a document

16:54:58 12    which has been marked Henry Exhibit 34.

16:55:26 13    Do you recall receiving this document

16:55:28 14    which is a letter dated January 10th,

16:55:31 15    2006, from Littece Culler?

16:55:37 16    A.    Yes.

16:55:38 17    Q.    If you look at the second

16:55:47 18    paragraph, second sentence, it says

16:55:50 19    "Unless you submit appropriate medical

16:55:51 20    documentation indicating your ability

16:55:53 21    to return to work within a reasonable

16:55:55 22    and defined period of time, your

16:55:57 23    employment will be terminated effective

16:56:00 24    February 6th, 2006." Do you remember

16:56:04 25    reading that?

HOWARD A. HENRY

16:56:05  2        A.     Yes.

16:56:06  3        Q.     Did you ever obtain any type

16:56:11  4    of medical -- any additional medical

16:56:15  5    documentation from any of your doctors

16:56:17  6    who were treating you and provide it to

16:56:20  7    Wyeth?

16:56:20  8        A.     And provided it to Wyeth?

16:56:22  9        Q.     Yes.

16:56:23 10        A.     Before this date?

16:56:24 11        Q.     Yes.

16:56:29 12        A.     I'm not sure I provided it

16:56:31 13    to Wyeth.  I think I provided it to

16:56:33 14    Workmen's Comp, but I don't think -- I

16:56:36 15    don't think so.

         16                   (Henry Exhibit 35 for

16:56:39 17    identification, Bates stamped D 00575.)

16:56:39 18        Q.     Okay.  I'm going to show you

16:56:40 19    a document that's been marked Henry

16:56:41 20    Exhibit 35, which is a February 7th,

16:56:52 21    2006 letter from Martin Allen.  Do you

16:56:57 22    remember receiving this document?

16:56:57 23        A.     Yes.

16:56:58 24        Q.     Okay.  And this document --

16:57:00 25    if you look at the second paragraph of

HOWARD A. HENRY

16:57:02  this document it says "To date, Wyeth

16:57:05  still has received no medical

16:57:06  documentation from you.  In response to

16:57:08  Ms. Culler's January 10th, 2006 letter.

16:57:12  Therefore, consistent with the standard

16:57:14  Wyeth practices your employment with

16:57:16  Wyeth is terminated effective Monday,

16:57:19  February 6th, 2006."  At this date you

16:57:23  still hadn't submitted any medical

16:57:25  documentation to Wyeth?

16:57:27      A.    Not at this -- not at this

point.

16:57:32      Q.    Is there any reason why you

16:57:33  didn't submit medical documentation to

16:57:36  Wyeth?

16:57:37      A.    Based on the treatment I

16:57:42  received when I was at Wyeth and based

16:57:45  on how I was received at Wyeth, at that

16:57:49  point I didn't feel it would -- it

16:57:51  would be conducive for me to return.

16:57:54      Q.    Were you capable of

16:57:56  returning at that point?

16:58:00      A.    To perform the same

16:58:02  functions, to feel the same way I was

301

HOWARD A. HENRY

17:26:00  2      A.    Yes.

3                        (Henry Exhibit 39 for

4          identification, Bates stamped 2224

17:26:27  5      through 2230.)

17:26:27  6      Q.    Mr. Henry, I put before you

17:26:27  7      another document that's been marked

17:26:29  8      Exhibit 39.  Do you recognize this

17:26:32  9      document?

17:26:33  10     A.    Yes.

17:26:44  11     Q.    Did you receive a copy of

17:26:46  12     this document during your employment?

17:26:49  13     A.    I recall signing it.  I

17:26:51  14     don't know if I got a copy.

17:26:53  15     Q.    Okay.  Well I can represent

17:26:56  16     to you that this document was produced

17:26:57  17     to us by your counsel.

17:27:16  18     A.    It was produced by counsel?

17:27:17  19     Q.    Your counsel.

17:27:19  20     A.    Okay.

17:27:20  21     Q.    Do you recall reading this

17:27:25  22     document?

17:27:25  23     A.    I don't know if I -- I don't

17:27:32  24     know if I read it completely.  I don't

17:27:41  25     even recall if at the time I understood

HOWARD A. HENRY

17:27:43  2   it.

3                 (Henry Exhibit 40 for

17:27:56  4   identification, Bates stamped D 00067.)

17:27:56  5        Q.    Okay, Mr. Henry, I'm putting

17:27:57  6   before you a document that's been

17:27:58  7   marked Exhibit 40 regarding the

17:28:03  8   harassment policy.  If you'd look at

17:28:09  9   the bottom, towards the bottom of the

17:28:12  10  page is an acknowledgment.  It says

17:28:15  11  "This is to acknowledge that I've read

17:28:16  12  the procedures above and received a

17:28:18  13  copy of Wyeth's equal employment

17:28:21  14  opportunity policy, harassment and

17:28:22  15  discrimination policy, complaint

17:28:24  16  procedure for unlawful discrimination

17:28:26  17  and harassment, Americans With

17:28:31  18  Disabilities Act policy, assurance of

17:28:32  19  fair treatment policy and open door

17:28:34  20  policy."  Is that your signature down

17:28:44  21  below?

17:28:44  22        A.    Yes.

17:28:44  23        Q.    So does this refresh your

17:28:46  24  recollection as to whether you read and

17:28:47  25  understood those policies?

HOWARD A. HENRY

A.    Well I read it, but I don't -- I can't say I completely understood them.

Q.    Did you understand that you had the right to make complaints with management and HR if you felt that you were being discriminated against?

A.    Say that for me once more.

Q.    Did you understand that you had the right to make complaints to either Wyeth management or HR if you felt that you had been discriminated against?

A.    I learned of that right, yes.

Q.    When did you learn of that right?

A.    As I started to proceed with the process of what was occurring with me in 2003.

Q.    Did you --

A.    As a result of going through what I'm going through.

Q.    So are you saying, are you

304

HOWARD A. HENRY

17:29:45 2  telling me that before 2003 you didn't

17:29:46 3  know that you had the right --

17:29:50 4      A.   It wasn't -- it wasn't

17:29:51 5  something that we paid attention to.

17:29:52 6  You knew you had certain inalienable

17:29:56 7  rights but you just don't really give

17:29:58 8  it much thought until you actually have

17:29:59 9  to execute and use some of that.  So it

17:30:02 10  wasn't a thought that, you know, I paid

17:30:04 11  that much attention to.

17:30:15 12      Q.   Do you recall if you read

17:30:16 13  this document before you signed it,

17:30:20 14  referring to Exhibit 40?

17:30:22 15      A.   I can't say that I recall

17:30:30 16  reading it and scrutinizing it like I

17:30:32 17  am now.  I mean we were given a lot of

17:30:34 18  things to sign sometimes and sometimes

17:30:36 19  just because we have a deadline to meet

17:30:38 20  to get it in by a certain date you may

17:30:40 21  just glance over it and sign it.

17:30:55 22      MR. McQUADE:  Mark that,

17:30:56 23  please.

24      (Henry Exhibit 41 for

25  identification, Bates stamped 2312