# EXHIBIT   2

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Index No. CV 8106

5  - - - - - - - - - - - - - - - - - - - - - - - - -x

6  HOWARD HENRY,

7                    Plaintiff,

8       - against -

9  WYETH PHARMACEUTICALS, INC., WALTER

10  WARDROP, ANDREW SCHASCHL and MICHAEL

11  McDERMOTT,

12                    Defendants.

13  - - - - - - - - - - - - - - - - - - - - - - - - -x

14                    July 25, 2006

                     3:10 p.m.

15

16            Deposition of WALTER WARDROP,

17  taken by the Plaintiff, pursuant to

18  Notice, held at the offices of Orrick,

19  Herrington & Sutcliffe, LLP, 666 Fifth

20  Avenue, New York, New York, before

21  Brian Glickman, a Shorthand Reporter

22  and Notary Public of the State of New

23  York.

24

25

14

WARDROP

1

2      A.      They are the ones that blend,
3  press coat the tablets.

4      Q.      And are you currently in the
5  same position today?

6      A.      No.

7      Q.      How long did you hold that
8  position?

9      A.      I held that position for
10  approximately two and a half years.

11      Q.      What did you do next?

12      A.      I was the production
13  coordinator for consumer health.

14      Q.      When did you attain that
15  position?

16      A.      2000.

17      Q.      What are your duties in this
18  position, what were your duties in this
19  position?

20      A.      Coordinate the flow of
21  materials through the factory.

22      Q.      How long did you hold this
23  position?

24      A.      It was less than a year.  It
25  might have been about eight months.

15

WARDROP

1

2      Q.      What was the next position
3  you held?

4      A.      Department head train 1.

5      Q.      Department head?

6      A.      Train 1.

7      Q.      What is train 1?

8      A.      Train 1 is just a name for a
9  department, an operating unit.

10      Q.      Which is a production line,
11  is train a production line?

12      A.      The train is what they call
13  the department.  It was all the people
14  that were engaged in the manufacturing
15  of Centrum silver tablets.

16      Q.      Did you supervise employees
17  in that position?

18      A.      Yes, I did.

19      Q.      How many?

20      A.      Upwards of between 70 and 80.

21      Q.      How long did you hold that
22  position?

23      A.      Probably about a year and a
24  half.

25      Q.      Where did you next work at

16

1              WARDROP

2  Wyeth?

3      A.    I was reassigned to

4  department head of train 2, which is

5  Centrum manufacturing.

6      Q.    When did that happen?

7      A.    I'm not sure of the date.

8      Q.    Do you remember the year?

9      A.    It might have been early

10  2003, somewhere in 2003.

11      Q.    What are your duties as a

12  department head train 2?

13      A.    I was accountable for the

14  manufacturing and delivery of all the

15  Centrum silver tablets.  I managed the

16  supervisors.  I managed the engineer,

17  the production clerk, and was

18  responsible for all the operators that

19  reported to those individuals.

20      Q.    How many individuals were

21  under you at this point, that you were

22  responsible for?

23      A.    It was upwards of between 70

24  and 80 people.

25      Q.    Prior to your attaining your

19

WARDROP

1

2   classes you have to take these are the

3   SOPs you have to complete, so it was in

4   my curriculum.

5        Q.    When were you first given a

6   curriculum at Wyeth?

7        A.    When I became a supervisor.

8        Q.    When did you first meet

9   Howard Henry?

10       A.    When I interviewed him for

11   the position of production engineer for

12   train 1.  I'm sorry, train 2.

13       Q.    Prior to your interviewing

14   him for that position, was he an

15   employee of the company?

16       A.    Yes.

17       Q.    Did you know him prior to

18   that?

19       A.    No.

20       Q.    After your interviewing him

21   for that position, did he get that

22   position?

23       A.    Yes.

24       Q.    What position did he get?

25       A.    Production engineer.

20

WARDROP

1

2      Q.      When he received that

3  position, was he supervised by

4  yourself?

5      A.      Yes.

6      Q.      What were his duties as

7  production engineer?

8      A.      Maintain the equipment,

9  conduct the PMOs, preventative

10  maintenance for the equipment, validate

11  new equipment, help validate processes,

12  respond to maintenance concerns and act

13  as a liaison between the operating

14  department and the maintenance

15  department.

16      Q.      How long did you supervise

17  Mr. Henry?

18      A.      Three years.

19      Q.      During this period of three

20  years, did you provide him with

21  performance appraisals?

22      A.      Yes, I did.

23      Q.      How many performance

24  appraisals did you provide for Mr.

25  Henry?

21

WARDROP

1

2     A.     Four.

3     Q.     The first appraisal you

4 provided to him was during the first

5 year of his employment in your

6 department; is that correct?

7     A.     I'm sorry?

8     Q.     The first appraisal that you

9 provided to him was during the first

10 year of his working in your department?

11     A.     That is correct.

12     Q.     And had you had the

13 opportunity to evaluate him over the

14 year period at that time?

15     A.     I believe in 2000 he had not

16 worked an entire year for me.

17     Q.     Did you request any input

18 from any other department heads with

19 respect to his performance in preparing

20 your evaluation in the year 2000?

21     A.     I don't recall.

22     Q.     Do you recall what level you

23 found him to be in the year 2000?

24     A.     What his performance rating

25 was?

22

WARDROP

1

2      Q.      Yes.

3      A.      Yes, it was a three.

4      Q.      Did you have the opportunity

5  to appraise his performance the

6  following year, 2001?

7      A.      Yes, I did.

8      Q.      And during that period of

9  time you supervised him for the entire

10  year?

11     A.      Correct.

12     Q.      And do you recall what

13  performance rating you gave him in

14  2001?

15     A.      Yes.

16     Q.      What was that rating?

17     A.      Four.

18     Q.      What was the difference in

19  your opinion between 2000 and 2001 that

20  warrant had the jump of one level in

21  his performance appraisal?

22     A.      In 2000 it was a learning

23  curve for him.  He had not mastered the

24  job and I felt in 2001 he started to

25  show that he was beginning to master

23

**WARDROP**

1
2 the position.

3    Q.    Are these performance

4 appraisals that are given to Mr. Henry

5 and your other reports done entirely by

6 you?

7    A.    I am responsible for writing

8 it and presenting it but I receive

9 input from other senior management in

10 consumer health, yes.

11    Q.    The performance appraisals

12 that you gave to Mr. Henry in 2000 and

13 2001, did you consult with any other

14 management in preparing those

15 appraisals?

16    A.    I don't recall what year we

17 began doing the collaboration session

18 and that's the session where we solicit

19 input from the other department heads,

20 but we did do a collaboration session

21 in 2002. I don't recall if we did one

22 in 2001.

23    Q.    Did you have any problem with

24 Mr. Henry's performance in 2001?

25    A.    No.

24

WARDROP

1

2  Q.    Would it be fair to say that

3  the two of you got along very well?

4  A.    Yes.

5  Q.    You liked each other, you

6  worked well together?

7  A.    Yes.

8  Q.    In 2002, you also provided a

9  performance appraisal for Mr. Henry?

10  A.    That is correct.

11  Q.    And I believe you just

12  indicated that in 2002 it wasn't only

13  your performance appraisal, it was done

14  in conjunction with other managers; is

15  that correct?

16  A.    That is correct.

17  Q.    And in 2002, what was Mr.

18  Henry rated?

19  A.    Four.

20  Q.    And that was as a result of

21  your conversations with other managers

22  where in you all decided to give him a

23  four rating?

24  A.    I present what rating I think

25  he deserves and then people have the

25

WARDROP

1

2  opportunity to present input.

3       Q.    Do you recall in 2002 what

4  rating you presented for Mr. Henry?

5       A.    Four.

6       Q.    Again in 2002, did you get

7  along with each other?

8       A.    Yes.

9       Q.    You worked well together?

10      A.    Yes.

11      Q.    You liked each other, no

12  problems?

13      A.    Yes.

14      Q.    In the following year, you

15  provided an employment appraisal for

16  Mr. Henry?

17      A.    Yes.

18      Q.    And in that year do you

19  recall what his rating was?

20      A.    Yes.

21      Q.    What was his rating?

22      A.    Three.

23      Q.    Was that the original rating

24  you had presented?

25      A.    Yes, it is.

26

WARDROP

1

2    Q.    Why did you feel there was a

3 drop off in his performance between the

4 year before and 2002?

5    A.    Because there had been a drop

6 off in his performance.  He was not

7 performing --

8    Q.    I'm sorry, I said 2002, I

9 meant 2003.

10    A.    Yes.  In 2003, when you do a

11 performance review, it is a discrete

12 bucket of time.  There is a time fence.

13 The time prior to the beginning of the

14 year he had already been rated, so

15 within the time fence that he was being

16 rated for 2003, his performance began

17 to slide.  He was late on projects.  He

18 missed projects.  He delivered them

19 either behind schedule, on the last day

20 they were due and some he missed

21 entirely, and that was a major concern

22 for myself and a major concern to the

23 other managers who depended on him to

24 complete assignments on time.

25    Q.    Who were the other managers

WARDROP

1

2    to which this was a concern?

3        A.    Andy Schaschl, the managing

4    director had a concern.  On at least

5    two occasions I was instructed to

6    intervene on two projects that Mr.

7    Henry was leading up because they were

8    falling behind and instructed to get

9    involved and make sure they get done on

10   time.

11       Q.    Who were you instructed to do

12   that by?

13       A.    Andy Schaschl.

14       Q.    Were there any other managers

15   that had concerns with Mr. Henry's

16   performance?

17            MR. MCQUADE:    Objection.

18       Q.    To your knowledge?

19       A.    The other managers as well

20   had a concern that -- one of the

21   concerns is -- one of the issues that

22   came up in his mid-year was he was not

23   responding to his pager, which is when

24   a supervisor on an off shift needs

25   assistance by the end of the year they

28

WARDROP

1
2  page him, the engineer on train 2
3  reporting to Bob Bracco was getting
4  called at home because Mr. Henry was
5  not responding to pages, and Mr. Colas
6  who was the train 1 -- I'm sorry, train
7  2 engineer was beginning to complain
8  that he was concerned that he's being
9  called at home for equipment and
10  processes that was outside of his
11  scope, why isn't Mr. Henry responding,
12  so that was one of the concerns that
13  came up with calibration.
14      Q.    Did you raise this concern
15  with Mr. Henry?
16      A.    Yes, I did.
17      Q.    And what did he say about it?
18      A.    He claimed that he answered
19  his pager every time he was contacted
20  and he contacted the communication
21  department and identified a period of
22  time where the pagers were not working.
23      Q.    Did you ascertain if this was
24  in fact the case that the pagers
25  weren't working?

30

WARDROP

2  MR. MORELLI:  If there are

3  written reviews, we've asked for

4  this already, but if there are

5  written mid-year reviews prior to

6  2003, we call for the production of

7  those documents.

8  (Information requested.)

9  Q.  In 2003 you did a review of

10  Mr. Henry's work, mid-year?

11  A.  Yes.

12  Q.  Did you have a personal

13  sit-down with Mr. Henry?

14  A.  Yes, I did.

15  Q.  And did you discuss your

16  concerns with him at that time?

17  A.  Yes, I did.

18  Q.  And this was how many months

19  after you had just given him a four for

20  his performance a year before?

21  A.  Probably six to seven months

22  in.

23  Q.  Were you aware that during

24  this time period Mr. Henry was

25  searching for other employment within

WARDROP                                    33

1

2          A.        I believe he did.

3          Q.        I'm going to show you a

4     document that's been previously marked

5     as Henry Exhibit 13, and I would ask

6     you if you can identify that document.

7          A.        Yes.

8          Q.        What is it?

9          A.        This is the mid-year review.

10         Q.        Does this document refresh

11    your recollection as to whether or not

12    Howard Henry signed the document?

13         A.        I believe he signed it.  This

14    could be an electronic copy that I

15    forwarded to him which would not be

16    signed.  We didn't sign and scan.  This

17    may have been an electronic word

18    document.

19         Q.        Do you know if a signed copy

20    exists somewhere in your records?

21         A.        I don't know at this time.

22         Q.        Do you know if you signed the

23    document?

24         A.        My recollection is that we

25    both signed it, but I don't know if I

39

1                     WARDROP

2 gave this to him other than yourself?

3     A.    No.

4     Q.    Subsequently you gave Mr.

5 Henry a performance evaluation for the

6 year 2003, that's correct?

7     A.    Yes.

8     Q.    And that was done when?

9     A.    Mid-December.

10     Q.    According to the mid-year

11 evaluation that was done in September;

12 is that correct, September of '03?

13     A.    Yes.

14     Q.    So some three months later

15 you did the end of the year review?

16     A.    That is correct.

17     Q.    And in preparing this end of

18 the year review, did you discuss that

19 particular review with other managers?

20         MR. MCQUADE:  Objection.

21         You can answer the question

22     if you can.

23     A.    The only person that I may

24 have -- would have shared this document

25 with would be Joanne Rose, if she had

45

WARDROP

1   the review.

2

3        Q.    Did he tell you that he was

4   going to speak to someone other than

5   you about the review?

6        A.    That would have been the

7   rebuttal process, yes.

8        Q.    And during these subsequent

9   conversations that you had with Mr.

10  Henry regarding his review and his

11  transfer, were there any other

12  individuals in the room during these

13  discussions?

14       A.    Not until January 16th, when

15  we met with Joanne Rose.

16       Q.    Prior to January 16th, were

17  you made aware that Mr. Henry had made

18  a charge of racial discrimination?

19       A.    I was not.

20       Q.    On January 16th, were you

21  made aware that he did?

22       A.    No.

23       Q.    Ms. Rose didn't tell you that

24  he had filed a charge?

25       A.    No.

54

**WARDROP**

1

2    Q.    The conversation on

3 January 16th that you had with Mr.

4 Henry with Ms. Rose present, what was

5 the sum and substance of that

6 conversation?

7    A.    As I recall we presented him

8 again with the now revised performance

9 appraisal, again that his job

10 assignment was packaging, and again he

11 was not happy with that. He said he

12 would not accept it and we ended the

13 meeting. He said he would take it

14 higher.

15    Q.    Okay, how did it come about

16 that the performance appraisal was

17 revised?

18    A.    I revised it.

19    Q.    Why did you do that?

20    A.    I changed it because there

21 were things that I needed to

22 communicate to Howard, developmentally

23 things that had come up at the

24 collaboration sessions that he needed

25 to work on moving forward, primarily

55

WARDROP

1

2 delivering projects on time and the

3 timeliness of his work.  I felt after

4 having communicated that to him that

5 there was no reason to keep it in the

6 permanent record.  I was very aware

7 that the performance appraisal is a

8 permanent record.  It could be pulled

9 by a manager in the future who may be

10 considering him for a job, and I didn't

11 want something that he improved upon

12 between now and then to become an

13 obstacle for him to get a position that

14 he might be interested in.

15     Q.    Did you discuss your decision

16 to revise the performance appraisal

17 with anyone?

18     A.    I notified Joanne because it

19 was what we discussed at the

20 January 16th meeting.

21     Q.    Did you discuss it with Mr.

22 Bigelow?

23     A.    No.

24     Q.    Did you discuss it with Mr.

25 Schaschl?

67

WARDROP

1

2  offered you had nothing to do with his

3  being put in that position or

4  recommended for that position?

5      A.    No.

6          MR. MORELLI:  Fair enough.

7  Thank you.  I have nothing further.

8          MR. MCQUADE:    I'd like to

9  confer with Mr. Wardrop for a

10  minute, please.

11          Step outside.

12          (Brief recess was taken.)

13  EXAMINATION BY

14  MR. MCQUADE:

15      Q.    All right, Mr. Wardrop, are

16  we ready?

17      A.    Yes.

18      Q.    I have a few questions.

19          I believe you testified the

20  first time you met Mr. Henry was when

21  you interviewed him for the production

22  engineer position; is that correct?

23      A.    Yes.

24      Q.    And who made the decision to

25  hire Mr. Henry for that position?

68

WARDROP

1

2      A.      I did.

3      Q.      You also testified about the

4   organizational cascade that occurred at

5   the Pearl River facility in 2003.

6              Were you affected in any way

7   by the organizational cascade?

8      A.      Yes, I was.

9      Q.      How were you affected?

10     A.      I was reassigned at the same

11  time.

12     Q.      What position were you

13  reassigned into?

14     A.      I was reassigned to

15  department head for train 2.

16     Q.      And as part of the

17  organizational cascade when you were

18  reassigned into the department head

19  train 2 position, did you have an

20  opportunity to select the employees who

21  would be working under you in train 2?

22     A.      Yes, I did.

23     Q.      Were there any engineers that

24  would be working under you in train 2?

25     A.      Yes.

69

WARDROP

1

2      Q.      How many engineers reported

3  up to you in train 2, how many

4  positions were available?

5      A.      One.

6      Q.      And who did you select for

7  that position?

8      A.      Jean Colas, J-E-A-N,

9  C-O-L-A-S.

10     Q.      Do you know Mr. Colas' race?

11     A.      Yes.

12     Q.      And what is it?

13     A.      Black.

14     Q.      Why did you select Mr. Colas?

15     A.      Because he was a highly

16  qualified engineer.  I knew him and he

17  would provide stability for the train.

18  As I'm new, he would provide stability

19  and he was a high performer.

20          MR. MCQUADE:    I have nothing

21     further.

22          MR. MORELLI:   I have a couple

23     further questions.

24  CONTINUED BY

25  MR. MORELLI:

# EXHIBIT  3

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Index No. CV 8106

5  - - - - - - - - - - - - - - - - - - - - - - - - -x

6  HOWARD HENRY,

7                    Plaintiff,

8        - against -

9  WYETH PHARMACEUTICALS, INC., WALTER

10  WARDROP, ANDREW SCHASCHL and MICHAEL

11  McDERMOTT,

12                    Defendants.

13  - - - - - - - - - - - - - - - - - - - - - - - - -x

14                    July 25, 2006

                     1:45 p.m.

15

16          Deposition of JOANNE ROSE,

17  Non-Party Witness, taken by the

18  Plaintiff, pursuant to Notice, held at

19  the offices of Orrick, Herrington &

20  Sutcliffe, LLP, 666 Fifth Avenue, New

21  York, New York, before Brian Glickman,

22  a Shorthand Reporter and Notary Public

23  of the State of New York.

24

25

23

ROSE

1

2  them over but he didn't want to do

3  that.

4      Q.    Did he indicate to you that

5  he had received a higher rating the

6  year prior to the performance appraisal

7  that he was upset with?

8      A.    I don't recall if he said

9  those exact words.

10     Q.    Was it your understanding

11 that he had received higher reviews in

12 the prior years than the year he was

13 discussing?

14     A.    Yes.

15     Q.    Did you have any

16 conversations with anyone regarding Mr.

17 Henry and/or his unhappiness with his

18 rating review, and/or his assignment?

19     A.    Yes, I talked to his manager.

20     Q.    Who did you speak to?

21     A.    Walter Wardrop,

22 W-A-R-D-R-O-P.

23     Q.    Was that conversation on the

24 telephone or in person?

25     A.    I don't recall.

31

ROSE

2     When you saw this document on

3 January 16th of 2004, what did you do

4 with respect to this issue, anything?

5     A.    That same day I had a meeting

6 with Mr. Henry.

7     Q.    Did you have a conversation

8 with Mr. Henry as to what was in the

9 memo that you had seen on the same day?

10     A.    No, I did not.

11     Q.    Did you ask him if he felt he

12 was being discriminated against?

13     A.    I did not use that word.  I

14 asked him on several occasions, after

15 we were in discussion, about his

16 unhappiness with his rating and

17 unhappiness with his assignment.  I

18 asked him what would he like to see

19 done about that.

20     Q.    Okay.

21     Were you his representative

22 at Pearl River, his human resource

23 representative, at Pearl River?

24     A.    Yes.

25     Q.    And on that day that you saw

32

1                    ROSE

2   this memo you didn't ask him if he felt

3   he was being discriminated against?

4        A.     No, I did not.  I asked him,

5   talked to him about his unhappiness.  I

6   talked to him about the fact that if he

7   could let me know what he would like to

8   have done.

9        Q.     Did you ever ask Mr. Henry if

10  he felt he was being discriminated

11  against?

12       A.     I did not.

13       Q.     Upon your questioning Mr.

14  Henry on January 16th as to what he

15  wanted done, do you recall what he

16  said?

17       A.     He said that he would pray on

18  it and he would let me know.

19       Q.     And did he let you know?

20       A.     No.

21       Q.     Did there come a time when

22  his performance evaluation was changed?

23       A.     Some of the wording in his

24  performance evaluation was changed.

25       Q.     Who made the decision to

33

ROSE

1    change his performance evaluation?

3    A.    His manager Walter Wardrop.

4    Q.    Were you involved in any

5    discussions involving this decision?

6    A.    I can't recall exactly any

7    discussions but I would normally be

8    involved with any matters related to

9    performance reviews.

10    Q.    Did you have a discussion

11    with Mr. Schaschl and Mr. McDermott

12    regarding a change of Mr. Henry's

13    performance appraisal?

14    A.    I'm sure I probably had a

15    discussion. I don't really recall the

16    discussion. I can tell you any

17    direction I would give to anyone is the

18    rating can never change. Once a rating

19    is assigned, that cannot be changed.

20    If Walter Wardrop decided to change

21    wording, then that would have been his

22    choice.

23    Q.    It is your testimony that the

24    decision as to whether or not to change

25    this particular performance evaluation

41

ROSE

1

2    Q.    When you say "we," were you

3  involved in that process?

4    A.    Yes, I was.

5    Q.    Were you involved in the

6  decision to put Howard Henry in the

7  packaging supervisor position?

8    A.    I was involved with

9  facilitating the meeting with about 20

10  or so people.  I did not personally

11  assign people to any one position, no.

12    Q.    Are you aware of who assigned

13  Mr. Henry to the packaging supervisor

14  position?

15    A.    No, I'm not.

16    Q.    Did you look into his

17  concerns with respect to this transfer

18  to the packaging supervisor position?

19    A.    I talked to him for a good

20  period of time about it.  I tried to

21  counsel him on the fact that it was an

22  assignment, that I thought it was a

23  good opportunity for him, because in a

24  manufacturing production environment,

25  working as a supervisor of hourly

42

ROSE

1
2 employees is a job that's one that's
3 really very critical, it's probably one
4 of the key jobs at the plant site.  So
5 I told him I thought that was a good
6 opportunity for him to go through and
7 learn and grow and I remember having
8 that discussion with him.
9     Q.     Do you know how many chemists
10 at Wyeth have held that position in the
11 past?
12     A.     Chemists?
13     Q.     Yes.
14     A.     I wouldn't know how many
15 chemists, I know that someone that had
16 a chemical engineering degree held that
17 position.
18     Q.     Who was that?
19     A.     Cara Muscolo, M-U-S-C-O-L-O.
20     Q.     When did she hold that
21 position?
22     A.     I don't remember the year she
23 was -- I do recall she was -- she has a
24 bachelor degree in chemical engineering
25 from Purdue University and she was a

43

ROSE

1

2    packaging supervisor.

3        Q.    Is she still with the

4    company?

5        A.    Yes.

6        Q.    What position does she hold

7    today?

8        A.    Today her title is probably

9    something like project manager.  She is

10   on a special assignment in Pearl River

11   working with consumer health business.

12       Q.    How long has she been with

13   the company?

14       A.    I don't remember what year

15   she was hired.

16       Q.    Do you know if it's been ten

17   years, 20 years, 50 years?

18       A.    I know it's not 20 or 50.  I

19   really don't recall.

20       Q.    Do you know if that was her

21   first position when she came to Wyeth.

22       A.    Yes, it was.

23       Q.    Did you have a conversation

24   with Mr. Henry as to what affected the

25   decision to transfer him to packaging

45

ROSE

1

2     Q.     Was Mr. Henry ever evaluated

3  on a mid-year basis during his entire

4  employment with Wyeth prior to 2003?

5     A.     If he was an employee of the

6  consumer health group prior to 2003 he

7  would have received mid-year reviews,

8  or discussions at mid-year.

9     Q.     Would these reviews have been

10  in writing?

11     A.     Our mid-year -- I can't say

12  whether his was or not, our mid-year --

13  I can give you how we do it mid-years.

14     Q.     Sure.

15     A.     At the company if you would

16  like.

17     Q.     Sure.

18     A.     Basically a mid-year

19  discussions -- takes place with

20  employees.  It does not have to be

21  written.  There is not a number

22  assigned to that mid-year discussion,

23  some groups do a written mid-year

24  review, and some managers choose to

25  just have the discussion.

# EXHIBIT  4

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Index No. CV 8106

- - - - - - - - - - - - - - - - - - - - - - - - - -x

HOWARD HENRY,

                              Plaintiff,

        - against -

WYETH PHARMACEUTICALS, INC., WALTER

WARDROP, ANDREW SCHASCHL and MICHAEL

McDERMOTT,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -x

                         July 25, 2006.

                         10:25 a.m.


                    Deposition of PETER T.

BIGELOW, Non-Party Witness, taken by

the Plaintiff, pursuant to Notice, held

at the offices of Orrick, Herrington &

Sutcliffe, LLP, 666 Fifth Avenue, New

York, New York, before Brian Glickman,

a Shorthand Reporter and Notary Public

of the State of New York.

22

BIGELOW

2     A.     I held it until November of
3  2003, at which time I was temporarily
4  assigned to a different job and
5  somebody took on my position while I
6  was away in the next position.

7     Q.     Who took your position?

8     A.     Germain, G-E-R-M-A-I-N,
9  Morin, M-O-R-I-N, who was the plant
10 manager in in the Montreal plant.

11    Q.     This temporary assignment
12 that you had, was that within Wyeth
13 Pharmaceuticals?

14    A.     Yes.

15    Q.     Did it have anything to do
16 with the Pearl River operation?

17    A.     Yes, it was to move -- to run
18 the Pearl River site full-time.  That's
19 the entire site, meaning both the
20 Centrum manufacturing and the vaccine
21 manufacturing operation.

22    Q.     How long did you act in this
23 temporary capacity?

24    A.     About 15 months.

25    Q.     What position did you hold

25

BIGELOW

1

2    A.    I don't exactly recall, but

3    he either -- either just knocked on my

4    door and came into my office or made an

5    appointment through my secretary.  I

6    don't exactly remember how that

7    happened.

8    Q.    Did you have a meeting with

9    him?

10    A.    Yes.

11    Q.    How long did the meeting

12    last?

13    A.    I don't recall.

14    Q.    Was it a matter of minutes --

15    A.    It was probably, you know, in

16    the half-hour range.

17    Q.    And what was discussed in in

18    meeting?

19    A.    The first time I ever met

20    Howard?

21    Q.    Yes.

22    A.    I don't really remember the

23    exact conversation.  I know it had to

24    do with him expressing to me, you know,

25    some unhappiness with his performance

26

BIGELOW

1
2 appraisal.

3      Q.    Do you recall what he

4 indicated he was unhappy about with

5 respect to his performance appraisal?

6      A.    He was unhappy with his

7 rating, and he did say he was unhappy

8 with the appraisal itself.

9      Q.    Did he indicate how his

10 appraisal was compared to prior

11 appraisals; do you recall?

12      A.    I don't recall.

13      Q.    Do you recall in this first

14 meeting his discussing discrimination

15 at all?

16      A.    Not in the first meeting we

17 had.

18      Q.    By the way, did you have the

19 opportunity to review the transcript of

20 Mr. Henry's deposition prior to your

21 testifying today?

22      A.    Transcript, I'm not sure

23 whether that's privileged information

24 or not.

25           MR. MCQUADE:   You can answer

30

**BIGELOW**

1
2  expressed them to you other than the
3  question of discrimination?
4      A.    Yes.  He asked me to review
5  his appraisals.  I did that.  He asked
6  me to talk to his supervisors and not
7  only did he ask me to, it kind of made
8  sense for me to kind of understand a
9  little bit.  He was obviously somebody
10 who was pretty upset over his
11 situation, so I wanted to understand
12 the background a little bit, so yes, I
13 did some, you know, looking in to it.
14     Q.    Do you recall who you spoke
15 to?
16     A.    Mike McDermott and Andy
17 Schaschl.
18     Q.    Did you speak to Mr.
19 McDermott and Mr. Schaschl together or
20 separately?
21     A.    I think I spoke to Mr.
22 McDermott separately and then the two
23 of them together, but I'm not exactly
24 positive, but I think that's the way it
25 went.

32

BIGELOW

1
2  little bit about the background of the
3  situation and they did that.
4       Q.    Did they indicate to you that
5  they had any problem with Mr. Henry or
6  his performance?
7       A.    That's not really clear.
8  They told me a little bit about his
9  performance but I wouldn't characterize
10 it as a problem, necessarily.
11      Q.    What did they tell you?
12      A.    That he was -- you know, that
13 he was a person that had performed kind
14 of middle of the road, you know, wasn't
15 meeting all of his objectives, met a
16 number of them, you know, did well in
17 some areas and did not so well in some
18 areas.  His performances were kind of
19 middle of the road and not stellar but
20 they had been working with him and
21 trying to make improvements.
22      Q.    You indicated that at some
23 point you received an e-mail from Mr.
24 Henry that raised the issue of
25 discrimination?

33

BIGELOW

1

2      A.      Yes.

3      Q.      I'm going to show you a

4  document that's been previously marked

5  as Henry Exhibit 18, and I would ask

6  you if that is a copy of the e-mail

7  that you were speaking about?

8      A.      Yes.

9      Q.      When you received this e-mail

10 from Mr. Henry, did it cause you

11 concern?

12     A.      Yes.

13     Q.      And what did you do in

14 response to receiving this e-mail?

15     A.      I asked that our head of

16 human resources on the site give some

17 advice as to how we had to look into

18 this.

19     Q.      Who was the head of human

20 resources?

21     A.      It was Donna Grantland,

22 G-R-A-N-T-L-A-N-D.

23     Q.      And did Ms. Grantland have a

24 conversation or conversations with you

25 about how to treat this matter?

34

1                    BIGELOW

2       A.    I'm sure we did.

3       Q.    Do you recall any specific

4  conversations?

5       A.    I really don't.  I mean we

6  had conversations -- a lot of

7  conversations all day long about a lot

8  of things and I'm sure this was one we

9  had conversations about.

10      Q.    As a result of any possible

11 conversations you had with anyone, did

12 you reach an understanding as to what

13 should be done in response to this

14 e-mail?

15      A.    Yeah, we decided to have kind

16 of the corporate HR department notified

17 of this allegation and we decided that

18 it should be investigated by somebody

19 outside the site who was impartial and

20 not involved in this case in any way.

21      Q.    Was someone from corporate HR

22 notified?

23      A.    Yes.

24      Q.    Who was notified?

25      A.    Certainly two people were

35

BIGELOW

1
2  notified.  Ann Judge who is our head of
3  HR for the whole manufacturing
4  organization was notified.  You know,
5  she's the only one that I'm sure would
6  have been notified.  I really don't
7  recall who else would have been.
8      Q.    Do you recall anyone else who
9  might have been notified because you
10  seem to have someone in your mind?
11     A.    I think we would have
12  notified, but I don't know for sure
13  Michael Dougherty who was head at the
14  time of labor relations, but I don't
15  know for sure whether I talked to Mike
16  or I would have expected Ann to or
17  whether he was definitely notified or
18  not, so --
19     Q.    Did you have a conversation
20  with Ms. Judge about Mr. Henry?
21     A.    I'm almost positive I did,
22  yeah.
23     Q.    Do you recall the sum and
24  substance of that conversation?
25     A.    Just filled her in on what I

36

### BIGELOW

1

2 knew of the situation and, you know,

3 got her advice and suggested that we

4 identify somebody that could do an

5 investigation around this.

6      Q.     Do you recall what her advice

7 was?

8      A.     I think what she suggested

9 was that she wanted to get back to me

10 and let me know who could be available.

11 I think her advise was, yes, it sounds

12 like something we should investigate.

13 So both she and I and Donna Grantland

14 felt this was a fairly serious

15 allegation and one we should

16 investigate and look into.

17      Q.     Was Mr. Henry, ever made

18 aware of your efforts in this regard?

19      A.     To investigate it?

20      Q.     Yes.

21      A.     Yes.

22      Q.     How did he find that out?

23      A.     I called him and told him

24 there was going to be an investigation

25 into this.

37

1                    BIGELOW

2      Q.      Did you tell him that

3   corporate was involved, corporate HR?

4      A.      You know, corporate it's not

5   -- you know it's division, it's not

6   corporate that's kind of not a term we

7   use, but I told him it would have been

8   somebody from outside of Pearl River.

9   I'm sure.

10     Q.      Was someone from outside of

11  Pearl River assigned to do an

12  investigation?

13     A.      Yes.

14     Q.      Who was that?

15     A.      His name is Eugene Sackett,

16  S-A-C-K-E-T-T.

17     Q.      And who is Mr. Sackett?

18     A.      He works in the HR department

19  and I don't know what the -- what his

20  title would be, but he's been involved

21  in investigating things in the past and

22  so he's somebody that's made available

23  for this kind of a situation.

24     Q.      Do you know if he conducted

25  an investigation?

38

BIGELOW

1

2      A.      Yes, he did.

3      Q.      Do you know what he did in

4  conducting an investigation?

5      A.      I know he interviewed a

6  number of people that were involved in

7  the case including Howard himself.

8      Q.      Do you know who else he

9  interviewed?

10      A.      I don't know all the names.

11  I know some.  I know he talked to Mike

12  McDermott, Andy Schaschl, Walter

13  Wardrop, Donna Grantland, probably Joe

14  Vitanza too, V-I-T-A-N-Z-A.

15      Q.      As a result of Mr. Sackett's

16  investigation, was a report generated?

17      A.      There was a report -- he did

18  report back to me on the investigation.

19      Q.      Did he provide a written

20  report?

21      A.      He provided me with a set of

22  notes.  I don't recall ever seeing a

23  written kind of narrative report but

24  certainly he provided me with a set of

25  his notes.

39

BIGELOW

1

2          MR. MORELLI:   If there are

3     any notes that exist that we don't

4     have, we would call for their

5     production.

6          I don't know if you turned

7     over any notes.

8          (Information requested.)

9          MR. MCQUADE:   We have

10    produced whatever notes we've been

11    able to find.

12    Q.    Do you recall the sum and

13 substance of Mr. Sackett's findings

14 with respect to the investigation?

15    A.    Yes, he told me he found no

16 evidence of racial discrimination.

17    Q.    Does Mr. Sackett still work

18 for Wyeth?

19    A.    I understand he doesn't.  I

20 don't know that absolutely for a fact

21 but somebody told me recently that he

22 has left the company.

23    Q.    Any understanding as to where

24 he went?

25    A.    No.

43

BIGELOW

1   he was upset?

2       A.    Yes.

3       Q.    That was prior to the

4   conclusion of the investigation?

5       A.    Yeah, that was before the

6   investigation even started, yes.

7       Q.    And what was his concern?

8       MR. MCQUADE:    Objection.

9       A.    He was slated to be

10  transferred to a position at the same

11  level he was at in the organization

12  which he did not really want to take

13  which was supervisor of packaging, so

14  he was going to be moving from project

15  engineer to packaging supervisor and as

16  far as I remember they are the same

17  level in the corporation, so it wasn't

18  a demotion but it was a transfer, that

19  he did not want to take that transfer.

20      Q.    Do you know how this transfer

21  came about?

22      A.    I know a little bit about it,

23  not a lot about it because it happened

24  before we got it.

44

BIGELOW

Q.    Could you tell us, please?

A.    We did have a program called Organizational Cascade, and what it was was that the leadership level for our manufacturing organization.  We came up with some principles about the way we should organize ourselves, and then we cascaded those principles down to each of the plants.

So each of the plants, kind of did a reorganization, moved, you know, combined some jobs, eliminated some jobs, you know -- and it ended up being quite a bit of movement of people in each one of the plants, so this organization cascade which took place at Pearl River, which I wasn't intimately involved with, was a reorganization and out of that was a recommendation that Howard be moved from a project engineering role he was in to a supervisor of packaging role.

Q.    Do you know prior to this proposed transfer if any chemist had