# EXHIBIT  5

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Index No. CV 8106

5  ------------------------------------------x

6  HOWARD HENRY,

7                          Plaintiff,

8         - against -

9  WYETH PHARMACEUTICALS, INC., WALTER

10  WARDROP, ANDREW SCHASCHL and MICHAEL

11  McDERMOTT,

12                          Defendants.

13  ------------------------------------------x

14                     July 25, 2006

                       11:35 a.m.

15

16           Deposition of MICHAEL

17  McDERMOTT, taken by the Plaintiff,

18  pursuant to Notice, held at the offices

19  of Orrick, Herrington & Sutcliffe, LLP,

20  666 Fifth Avenue, New York, New York,

21  before Brian Glickman, a Shorthand

22  Reporter and Notary Public of the State

23  of New York.

24

25

26

1                    McDERMOTT

2    New Jersey, L-E-O-N-I-A.

3         Q.     Did you have any interaction

4    with Pearl River during these years?

5         A.     No, the sporadic call for,

6    you know, help, but no, no formal

7    oversight of Pearl River during that

8    time.

9         Q.     After this position as vice

10   president of operations of Solgar, what

11   position did you hold?

12        A.     The next position I held was

13   vice president manufacturing services

14   in Madison, New Jersey.

15        Q.     How long did you hold that

16   position?

17        A.     Approximately a year and a

18   half.

19        Q.     After holding that position,

20   what position did you hold next?

21        A.     The next position was site

22   managing director for Wyeth's Pearl

23   River facility.

24        Q.     When did you attain that

25   position?

McDERMOTT

1

2      A.      It would be approximately

3   four years ago.  So that would make it

4   2002.

5      Q.      How long did you hold that

6   position?

7      A.      For approximately a year and

8   a half.

9      Q.      What position did you hold

10  after that position?

11     A.      My current position managing

12  director vaccines, Wyeth, Pearl River.

13     Q.      And when did you attain that

14  position 2004?

15     A.      That was February of 2004,

16  correct.

17     Q.      As the site managing director

18  of Pearl River, what were your duties?

19     A.      As the site managing director

20  I was responsible for our

21  pharmaceutical production facility, our

22  consumer health production facility,

23  and we refer to it as site services, so

24  engineering, HR, materials and supply,

25  purchasing, finance, and I'm sure a few

McDERMOTT

1

2    attention to the plaintiff Howard

3    Henry, when did you first become aware

4    of Mr. Henry in any way?

5        A.    If you would please --

6        Q.    In any way?

7        A.    I couldn't put a date to it,

8    but my first recollection of meeting

9    Howard was on the production floor,

10   during a tour of the production area,

11   and meeting him just informally in the

12   production facility.

13       Q.    Do you recall what position

14   you held when you met Mr. Henry on the

15   production floor?

16       A.    Site managing director.

17       Q.    So prior to attaining the

18   position of site managing director you

19   had no interaction with Mr. Henry?

20       A.    That is correct.

21       Q.    Did there come a time when

22   you supervised his work at all?

23       A.    There had never been a time

24   where I directly supervised Howard's

25   work, no.

32

McDERMOTT

1

2      Q.     Did there ever come a time

3  where you directly participated in the

4  preparation of his performance

5  appraisals?

6      A.     No, there is not.

7      Q.     Did you at any time

8  participate in the cascade plan of

9  putting employees in particular

10  positions?

11      A.     My role in the organization

12  cascade process was to -- was formal

13  involvement in my direct reports.  So I

14  did participate in that, not only

15  participate but drive that effort for

16  my directs, it was my directs who

17  managed that for the next level in

18  their organization.

19      Q.     What is this organizational

20  cascade process, can you explain it to

21  us?

22      A.     The organization cascade

23  process was a corporate initiative

24  program that was expected from all the

25  manufacturing sites worldwide for Wyeth

33

McDERMOTT

1
2   and the approach was to be sure that we

3   had -- the primary approach was to

4   ensure we had organization focus on the

5   manufacturing areas.  When I say

6   manufacturing, packaging, the functions

7   of making products for our customers.

8       Q.    Is this an ongoing process or

9   a process that was during a particular

10  time period, how did that work?

11      A.    It was a formal process again

12  directed by corporate, but it is an

13  inherent ongoing process as part of

14  good management.

15      Q.    Do you recall when you first

16  heard the term "organizational cascade

17  process" while at Wyeth?

18      A.    I couldn't even guess.  It

19  was during my employment as site

20  managing director.

21      Q.    Do you know if prior to the

22  time you were a site managing director

23  they had an organizational cascade

24  process at Wyeth?

25      A.    I'll restrict my answer to

34

McDERMOTT

1. 

2  Wyeth Pearl River, which I'm primarily

3  aware of, and during that time in

4  particular my previous manager Steve

5  white, that I had indicated earlier.

6  He did not call it organization

7  cascade, but we used a similar process

8  at that time and as a matter of fact my

9  assignment as department head was part

10  of Steve's process for his approach.

11     Q.    In this organizational

12  cascade process, did you have anything

13  to do with putting Mr. Henry in the

14  position that he was slated to take

15  over?

16     A.    In the organizational process

17  I did not have direct involvement in

18  Howard's assignment to packaging.  My

19  involvement in the process was an

20  awareness that the process was

21  happening and final, if you will,

22  administrative approval of the changes.

23     Q.    So any change with respect to

24  the Pearl River plant during this time

25  period would have to be approved by

36

McDERMOTT

1
2  meeting was held shortly thereafter on
3  my calendar when my administrative
4  assistant was able to schedule that.
5      Q.    And so you had two meetings
6  with Mr. Henry with respect to this
7  proposed change in his employment?
8      A.    I had two meetings with Mr.
9  Henry regarding this -- regarding this
10  change and his performance review.
11      Q.    At the first meeting what was
12  discussed?
13      A.    At the first meeting Howard
14  came to my office and discussed two
15  issues that he had regarding his
16  employment at Wyeth.  One was that he
17  disagreed with his rating, which was a
18  three rating out of a five scale
19  system, three rating being meeting
20  expectations.  He strongly believed
21  that he deserved a four rating which is
22  exceeding expectations, and his second
23  concern was that he was being assigned
24  to the packaging supervisor position as
25  part of the organization cascade.

37

McDERMOTT

1

2      Q.      During this first meeting,

3  did Mr. Henry show you his prior

4  performance appraisals at Wyeth?

5      A.      He did not.

6      Q.      Did he indicate to you that

7  he had been previously rated a four?

8      A.      He did.

9      Q.      And did he tell you that he

10  had been previously rated a four on the

11  two performance appraisals prior to the

12  one he was complaining about?

13      A.      That's correct.  Howard did

14  share with me that he had received a

15  four in the two years prior to the

16  current year three rating.  That's

17  correct.

18      Q.      Did he indicate to you in

19  this meeting why he felt he deserved a

20  four?

21      A.      Yes.

22      Q.      What did he say?

23      A.      Howard felt that based on his

24  role being the same, so it is my

25  recollection that he had the same role

39

McDERMOTT

2  his mind it did not meet his career

3  goals, and that it was a step backwards

4  for him in terms of his employment.

5      Q.    Did you respond to his

6  concerns?

7      A.    I did respond.

8      Q.    What did you say?

9      A.    I indicated to Howard that

10  the packaging supervisor position was

11  an important part of his development at

12  Wyeth, so that he could gain direct

13  supervisory experience as part of

14  his -- I won't say training, but as

15  part of his development for future

16  roles within the company.

17      Q.    Did he indicate to you at

18  either the first or the second meeting

19  that he felt that as an African

20  American he would have a very difficult

21  time explaining this position on his

22  resume?

23      A.    I can't say those were his

24  exact words.  I can say that the spirit

25  of it, of that this change would impact

40

McDERMOTT

1
2  his career goals were an issue for him.

3          My response to Howard at the

4  time was given that Wyeth's a very

5  diverse site I would be concerned if

6  that was an issue and if he had an

7  issue he should share that with me.

8      Q.    Would it be fair to say that

9  he raised the issue of his race in one

10  of those meetings with you?

11      A.    I never had the sense that

12  Howard raised the issue of race and

13  even when I took it to the next step

14  and asked him it is a diverse site is

15  this a concern for you, he did not

16  raise any concerns regarding race to me

17  during either of the two meetings.

18      Q.    Why would you say to him

19  "this is a diverse site" if he didn't

20  raise the issue of race himself?

21      A.    The reference to, and again I

22  can't say his wording, but his

23  reference to as an African American

24  versus as a production, you know,

25  engineer, this was an issue for him,

41

McDERMOTT

1

2 that's why I brought up the issue of

3 diversity -- the point of diversity.

4      Q.    So it is a fact that he did

5 raise the issue himself of being

6 African American and this might have an

7 impact upon him because he is an

8 African American?

9      A.    He did not go -- he did not

10 go that far and make that statement.

11      Q.    Let me break it down then.

12      A.    Sure.

13      Q.    Did he indicate to you at any

14 time that he was an African American,

15 verbally?

16      A.    Again I cannot confirm that

17 the words African American was his

18 statement at the time.  I can say to

19 you that for me to volunteer a response

20 about diversity that I did get the

21 point that he was referring to that.

22      Q.    So your indication that Wyeth

23 is a diverse place must have been as a

24 result of his raising concerns with

25 respect to his race?

42

McDERMOTT

1

2      A.      No.   Howard, in our meetings,

3  did not formally say to me he had an

4  issue with race regarding his rating or

5  his assignment.  He clearly made some

6  reference to his race for me to have

7  suggested it, it is a diverse site and

8  if there's any issues I would want to

9  know about it.

10      Q.      And you were the site

11  director at this point that he had this

12  meeting with you?

13      A.      That is correct.

14      Q.      Did you look into the issue

15  of whether or not Howard's race played

16  a role in his being positioned as

17  packaging supervisor after this meeting

18  or these meetings with him?

19      A.      I did not pursue Howard's

20  assignment based on a diversity issue

21  because Howard didn't raise it to me as

22  a diversity issue.  However, I did

23  follow-up regarding Howard's reviews

24  which he requested that I take a look

25  at, which I did, his three years of

43

McDERMOTT

reviews, and for him -- and his request
for me to look at his assignment to
packaging whether or not that --
whether there was anything I could do
and I did follow-up on those two
things.

Q.    With respect to his three
reviews, did you make any determination
after you had looked at his three
reviews?

A.    Reviews you make plural,
review, one, three and two, four, just
to restate your question.

Q.    I'm talking about the three
years of reviews?

A.    I'm sorry, three years.

Q.    Three years of reviews?

A.    I did review Howard's three
years of reviews, correct.

Q.    And as a result of reviewing
those three years of reviews, did you
come to any conclusion yourself?

A.    My conclusion after reviewing
Howard's reviews, for the three-year

44

McDERMOTT

1

2   period, was that his ratings in all

3   three years were justified and in

4   particular his issue with the

5   third-year three review, the three

6   rating in particular, I felt that that

7   was a fair rating as again meets

8   expectations.  Given that his manager

9   at the time had done a mid-year review

10  with Howard, which I did review as part

11  of his review for that year of the

12  three rating, and based on the mid-year

13  review based on the projects that were

14  highlighted to Howard that needed to be

15  completed by year end, and based on the

16  results that not all those projects

17  were completed on time, I felt that an

18  at expectations was not only -- it was

19  not only fair but a reasonable rating

20  given that in a couple of respects he

21  did not even meet expectations from his

22  mid-year review of his manager.

23       Q.    Did you have any discussions

24  with his manager in making this

25  determination that these ratings were

46

1                      McDERMOTT

2         A.      It was Joanne Rose.

3         Q.      Wasn't she the manager of the

4    entire human resources department?

5         A.      That's incorrect, Joanne was

6    responsible for the employees in the

7    consumer health group.  She was not the

8    HR director for the site, that was

9    another individual.

10        Q.      Were there any other HR

11   representatives under Ms. Rose that

12   dealt with this area?

13        A.      There were not that I am

14   aware of.

15        Q.      Do you know if it's common

16   procedure to do a mid-year review on an

17   employee of Mr. Henry's status at

18   Wyeth?

19        A.      I'll answer your question in

20   general, that mid-year reviews are

21   encouraged for all employees, and it

22   would not have surprised me that Mr.

23   Henry received a mid-year review as did

24   many of the employees at the time.

25        Q.      Do you know if Mr. Henry had

47

McDERMOTT

1  

2  received a mid-year review at Wyeth

3  prior to this particular mid-year

4  review ever?

5     A.    I'm not aware because I

6  didn't ask for it nor did I review any

7  mid-year reviews of Howard prior to

8  this year in question.

9     Q.    Did you think it might be

10  unusual that a mid-year review was

11  being done for Mr. Henry after he had

12  rated a four the year prior?

13     A.    It does not surprise me at

14  all that Mr. Henry was -- went through

15  a formal mid-year review process.  It

16  is a process we encourage for all

17  employees.

18     Q.    Do you know or did you have

19  any discussions with anyone concerning

20  changing Mr. Henry's performance

21  appraisal for this particular year?

22     A.    I'm sorry, could you restate?

23     Q.    Sure.

24     At any time during this

25  period, were there any discussions that

48

McDERMOTT

involved you concerning changing Mr.

Henry's performance appraisal for this

particular year?

        A.      Yes.

        Q.      With whom did you have such

discussions?

        A.      First the -- the first

discussion about this was with Howard

himself.  I encouraged Howard in our

first meeting when he had concerns with

his rating that it's every employee's

right to disagree with the rating and

put it in writing and provide any

supporting documentation that would

help us make that decision, which I

encouraged him to do.

            After reviewing his three

years of reviews and discussions with

Joanne Rose and Andy Schaschl, it was

Joanne and I who suggested that we

incorporate some of Howard's comments

regarding his comments rebuttal, if you

will, regarding his review into a

modified review.

50

1                        McDERMOTT

2   yourself with respect to why this

3   particular performance appraisal should

4   be changed?  Did the three of you feel

5   it was unfair, the original performance

6   appraisal?

7        A.    We did not feel it was unfair

8   which is why the three rating stood.

9        Q.    But you felt the three of you

10  felt that it should be modified to

11  include Mr. Henry's comments?

12            MR. MCQUADE:    Objection.

13       Q.    Is that an accurate

14  statement?

15       A.    That's not an accurate

16  statement.

17       Q.    The discussion that was held

18  between yourself, Mr. Schaschl and Ms.

19  Rose resulted in a decision being made

20  that the performance appraisal should

21  be modified; is that correct?

22       A.    The outcome of our discussion

23  was that the performance review would

24  be modified, correct.

25       Q.    And as a result of those

56

McDERMOTT

1

2    A.    I did address his concerns at

3    the meetings with him, and in

4    particular his -- and in particular his

5    -- well, we'll start with his feeling

6    that he already manages people as a

7    project engineer.

8         What I shared with Howard at

9    the time was, yes, indeed as a project

10    engineer you do involve and direct the

11    activities of many individuals, he's

12    not formally in a management or

13    supervisory position and as such

14    doesn't have experience in that role in

15    performance management, salary,

16    development plans for an individual.

17         So I agree with him, he does

18    have some management experience in his

19    current role, but that the packaging

20    supervisor position would give him that

21    formal supervisory experience that

22    would be very beneficial to his career.

23         The second being on whether

24    or not packaging was a demotion for him

25    or not, I felt that that was -- maybe

57

McDERMOTT

1

2    more to his point packaging was an

3    entry position and packaging.

4         My response to him was

5    packaging can be an entry position as

6    being any other job, that packaging is

7    a critical part of the work we do.

8    It's the area closest to our customer

9    and it's an area that I felt that

10   Howard's background, as a project

11   engineer, he could really benefit our

12   packaging facility at the time, so I

13   really felt this was a good thing for

14   his career and his development.

15        Q.    Did you share with him that

16   when you started in the field that you

17   had started in packaging?

18        A.    I didn't need to share that

19   with Howard, he knew that I started in

20   packaging and we did talk about that.

21        And again for me it was just

22   luck or whatever that is, where I

23   started that doesn't mean work in the

24   packaging area is only for first time

25   folks in the organization.  It is a

58

1    McDERMOTT
2    critical step in the process.
3        Q.    In your experience at Wyeth
4    and its predecessors, can you recall
5    any instance where a chemist or a
6    chemical engineer was asked to be a
7    packaging supervisor in the Pearl River
8    facility?
9        A.    Yes, I am aware of chemical
10    engineers being packaging supervisors.
11        Q.    Who?
12        A.    One in particular I can
13    recall is Heidi Zeck, Z-E-C-K, and
14    I'm --
15        Q.    When did Ms. Zeck serve in
16    that position?
17        A.    Heidi -- I'd be guessing but
18    '94, '95.
19        Q.    Is Heidi still with the
20    company?
21        A.    She is not.
22        Q.    Do you know when she left
23    Wyeth or its predecessor?
24        A.    A couple of years later, so
25    '96 perhaps.

# EXHIBIT  6

EEOC FORM 131

# U.S. Equal Employment Opportunity Commission

| Director of Human Resources<br>WYETH PHARMACEUTICALS<br>401 North Middletown Road<br>Pearl River, NY 10965 | PERSON FILING CHARGE<br><br>**Howard Henry** |
|---|---|
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>160-2005-00013 |

## NOTICE OF CHARGE OF DISCRIMINATION
### (See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act        [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act        [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **22-OCT-04** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **22-OCT-04** to **Michael Bertty, ADR Coordinator, at (212) 336-3646**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Pedro A. Hernandez,<br>Investigator<br><br>EEOC Representative<br><br>Telephone: **(212) 336-3760** | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [X] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [ ] RETALIATION   [ ] OTHER

See enclosed copy of charge of discrimination.

| Date<br><br>Oct 01, 2004 | Name / Title of Authorized Official<br><br>Spencer H. Lewis, JR,<br>Director | Signature |
|---|---|---|

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | ☐ FEPA | |
| | X EEOC | 160-2005-0001 |

**New York State Division of Human Rights**

*State or local Agency, if any*    and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | | | TELEPHONE (Include Area Code) |
|---|---|---|---|
| Mr. Howard Henry | | | (845) 352-6531 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY | DATE OF BIRTH |
|---|---|---|---|
| 29 North Brook Road | Hillcrest, New York 10977 | Rockland | 12/3/68 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Wyeth Pharmaceuticals, Inc. | more than 15 | (845) 602-5000 |

| WORKPLACE ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 401 North Middletown Road | Pearl River, New York 10965 | Rockland |

| EXECUTIVE OFFICE ADDRESS | CITY, STATE AND ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|
| 5 Giralda Farms | Madison, New Jersey 07940 | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

X RACE    X COLOR    ☐ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN

☐ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 12/01 | Present |

X CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Please see attached rider.

2004 SEP 24 PH 2: 06

EEOC-NYDO

X I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY (when necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct

SIGNATURE OF COMPLAINANT

09/24/2004

DATE 09/24/04    Howard Henry
Charging Party (signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year) 24 day of Sept 2004

NY0C 289 387208

*Phyllis Talisman*

PHYLLIS TALISMAN
No. 01TA5040419
Notary Public, State of New York
Qualified in Rockland County
My Commission Expires Feb. 16, 2006

## RIDER TO EEOC CHARGE OF DISCRIMINATION

### Howard Henry v. Wyeth Pharmaceuticals, Inc.

1.        I am African-American and I am currently employed as a Production Engineer by Wyeth Pharmaceuticals, Inc. ("Wyeth"). Beginning in 2001 and continuing through the present, Wyeth has denied me a series of promotions and demoted me based on my race and color, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the New York State Human Rights Law ("Human Rights Law"), N.Y. Exec. Law § 290, *et seq.*

2.        I began working for Wyeth in 1992 on a temporary basis. In 1993, based on my B.S. in physical science and my excellent work performance, Wyeth hired me on a permanent basis as a Chemist in its Chemical Process Research and Development Kilo Laboratory.

3.        I hoped to work my way up through the company and eventually obtain a management position. In 1997, I obtained a B.E. in chemical engineering to further my career at Wyeth. That same year, I received a merit promotion, a corresponding five per cent raise, and a Special Recognition Award for my work in chemical processing. In 2000, I received a promotion to my current position as a Production Engineer in the Lederle Consumer Health Division ("LCH").

4.        Walter Wardrop, formerly the Associate Director of LCH and my supervisor, gave me extremely positive and detailed performance evaluations in 2000, 2001, and 2002. In 2000, I received an overall rating of three on a scale of one through five, with five being the highest. In 2001 and 2002, I received overall ratings of four. The evaluations stated that I exceeded expectations, completed projects on time, had commendable multi-tasking skills, worked extra hours to complete assignments, and responded to calls for assistance during the night and on weekends. The 2002 evaluation was signed by both Mr. Wardrop and Andrew Schaschl, formerly the Director of LCH

Manufacturing. Throughout 2003, I received emails from Mr. Wardrop praising my performance and noting my quick responses to problems, along with my quick turnaround on projects.

5.      Despite my success and experience, I have been unable to advance at Wyeth based on my race and color. In December 2001, I applied for a position as a Project Engineer. The position was given to Cara Muscolo, a white employee who eventually obtained a management position.

6.      In July 2002, I applied for a position as a Production Coordinator in LCH. The position was given to Chris DeFeciani, a white employee without an engineering or science degree. Mr. Schaschl informed me that Mr. DeFeciani received the position, because he had filled the role on a temporary basis in the past. In April 2003, the Production Coordinator position became available on a temporary basis. I expressed interest in the temporary opening, but it was awarded to Richard Morgan, a white employee without a degree. When I asked Mr. Wardrop about the promotion denial, he stated it was a good opportunity for Mr. Morgan "to show what he [could] do." When I responded that I too would like "to show what I can do," Mr. Wardrop dismissed the matter and stated that "they," referring to Mr. Schaschl and others, had made the decision.

7.      In January 2004, I applied for a position as a Process Engineer in Wyeth's Vaccines Division, but was denied the position. That same month, I applied for a position as a Staff Engineer in the Bioprocess Development Department. I received no response from Wyeth, other than a confirmation of my application. There were two Staff Engineer openings and they were both awarded to white employees.

8.      Immediately after I began questioning the promotion denials, which first occurred in the spring of 2003, my supervisors began criticizing my work performance. In 2003, I received a

2

mid-year performance evaluation. Mr. Wardrop asserted that there were times when I could not be reached on my pager. I responded that numerous Wyeth employees had experienced problems with their pagers. Mr. Wardrop next asserted that, on one occasion, I took too long to get a shot at the nurse's office. On several occasions when Mr. Wardrop knew I was out sick, Mr. Wardrop would ask other employees if they knew where I was.

9.     In December 2003, I received my fourth annual evaluation from Mr. Wardrop. Mr. Wardrop gave me an overall rating of three and complained that I completed assignments late. Although he had been supervising me for four years, Mr. Wardrop stated that he had trouble evaluating me, because I had not handed in a self-evaluation. I had been unable to complete the self-evaluation by its due date, because I had to take on the job duties of two other employees and then was out of work on my honeymoon. When I returned, which was two months prior to the December 2003 performance evaluation and only six days after the due date, I asked if I should hand in the self-evaluation. Mr. Wardrop said no.

10.     During the 2003 evaluation, Mr. Wardrop explained that there was a difference at Wyeth between others' "perception and the reality" of me. He stated that I was perceived as someone who completed projects late and this perception affected my position under an "organizational cascade" occurring at Wyeth. He informed me that I would be demoted to a Packaging Supervisor, a position that requires neither a degree nor my level of skill or experience. Mr. Wardrop also informed me that the perception of lateness was the reason that I had been denied more favorable positions in the organizational cascade.

11.     The Packaging Supervisor position required that I do little more than stand on an assembly line all day. On January 5, 2004, I met with Derek Burt, who was to be my new supervisor. Mr. Burt informed me that my name had been available in the organizational cascade. He stated that,

3

although he was pleased to have me in his division, he had not chosen me.

12.     Mr. Wardrop expressed conflicting reasons for the demotion to Packaging Supervisor and my performance evaluation. On January 5, 2004, Mr. Wardrop informed me that he had never made any comments about me completing projects late and stated that the 2003 performance evaluation and my new assignment had nothing to do with each other. Mr. Wardrop also refused to change my evaluation. On January 7, 2004, I met with Mr. Wardrop who stated that he wanted "to be honest" with me. He explained that Mr. Burt had worked very hard to have me made a Packaging Supervisor that he, Mr. Wardrop, had gone out of his way to ensure that Mr. Burt would not place me on a midnight shift. He stated that he had given the matter a lot of thought and wanted to resubmit my performance evaluation. Although the revised evaluation did not contain allegations of lateness on projects, unlike my prior evaluations, it is very short and implies that I am merely an average employee.

13.     On January 9, 2004, I met with Mr. Schaschl regarding my performance evaluation and demotion. He stated that he had a problem with my multi-tasking skills and that it was necessary for me to obtain supervisory experience as a Packaging Supervisor. I have never had a problem with multi-tasking and numerous white employees have obtained management positions without prior supervisory experience. In addition, I oversee operators in my current position. When I asked Mr. Schaschl why the temporary Production Coordinator position was given to Mr. Morgan in the spring of 2003, Mr. Schaschl responded that Mr. Morgan had filled the position in the past. However, I was never given the same opportunity to temporarily fill the position.

14.     Joanne Rose in Human Resources later informed me that my negative performance evaluation and my alleged problems with multi-tasking were factors in determining my new position. Before I met with Ms. Rose, Mr. Wardrop stopped me and apologized that "things got so bad."

4

15.    On January 13, 2004, I met with Michael McDermott, the Managing Director of the site, who stated that I had been given a new position, because he was opposed to employees being in one job for too long. He stated that he and Mr. Schaschl were responsible for the demotion. Mr. McDermott stated that he would get back to me about the demotion within one week, but never did. I later contacted Mr. McDermott, because he did not get back to me, and met with him on January 22, 2004. Mr. McDermott stated that he would not change my position and I should not view the Packaging Supervisor job as a demotion, but rather as a way to learn new skills. I explained that, as an African-American, I would have a very difficult time explaining the demotion on my resume. Mr. McDermott responded: "I'm all for diversity, but I am not going to get into that silly discussion with you."

16.    On January 26, 2004, I met with Peter Bigelow, Senior Vice President of Wyeth, and stated that I had not received an honest answer regarding my performance evaluation or my placement following the organizational cascade. I also stated that I believed I was being discriminated against based on my race. On February 11, 2004, Mr. Bigelow informed me that I had not met certain goals, which led to my performance evaluation and demotion. On February 16, 2004, I sent Mr. Bigelow an email again asserting claims of race discrimination. On February 26, 2004, Mr. Bigelow sent me an email stating that I should feel free to schedule time to discuss the situation, but the tone of the email implied that he had no intention of taking any further action. However, on March 29, 2004, after taking no action for one month, Mr. Bigelow contacted me and stated that he wanted to investigate my claims of race discrimination. Although he later informed me that the investigation found no evidence of discrimination, he provided me with no details of the investigation.

17.    By email to Mr. Bigelow dated April 26, 2004, I requested that I be promoted to a position as Consumer Health Project Engineer. I received no response. On May 6, 2004, I was informed that I would remain a Production Engineer and would not become a Packaging Supervisor.

18.    A culture of discrimination pervades many divisions of Wyeth's Pearl River facility. Minorities remain in lower-level positions and are routinely denied opportunities for advancement, such that Wyeth's management is dominated by white employees. The white managers have developed a "good old boys club," through which they socialize together, save accolades and promotions for each another, and exclude minorities. In the winter of 2004, Mr. Wardrop made a discriminatory comment about another employee named Manny Rivera. Mr. Wardrop made gestures imitating the hip-hop youth culture and stated in a derogatory manner to another employee: "Is Manny the kind of guy to wear his pants hanging down like this?" In a February 2004 meeting, Joe Vitanza, the current Managing Director of LCH, stated that a malfunctioning alarm system was "a tar baby that [he] just [couldn't] get off [his] back." Several years ago, Mr. McDermott walked up a group of African-American employees at an office party, while they were eating and talking, and stated: "You guys are a bunch of *animals.*" The white managers lack any understanding of those that are different from them. For example, during a discussion in 2002 regarding a "Green Book" widely relied on by Mr. Schaschl, Mr. Schaschl made a demeaning reference to my strong Christian faith and stated: "It even has a part on 'acts of god' for you."

19.    At all times relevant herein, I have been an "employee" within the meaning of Title VII and the Human Rights Law.

20.    At all times relevant herein, Wyeth was an "employer" within the meaning of Title VII and the Human Rights Law, and has continuously been engaged in an industry affecting commerce within the meaning of Title VII.

6

21.    As a result of the conduct detailed above, I have suffered emotional distress, mental anguish, and loss of enjoyment of life.

22.    I seek: lost wages and benefits; punitive and compensatory damages; payment of attorneys' fees and costs; and an order prohibiting Wyeth from discriminating against individuals on the basis of race and color, in accordance with the requirements of Title VII and the Human Rights Law. I respectfully request that a copy of this Charge be filed with the New York State Division of Human Rights solely and exclusively for the purpose of exhausting any exhaustion requirements of federal law, and not for the purpose of electing an administrative remedy provided by state law.

F:\APPLICAT\WFAHenry\EEOC.Charge.Rider.wpd\dp

# EXHIBIT   7

EEOC FORM 131 (5/01)

# U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| **WYETH PHARMACEUTICALS, INC**<br>**Director of Personnel**<br>**401 Middletown Road**<br>**Pearl River, NY 10965** | **Howard Henry** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**160-2006-00276** |

## NOTICE OF CHARGE OF DISCRIMINATION
### (See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act                    [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act       [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [X] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **17-NOV-05** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by  **10-NOV-05**
to  **Michael Bertty, ADR Coordinator, at (212) 336-3646**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| **Michael Bertty,**<br>**ADR Coordinator**<br>_EEOC Representative_<br>Telephone: **(212) 336-3646** | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **Oct 27, 2005** | **Spencer H. Lewis, Jr.,**<br>**Director** | |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ✔ EEOC | 160-2006-00276 |

_____ and EEOC

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Howard Henry | (845) 352-6531 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 29 North Brook Road | Hillcrest, NY 10977 | 12/03/1968 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Wyeth Pharmaceutical, Inc. | 15+ | (845) 602-5000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 401 North Middletown Road | Pearl River, NY 10965 | Rockland |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ AGE
✔ RETALIATION ☐ NATIONAL ORIGIN ☐ DISABILITY ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE |
|---|
| EARLIEST (ADEA/EPA) | LATEST (ALL) |
| 09/30/2004 - Present |

✔ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**Please See Attachment A - Henry**

OCT 1 8 2005

EEOC NYDO-CRTIU

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 10/06/05 | |
| Date          Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 10/10/05 |

EEOC FORM 5 (10/94)

CYNTHIA JEAN JACQUES
No. 01JE6107496
Notary Public, State of New York
Qualified in Rockland County
My Commission Expires April 5, 20__

**Attachment A - Henry**

1. Howard Henry ("Howard") filed a Charge of Discrimination with the EEOC on September 24, 2004 (Charge No. *160-2005-00013*).

2. As a result of filing a Charge, Howard was, and continues to be, subjected to retaliation.

3. Examples of the retaliation to which Howard was subjected include, but are not limited to the following:

4. On September 30, 2004, Howard applied for the position of manager in the Manufacturing Support Department. On November 30, 2004 he was denied the position, as a result of his complaints regarding discrimination.

5. On or about June 24, 2005, Howard was placed on a Performance Improvement Program ("PIP") in retaliation for his complaints regarding discrimination. Howard's placement on PIP will prevent Howard from bidding on future positions for one year.

6. On several occasions, Howard was falsely accused of failing to respond to e-mails and itinerary updates from his supervisors. This was done in an attempt to pretextually label Howard as a poor employee.

7. Howard is also assigned an excessive workload compared to similarly situated employees outside his protected classes and is given unrealistic deadlines in retaliation for his complaints in furtherance of management's pretextual attempts to label Howard as a poor employee.

8. On or about July 9, 2005, Howard received a negative mid-year review in retaliation to his complaints regarding discrimination. Management did not conduct a mid-year review for any other employee.

9. As a result of the foregoing, Howard was, and continues to be, subjected to retaliation because of his filing a Charge of Discrimination with the Commission and his good faith opposition to discriminatory practices in violation of Title VII of the Civil Rights Act of 1964, as amended, and all other federal, state, and local statutes that can be inferred from the facts set forth herein.

