Michael Delikat (MD 1165)
James H. McQuade (JM 0788)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals, a Division of Wyeth, Walter Wardrop, and Michael McDermott

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOWARD HENRY,

    Plaintiff,

v.

WYETH PHARMACEUTICALS, INC., WALTER WARDROP, ANDREW SCHASCHL, and MICHAEL McDERMOTT,

    Defendants.

05-CV-8106 (RCC) (DFE)

**DECLARATION OF MAX KATZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Max Katz, declare:

1. I am employed by Wyeth Pharmaceuticals, a Division of Wyeth ("Wyeth"), as a Manager Manufacturing Support. I make this declaration based on my own personal knowledge.

2. Wyeth is a company engaged in the development and manufacture of pharmaceutical consumer healthcare, and animal health products. Wyeth operates a pharmaceutical manufacturing facility in Pearl River, New York, where I currently am employed. As a pharmaceutical manufacturing facility, Wyeth must comply with certain Good

Manufacturing Practices ("GMPs"), which are set forth in regulations issued by the Food and Drug Administration.

3. I received my Bachelor of Science degree in Computer-based Management Systems from Clarkson University, and I received my Master of Engineering degree in Environmental Engineering from Stevens Institute of Technology.

4. I have held a number of different positions within Wyeth. In 1995, I accepted a position as a Production Engineer, working in the Branded Products area, where I was responsible for, among other things, continuous operation of manufacturing equipment, working with vendors, maintenance staff, and pharmaceutical operators to diagnose equipment problems, and performing various investigations on multiple products. Thereafter, I joined the Environmental Technology group, where I worked as an Environmental Engineer and eventually a Senior Environmental Engineer, responsible for site-wide compliance for Hazardous Waste, Solid Waste and Regulated Medical Waste and management of employees. I managed environmental projects dealing with remediation and RCRA Corrective Action with budgets up to $2 million. In 2003, I joined the Safety Department as a Senior Engineer, where I was responsible for all areas of safety. A summary of my pre-1995 employment background is set forth in the copy of my (not current) resume attached hereto as Exhibit 1.

5. In late 2004, I was hired for a new position as the Manager of Manufacturing Support. I understand that Howard Henry also had applied for this position, but was not selected. When I began to work in this new position in January 2005, Mr. Henry began reporting directly to me.

6. From the outset, Mr. Henry presented problems. On a number of occasions, I received complaints from others that Mr. Henry had failed to meet a deadline or

complete a task in a timely manner. In addition, Mr. Henry frequently failed to communicate with me, often failing to return my phone calls or my emails. He also could not be counted on to show up for work, as he was frequently absent from work or failed to provide adequate notice.

7. For example, in an email dated February 3, 2005, Grant Livermore, who was an outside consultant working with Wyeth on compliance issues, asked Andrew Espejo to intervene to try to get Mr. Henry to complete a long delayed project. On that same day, February 3, 2005, I sent an email to Mr. Henry asking him to prepare a timeline for the completion of the project and to forward the timeline to Mr. Livermore, Mr. Espejo, and myself. I never received a response or the timeline from Mr. Henry. (A copy of these emails are attached hereto as Exhibit 2.)

8. Similarly, on February 9, 2005, I sent Mr. Henry an email requesting that, by February 16, 2005, he prepare a timeline of the steps he was taking to resolve issues regarding certain Maintenance Investigation Reports ("MIRs"). Mr. Henry did not provide me with a response or timeline. (A copy of this February 9, 2005 email is attached hereto as Exhibit 3).

9. In late February 2005, Mr. Henry had scheduled an important meeting with outside vendors and managers from another Wyeth facility. Mr. Henry arrived very late for the meeting and failed to inform me that he would be late. On February 23, 2005, I went to speak with Mr. Henry in his office to let him know that, if he was going to be significantly late to an important meeting like this in the future, he must contact me and give me notice. Mr. Henry interrupted me and told me that we should go to a nearby empty supervisors office. I agreed, and we walked to an empty office. Mr. Henry than told me to sit down, which I did, and he proceed to pace back and forth telling me that he was not a child and that I was treating him like a child by discussing this issue. I told him that, as his supervisor, he needed to contact me if he was not

able to make it to work for a meeting, especially when there were people from other departments waiting in a conference room for him, as was the case here. Mr. Henry responded that he might not be able to contact me all the time.

10.     On February 18, 2005, Andrew Espejo advised Mr. Henry that he would be responsible for reviewing and signing Weekly Zone Checklists. Almost immediately, Mr. Henry fell behind on this important project, failing to review and approve the Weekly Zone Checklists. On March 15, 2005, Mr. Espejo advised Mr. Henry that he needed to address this. The following day, Mr. Henry advised Mr. Espejo and me that the overdue Weekly Zone Checklists would be submitted by March 25, 2005 or sooner. (Attached hereto as Exhibit 4 are copies of these email messages on this topic.)

11.     In March 2005, I was informed by the Maintenance Department that Mr. Henry had fallen far behind on completing Preventive Maintenance Orders ("PMOs"). According to Wyeth's standard operating procedures (SOPs), which were developed to help comply with FDA regulations, PMOs are to be reviewed and approved within two business days. After I advised Mr. Espejo of this issue, Mr. Espejo expressed his concerned that Mr. Henry's failure to complete the PMOs could lead to compliance issues and suggested that we could initiate a formal Performance Improvement Plan to improve Mr. Henry's performance.

12.     On March 30, 2005, I spoke to Mr. Henry about his failure to sign off on PMOs in a timely manner. When I notified Mr. Henry that someone had notified me of the problem caused by Mr. Henry's failure to approve the PMO's in a timely manner, he expressed his annoyance that someone would notify me of this problem. Mr. Henry provided a host of excuses for his lateness. I advised Mr. Espejo of this meeting in an email dated March 30, 2005, a copy of which is attached hereto as Exhibit 5.

13. In addition, in March 2005, Cara Muscolo, a Wyeth manager, complained to me that Mr. Henry failed to fulfill many of his responsibilities on a project he was working on with her.

14. Although Mr. Henry had promised to submit the overdue Weekly Maintenance Zone Checklists by March 25, 2005 or sooner, I understand that he did not submit them until April 2005, and that a review of these Checklists revealed that Checklists had not been completed for certain areas since February 5, 2005, in violation of Wyeth's SOPS and GMPs. As a result of this failure, a formal compliance investigation was initiated and a formal Event Report Form had to be prepared.

15. Concerned about Mr. Henry's performance, in or about April 2005, I prepared a chart tracking emails that were sent to Mr. Henry asking him to complete a task or to provide some type of response and tracking Mr. Henry's response. A copy of this chart, the emails, and email tracking information is attached hereto as Exhibit 6. As indicated in this chart, Mr. Henry often took days to respond to email or provided me with no response at all.

16. As another example, at approximately 8:00 a.m. on May 19, 2005, I sent Mr. Henry a "red" high priority email with three high priority items. According to the tracking information on this email, Mr. Henry did not open the email until the following day, after I went to talk to him about the email. One of the tasks assigned to Mr. Henry in the email had a June 3, 2005 commitment date, and it was Mr. Henry's responsibility to meet that deadline. Several people, including Mr. Espejo had to stay late on June 3, 2005 to complete this assignment on time. (A copy of this email is attached hereto as Exhibit 7).

17. Because Mr. Henry's performance had not been improving, I decided to place Mr. Henry on a Performance Improvement Plan (the "PIP") in an attempt to help improve his performance, and I scheduled three meetings to discuss Mr. Henry's performance.

18. On June 24, 2005, Stacey Marroso, a Human Resources employee, and I met with Mr. Henry to give him his mid-year performance review and to give him a copy of his PIP. First, I read the PIP to Mr. Henry. When I was finished, Mr. Henry said that he disagreed with the tactics and that he would need to have the PIP reviewed. I then read Mr. Henry his mid-year performance evaluation, while Mr. Henry just stared off to the side. Ms. Marroso asked Mr. Henry if he had any questions, and he responded no, and Mr. Henry walked out.

19. I gave all of the full-time employees reporting to me mid-year performance reviews in 2005.

20. On July 6, 2005, Ms. Marroso and I met with Mr. Henry to discuss the status of Mr. Henry's PIP. We discussed a number of topics with Mr. Henry in attempt to coach him on his performance. I told Mr. Henry that I wanted him to be successful and that I want him with the company. Mr. Henry's work performance seemed to improve after he was issued the PIP.

21. On July 25, 2005, Mr. Espejo, Stacey Marroso, and I met with Mr. Henry for his final PIP status discussion. At this meeting, Mr. Henry was advised that the PIP was being closed out and that he had successfully completed the program.

22. Shortly thereafter, in August 2005, Mr. Henry left work on an extended medical leave. When Mr. Henry left on medical leave, I hired a temporary employee, John McHoney, to fill Mr. Henry's position. After Mr. Henry's employment ultimately was

termination, I hired Mr. McHoney as a full time employee. Mr. McHoney is African American, as are other employees who report to me.

Executed on October 27, 2006 at Pearl River, New York.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Max Katz