Michael Delikat (MD 1165)
James H. McQuade (JM 0788)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals, a Division of Wyeth, Walter Wardrop, and Michael McDermott

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOWARD HENRY,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>WYETH PHARMACEUTICALS, INC., WALTER WARDROP, ANDREW SCHASCHL, and MICHAEL McDERMOTT,<br><br>　　　　　Defendants. | 05-CV-8106 (RCC) (DFE)<br><br>**DECLARATION OF ANDREW ESPEJO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, Andrew Espejo, declare:

1.　I am employed by Wyeth Pharmaceuticals, a Division of Wyeth ("Wyeth"), as a Director of Manufacturing. I make this declaration based on my own personal knowledge.

2.　In late 2003, Wyeth's Pearl River facility initiated a corporate reorganization referred to as the Organizational Cascade. Prior to the Organizational Cascade, I held a position as Senior Maintenance Manager in the Maintenance Group. In connection with the Organizational Cascade, I was selected for the position of Associate Director of Manufacturing for Centrum operations. After I was selected for this position, I participated in

the Organizational Cascade process by filling the employment positions that would be reporting to me. I selected Honario Ordenez as the Engineer for the Centrum unit, based on the recommendation of the other Associate Directors and Managers participating in this process, who believed that Mr. Ordenez would perform well in this position.

3. Howard Henry ultimately was selected as Packaging Supervisor in the Packaging Department. I understand that Mr. Henry was upset with his assignment and refused to accept the transfer. I felt that the Packaging Supervisor was an excellent developmental opportunity for Mr. Henry, as he would be a team leader and would be responsible for directly supervising a number of employees, which could lead to future management opportunities.

4. Ultimately it was decided that Mr. Henry would remain in his position as Production Engineer, and he began to report directly to me. As a Production Engineer, Mr. Henry was responsible for maintaining the equipment used in the production process. As I do with all of the employees I manage, I created a timeline for Mr. Henry, assigning due dates for tasks he was performing and tracking progress on those due dates.

5. In July 2004, I provided Mr. Henry with a mid-year review. In this review, I listed the projects Mr. Henry was working on and noted the progress that I felt he had made on those projects. (A true and correct copy of this review is attached hereto as Exhibit 1.) As indicated on the review, Mr. Henry missed several deadlines for projects that he was working on. The review also noted what I viewed as Mr. Henry's areas of strength and areas of improvement, including improving his follow-up on pending issues, managing completion of tasks to meet due dates, expanding breadth of knowledge on department equipment, and developing and implementing project timelines. The purpose of this mid-year review was to

help Mr. Henry meet the expectations of his positions and to continue to improve and develop as an employee.

6.  I met with Mr. Henry and presented him with his mid-year review. We discussed the issues in the review, and Mr. Henry told me that he disagreed with the areas of improvement identified in the review, and he refused to sign the review.

7.  In September 2004, a new position, Manager Manufacturing Support, was created to handle, among other things, production engineering, compliance, and training issues in the Centrum unit. A more complete description of this position is set forth in the job posting for this position. (A true and correct copy of the Job Posting for this position is attached hereto as Exhibit 2.) The person in this new position would report directly to me.

8.  Nearly thirty people applied for this position, and I selected ten individuals to be interviewed, including Max Katz and Mr. Henry. These ten applicants were then each individually interviewed by a panel of five managers. The panel asked each of the ten candidates the exact same questions and gave them a numerical score in eight different categories based on their responses. (A true and correct copy of the guidelines for this competency based interview process is attached hereto as Exhibit 3.) These questions were designed to assess the candidates' core competencies and skills relevant for the job and were designed to help the panel find the most competent candidate for the position. Max Katz received the highest overall score in this competency based interview process, and the panel unanimously selected Mr. Katz for this position. (A true and correct copy of the score sheet maintained by the panel is attached hereto as Exhibit 4.)

9.  In addition, Mr. Katz also stood out because of his significant project management experience, which was very important for this position. In addition, Mr. Katz had a

diverse background, holding positions as a Production Engineer, a Senior Environmental Engineer, and a Senior Engineer in the Safety Department. (A copy of my memorandum to Consumer Healthcare Manufacturing Employees, which is attached hereto as Exhibit 5, briefly lays out some of Mr. Katz's experiences.) For all of these reasons and because I felt he was the best candidate for the position, I decided to hire Mr. Katz for the position. Mr. Henry, in contrast, did not distinguish himself in any way during the interviewing process and ended up with one of the lower scores from the panel.

10. After Mr. Katz assumed his position in January 2005, Mr. Henry began to report to Mr. Katz.

11. On January 12, 2005, I met with Mr. Henry and gave him his 2004 performance review, providing an overall rating of 3, which indicated that Mr. Henry met the objectives, responsibilities, and expectations of his position. As indicated in the review, I felt that Mr. Henry had demonstrated his technical knowledge and experience to help the department meet its objectives, but that his ability to set commitment dates and to meet those commitments dates needed improvement. On a number of occasions in 2004, Henry missed commitment dates, and I received complaints that Mr. Henry had fallen behind on deadlines. Mr. Henry felt that his overall rating was too low and refused to sign the performance review.

12. After receiving his 2004 performance review, Mr. Henry continued to miss a number of deadlines, and I began to receive complaints from others about Mr. Henry's delay in completing assignments. One example is provided in the emails attached hereto as Exhibit 6. In the email dated February 3, 2005, Grant Livermore, who is a Computer Validation Consultant, asked me to intervene to try to get Mr. Henry to complete a long delayed project. On that same day, February 3, 2005, Mr. Katz asked Mr. Henry to prepare a timeline for the

completion of the project and to forward the timeline to Mr. Livermore. On February 16, 2005, Mr. Livermore, obviously upset by the continued delay, advised me that he still had not received a timeline for the completion of the requested work. I asked Mr. Henry, once again, to provide a timeline or date of completion to Mr. Livermore "ASAP" on this "critical item."

13. As part of an effort to comply with Wyeth's SOPs and with Good Manufacturing Practices (GMPs) required by the FDA, I established certain procedures for supervisors to conduct maintenance audits of their assigned zones. As part of this plan, I assigned to Mr. Henry the responsibility of reviewing and signing the Weekly Maintenance Zone Checklists prepared by the supervisors. I advised Mr. Henry and the others of this procedure on February 18, 2005. Almost immediately, Mr. Henry fell behind on this project, failing to review and approve the Weekly Maintenance Zone Checklists. Concerned that Mr. Henry's failure to timely process these checklists could lead to compliance issues, on March 15, 2005, I advised Mr. Henry that he needed to address this. The following day Mr. Henry advised me that the overdue Weekly Maintenance Zone Checklists would be submitted by March 25, 2005 or sooner. (Attached hereto as Exhibit 7 is a series of email messages with Mr. Henry on this topic.)

14. In late March 2005, I was informed by the Maintenance Department that Mr. Henry had fallen far behind on completing PMOs. In a March 29, 2005 email, I advised Mr. Katz that I was concerned that Mr. Henry's failure to complete the PMOs could lead to serious regulatory compliance issues. I also advised Mr. Katz of Mr. Henry's failure to complete the Weekly Maintenance Zone Checklists in a timely manner. I suggested that we could initiate a formal Performance Improvement Plan to improve Mr. Henry's performance. (A copy of my March 29, 2005 email is attached hereto as Exhibit 8.)

15. On March 30, 2005, Mr. Katz advised me that he had discussed these issues with Mr. Henry, and, rather than showing any concern, Mr. Henry exhibited a general tone of displeasure, and he provided a number of excuses for failing to complete the PMOs.

16. Although Mr. Henry had promised to provide me with the overdue Weekly Maintenance Zone Checklists by March 25, 2005 or sooner, he did not provide them to me until April 5, 2005. Upon review of these Checklists, for which Mr. Henry had been responsible for reviewing and approving, it was discovered that Checklists for certain areas had not been completed since February 5, 2005, in violation of Wyeth's SOPS and GMPs. This was a serious compliance issue. As a result of this failure, a formal compliance investigation was initiated and a formal Event Report Form ("ERF") had to be prepared. Wyeth is obligated to make these ERFs available to the FDA for review, if requested.

17. Because Mr. Henry's performance had not been improving, Mr. Henry was placed on a Performance Improvement Plan in an attempt to help improve his performance. Three meetings were scheduled to discuss Mr. Henry's performance. I attended the final meeting on July 25, 2005, and discussed a number of issues with Mr. Henry, including his performance and role on a going forward basis. I told Mr. Henry that I respected him and that I wanted to see him succeed in his job.

18. Shortly thereafter, in August 2005, Mr. Henry advised me that he would be going on a medical leave due to an unspecified medical condition. I wished Henry well and hoped he got better and returned to work soon.

Executed on October 23, 2006 at Pearl River, New York.

I declare under penalty of perjury that the foregoing is true and correct.

_____  10-23-06
Andrew Espejo