Michael Delikat (MD 1165)
James H. McQuade (JM 0788)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals, a Division of Wyeth, Walter Wardrop, and Michael McDermott

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOWARD HENRY,

    Plaintiff,

v.

WYETH PHARMACEUTICALS, INC., WALTER WARDROP, ANDREW SCHASCHL, and MICHAEL McDERMOTT,

    Defendants.

05-CV-8106 (RCC) (DFE)

**DECLARATION OF ANDREW SCHASCHL**

I, Andrew Schaschl, declare:

1. I reside in Ballsbridge, Ireland (Dublin 4), and I am employed by Wyeth Pharmaceuticals, a Division of Wyeth ("Wyeth") as a Senior Director of the BZA/CE-PNP Project at Wyeth's Newbridge, Ireland facility. Prior to my transfer to Wyeth's Newbridge, Ireland facility, I worked at Wyeth's Pearl River, New York facility. I make this declaration based on my own personal knowledge.

**Production Coordinator Position**

2. In or about July of 2002, as a Director, I was a responsible for hiring an individual for a vacant Production Coordinator position, a position which reported to me and a position which had been held by Todd Davenport. The Production Coordinator was responsible

for planning the manufacturing process for three different departments as the product passed through four primary production areas. A more complete description of the job responsibilities for this position is provided on the Job Description Worksheet attached hereto as Exhibit 1. I believed that it was extremely important that the Production Coordinator have strong multi-tasking skills and a good cross-functional background.

3. Several people expressed interest in this position, including Chris DeFeciani and Howard Henry. I decided to hire Mr. DeFeciani for the position because I believed that he was the most qualified for the position for a number of reasons. Mr. DeFeciani had excellent multi-tasking skills, which were critical for this job. In addition, at the time he was hired, he had either completed his APICS certification in logistic planning or was close to completing his APICS certification for logistic planning. Mr. DeFeciani also had a very good cross-functional background and excellent knowledge of manufacturing operations, which I believed were important for this position. I had hired Mr. DeFeciani into another position in the organization for which I was responsible, and I had the opportunity to work with him in this position. Mr. DeFeciani had proven himself to me as an excellent performer and a very capable employee. Finally, Mr. DeFeciani had filled in as the Production Coordinator at times in the past when his predecessor, Mr. Davenport, was absent from the job. Mr. DeFeciani had performed the Production Coordinator job responsibilities very well on these occasions. For these reasons, I believed Mr. DeFeciani was the best choice for the Production Coordinator position, and I hired him for that position.

4. Mr. Henry also had applied for this open Production Coordinator position. Because Mr. Henry was then working in an organizational unit that I headed, I was familiar with Mr. Henry's work experience and performance. I did not believe that Mr. Henry had a full

breadth of knowledge and experience in the manufacturing operations, as Mr. DeFeciani had. At this time, Mr. Henry's work was primarily focused on one project, the installation of a continuous tablet coater. In addition, based on my experiences with Mr. Henry, I believed that he had problems multi-tasking, which would have made it difficult for him to succeed in the Production Coordinator position.

5. In April 2003, Mr. DeFeciani took a medical leave of absence, and I asked another employee, Richard Morgan, to perform the Production Coordinator job responsibilities on a temporary basis during Mr. DeFeciani's absence. Even before Mr. DeFeciani's medical leave, Mr. Morgan had been filling in for Mr. DeFeciani and had been performing the Production Coordinator job responsibilities in Mr. DeFeciani's routine absences from work. Mr. Morgan had performed this job well in the past, had a good breadth of knowledge of the manufacturing operations, and, in general, was an excellent performer. For these reasons, I asked Mr. Morgan to perform the Production Coordinator job responsibilities while Mr. DeFeciani was on his medical leave.

6. Mr. DeFeciani's medical leave did not create an opening for this position, and Mr. Morgan was not formally placed into this position during Mr. DeFeciani's medical leave. Mr. Henry never asked me if he could perform the Production Coordinator position during Mr. DeFeciani's medical leave. Even if he had specifically requested to perform these duties during Mr. DeFeciani's absence, I still would have asked Mr. Morgan to perform these duties for the reasons explained above.

**The Organizational Cascade**

7. In 2003, Wyeth's Pearl River facility initiated a massive corporate restructuring referred to as the Organizational Cascade. As part of the Organization Cascade, the

highest level managers at the Pearl River facility, created a new corporate structure and a new organizational chart at the Pearl River facility. At this stage in the Organizational Cascade, no individuals were assigned to positions in the new organizational structure. In essence, every employee was removed from their position and placed in a pool of people available for hire for a position in the new organizational structure. Positions in the new organizational structure then were filled from the top down, in a cascading manner.

8. First, Michael McDermott, Managing Director, selected individuals to fill the Director level positions and the positions that reported directly to him. Next, those that had been selected for these Director level positions in the new organizational structure, selected individuals to fill the positions that were the next level down and that reported directly to them (Associate Directors and Managers). Next, those that had been selected for these Associate Director and Manager positions filled the remainder of the positions in the new organizational structure by selecting the individuals who would report to them. This was done as part of a group meeting of Associate Directors and Managers, who utilized a collaborative approach and reached a consensus of opinion. The primary considerations in placing these individuals were matching an individual's skills to the skills required by the position, potential for a developmental opportunity for the individual, and an individual's performance.

9. The Organizational Cascade affected all people in the organization. One of the purposes of the Organizational Cascade, and the job rotation that it produced, was to ensure that employees develop a well-rounded and diverse background in the manufacturing process. In connection with the Organizational Cascade process, Mr. Henry was assigned to assume a position as a Packaging Supervisor.

10. On January 9, 2004, Henry met with me to express his job assignment as part of the Organizational Cascade and his overall rating on his 2003 Performance Review. Henry told me that he believed that he had been placed in the Packaging Supervisor position as a punitive measure in response to his 2003 Performance Review. I explained to Henry that this was not the case, and I explained how the selections were made as part of the Organizational Cascade. I also explained to Henry that the Packaging Supervisor position would be a good developmental opportunity for him, as it would provide him with direct supervisory experience and would give him exposure to the packaging operation, which could help him obtain other positions in the future.

11. Henry also complained that he should have been rated a 5 or at least a 4 in his 2003 Performance Review. I explained to Henry that I felt that he had problems with overall project management and driving multi-tasked, cross functional projects to completion. I gave him two examples of projects (the CTC Cleaning Verification and the CTC Weigh Belt) that were completed well beyond an acceptable time frame. Henry was responsible for leading both of these projects. However, because the projects were taking so long to complete, I had to ask Henry's supervisor, Walter Wardrop, to intervene to get the projects completed on a timely basis. Mr. Wardrop, rather than Mr. Henry, then was forced to lead this project and to see that the projects were completed. I explained to Henry that he required too much attention from his managers to ensure tasks like this are completed and that one of the expectations of the position was that assignments are completed with minimal supervision. In response, Mr. Henry became vocal, yelling that I was wrong and that he did work hard.

12. Ultimately, I advised Henry that I believed that the performance review process was administered fairly and that the Organizational Cascade was administered the same

to all personnel so it would not be appropriate to re-review him or re-assign him. A more complete description of my conversation with Mr. Henry on January 9, 2006 is provided in the memorandum, which I prepared and which is attached hereto as Exhibit 2.

13. At no time during my discussion with Mr. Henry on January 9, 2006, did Mr. Henry state that he felt that he had been discriminated against based on his race or color. Moreover, at the time of my January 9, 2004 meeting with Mr. Henry, I had no knowledge, or reason to believe, that Mr. Henry had ever made any complaint of discrimination.

Executed on October 20, 2006 at Newbridge, Ireland.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Andrew Schaschl