UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HOWARD HENRY,                                        :
                                                    :        05-CV-8106 (RCC)(DFE)
                              Plaintiff,             :
                                                    :
        -against-                                   :
                                                    :
WYETH PHARMACEUTICALS, INC., WALTER :
WARDROP, ANDREW SCHASCHL, and                       :
MICHAEL McDERMOTT,                                  :
                                                    :
                              Defendants.           :
------------------------------------------------------------x

---

## AFFIDAVITS AND EXHIBITS IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

LEEDS MORELLI & BROWN, P.C.
Attorneys for Plaintiff
By: Steven A. Morelli (SM 4721)
One Old County Road, Suite 347
Carle Place, New York 11514
(516) 873-9550

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

HOWARD HENRY,                              :

                  Plaintiff,        :        05-cv-8106 (RCC)(DFE)

                              :        **PLAINTIFF'S STATEMENT**

  -against-                                 :        **PURSUANT TO LOCAL**

                              :        **RULE 56.1**

WYETH PHARMACEUTICALS, INC., WALTER :
WARDROP, ANDREW SCHASCHL, and        :
MICHAEL McDERMOTT,                           :

                              :

               Defendants.        :

-----------------------------------------------------------x

       Plaintiff HOWARD HENRY ("Henry"), by his attorneys, Leeds Morelli & Brown, P.C.,

as and for his statement of material facts as to which it is contended that there exists a genuine

issue to be tried, states, in correspondingly numbered paragraphs in response to Defendants' Rule

56.1 Statement, and additional subparagraphs, as follows:

**Preliminary Statement**

       Rule 56.1 of the Local Civil Rules for the Eastern District of New York states requires

that each statement of fact contained in a moving party's 56.1 statement be "followed by citation

to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure

56(e)." Accordingly, Plaintiff notes that Defendants' Rule 56.1 Statement contains many "facts"

which are contained in the Declarations of certain parties and witnesses, none of which are sworn

to under oath before a notary public, and are, as such, inadmissible hearsay. Therefore, these facts

as set forth in Defendants' Rule 56.1 Statement are disputed to the extent that they are not

admissible as required by Rule 56.1. Notwithstanding the foregoing, Plaintiff sets forth the

following:

**Background**

1    The facts contained in Defendants' paragraph "1" are undisputed.

2    The facts contained in Defendants' paragraph "2" are undisputed.

3    The facts contained in Defendants' paragraph "3" are undisputed.

4    The facts contained in Defendants' paragraph "4" are undisputed.

5    The facts contained in Defendants' paragraph "5" are undisputed.

6    The "year-end performance reviews" cited in Defendants' paragraph "6" are documents which speak for themselves. As such, their contents are not in dispute. However, Plaintiff disputes Defendants' characterization of his yearly performances as performances which "fell directly in the middle of the rating scale." Plaintiff considered his performance to be above average to high, especially considering his comparators and colleagues were mostly Ph.D. and Masters Degree recipients. (Henry Aff. at ¶ 4). For example:

6.1    In 1993, Plaintiff received, on a scale of A to C with A being the best, a B on 22 out of the 25 skills rated, and an A on the remaining three skills, without receiving any C ratings. (Ex. 1).

6.2    In 1994, Plaintiff improved and received, on the same scale, a B on 19 out of the 28 skills rated, with an A in seven of the skills rated, without receiving any C ratings. (Ex. 2). He "achieved" four out of six performance plan objectives, "exceeded" one objective," and the other objective was "not achieved" as "[p]riority [was] given to other development projects." (*Id.*).

6.3    In 1995, Plaintiff received, on the same scale, a B on 20 out of 27 skills rated, an A on the other seven remaining skills, and received no C ratings. (Ex. 3). He "achieved" three out of six performance plan objectives, "exceeded" expectations on two objectives, and one was "in

progress" at the time of the review in August of that year and slated to be completed by January of 1996. (*Id.*). Despite the above, Plaintiff made written comments in the Employee Comments box which stated that he did not feel the review fully captured the "time, effort, and dedication I truly gave to achieve the goals set." (*Id.*). For example, he was working full-time and going to school full-time: arriving to work at 5:00 am on certain days to start chemical reactions, left to go to school to take classes during the day, and then returned to work after class to ensure that he was achieving all the goals set forth for him by the company. (Henry Aff. at ¶ 4).

6.4    In 1996, Plaintiff received, ratings of "at expectations" on all five of his performance objectives. (Ex. 4). The 1996 review did not include reviews of skills as the prior years have. However, in the "Appraiser's Summary" section, his appraiser concluded that Plaintiff "should work on a project that will give him the opportunity to further broaden his skill level through increased responsibility." (*Id.*).

6.5    In 1997, Plaintiff received ratings of "at expectations" on all four of his performance objectives. (Ex. 5). The "Appraiser's Summary" section reminds the reader that Plaintiff received a special recognition award and was promoted during the year. (*Id.*; *see* Ex. 18).

6.6    In 1998, Plaintiff received ratings of "exceeded expectations" on two out of four performance objectives, and "at expectations" on the remaining two objectives. (Ex. 6). The overall rating for Plaintiff during 1998 was "Exceeds Expectations." (*Id.*). The appraiser stated that Plaintiff "is a hard worker and completes <u>all</u> the assigned tasks <u>in a timely manner</u>." (*Id.*) (emphasis added).

6.7    In 1999, Plaintiff received ratings of "at expectations" on all four of his

-3-

performance objectives for the year. (Ex. 7). The appraiser stated that Plaintiff "is expected to play a key role in the new development facility, bldg. 240." (*Id.*). In addition, during this appraisal period Plaintiff worked outside his normal area and in the Bioprocess Group for six months helping it to achieve its own goals and deadlines. (*Id.*). Plaintiff felt that this experience would help him attain increased levels of responsibility in the years to come. (Henry Aff. at ¶ 6).

6.8    In 2000, Plaintiff received, on a scale of 1 to 5 with 5 being the best, ratings of 3 in each and every category, with a 3 being defined as a "solid performer." (Ex. 8). His manager, Defendant Wardrop, gave generally positive and detailed comments on Plaintiff's performance. (*Id.*). For example, Wardrop states that Plaintiff had good leadership skills, was a good team member, and "innovative." (*Id.*).

7    The facts contained in Defendants' paragraph "7" are undisputed.

8    The facts contained in the 1st sentence of Defendants' paragraph "8" are undisputed. Plaintiff never testified that he thought the review was "extremely positive" as Defendants state in the 2nd sentence of paragraph "8". Plaintiff stated that he believed his reviews were "extremely positive" in a Rider attached to his EEOC complaint which his attorney wrote for him. (Ex. 25). However, Plaintiff testified at his deposition that he was "accepting" of the review because he was new to the area. (Ex. A at 134-35).

9    The facts contained in the 1st and 3rd sentence of Defendants' paragraph "9" are undisputed. Plaintiff never testified that he thought the review was "extremely positive" as Defendants state in the 2nd sentence of paragraph "9". Plaintiff stated that he believed his reviews were "extremely positive" in a Rider attached to his EEOC complaint which his attorney wrote for him. (Ex. 25). However, Plaintiff testified at his deposition only that he did not

disagree with the review. (Ex. A at 138). Plaintiff and Wardrop did get along and work well together at the time of this review; however, the relationship began to change and deteriorate contemporaneously with Plaintiff's requests for promotional opportunities. (Henry Aff. at ¶¶ 16, 18, 24).

9.1    In 2001, Plaintiff received, on a scale of 1 to 5 with 5 being the best, ratings of 4 in six out of ten categories rated, a rating of 5 in two of the categories, 3 in one category, and 2 in one category (Ex. 9). His manager, Defendant Wardrop, gave generally positive and detailed comments on Plaintiff's performance. (*Id.*).

10    It is undisputed that Wardrop prepared Plaintiff's 2002 review. However, Plaintiff stated that he believed his reviews were "extremely positive" in a Rider attached to his EEOC complaint which his attorney wrote for him. (Ex. 25). Plaintiff testified at his deposition that he believed he should have been rated higher due to certain accomplishments that were "critical" to the operations of the group. (Ex. A at 139-40). He also inquired how he could improve his performance because he sought career advancement. (*Id.*).

10.1    In 2002, Plaintiff received a rating of 4 in nine out of twelve categories rated, a 5 in one category, and a 3 and 2 in the remaining two categories. (Ex. 10). His manager, Defendant Wardrop, gave generally positive and detailed comments on Plaintiff's performance. (*Id.*).

**Project Engineer Position**

11    The facts contained in Defendants' paragraph "11" are undisputed, but only to the extent that the job posting bulletin board on the intranet site is only one way that Wyeth fills vacant job positions.

11.1    Wyeth also promotes or transfers individuals into vacant or newly-created job

positions without offering employees the opportunity to "bid" on them. (Henry Aff. at ¶ 8). Plaintiff applied for promotions through the bidding process mainly because he was limited to seeking promotions in this manner since he realized that his verbal requests for advancement opportunities were not being addressed. (*Id.* at 25).

12    The facts contained in Defendants' paragraph "12" are undisputed.

13    It is undisputed that other individuals applied for the position as Project Engineer and that Kevin Costello hired Cara Muscolo for the position. The rest of the "facts" contained in Defendants' paragraph "13" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

14    The facts contained in the 5th sentence of Defendants' paragraph "14" are not in dispute. The rest of the "facts" contained in Defendants' paragraph "14" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Plaintiff never admitted that Muscolo was qualified for the position as Defendants state in the 6th sentence of paragraph "14". Plaintiff merely testified that he had no reason to believe she was not qualified. (Ex. A at 49-50). It is, however, undisputed that Plaintiff was not even given the opportunity to interview for the position. (Ex. A. at 45).

15    The "facts" contained in Defendants' paragraph "15" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

15.1    Plaintiff states that he had worked with Costello on an interim basis as a Project Engineer under a quasi-reporting scheme under which Plaintiff reported to Costello about project development (the Continuous Coater Project).

15.2    Through this position, Plaintiff and Costello had a good relationship such that

-6-

Plaintiff felt comfortable enough to speak directly to Costello about becoming a permanent Project Engineer as opposed to doing the job on an interim basis. (Henry Aff. at ¶ 9).

15.3    Contrary to the implications contained in Costello's Declaration, Costello told Plaintiff directly and in front of other employees that he had "complete confidence" in the work Plaintiff was doing and was "not concerned" about Plaintiff completing project tasks on time. (Henry Aff. at ¶ 9).

16    The facts contained in Defendants' paragraph "16" are undisputed except that Plaintiff testified that his belief that he was denied advancement opportunities is based upon an overall pattern of being denied opportunities for advancement. He stated: "Basically as I began to apply for more positions, and I—not in every case, but in most of those cases, there seemed to be a pattern at which we weren't even considered, when I say we, myself, and some of the African American men that I spoke with, were not considered for a managerial track position at Wyeth." (Ex. A at 53-54).

**Production Coordinator Position**

17    The facts contained in Defendants' paragraph "17" are undisputed.

18    The facts contained in the 1st sentence of Defendants' paragraph "18" are undisputed. (Ex. 19). The "facts" contained in the 2nd sentence of Defendants' paragraph "18" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

19    The facts contained in the 1st sentence of Defendants' paragraph "19" are undisputed. (Ex. 19). The "facts" contained in the 2nd sentence of Defendants' paragraph "19" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

20    The "facts" contained in the 1st, 2nd, 3rd, 4th, 8th, and 9th sentences of

Defendants' paragraph "20" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The facts contained in the 5th, 6th, and 7th sentences of Defendants' paragraph "20" are undisputed.

20.1    Prior to the position reporting into Schaschl, the position of Production Coordinator reported into Robert Bracco. Bracco knew that Plaintiff was interested in this position because: in approximately April or May of 2001, Todd Davenport, former Production Coordinator, was considering leaving the company; DeFeciani had filled in for Davenport while Davenport was out; DeFeciani made it known that he was not interested in the position on a full-time basis; therefore, Bracco offered to give the position to Plaintiff upon Davenport's resignation and Wardrop encouraged Plaintiff to take the position should it be offered to him. (Henry Aff. at ¶ 10).

20.2    Davenport, however, never resigned at that time and remained as Production Coordinator. Sometime between June 2001 and June 2002, the position began reporting directly to Schaschl in his capacity as Director of Manufacturing, at which time Davenport began reporting directly to Schaschl instead of Bracco. When Davenport was given the opportunity to obtain a senior supervisory position overseeing Compression Operations, the position of Production Coordinator became available. (*Id.* at 11). Since it was known that DeFeciani had previously stated that he was not interested in the position, Plaintiff applied for the position through the internal bidding process. (*Id.*). He did not, however, receive the position as stated in the Complaint.

20.3    Regarding the fact that DeFeciani had the opportunity to "fill in" as a Production Coordinator when Davenport was absent from the job, Plaintiff testified that he took issue with

this logic since he was denied the same opportunity and had made prior requests for the same opportunity, which went unanswered; therefore, his ability to advance was hindered. (*See* Ex. A at 69-83).

    20.4    Regarding the fact that DeFeciani had received ratings of "5" on his 2000-2001 performance appraisals, his reviewer, Wardrop, was DeFeciani's best friend and DeFeciani's ratings were skewed by cronyism. (Henry Aff. at ¶ 12).

    21    The "facts" contained in Defendants' paragraph "21" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

    21.1    Schaschl's statement that he did not believe that Plaintiff had a full knowledge of the position and relevant experience is attributed to the fact that he was denied the opportunity to "fill in" as DeFeciani had. (Ex. A at 69-71).

    21.2    Schaschl's statement that he believed Plaintiff had problems multi-tasking is belied by Plaintiff's performance reviews for the preceding nine years. (Ex. 1-10; Henry Aff. at ¶ 11). Specifically, in 2001 Plaintiff's performance review states in Section II under "Collaboration": "he found ways to minimize downtime through creative scheduling and multi-tasking." (Ex. 9). In 2002, in the same section, the review stated: "Howard collaborated very well with a variety of disciplines to start up and optimize the CTC." (Ex. 10). Schaschl even signed off on this review. (*See id.*).

    22    The facts contained in Defendants' paragraph "22" are undisputed.

    23    Plaintiff never admitted he has no basis for believing that he was not selected for the Production Coordinator position because of his race as Defendants state in paragraph "23". In fact, Plaintiff described the entire basis for why he did believe the decision was based upon his

-9-

race. (Ex. A at 77-78). Plaintiff testified that when he asked Schaschl why he was denied the position, Schaschl became "truculent" and again stated that DeFeciani received it because he had previously been given the opportunity to substitute in another's absence. (*Id.*). Plaintiff asked why he had not been given the same opportunity despite his request to be able to substitute, and that Schaschl could not answer him other than to repeat the same thing he had previously said. (*Id.*).

## Performing Production Coordinator Duties on a Temporary Basis

24      The facts contained in Defendants' paragraph "24" are undisputed.

25      The facts contained in the 1st, 2nd, and 4th sentences of Defendants' paragraph "25" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The facts contained in the 3rd sentence of Defendants' paragraph "25" are undisputed.

25.1     Contrary to Schaschl's implications otherwise, he had signed off on Henry's 2002 performance appraisal which stated that Plaintiff "exceeds expectations." (Ex. 10). Schaschl also knew that Plaintiff was interested in the position because of Plaintiff's prior application for the position and past conversations with him regarding same. (Henry Aff. at ¶ 13). Nevertheless, Schaschl never approached Plaintiff to perform these interim duties. (*Id.*).

26      The facts contained in Defendants' paragraph "26" are undisputed to the extent that there was no official opening for the position. However, the interim position does afford the employee performing the duties future career advancement opportunities such that holding the position, even on a temporary basis, is an important step in one's career at Wyeth. (Henry Aff. at ¶ 14). For example, Chris DeFeciani, and Wardrop both previously held the Production Coordinator position on an interim basis at some point in their careers, they both were later given

-10-

the position on a permanent basis, and both later were promoted to management positions within the company. (*Id.*).

27    The facts contained in Defendants' paragraph "27" are undisputed. However, Plaintiff made it known that he was seeking advancement opportunities (to which this substitute position would have been a stepping stone), and had already taken issue with the fact that he was denied this opportunity when DeFeciani was granted it in the past. (Ex. A at ¶ 79-81).

28    The facts contained in Defendants' paragraph "28" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Contrary to Schaschl's implications otherwise, he had signed off on Henry's 2002 performance appraisal which stated that Plaintiff "exceeds expectations" (Ex. 10) and Schaschl's statements that he would not have given Plaintiff the opportunity if he had requested it are speculative at best.

29    The facts contained in Defendants' paragraph "29" are undisputed.

30    Plaintiff never admitted he has no basis for believing that he was not selected to fill in for DeFeciani because of his race as Defendants state in paragraph "30". In fact, Plaintiff described the entire basis for why he did believe the decision was based upon his race. (Ex. A at 81).

**Process Engineer Position**

31    The facts contained in Defendants' paragraph "31" are undisputed.

32    The facts contained in Defendants' paragraph "32" are undisputed. (Ex. 20).

33    The "facts" contained in Defendants' paragraph "33" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

34    The facts contained in the 1st sentence of Defendants' paragraph "34" are

-11-

undisputed. It is also undisputed that other individuals, including Rokad, interviewed Plaintiff for the position. (Ex. A at 86-87). The remaining "facts" contained in the 2nd sentence of Defendants' paragraph "34" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

35.    The "facts" contained in the 1st, 2nd, 4th, 5th, and 6th sentences of Defendants' paragraph "35" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The 3rd sentence of Defendants' paragraph "35" is undisputed.

35.1    With regard to the 5th sentence of Defendants' paragraph "35" wherein Montanez's degree is mentioned, Plaintiff had two baccalaureates (one in physical science and one in chemical engineering) as opposed to Montanez's one degree. (Ex. A at 17). Plaintiff also had already completed two graduate courses in chemical and environmental engineering as opposed to Montanez who was allegedly in progress on his graduate work. (Henry Aff. at ¶ 26).

35.2    With regard to the 2nd sentence of Defendants' paragraph "35" wherein the benefits of previously working in the Vaccines Department are mentioned, McDermott himself was transferred to the Vaccines Department as part of the Organizational Cascade (referred to *infra*) without, upon information and belief, any prior experience in the Vaccines Department. (Henry Aff. at ¶ 27).

36    The "facts" contained in Defendants' paragraph "36" are cited to a Declaration and, as such, the credibility of these statements is in dispute. For the reasons stated above in Plaintiff's paragraph "35.2", Plaintiff's lack of experience working in the Vaccines Department should have been of little importance.

37    The facts contained in Defendants' paragraph "37" are undisputed. Plaintiff's

-12-

position is that the overall pattern of being denied advancement opportunities, rather than one specific incident, evinces a discriminatory intent.

**Staff Engineer I**

38      The facts contained in Defendants' paragraph "38" are undisputed. However, the main reason Plaintiff applied for this position in the Bioprocess Department was because he had previously worked in the department for a six-month period and had become acquainted with the operation and needs of the department. (Henry Aff. at ¶ 37).

39      The facts contained in the 1st sentence of Defendants' paragraph "39" are undisputed. The "facts" contained in the 2nd sentence of Defendants' paragraph "39" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

40      The facts contained in the 1st, 2nd, and 4th sentences of Defendants' paragraph "40" are undisputed. The "facts" contained in the 3rd sentence of Defendants' paragraph "40" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

41      The "facts" contained in the 1st sentence of Defendants' paragraph "41" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The facts contained in the 2nd sentence of Defendants' paragraph "41" are undisputed.

42      The facts contained in Defendants' paragraph "42" are undisputed. Plaintiff did, however, have experience working with Simpson. (Ex. A at 95; Henry Aff. at ¶ 37).

43      The facts contained in Defendants' paragraph "43" are undisputed. Plaintiff's position is that the overall pattern of being denied advancement opportunities, rather than one specific incident, evinces a discriminatory intent. In fact, it was because Plaintiff did not receive an interview for this position that his belief that there was a discriminatory practice regarding

-13-

advancement at the Wyeth facility continued to grow. (Ex. A at 99).

**2003 Performance Review**

44      It is undisputed that these facts are what Wardrop testified to at his deposition but the credibility and substance of these statements is highly disputed for the reasons stated in the following paragraphs. Plaintiff is unaware of what tasks or projects he allegedly "completely missed the deadline" for and cannot understand the basis for this statement contained in Defendants' paragraph "44". (Henry Aff. at ¶ 18).

45      The "facts" contained in Defendants' paragraph "45" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Plaintiff is unaware of any complaints made by other managers to Wardrop regarding Plaintiff's performance. (Henry Aff. at ¶ 18). Defendants have produced no evidence, other than self-serving statements, to support these assertions.

46      It should be noted that Defendants' paragraph "46" should presumably reference the year 2003 instead of 1993. It is undisputed that these facts are what Wardrop testified to at his deposition. Plaintiff believes the two projects that Defendants refer to are the CTC Cleaning Qualification/Verification and the CTC Weigh Belt projects. With regard to these projects:

46.1      CTC Cleaning Qualification/Verification: Plaintiff returned from a medical leave of absence in or about January 2003. (Henry Aff. at ¶ 20). In or about late February/early March 2003, Wardrop asked Plaintiff to take charge of this project because there were problems with most of the CTC (Continuous Tablet Coater) equipment passing the Quality Assurance ("QA") cleaning verification requirements. (*Id.*). Prior to this time, pharmaceutical supervisors oversaw these activities and Plaintiff occasionally provided assistance. (*Id.*). Plaintiff immediately sent

-14-

out an email enclosing a detailed flow chart which showed the steps that would be taken from that point forward to ensure that the CTC Cleaning Verifications were successful. (Ex. 28, Bates 1965-67). Wardrop replied by email thanking Plaintiff for his work and wrote "I know you will lead the way and hold the torch high." (Ex. 28, Bates 1964). The only time the project was behind schedule as Defendants claim was prior to when Plaintiff became responsible for it. (Henry Aff. at ¶ 20). Once Plaintiff became involved, the CTC passed inspection three straight times (which was the criteria set forth by QA) and the project was considered 100% successful. (*Id.*). At no time did Wardrop or Schaschl inform Plaintiff that the project was behind schedule or that Plaintiff's work was deficient, late, or lacking. (*Id.*). Plaintiff was never told that any problems associated with the Cleaning Verification project were attributed to him until he began to investigate his demotion in January 2004. (*Id.*).

46.2    CTC Weigh Belt: The Weigh Belt is a piece of equipment that is part of the CTC system which weighs the Centrum® tablets prior to them being conveyed into and coated by the CTC. (Henry Aff. at ¶ 21). In or about July 2001, Plaintiff became the Project Engineer on an interim basis, specifically to successfully install the CTC by March 2002. (*Id.*). As Plaintiff and other CTC team members began to research and investigate CTC peripheral equipment (Weigh Belt, conveyor belts, bins, etc.), the members found that the Weigh Belt was inherently flawed for use in this type of process. (*Id.*). Plaintiff and other team members reported their findings to upper management and were told that due to the limited time frame given for the project's execution, the Weigh Belt had to be used despite its flaws. (*Id.*). All of the duties associated with the project were completed and the CTC was successfully installed by its March 2002 deadline; however, the Weigh Belt, *inter alia*, continued to be a problem. (*Id.*). As the project progressed,

-15-

Plaintiff and other engineers researched and finally found a piece of equipment (the Check Weigher) that could possibly replace the Weigh Belt. (*Id.*). The engineers were told by Kevin Costello that the Weigh Belt would not be replaced because of a lack of familiarity and potential QA verification and qualification issues. (*Id.*). Accordingly, Plaintiff was forced to come up with ideas on how the CTC could continue to function effectively with the Weigh Belt and its associated problems; however, once equipment (like the CTC) is permanently installed and qualified for production use, the Maintenance Department is primarily responsible for the equipment's performance, and the engineers' job is limited to ensuring that the equipment remains functional. (*Id.*). Plaintiff did find a solution to the Weigh Belt problems in the spring of 2005, but all the problems associated with it during 2003 were inherent problems that Plaintiff had warned upper management about previously. (*Id.*). Defendants' contention that Plaintiff was somehow responsible for any delay in the completion of this project is utterly false and pretextual. (*Id.*). (*See also* Ex. 28, Bates 1936, 1938 (email correspondence regarding the Weigh Belt project)). At no time did Wardrop or Schaschl inform Plaintiff that the project was behind schedule or that Plaintiff's work was deficient, late, or lacking. (Henry Aff. at ¶ 21). Plaintiff was never told that any problems associated with the Weigh Belt project were attributed to him until he began to investigate his demotion in January 2004. (*Id.*).

47     With regard to the complaints made about Plaintiff not answering his pager, Plaintiff testified that this was the result of a company-wide problem concerning the pagers not working. (Ex. A at 152). Wardrop admitted that Plaintiff informed him of this problem and there was a period of time when the pagers were not working properly. (Ex. B at 28-29). Regarding Jean Colas's complaint that he was getting pages for Plaintiff, Plaintiff also got pages for areas

that were Jean Colas's responsibility. (Henry Aff. at ¶ 22). This was normal because the engineers worked as a team and often "backed up" each other. (*Id.*). To now make this into an issue is simply pretextual.

48     Plaintiff never received a mid-year review on September 3, 2003 as Defendants state in paragraph "48". (Henry Aff. at ¶ 17).

48.1    Plaintiff met with Wardrop in the March 2003 to have a mid-year review in an informal setting, and Wardrop accepted Plaintiff's goals and objectives as prepared by Plaintiff. (Henry Aff. at ¶ 16; Ex. 29). Wardrop emailed Plaintiff on March 17, 2003 with brief comments about the goals and objectives. (Ex. 28, Bates 1954).

48.2    Plaintiff later met again with Wardrop in April or May of 2003 to discuss some other issues that later appeared in the document that Defendants contend constitutes Plaintiff's mid-year review; however, Plaintiff *signed* this document. (Henry Aff. at ¶ 16).

48.3    The document that Defendants now contend constitutes the 2003 mid-year review (Ex. 11) is not the same document that Plaintiff reviewed and signed in April/May 2003. (Henry Aff. at ¶ 16, 17). Plaintiff was never given a copy of the earlier 2003 mid-year review to keep for his records. (Henry Aff. at ¶ 16). Plaintiff testified that he does not remember any review taking place on September 3, 2003 and does not remember discussing many of the items contained in the document. (Ex. A at 145-54). Wardrop himself was obviously conflicted when he was questioned by Plaintiff's attorney as to when he prepared the document. (Ex. B at 32-39). As such, the genuineness of the document is highly disputed. What is undisputed is that Plaintiff never signed the document and does not remember ever receiving it. (Ex. A at 145-47).

49    The document speaks for itself; however, for the reasons set forth in Plaintiff's

-17-

paragraph 48, the genuineness of the document is highly disputed.

50     The document speaks for itself; however, for the reasons set forth in Plaintiff's paragraph 48, the genuineness of the document is highly disputed.

51     The document speaks for itself; however, for the reasons set forth in Plaintiff's paragraph 48, the genuineness of the document is highly disputed.

51.1     Notwithstanding the above, the document makes it clear that Wardrop received a message that the pager system was not functioning properly and that "[s]ince the system is not working, it is likely that Howard did not receive the pages." (Ex. 11).

51.2     Regarding Wardrop's statement that Plaintiff was "observed doing nothing at work," not only is the credibility of this statement in dispute, but the substance of it is belied by an email dated August 20, 2003 that Wardrop wrote himself in which he states: "Thanks for your diligence in covering issues on all three shifts," (Ex. 28, Bates 1934), and again on August 22, 2003 in which he states: "I am well aware of our recent 'challenges,' so we need a move-forward plan. Howard can not [sic] be here 24-hours a day to keep the unit running," (Ex. 28, Bates 1932).

52     The document speaks for itself; however, for the reasons set forth in Plaintiff's paragraph 48, the genuineness of the document is highly disputed..

53     It is undisputed that these facts are what Joanna Rose and Michael McDermott testified to, but the credibility of these statement is in dispute as Plaintiff is unaware of any policy or custom at Wyeth reflecting Defendants' contention. (Henry Aff. at ¶ 16).

54     The facts contained in the 1st sentences of Defendants' paragraph "54" are undisputed. The "facts" contained in the remaining sentences of Defendants' paragraph "54" are

-18-

cited to a Declaration and, as such, the credibility of these statements is in dispute.

54.1    Plaintiff attested that the self-appraisal is not used as a "tracking system" as Defendants state in the 2nd sentence of paragraph "54". (Henry Aff. at ¶ 28). It was not a mandatory document required to be turned in to one's supervisor, some managers did not require a self-appraisal, and in certain instances managers actually wrote the self-appraisal for the employee. (*Id.*).

55    The facts contained in Defendants' paragraph "55" are undisputed, except it should be noted that the email of September 8, 2003 and October 2, 2003 are the same email (viz., it was forwarded again on October 2, 2003).

56    The facts contained in Defendants' paragraph "56" are undisputed.

57    The facts contained in Defendants' paragraph "57" are undisputed.

57.1    Plaintiff did not turn in his Self Appraisal in 2003 because, as he testified, Wardrop did not need the Self Appraisal because he knew exactly what Plaintiff was doing and had been doing because they spoke on a consistent basis. (Ex. A at 164-66). Additionally, Plaintiff was away on his honeymoon in the early part of October 2003. (Henry Aff. at ¶ 28). When he returned from his honeymoon on October 8, 2003, he orally asked Wardrop if he still needed the Self Appraisal, and Wardrop responded, "don't worry about it." (*Id.*).

**The Organizational Cascade**

58    The facts contained in Defendants' paragraph "58" are undisputed.

59    The "facts" contained in Defendants' paragraph "59" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

60    The "facts" contained in Defendants' paragraph "60" are cited to a Declaration

and, as such, the credibility of these statements is in dispute.

61      It is undisputed that this is what McDermott testified to; however, the credibility of this statement is in dispute.

62      The facts contained in Defendants' paragraph "62" are undisputed.

62.1      Wardrop testified that Jean Colas was later promoted from this position to a Senior Engineer position in the Vaccines Department at Wyeth. (Ex. B at 70-71).

63      It is undisputed that Honario Ordenez was selected as an engineer to work under Andrew Espejo; however, the remaining "facts" contained in Defendants' paragraph "63" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

64      The facts contained in Defendants' paragraph "64" are undisputed.

65      It is undisputed that Plaintiff's assignment to a Packaging Supervisor carried with it no change in money or grade. (Ex. A at 170). Plaintiff disputes whether the move was actually a "demotion" despite not having a change of money or grade. He testified that the position of Packaging Supervisor was normally held by former Packaging Operators, and the position required merely a high school diploma. (Ex. A at 169). It required Plaintiff to do little more than sit on an assembly line and watch hourly employees pack vitamins into a bottle. (Henry Aff. at ¶ 29). The Packaging Supervisor position is one for someone who is "possibly getting their foot in the door but not somebody at that time who had seven, eight, nine years of experience that I had, and the track record I had." (Ex. A at 170). People that work at the site hold the opinion that to be transferred from an engineer position to the Packaging Supervisor position implies that the transferee is incompetent. (Ex. A at 171).

66      The "facts" contained in Defendants' paragraph "66" are cited to a Declarations

and, as such, the credibility of these statements is in dispute.

67    It is undisputed that this is what McDermott and Rose testified to; however, the credibility of these statements is in dispute.

## Meeting with Wardrop Regarding the Performance Review and Organizational Cascade

68    The facts contained in the 1st, 2nd, 3rd, and 5th sentences of Defendants' paragraph "68" are undisputed. (Ex. 12). The 4th sentence of Defendants' paragraph "68" is responded to below in paragraph "68.2". The"facts" contained in the 6th and 7th sentences of Defendants' paragraph "68" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

68.1    The 2003 review is unsigned by any of the parties or other persons involved. (Ex. 12). Plaintiff averred that the document that Defendants contend is the 2003 year-end review is not the same document that Plaintiff was given at his 2003 review meeting. (Henry Aff. at ¶ 28).

68.2    Plaintiff disputed the review and left the meeting because he was upset and went for a walk. (Ex. A at 172-73). The review contained the example of the timeliness of Plaintiff's Self Appraisal (Ex. 12), which Plaintiff disputed because he was told by Wardrop that it was not necessary for Plaintiff to turn in the Self Appraisal. (Henry Aff. at ¶ 28). Plaintiff believed that it was unfair that his review for the entire year stated that "the timeliness of completing assignments still needs improvement" when the only example given was the Self Appraisal which he was told not to submit. (*Id.*; *see* Ex. A at 174-75). Additionally, Plaintiff *did* submit his 2003 goals and objectives to Wardrop in March 2003 as part of his mid-year review. (Ex. 29).

68.3    In part, it is this review that Plaintiff believes held him back from being promoted to higher and better positions as part of the Organizational Cascade, and was an indicator that

Wyeth was trying to justify its decision to deny Plaintiff opportunities for advancement. (Henry Aff. at ¶ 28-29).

68.4    The review also states that Wardrop had to "intervene" in two projects that were Plaintiff's responsibility and were behind schedule. (Ex. 12). Again, the two projects referred to are believed to be the CTC Cleaning Qualification and CTC Weigh Belt projects, in which material questions of fact exist as to whether it was, in fact, Plaintiff's responsibility for any alleged delay in the projects' completion. *See, supra,* ¶ ¶ 46.1, 46.2. Additionally, as stated above, no mention of the projects' delay, or the attribution of the delay to Plaintiff, was made until Plaintiff began to investigate his reassignment under the Organizational Cascade. (Henry Aff. at ¶¶ 20, 21).

69    The facts contained in the 1st sentence of Defendants' paragraph "69" are undisputed. The facts contained in the 2nd sentence of Defendants' paragraph "69" are completely misstated. Plaintiff never submitted his 2003 goals and objectives to Wardrop and even testified that he tried to show them to Wardrop but Wardrop refused to read them. (Ex. A at 175). The "facts" contained in the 3rd sentence of Defendants' paragraph "69" are cited to a Declarations and, as such, the credibility of these statements is in dispute; however, the implication contained in this sentence is misleading for the reasons already stated; i.e., the self-appraisal is not a mandatory document and Wardrop even told Plaintiff not to submit the self-appraisal on October 8, 2003. *See, supra,* ¶ 57.1.

**Henry's January 9 Meeting with Schaschl**

70    The facts contained in Defendants' paragraph "70" are undisputed. Plaintiff disagreed with Schaschl's opinions regarding the value of the Packaging Supervisor position.

-22-

(*See* Henry Aff. at ¶ 29).

71     The facts contained in the 1st and 2nd sentences of Defendants' paragraph "71" are undisputed. Plaintiff disagreed with Schaschl's opinions regarding Plaintiff's performance. (*See* Henry Aff. at ¶¶ 20, 21).  The "facts" contained in the remaining sentences of Defendants' paragraph "71" are cited to a Declaration and, as such, the credibility of these statements is in dispute. For example, with respect to the two projects Schaschl referred to at this meeting:

71.1     CTC Cleaning Verification: *See, supra,* ¶ 46.1.

71.2     CTC Weigh Belt: *See, supra,* ¶ 46.2.

71.3     Wardrop was not "forced to lead this project" instead of Henry as Defendants state in paragraph "71". (Henry Aff. at ¶¶ 20, 21). Henry led both projects himself and finished them with input from other engineers, including Wardrop, as part of a collaborative effort for such a high-priority project. (*Id.*).

**Henry's January 12 Meeting with Rose**

72     The "facts" contained in Defendants' paragraph "72" are cited to a Declaration and, as such, the credibility of these statements is in dispute; however, it not disputed that Plaintiff met with Rose on January 12, 2004.

72.1     On January 12, 2004, prior to Plaintiff's meeting with Rose, Wardrop asked Plaintiff to join him in his office where he stated: (1) Plaintiff did work hard on projects; (2) "I'm sorry for the way things turned out"; and, (3) he did not like to see Plaintiff unhappy. (Henry Aff. at ¶ 31).

73     The "facts" contained in Defendants' paragraph "73" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

## January 13 and 22 Meetings with McDermott

74    It is undisputed that this is what McDermott testified to at his deposition; however, the credibility of these statements is in dispute, except it is not disputed that Plaintiff met with McDermott on January 13 and 22, 2004.

74.1    McDermott merely told Plaintiff at the first meeting on January 13, 2004 that McDermott would "look into" the situation, but that he was opposed to one person remaining in a position for too long and that was why he felt Plaintiff's transfer to the Packaging Supervisor position would be beneficial. (Henry Aff. at ¶ 33). It is noteworthy that this reasoning for Plaintiff's transfer was different than the reasoning that Wardrop, Schaschl, and Rose gave. (Ex. A at 201-04). Additionally, Defendants state that McDermott informed Plaintiff that the Packaging Supervisor position would give him "formal" experience in a supervisory role, which Plaintiff disputes; however, McDermott testified at his deposition that prior to this time Plaintiff already had supervisory experience. (Ex. C at 56). Regardless, McDermott himself had no supervisory positions within Wyeth prior to becoming a manager. (Ex. C at 15-20).

74.2    On January 22, 2004, McDermott was considerably less congenial and more stern than he was on January 13, and was very adamant in his position, which was that he had to "trust his direct reports" and that he could not issue an executive order directing Wardrop and/or Schaschl to change the 2003 review. (Henry Aff. at ¶ 33). Plaintiff asked McDermott at this meeting if he had read Plaintiff's performance appraisals from the previous years, to which McDermott responded, "No. I don't care about them." (*Id.*).

75    The facts contained in 1st sentence of Defendants' paragraph "75" are undisputed, except that it should be made clear that the "meeting" referred to in Defendants' paragraph "75"

is the January 22 meeting and not the January 13 meeting as paragraph "75" implies. McDermott never made the statements referred to in the 2nd and 3rd sentences of paragraph "75". (Henry Aff. at ¶ 34). Plaintiff *did* raise the issue about race at this meeting by stating that it would be hard to explain the transfer from Engineer to Packaging Supervisor on his resume because he was an African American as stated in the 1st sentence of Defendants' paragraph "75". McDermott's only response to Plaintiff's concern about race was, "I am all for diversity [long pause] but I'm not going to get into that silly discussion with you." (*Id.*).

76      It is undisputed that this is what McDermott testified to. However, the credibility of these statements is in dispute. The mid-year review that McDermott refers to is, presumably, the review that Wardrop testified he conducted on September 3, 2003; however, Plaintiff states that this review never took place and the document that allegedly reflects the September 3, 2003 mid-year review is not the same document that Plaintiff reviewed and signed in the <u>spring</u> of that year. (*See, supra,* at ¶¶ 48.1-48.3). Furthermore, the projects referred to therein were in actuality either completed or were in progress and Plaintiff was never told that his work on these projects was late or lacking. (Ex. 32; *see, supra,* at ¶ 48 *et seq.* and ¶ 51 *et seq.*). With regard to the notion that Plaintiff did not "[satisfy] supervisor's expectations," Wardrop told Plaintiff on January 12, 2004 that Plaintiff did work hard and did do a good job. (Henry Aff. at ¶ 31).

## Henry's January 16 Meeting with Rose and Wardrop

77      With regard to the facts contained in the 1st sentence of Defendants' paragraph "77", it is undisputed that this is what Wardrop testified to. The revised 2003 Performance Appraisal is a document which speaks for itself. (Ex. 13). Despite stating that a performance rating cannot be changed once it is assigned, Defendants have never given a reason for this policy

-25-

and Plaintiff is unaware of any reason why a performance rating cannot be changed once it is formerly rebutted by an employee. (Henry Aff. at ¶ 32).

78      The facts contained in Defendants' paragraph "78" are undisputed.

79      The facts contained in Defendants' paragraph "79" are undisputed.

**Meetings with Peter Bigelow**

80      The facts contained in the 1st and 3rd sentences of Defendants' paragraph "80" are undisputed. Plaintiff never told Bigelow that he wished to remain in his current position after the Organizational Cascade as Defendants state in paragraph "80". (*See* Henry Aff. at ¶ 35). Plaintiff did, however, tell Bigelow that he did not want to be moved down to the position of Packaging Supervisor. (*Id.*).

80.1    Plaintiff also told Bigelow that the reason he approached him was that he was not receiving honest answers from Bigelow's underlings, to which Bigelow responded, "you deserve an honest answer." (Henry Aff. at ¶ 35).

81      It is undisputed that these facts are what Bigelow testified to. Plaintiff cannot respond to paragraph "81" because it asserts facts which are outside the scope of his knowledge.

82      The facts contained in the first sentence of Defendants' paragraph "82" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The facts contained in the second sentence of Defendants' paragraph "82" are contained in a document which speaks for itself; as such, the contents of the document are not in dispute.

82.1    On February 11, 2004, Plaintiff had another meeting with Bigelow which Defendants have not spoken to in their Rule 56.1 Statement. At this meeting, Bigelow told Plaintiff that he was not comfortable with him going to the position of Packaging Supervisor

because it was not a good use of resources. (Henry Aff. at ¶ 36; Ex. 33). This comment was confirmed in Plaintiff's personal notes and a follow-up email that Plaintiff sent to Bigelow dated February 16, 2004. (Ex. 33).

83    The facts contained in Defendants' paragraph "83" are contained in a document which speaks for itself; as such, the contents of the document are not in dispute.

84    The facts contained in Defendants' paragraph "84" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Plaintiff never heard back from Bigelow after the February 25, 2004 email until March 29, 2004 when Bigelow informed Plaintiff that Eugene Sackett would be conducting an investigation into Plaintiff's claims of discrimination. (Henry Aff. at ¶ 36). Bigelow's statement that he communicated with Plaintiff "several times" over the "next several weeks" or that Plaintiff continued to insist that he should remain in his current position is contrary to Plaintiff's testimony. (*See id.*).

85    The facts contained in Defendants' paragraph "85" are undisputed subject to the subparagraphs below.

85.1    Plaintiff objects to Defendants' characterization of the position of Consumer Health Project Engineer as a "lateral move" rather than as a promotion. The position would have afforded Plaintiff the opportunity for advancement in the future either within or without the company. (Henry Aff. at ¶ 38).

85.2    With regard to Defendants' "facts" that Plaintiff never applied for or bid on this position, to the best of Plaintiff's knowledge the position was never posted on the Wyeth intranet site as a position for which one could bid on. (Henry Aff. at ¶ 38). The position was later given to another employee who also, upon information and belief, never bid on the position. (*Id.*).

-27-

Regardless, Plaintiff received no response to his email and, if someone had responded to it and informed Plaintiff that he had to bid on the position, Plaintiff would have done so. (*Id.*).

86    As Plaintiff's paragraphs "80" and "84" make clear, Plaintiff was not "insisting all along that he wished to remain in his position as Production Engineer." (*See* Henry Aff. at ¶ 35). The rest of facts contained in Defendants' paragraph "86" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The Engineer Project Status Report, and all the prior years' performance reviews, completely belie the assertions contained in Defendants' paragraph "86" that Plaintiff had trouble completing projects on time. (Ex. 32; Exs. 1-10).

87    Henry first "officially" and in writing complained about racial discrimination in the email to Bigelow dated February 16, 2004. (Ex. A at 199). Henry originally raised the issue about being treated unfairly because of his race one month prior on January 16, 2004 to Richard Gaskins, the head of the Diversity Program, (Henry Aff. at ¶ 34), and again in his meeting with McDermott on January 22, 2004, (Ex. A at 193-94).

88    The facts contained in Defendants' paragraph "88" are undisputed.

89    The facts contained in Defendants' paragraph "89" are undisputed. (Ex. 35). Obviously, Plaintiff disputes the results of Sacket's investigation because he filed this lawsuit.

90    The facts contained in Defendants' paragraph "90" are undisputed.

91    The facts contained in Defendants' paragraph "91" are highly disputed. Plaintiff was never ultimately moved to the packaging department nor did he perform the duties of a Packaging Supervisor; however, all of Plaintiff's paperwork and reporting structure had changed such that he was reporting to Derek Burt and/or Monte Bradford, both packaging department managers, his curriculum changed to match that of a Packaging Supervisor, and he had to go

-28-

through the packaging department management to get his expense reports approved. (Henry Aff. at ¶ 39; Ex. 34).

**Henry's 2004 Mid Year Review**

92      The "facts" contained in Defendants' paragraph "92" are cited to a Declaration and, as such, the credibility of these statements is in dispute. For example, the 2004 Mid Year Review states that Plaintiff was late on the following projects: a) the Predictive Maintenance Plan; b) the Preventative Maintenance Plan; and, c) SOP Review Timeline. (Ex. 14). With respect to these projects, Plaintiff testified as follows:

92.1      <u>Predictive & Preventative Maintenance Plans</u>: Prior to the time that Espejo took the position as the Manager of PPU#1 (Primary Processing Unit), Production Engineers were not responsible for maintenance engineering operations as their training curriculums and job descriptions did not support such responsibilities. (Henry Aff. at ¶ 42). Plaintiff himself was not responsible for the maintenance plans as a Production Engineer and it should have been the maintenance department who was responsible. (Ex. A at 217-18). When Espejo assumed the role of Manager of PPU#1, he insisted that Plaintiff assume dual roles as a maintenance/production engineer. (Henry Aff. at ¶ 42). Despite Plaintiff's lack of training as a maintenance engineer, Plaintiff agreed to make an attempt to try and complete the tasks as assigned by Espejo (Henry Aff. at ¶ 42); however, Plaintiff was never informed of a specific date when this project was due and Espejo never made himself clear that there was a hard deadline for this project. (Ex. A at 216-19).

92.2      <u>SOP (Standard Operating Procedure) Review Timeline</u>: As stated above, Espejo was new to the department/area and had no idea what it took to complete the SOPs, and to say

-29-

that SOPs were late was inaccurate because, as someone with experience, Plaintiff knew the SOPs could not be completed according to a timeline the way Espejo believed they could. (Ex. A at 219-20).

93    The facts contained in Defendants' paragraph "93" are undisputed.

94    The facts contained in the first sentence Defendants' paragraph "94" are contained in a document which speaks for itself, and they are addressed by Plaintiff above in paragraph "92". (Ex. 14). The "facts" contained in the second sentence of Defendants' paragraph "94" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

95    The facts contained in Defendants' paragraph "95" are undisputed.

95.1    Plaintiff also told Espejo that he would begin providing monthly reports to him so that he could show him that he was, in fact, on schedule regarding the projects he was responsible for since he felt he needed to begin documenting his case. (Henry Aff. at ¶ 44; Ex. 36). The emails show that Plaintiff was responsible for an incredible amount of work being completed in each month. (Ex. 36). Espejo eventually asked Plaintiff to stop documenting his work after he saw that Plaintiff was standing up for himself. (Henry Aff. at ¶ 44).

**Manager Manufacturing Support Position**

96    The facts contained in Defendants' paragraph "96" are disputed in that the Manager of Manufacturing Support's duties were substantially the same as the former position of Senior Supervisor of Compression, and the only thing that was "new" about the position was the title. (Henry Aff. at ¶ 45).

96.1    Plaintiff was extremely qualified for this position: He had four full years of experience working in the Centrum® Production area; he had assisted all of the former people

who held the position when it was entitled "Senior Supervisor of Compression," Joe Torres, Michael Collaraffi (ph.), and Todd Davenport; he was familiar with the compression operations as the job description required; he was familiar with the staff he would be managing; he collaborated with all the departments that the position would be required to collaborate with and knew the individuals personally in those departments; and he had the requisite educational level. (Henry Aff. at ¶ 45; *see* Ex. 31).

97     The interview tally shows that eleven people were interviewed by four managers (not five) and that David Dittlerman received the highest overall score. (Ex. 21). The "facts" contained in the last sentence of Defendants' paragraph "97" are cited to a Declaration and, as such, the credibility of these statements is in dispute. The rest of the facts contained in Defendants' paragraph "97" are undisputed.

98     As stated above, Dittlerman received the highest overall score, not Max Katz, as Defendants state in paragraph "98".

99     The "facts" contained in Defendants' paragraph "99" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

100     The "facts" contained in Defendants' paragraph "100" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

101     The "facts" contained in Defendants' paragraph "101" are cited to a Declarations and, as such, the credibility of these statements is in dispute. Plaintiff is not, however, disputing Max Katz's resume and pedigree.

102     The "facts" contained in Defendants' paragraph "102" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

-31-

103    The interview panel itself consisted of four newly-<u>appointed</u> managers, two of whom had been chosen for other positions in the past over Plaintiff (Chris DeFeciani and Cara Muscolo)—the positions that consist of two of Plaintiff's claims herein—and Max Katz had no direct production experience in the area that the position would be expected to oversee. (Ex. 21; Henry Aff. at ¶ 46).

104    The facts contained in Defendants' paragraph "104" are undisputed to the extent the highest salary grade was three levels above Plaintiff's.

## Henry's 2004 Performance Review

105    Plaintiff's 2004 performance review is a document which speaks for itself. (Ex. 15). As such, the contents of the document are not in dispute.

105.1    The 2004 performance review did not "capture a key element" that Plaintiff believed should have been included which may have affected his rating—the Continuous Coater Single Pass Project in which Plaintiff participated by taking on a leadership role. (Ex. A at 122-23). Under Plaintiff's leadership and with his advisement, a problem with the Continuous Coater was remedied that could not be fixed even by the technical service department for the prior nine or ten months. (Ex. A at 122). Henry believed he should have been rated higher than a 3 because of his leadership in this project since the work he did was critical to Wyeth because it allowed Wyeth to coat Centrum® at a much higher rate and speed than it was being coated before. (Ex. A at 225).

105.2    Regarding the portion of the review that states Plaintiff was having trouble meeting certain dates, Plaintiff disagreed with that portion because he had to collaborate with many people and he should have been afforded certain extensions on those dates, to which

Espejo responded that Plaintiff was correct and had been given extensions himself. (Ex. A at 224). Additionally, Plaintiff had been documenting his work progress each month since his mid-year review, which emails show that Plaintiff was not behind on his projects. (Ex. 36).

105.3    Plaintiff refused to sign the 2004 performance review because he disagreed with the comments and rating as described above. (Ex. A at 225-26).

### Henry's "Performance Issues" in 2005

106    The "facts" contained in Defendants' paragraph "106" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

107    The "facts" contained in Defendants' paragraph "107" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Katz's statement that he had "difficulties with [Plaintiff] from the outset" is belied by emails sent from Espejo and Katz to Plaintiff in the beginning of the year acknowledging Plaintiff's hard work and late hours. (Ex. 37).

108    The "facts" contained in Defendants' paragraph "108" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Espejo and Katz themselves were also absent from work without providing what could be considered adequate notice and there were other times when Plaintiff was ill, notified Espejo and/or Katz that he was not going to be in, but *still* went to work for the sake of the company. (Henry Aff. at ¶ 49).

109    The email referred to in the 1st sentence of Defendants' paragraph "109" states that Livermore was aware that there was technical problem with the Coater and that Plaintiff was extremely busy. (Ex. 22). The facts contained in the 2nd, 3rd, and 4th sentences of Defendants' paragraph "109" are undisputed as they are contained in a document which speaks for itself. (Ex.

22).

109.1  In response to the 5th sentence of Defendants' paragraph "109", Plaintiff was communicating verbally with Katz and by email with other members of the team on an almost daily basis. (Henry Aff. at ¶ 49).

110    The facts contained in Defendants' paragraph "110" are contained in a document which speaks for itself. As such, the contents of the emails are undisputed. With respect to the second sentence of paragraph "110", Plaintiff's pattern and practice was to respond to many of Katz's emails verbally as it was oftentimes quicker to respond verbally in passing than it was to go back to his desk in order to write a formal email. (Henry Aff. at ¶ 49).

111    The "facts" contained in Defendants' paragraph "111" are cited to a Declaration and, as such, the credibility of these statements is in dispute. With regard to this meeting, it snowed significantly that day and Plaintiff arrived to work as soon as the weather permitted him to. (Henry Aff. at ¶ 51). Plaintiff still arrived in time to conduct the meeting and the meeting was a success. (*Id.*).

112    The facts contained in the 1st, 2nd, and 3rd sentences of Defendants' paragraph "112" are undisputed. With respect to falling behind on the Weekly Zone Checklists, Plaintiff explained to Espejo that the problem did not lie with him, but with supervisors who needed to fill out the documents better and that it was a departmental problem. (Ex. A at 232-33; Ex. 16, Bates D.00094-95). These problems were documented in an email sent by Plaintiff to Espejo on March 16, 2005 and Espejo responded by saying that they would work with the supervisors to ensure that they were properly applying the procedures for the Weekly Zone Checklists. (Ex. 23).

113    The emails referenced in Defendants' paragraph "113" are documents which

-34-

speak for themselves. (Ex. 23). As stated above in Plaintiff's paragraph "112", it was not Plaintiff's "failure to timely process [the] Weekly Maintenance Zone Checklists" which led to problems as stated in Defendants' paragraph "113", but it was an overall departmental problem that was being arbitrarily attributed to Plaintiff.

114    The facts contained in the first sentence of Defendants' paragraph "114" are undisputed. It is also undisputed that Espejo suggested a formal Performance Improvement Plan ("PIP") for Plaintiff. (Ex. 24). The rest of the "facts" stated in Defendants' paragraph "114" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

115    The facts contained in the 1st sentence of Defendants' paragraph "115" are undisputed. The rest of the "facts" stated in Defendants' paragraph "115" are cited to a Declaration and, as such, the credibility of these statements is in dispute. With respect to the PMOs not being completely in a timely manner, Plaintiff informed Katz that there were several reasons for the problem verbally, which are confirmed in an email from Katz to Espejo dated March 30, 2005. (Ex. 24). In this email, it is documented that Plaintiff informed Katz that the PMOs were not being turned into Plaintiff on time by others, in many instances there were mistakes made by others, and the December holiday season caused there to be a backup in work. (*Id.*). Plaintiff testified to exactly the same problems. (Ex. A at 230-32). Katz then stated that he would work with Plaintiff to track the source of the problem by creating a spreadsheet which would reflect when he received the PMOs from others, which implies and assumes that Plaintiff was not the source of the problem. (Henry Aff. at ¶ 51; Ex. A at 231).

116    The "facts" contained in Defendants' paragraph "116" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Upon information and belief, the

-35-

project that is referred to in Defendants' paragraph "116" is the Water System Management Project. (Henry Aff. at ¶ 52). Meetings were held and all the engineers agreed that the workload was heavy, especially for Production Engineers such as Plaintiff. (*Id.*). All present agreed that whichever engineer took their time to work on the Water System Management Project would be losing time from working on the production floor. (*Id.*). Nevertheless, Plaintiff did spend time working on this project and, as expected, the workload was heavy. (*Id.*). There was no schedule communicated to Plaintiff for this project, and he completed all the necessary training for this project by reading the necessary SOPs. (*Id.*). Plaintiff was unaware (until now) of any alleged complaint made about him by Cara Muscolo at any time, especially not in March 2005. (*Id.*).

117    The "facts" contained in Defendants' paragraph "117" are cited to a Declaration and, as such, the credibility of these statements is in dispute. (*See* Henry Aff. at ¶ 50). Plaintiff never "promised" to provide Espejo with the checklists by March 25, 2005 as Defendants state in paragraph "117". The language that Plaintiff used was: "the goal is to have them all to you by the end of next week or sooner if feasible." (Ex. 23). Additionally, Espejo himself was part of the problem as he had a checklist dated December 6, 2004 in his possession and did not give it to Plaintiff until March 2, 2005. (Henry Aff. at ¶ 50).

118    The "facts" contained in Defendants' paragraph "118" are cited to a Declaration and, as such, the credibility of these statements is in dispute. With regard to the issues raised by paragraph "118", the assignment was originally given to another group by QA because that group used the equipment in question. (Henry Aff. at ¶ 53). That group had approximately one month to complete the assignment, and it was already open for 13 days before it was given to Plaintiff, giving Plaintiff only two weeks to complete the assignment. (Ex. 38, Bates 1687). Plaintiff had

-36-

already "responded" to the email of May 19, 2005 the day before on May 18, 2005 by informing Espejo that he realized they were due, but since he just received the assignment, completing it by the June 3, 2005 target date was not feasible. (Ex. 38, Bates 1685). In regard to Defendants' contention that many people had to stay late to work on the assignment, staying late was commonplace and Plaintiff has had to stay late to help complete the assignments of others many times in the past. (Henry Aff. at ¶ 53).

**The PIP**

119    It is undisputed that Plaintiff was placed on a PIP. The rest of the "facts" contained in Defendants' paragraph "119" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

120    The facts contained in Defendants' paragraph "120" are undisputed.

120.1   Of the employees that worked for Katz at this time, Plaintiff was told by certain of those employees that they were not given a mid-year review; and, additionally, none of the employees were given goals or objectives for the year. (Henry Aff. at ¶ 54).

121    The facts contained in Defendants' paragraph "121" are in dispute. Stacey Marroso did not make the statements referred to in Defendants' paragraph "121" at the meeting of June 24, 2005 at the paragraph implies. She informed him of this on July 6, 2005. (Henry Aff. at ¶ 56).

121.1   Additionally, it was on June 24, 2005 that Marroso told Plaintiff that since he received a PIP, he would be unable to apply for any other position within the company for one year thereafter, and if the program was not completed successfully, disciplinary action would be taken "up to and including termination." (Henry Aff. at ¶ 54).

-37-

122     The facts contained in Defendants' paragraph "122" are undisputed. (Ex. 16). Plaintiff vehemently disagreed about the need for the PIP. (Ex. A. at 260-64). He submitted a formal rebuttal to the PIP with reasonable arguments for the unnecessary nature of its institution, and submitted a number of exhibits to corroborate his arguments. (Ex. 16).

123     The facts contained in Defendants' paragraph "123" are undisputed. (Ex. 17). As stated above, Plaintiff believes he was the only employee working for Katz who received a mid-year review at this time. (Henry Aff. at ¶ 54).

123.1   Referring to the 2005 mid-year review:

123.1.1     Two of the nine areas that were "behind pace" were departmental areas ("Batch Record Errors" and "Cycle Time") in which every employee would receive the same rating. (Henry Aff. at ¶ 55; Ex. 17) Nevertheless, Plaintiff was not even responsible for Batch Record Errors. (Henry Aff. at ¶ 55).

123.1.2     Three of the nine areas which were "behind pace" were based upon a subjective analysis performed by Katz. (Ex. 17). Those three areas ("Respect for People," "Leadership," and "Collaboration") are areas in which his prior reviews make clear he excelled in. (Exs. 1-10).

123.1.3     Of the remaining four areas which were "behind pace," three of them repeat themselves, and the project referred to therein was in progress; to wit, Katz's statement that it was "behind pace" was nothing more than his own subjective opinion. (Ex. 17). The other project, the Drag Finisher and Polisher Project, was never initiated. (Henry Aff. at ¶ 55).

123.2   Plaintiff's Engineer Status Report and the Project Summary (July 2005) make clear that Plaintiff did an overwhelming amount of work in 2005 which was completed on time

-38-

contrary to the review. (Ex. 39).

123.3  Of the five areas that were "unacceptable," one of them was departmental ("Mfg. Variance"), the remaining four repeat themselves and have already been addressed herein above at ¶¶ 112, 115 (Weekly Zone Checklists and PMO Turnaround).

124  The "facts" contained in Defendants' paragraph "124" are cited to a Declaration and, as such, the credibility of these statements is in dispute. (Henry Aff. at ¶ 54).

125  It is undisputed that Plaintiff met with Katz and Marroso on July 6, 2005. The remaining "facts" contained in Defendants' paragraph "125" are cited to a Declaration and, as such, the credibility of these statements is in dispute. Katz never told Plaintiff that he wanted him to be successful as stated in paragraph "125". Marroso was the person who made this statement. (Henry Aff. at ¶ 56). Plaintiff's Engineer Status Report shows that Plaintiff was always on track and completing his work satisfactorily; to wit, the characterization that his work "improved" is disingenuous. (*See* Ex. 39).

126  It is undisputed that Plaintiff met with Espejo, Katz and Marroso on July 25, 2005 and they informed him that the PIP was being closed out. (Ex. A at 262-64). The remaining "facts" contained in Defendants' paragraph "126" are cited to a Declaration and, as such, the credibility of these statements is in dispute.

127  The facts contained in Defendants' paragraph "127" are undisputed.

128  The wording of the facts contained in Defendants' paragraph "128" implies that Plaintiff simply refused to come to work; as such, Plaintiff objects to the implications contained therein. The medical leave of absence Plaintiff took was caused by the anxiety and depression he felt caused by the discrimination he felt he was being subjected to at Wyeth. (Ex. A at 271). This

leave was recommended by a doctor and a psychotherapist. (Ex. A at 272). As a result, Plaintiff sought a medical leave of absence, which was approved, and he took his leave. Espejo never told Plaintiff that he hoped he got better and would return to work soon. (Henry Aff. at ¶ 57).

129    The facts contained in Defendants' paragraph "129" are undisputed.

130    The facts contained in Defendants' paragraph "130" are undisputed.

131    The facts contained in Defendants' paragraph "131" are undisputed.

132    The facts contained in Defendants' paragraph "132" are undisputed.

133    The facts contained in Defendants' paragraph "133" are undisputed.

## Procedural History

134    The facts contained in Defendants' paragraph "134" are undisputed. (Ex. 25).

135    The facts contained in Defendants' paragraph "135" are undisputed. (Ex. 26).

136    The facts contained in Defendants' paragraph "136" are undisputed.

137    The facts contained in Defendants' paragraph "137" are undisputed.

## Management's Discriminatory Animus

138    In the spring of 2001, another Wyeth employee name Daisy Early's requests for a shift change were denied and she went to complain to her supervisor, Robert Bracco, that her request was denied unfairly. (Early Aff. at ¶ 3). Mr. Bracco's response was: "So sue me. All my supervisors are black so you can't prove discrimination." (*Id.*). A few weeks after this incident, Mr. Bracco became ill and told another employee, "Daisy tried to put voodoo on me but it didn't work." (*Id.* at ¶ 4). Upon his return to work, he again told another employee that "Daisy tried to put voodoo on me," and began showing the employee certain parts of his body where she supposedly inflicted "voodoo" on him. (*Id.*).

-40-

139     On another morning after this incident when Ms. Early was going into the Wyeth building where she worked, Defendant Wardrop stopped her and said, "Daisy, what are you doing at home? Sticking pins in a doll? What have I ever done to you?" (Early Aff. at ¶ 5). Ms. Early reported the incident to Michael Todd Davenport, Centrum® Production Coordinator, whose only response was, "If you knew all of the things that had gone wrong that night, you would understand the statement," to which Ms. Early responded, "The only way I would be able to understand that statement is if he stopped everyone who was coming into work that morning and told them the same thing." (*Id.*).

140     In February 2004, another Wyeth employee named Newton Paul witnessed Joe Vitanza (the then-current Managing Director of LCH and Defendant Walter Wardrop's immediate supervisor) refer to a malfunctioning alarm system as a "tar baby that I just can't get off my back." (Paul Aff. at ¶ 3). The project referred to above involved the installation of a new alarm system throughout the Centrum® manufacturing area. (*Id.* at ¶ 4) This project was led by Cara Muscolo, a white employee who was promoted to the position of Project Engineer over Plaintiff. (*Id.*). After the installation, the alarm system repeatedly malfunctioned and was eventually turned off, but Ms. Muscolo was promoted to a management position from the Project Engineer position despite her failures with regard to this project. (*Id.*).

141     In the winter of 2004, Mr. Paul witnessed Defendant Wardrop making fun of Manny Rivera, a Wyeth employee. (Paul Aff. at ¶ 5). Wardrop pulled his pants down low such that the waistband was around his thighs, supposedly imitating the dress of "hip-hop youth culture." (*Id.*). Mr. Rivera is a Hispanic employee, and Wardrop proceeded to make other gestures imitating the way he presumably perceives Hispanic youth. (*Id.*). He then said, "Is

-41-

Manny the kind of guy to wear his pants hanging down like this?" (*Id.*).

142    In May 2005, Mr. Paul applied for the position of Compliance Manager by sending his resume and a cover letter to Maura Corcoran, who was either a Director or an Associate Director of the Compliance Department in the Vaccines Group for Wyeth. (Paul Aff. at ¶ 6). He was qualified for the position and felt it would be a great opportunity for him. (*Id.*). He never received a response to his application despite sending repeated emails to Ms. Corcoran requesting an answer. (*Id.*). He was never interviewed for the position and it was eventually given to Mike Curry, who was a white employee. (*Id.*). Mr. Paul had more experience and team successes than Mr. Curry, yet was denied the opportunity to interview for the position. (*Id.*).

## Statistical Disparity in Wyeth's Upper Management Structure

143    Wyeth sends out emails which function as "promotional announcements," to its employees whenever an individual is promoted. (Henry Aff. at ¶ 58). Of the 53 announcements that Plaintiff has been able to retain in his records and tabulate to date, which cover the time period March 2004 through October 2005, only three promotions were given to black employees and one promotion was given to an Hispanic employee, (*Id.*), amounting to only 7.54% of the promotions being awarded going to minority employees out of the above-mentioned sample. All the other promotions were awarded to white employees. (*Id.*). Of the three promotions given to black employees, none were promotions into upper management. (*Id.*). Exhibit 40 shows the organizational chart for the Wyeth Consumer Health Division for both the 2003 and 2005 corporate reorganizations.

144    During the Organizational Cascade that took place in January 2004, there were four main management positions created for each Primary Processing Unit ("PPU") in Wyeth's

Consumer Health Division, the division in which Plaintiff worked. (Henry Aff. at ¶ 58). There were two PPUs and not one of the eight management positions was awarded to black employees. (*Id.*).

145    During another corporate reorganization which took place in October 2005, there were 17 management positions in the Consumer Health Division including Joe Vitanza'a directorship. (Ex. 40). Not one of the 17 management positions was awarded to a black employee. (*Id.*; Henry Aff. at ¶ 58).

**Dated:**       **Carle Place, New York**
                 **November 27, 2006**

                                        **Respectfully submitted,**

                          **By:** _____
                                        **Steven Morelli (SM 4721)**
                                        **LEEDS MORELLI & BROWN, P.C.**
                                        **Attorneys for Plaintiff, Howard Henry**
                                        **One Old Country Road, Suite 347**
                                        **Carle Place, N.Y. 11514**
                                        **(516) 873-9550**

-43-