Exhibit A

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

-----------------------------------x

HOWARD HENRY,

Plaintiff,

-against- 05 CV 8106

WYETH PHARMACEUTICALS, INC., WALTER WARDROP, ANDREW SCHASCHL, and MICHAEL McDERMOTT,

Defendants.

-----------------------------------x

June 12, 2006
10:10 a.m.

Videotaped deposition of HOWARD A. HENRY, pursuant to notice, at the offices of Orrick, Herrington & Sutcliffe LLP, 666 Fifth Avenue, New York, New York, before Gail F. Schorr, a Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public within and for the State of New York.

LEGALINK
A MERRILL COMPANY
420 Lexington Ave
Suite 2108
New York, NY 10170
tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171
www.merrillcorp.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

A P P E A R A N C E S:

LEEDS MORELLI & BROWN, P.C.
Attorneys for the Plaintiff
One Old Country Road
Suite 347
Carle Place, New York 11514
BY: STEVEN A. MORELLI, ESQ.

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Defendants
666 Fifth Avenue
New York, New York 10103-0001

BY: JAMES H. McQUADE, ESQ.
-and-
HEATHER A. GLATTER, ESQ.

ALSO PRESENT:
KENNETH M. O'BRIEN
Assistant Vice President

RICHARD BLY
LegaLink Action Video, Inc.

10:15:34
10:15:34

type of forum where you provided testimony?

A. I can't remember at this time. Not -- nothing -- nothing like this, no, that I can recall.

Q. Anything that you can recall where any attorney asked you questions where a court reporter was present?

A. Maybe when I was a kid. I really, really would have to be stretching that.

Q. Have you ever been a party to a lawsuit?

A. Not that I can recall. Maybe like those class action lawsuits that they send you in the mail, but nothing formal like this that I can recall.

Q. Have you ever commenced a lawsuit yourself?

A. Not that I can --

Q. Other than the class actions that you mentioned?

A. Not that I can recall.

HOWARD A. HENRY

10:31:49 Q. Mr. Henry, are you married?

10:31:56 A. Yes, sir.

10:31:57 Q. Do you have any children?

10:31:58 A. No, sir.

10:31:58 Q. Have you been married before?

10:32:00 A. No, sir.

10:32:00 Q. Can you tell me about your educational background?

10:32:04 A. How far back?

10:32:06 Q. Start from high school, please.

10:32:08 A. Graduated from Cardinal Spellman High School. After that I went to St. John's University and got a degree in physical science. After that I spent some time at the University of Maryland, came home, worked and got a degree from City College of New York in approximately -- in the fall of 1997.

10:32:29 Q. And what degree was that from City College?

10:32:31 A. Chemical engineering.

10:32:37 Q. That's a Master's degree?

10:32:39 A. Bachelor's degree. I have two Bachelor's degrees.

10:32:44 Q. When did you get your Bachelor's degree from St. John's?

10:32:47 A. 1990.

(Henry Exhibit 1 for identification, Bates stamped 4026 through 4028.)

(Henry Exhibit 2 for identification, Bates stamped 3320 through 3322.)

10:33:27 Q. I hand to you two documents. The first document I handed you, Exhibit number 1, if you look in the lower right-hand corner there's a Bates number, 4026. The second document I handed you, Exhibit number 2, if you look in the right-hand corner of that document there's a Bates number 3320.

10:33:51 Mr. Henry, referring to Exhibit number 1, this is a copy of your resume?

10:33:55 A. Yes, sir.

10:33:56 Q. Exhibit number 2 is also a

HOWARD A. HENRY

10:59:04 Q. Mr. Henry, I placed in front of you a document that's been marked Exhibit number 4. It's a copy of the complaint that was filed in this action. Is this the document that you said you had reviewed before today's deposition?

10:59:22 A. Without reading the entire document, it looks to be -- it looks to be the document. Without reading the entire thing, just skimming it.

10:59:49 Q. In your complaint you allege that you were denied a number of promotions during your employment at Wyeth because of your race; is that correct?

10:59:59 A. Yes, sir.

11:00:01 Q. Can you tell me the first instance in which you believe you were denied a promotion because of your race?

11:00:12 A. I applied for a position of project engineer on or about -- sometime in -- I can't remember the

exact time frame, but it was around 2001/2002, yes, December 2001, about that time.

Q. And how did you apply for that position?

A. Using the bid process at Wyeth.

Q. Why were you interested in this position?

A. Because during a special circumstance that had arisen at that time certain individuals were given opportunities to do other things and at that time I was performing the duties of a project engineer for a project that was taking place during that time. So I was functioning as a project engineer. So that's where the interest came from.

Q. Who were you working on this special project with that you referred to?

A. Peter McGarrigle, Kevin Costello, and certain outside vendors.

11:01:38 Q. And can you describe the project for me?

11:01:40 A. Basically it was called the continuous coater project where we were supposed to perform duties and functions to facilitate the proper installation, performance, of a new technology that was called the continuous tablet coater. So all the equipment associated with that, all the objects associated with that we were responsible for.

11:02:10 Q. Do you know how this position became open? Is there someone that left Wyeth that opened up this position as a project engineer?

11:02:21 A. From what I remember it was a restructuring that occurred and during this restructuring certain engineers were given the title as project engineers, certain engineers will remain production engineers, so forth and so on.

11:02:41 So there was some sort of

HOWARD A. HENRY

restructuring at that time that made the position available.

Q. So you submitted a bid for this open position, correct?

A. From what I remember, yes, yes.

Q. And what happened next?

A. Well, I didn't receive the opportunity and I didn't -- at that time I just took it as, well I'll continue to move on and continue searching.

Q. Were you interviewed for the position?

A. Not formally, no.

Q. Informally were you interviewed?

A. I don't think I was interviewed at all.

Q. Did you talk to anyone about this position?

A. I may have made mention to some of the engineers who were there at the time.

HOWARD A. HENRY

Q. Do you know who the decisionmakers were on this open position?

A. I think the main decisionmaker was Kevin Costello himself.

Q. Kevin Costello and who?

A. I think he was -- from what I remember I think he was the major decisionmaker, Kevin Costello.

Q. Anyone else involved? You said he was the major decisionmaker. Was there anyone else involved?

A. Well, when I use the word major, it's hard to tell who's major and who's minor at times. You just base your -- base your, for lack of a better word, your ability to understand and gather the information based on what you see going on in front of you. So he seemed to be the main one making the decision because the person was reporting to him.

Q. But you don't know who made

11:04:14 the decision?

11:04:15 A. Not a hundred percent.

11:04:17 Q. And you don't know who

11:04:24 was --

11:04:25 A. Well --

11:04:26 Q. -- was involved in this

11:04:27 decision?

11:04:27 A. Well I mean Kevin and I had

11:04:29 a conversation and based on that

11:04:31 conversation he told me that he made

11:04:34 this decision himself. Now whether his

11:04:40 decision was influenced by anybody

11:04:42 else, I don't know. But he said he

11:04:43 made the decision himself.

11:04:44 Q. When did he tell you that?

11:04:45 A. I can't remember exactly

11:04:47 when, but it was during -- it was

11:04:49 before the announcement was made as to

11:04:51 who got the position.

11:04:53 Q. But after Kevin had made the

11:04:54 decision?

11:04:56 A. Right. He had said that,

11:04:57 you know, there's a girl that he's

11:04:59 interested in and, you know, that was

HOWARD A. HENRY

his decision.

Q. Did he tell you the name of this girl?

A. I don't know if he told me the name at that time.

Q. Do you know who was ultimately hired for this position?

A. Yes.

Q. Who was that?

A. Cara Muscolo.

Q. Do you know what Cara's qualifications are?

A. I know she worked at Wyeth for a short stint. I know that she has a -- at the time she had a BE in chemical engineering.

Q. Do you know what her work background is?

A. I know that she worked at Wyeth as -- in the packaging area for a short stint as either a supervisor of some sort, but I don't know a hundred percent.

Q. Did you ever work with Cara?

HOWARD A. HENRY

A. Yes, I have.

Q. When did you work with her?

A. At various times during various projects throughout my stint at Wyeth when I was an engineer. The engineers, we kind of cross-pollinate, if you will.

Q. Did you work with her before she was hired for this particular position?

A. No.

Q. But you worked with her after?

A. Yes.

Q. And what are your impressions of Cara?

A. I'm not here to judge her. We worked together and, you know, I guess there are all areas where we can learn from each other and grow from each other. So, basically for the most, part we were amicable toward each other.

Q. Do you have any reason to

HOWARD A. HENRY

believe she was not qualified for the position she was hired at the time she was hired?

A. I cannot say she was not qualified.

Q. And after the decision was made and having had the opportunity to work with her, do you believe that she was in fact qualified for the position?

A. I believe that she -- she performed her functions, she did her duties. She performed the function in the position, but I can't -- I wouldn't judge her in that light. It's not for me to judge her like that.

Q. But I'm asking you to judge her and I'm asking you to tell me based on your experience with her in this position whether she was in fact qualified for this position?

A. I can't say she was not qualified. I can't say that she didn't perform the duties in the position. From what -- from my interaction with

her we interacted well, and that's the best I can assess.

Q. Do you know what criteria was used in selecting Cara Muscolo for this position?

A. All of the criteria, no.

Q. Do you know any of the criteria?

A. I mean what was mentioned to me was that there was a -- there was an area that she -- she -- she had some exposure to and based on that the decision was made.

Q. But you weren't involved in the decisionmaking process?

A. No.

Q. And who told you about this? You mentioned someone told you about this one criteria. Who was that person?

A. Mr. Costello himself.

Q. When you spoke to Mr. Costello about this decision, did you express any disappointment that you

weren't selected for the position?

A. I mean I didn't -- I don't know if I'm -- if I kind of looked disappointed. I may have looked disappointed, but at that time he and I, I took it as, you know, that was his decision, I respected it, and I moved on at that time.

Q. Do you have any basis for believing that you were not chosen for this particular position because of your race?

A. I believe a pattern was established as time went on. I mean I wasn't really looking for that at that time. You know, we were all working together to achieve goals, to do what's right for the company. So I wasn't really looking for anything at that time. But as time went on a pattern established itself.

Q. I don't think you answered my question. I'll ask it again. Do you have any basis for believing that

you were not chosen for that particular position because of your race?

A. At that time? Or now?

Q. At that time.

A. At that time I didn't see what I saw now.

Q. So the answer is at that time, no?

A. At that time, no.

Q. Okay. Now how about now?

A. Now --

Q. Do you have a basis for believing?

A. Now, as a pattern established itself I believe there is a basis for it.

Q. And what is that basis for believing that you were not chosen for this particular position because of your race?

A. Basically as I began to apply for more positions, and I -- not in every case, but in most of those cases, there seemed to be a pattern at

which we weren't even considered, when I say we, myself, and some of the African American men that I spoke with, were not considered for a managerial track position at Wyeth.

Q. Any other basis?

A. There may be some other basis, but I mean the baseline that's established, the foundational truth that's been established took time to develop themselves. It wasn't something that -- it wasn't an instantaneous thing that spurred in my emotion or spurred in my heart, but it's something that presented itself over time.

Q. I'd like you to focus again on this particular hiring decision. And is there anything at all about this particular decision, asking you just about this decision in isolation, do you have any basis for believing that you were not chosen because of your race? And I understand what you've

11:28:00 A. Yes.

11:28:02 Q. Did you have any discussions
11:28:06 with Mr. Schaschl about this position
11:28:10 and the fact that you did not get the
11:28:12 position?

11:28:13 A. Yes.

11:28:15 Q. When did that discussion
11:28:17 occur?

11:28:18 A. There may have been a
11:28:23 previous discussion, but the one I
11:28:24 recall the most was in January of 2004.

11:28:36 Q. About a year and a half
11:28:37 after --

11:28:40 A. There may have been --

11:28:41 Q. -- the decision was made?

11:28:42 A. There may have been another
11:28:43 discussion that occurred afterwards,
11:28:47 but --

11:28:48 Q. But you don't recall --

11:28:50 A. No.

11:28:50 Q. -- anything that was said
11:28:51 during that discussion? So the only
11:28:53 discussion you remember with Mr.
11:28:55 Schaschl is a discussion you had with

HOWARD A. HENRY

11:28:56 him in approximately January 2004, correct?

11:28:59 A. At that time -- at this time, yes.

11:29:02 Q. And can you tell me about that discussion you had with Mr. Schaschl in 2004?

11:29:07 A. I asked him how was the decision made as far -- regarding the production engineer product -- excuse me, product coordinator position at the time when it was available. He said that well, Chris had done it for a little while, he had done it for a little while. So I said well, given the opportunity, I would have liked to have done it for a little while. Because usually you're given the opportunity to do something for a little while just to expose yourself to it, and it, you know, if you show interest in a particular position they may extract some of the duties of that position for you to do it so that you

11:30:00 can -- should the position be made available perhaps slide into the position or be the chief candidate for the position once it becomes available.

11:30:16 Q. What did Mr. Schaschl say?

11:30:23 A. Basically he said that he, meaning Mr. DeFeciani was chosen because he did it for a little while, and I said, well, when it was made available on a temporary basis I would like to have had an opportunity to do it for a little while. And he said, well, it was given to Rich because he did it for a little while. And I said, well, when Chris went out hurt on medical leave why wasn't I afforded the opportunity to do it for a little while, you know I was interested in the position, you knew Chris and I interviewed for the position, therefore, I would have liked the opportunity to have done it for a little while. And he kind of excused and he kept on repeating that, you know, the reason why Rich was given the temporary assignment to do it

was that he did it for a little while.

Q. Did he explain any other, did Mr. Schaschl explain any other reason for his decision in choosing Mr. DeFeciani?

A. No.

Q. Did you ask?

A. I mean -- yes, I asked him, I said -- you know, sorry, I didn't mean to cut you off.

Q. No, go ahead.

A. I mean basically I questioned him again and I said so he did it for a little while and he said yes. That was it.

Q. Is there anything else you recall from this conversation with Mr. Schaschl in January of 2004, anything else you said or anything else he said?

A. Regarding this particular issue?

Q. Yes.

A. Not that I can recall.

Q. Did you tell Mr. Schaschl

11:31:58 that you believed you had not been
11:32:00 chosen because of your race?
11:32:01 A. At that time, no.
11:32:09 Q. At that time, January 2004,
11:32:10 had you told anyone that you believed
11:32:12 that you had not been chosen for any
11:32:16 particular position because of your
11:32:17 race?
11:32:18 A. I started to suspect certain
11:32:22 things at that time, but I didn't want
11:32:24 to come out right and say it until I
11:32:29 felt, you know, that was the case.
11:32:31 Q. So before -- at this time you
11:32:35 had made no complaint with anyone at
11:32:37 Wyeth regarding racial discrimination of
11:32:39 any sort, January of 2004?
11:32:42 A. Not that I can recall, no.
11:32:48 Q. You mentioned in your
11:32:53 meeting with Mr. Schaschl in January
11:32:56 2004, you mentioned something about Mr.
11:32:57 DeFeciani being out for a period of
11:33:01 time and you had wanted to fill in for
11:33:04 him. Can you explain to me what that
11:33:06 was about?

A. Mr. DeFeciani went out on medical leave. He had to get some heart surgery. So there was going to be someone who was going to fill the position as an interim, and it was going to -- that's how the position was made available on an interim basis.

Q. So Mr. DeFeciani went out on medical leave?

A. Right.

Q. With the understanding that he would be returning to Wyeth?

A. Right.

Q. Returning to the same position?

A. Right.

Q. So the position was just someone filling in in Mr. DeFeciani's absence, correct?

A. Right.

Q. Did you tell anyone that you were interested in this particular position or filling in for Mr. DeFeciani when he was out on medical

11:34:03 leave?

11:34:07 A. I had a discussion with Mr.
11:34:08 Wardrop as to why I wasn't afforded the
11:34:14 opportunity to do it when Chris was
11:34:16 out.

11:34:16 Q. Mr. Wardrop or Mr. Schaschl?

11:34:18 A. Mr. Wardrop.

11:34:19 Q. And when did that
11:34:21 conversation occur?

11:34:21 A. It was -- it occurred around
11:34:24 January of -- January/February of 2003.

11:34:31 Q. And this was after the time
11:34:42 period where Mr. DeFeciani had gone out
11:34:45 and returned from medical leave?

11:34:47 A. I can't recall. I don't
11:34:51 know.

11:34:51 Q. Do you know whether you told
11:34:53 anybody, anybody at Wyeth that you were
11:34:58 interested in filling in for Mr.
11:35:02 DeFeciani either before he went out on
11:35:05 his medical leave or during his medical
11:35:08 leave?

11:35:09 A. I don't recall. I don't
11:35:15 recall.

11:35:15 Q. When you met with Mr. Wardrop in January/February 2003, what was the purpose of this meeting?

11:35:37 A. Just so that we could discuss certain production issues on the floor, certain roles of certain individuals, including myself, and just to kind of lay out how we're going to proceed throughout the year.

11:36:03 Q. And did you bring up the issue of the production coordinator position, filling in for Mr. DeFeciani?

11:36:13 A. Yes.

11:36:14 Q. What did you say about that?

11:36:15 A. Basically I told him that, you know, I know that basically, most of the time people get positions because they do it for a little while. I interviewed for the position officially in 2002, and I would have -- I would have liked an opportunity to fill the position on that interim basis, why wasn't I given that opportunity. And he basically stated

11:36:43 that they, meaning Schaschl and others,
11:36:46 because I asked him who's the they, he
11:36:48 said Andy and some others, I didn't ask
11:36:51 him who the others were, told him, I
11:36:54 mean basically made a decision that
11:36:57 Rich Morgan would be able to do it for
11:36:59 a little while, should be given the
11:37:02 opportunity to do it for a little
11:37:03 while.

11:37:06 Q. And was in fact Chris Morgan
11:37:09 the individual who filled in for Mr.
11:37:11 DeFeciani?

11:37:12 A. Yes.

11:37:12 Q. Had Mr. Morgan been filling
11:37:15 in for Mr. DeFeciani prior to this --

11:37:19 A. I don't know.

11:37:19 Q. -- when he was absent for
11:37:22 short periods of time?

11:37:23 A. I don't know.

11:37:24 Q. Do you know anything about
11:37:33 Mr. DeFeciani's qualifications for this
11:37:36 particular position as a production
11:37:37 coordinator?

11:37:39 A. As to when he first got it

HOWARD A. HENRY

or him performing the duties himself?

Q. Let's start with when he first got it.

A. No.

Q. And how about today, as you sit here?

A. I mean no.

Q. Do you have any reason to believe that Mr. DeFeciani was not qualified for the position?

A. No.

Q. At the time he was hired?

A. No.

Q. Do you have any reason to believe that he was not qualified at any time he was serving in this position?

A. No.

Q. Do you have any reason to believe -- strike that.

Can you tell me what your basis is for believing that you were not selected for this particular position because of your race?

HOWARD A. HENRY

A. When I approached Mr. Schaschl and I asked him, you know, he appeared truculent and he stated that basically the reason why Chris got it was because he did it for a little while. I stated that well I wanted the opportunity to do it for a little while, you were well aware of the fact that I interviewed for the position previously, and that should an opportunity like this come up, I should have been afforded that opportunity.

And I don't recall his response at this time, but for all intents and purposes he just stated that well, at that time the decision was made because Chris had did it for a little while.

Q. Anything else?

A. No, I can't recall at this time.

Q. Now how about Mr. Morgan, the individual who filled in for Mr. DeFeciani during his medical leave, do

11:40:03 you know anything about his
11:40:04 qualifications for filling in for this
11:40:08 particular position?
11:40:09 A. Well, he was a production
11:40:12 supervisor. He started out as a
11:40:16 pharmaceutical operator. As far as his
11:40:21 education, he didn't have a degree at
11:40:30 the time.
11:40:30 Q. Anything else?
11:40:32 A. That's basically it.
11:40:35 Q. Do you know whether a degree
11:40:37 is required for this position?
11:40:40 A. I don't remember the exact
11:40:44 job posting. From what I do recall I
11:40:47 think a degree, they requested a
11:40:49 degree.
11:40:50 Q. But there was no job posting
11:40:53 for the position when it -- when Mr.
11:40:57 DeFeciani went out on medical leave?
11:41:00 A. No.
11:41:00 Q. There really was no
11:41:01 position?
11:41:02 A. Well, no, there wasn't. No.
11:41:07 Q. It was just filling in?

11:41:09 A. Yes.

11:41:10 Q. Mr. Morgan didn't get a new title during this position, did he, as far as you know?

11:41:18 A. Well, he would sign things electronically interim production coordinator. And, you know, they afforded us a loose interpretation of using titles like that if you did something on an interim basis.

11:41:34 Q. Did he continue to use that title after his period of filling in for Mr. DeFeciani ended?

11:41:41 A. No.

11:41:42 Q. Do you have any reason to believe that Mr. Morgan was not qualified to step in and temporarily perform the production coordinator job duties during Mr. DeFeciani's absence?

11:42:03 A. No.

11:42:04 Q. And can you tell me what your basis is for believing that you were not asked to fill in for Mr. DeFeciani during his medical leave

11:42:26 because of your race?

11:42:28 A. Usually, the -- more -- many of the individuals that had that position went on to become managers. So this position has a lot of exposure, introduces you to a lot of situations that a manager considers as he moves throughout the corporate structure. So this position is used as a stepping stone toward management.

11:43:04 And basically, I made it known throughout my constant speaking with individuals that I wanted to improve, acquire more knowledge and sought management positions, a management position within the organization.

11:43:22 Q. Do you have any other basis for believing that you were denied this opportunity because of your race?

11:43:35 A. No.

11:43:40 Q. Do you know who made the decision to have Mr. Morgan fill in for Mr. DeFeciani during his absence?

A. From what Mr. Wardrop told me it was Andy Schaschl's decision.

Q. Do you know whether Mr. DeFeciani had any input in this decision?

A. No.

Q. If I can refer you to the complaint which has been marked as Exhibit number 4, paragraph 25.

A. Yes.

Q. Paragraph 25 says, "In the spring of 2003, Howard complained to Walter Wardrop regarding his denial of advancement opportunities."

A. Right.

Q. Is that the conversation with Mr. Wardrop that you had referred to --

A. Yes.

Q. -- a little while ago?

A. Yes.

Q. And what advancement opportunities did you discuss at this particular meeting?

HOWARD A. HENRY

11:45:03 A. The mainly --
11:45:04 Q. Was it -- I'm sorry.
11:45:05 A. No, go on.
11:45:07 Q. Was it just the three positions that we have just discussed, the project -- well, I should say two positions, the project engineer position and the production coordinator position?
11:45:17 A. From what I can recall, yes.
11:45:20 Q. Okay. What was the next position that you were -- that you had applied for but did not receive?
11:45:43 A. I think it was the process engineer position.
11:45:48 Q. And that position was in the vaccine division; is that correct?
11:45:52 A. Yes.
11:45:52 Q. That's a separate division than you were working in?
11:45:56 A. Yes.
11:45:57 Q. And it's a separate division than the production coordinator position you had previously applied to?

A. Yes.

Q. As well as the project engineer position that you previously have applied to?

A. Yes.

Q. And how did you apply for this position?

A. Through the bidding process.

Q. What happened after you submitted your bid?

A. I think I got confirmation that my bid was received.

Q. What happened next?

A. From what I remember, I was contacted about an interview.

Q. And did you interview?

A. Yes.

Q. Who did you interview with?

A. A gentleman by -- I think his name was Kirit Rokad, I think.

Q. And who was Kirit Rokad?

A. He was the person that the position reported into.

Q. So is it your understanding

that he was the individual who was going to be making the hiring decision with this job?

A. Yes.

Q. And do you know what his position was at this time?

A. No.

Q. Did you know him before --

A. No.

Q. And can you tell me what your understanding of this position was?

A. It was performing functions within the vaccine area as an engineer dealing with their equipment, dealing with aseptic conditions.

Q. And why were you interested in this position?

A. Basically, after the restructuring, I decided that perhaps maybe I should look at some other opportunities outside of the consumer health division. So I started to look outside.

11:48:18 MR. McQUADE: Could you please mark that.

(Henry Exhibit 5 for identification, interview schedule for the process engineer position.)

11:48:31 Q. Mr. Henry, I've handed you an exhibit marked Exhibit number 5. Do you recognize this document?

11:48:53 A. Yes.

11:48:53 Q. And what is it?

11:48:54 A. Interview schedule for the -- for the process engineer position.

11:48:59 Q. And does this refresh your recollection as to who you interviewed with?

11:49:05 A. Yes.

11:49:06 Q. Robert Ruth, do you remember your interview with Robert Ruth?

11:49:14 A. I remember meeting him. I don't remember exactly everything that was said.

11:49:22 Q. Kirit Rokad we already spoke about. You also met with Andrew Fong.

11:49:28 A. Right.

11:49:29 Q. Do you remember anything about that particular meeting?

11:49:31 A. Not everything that was said, no.

11:49:33 Q. Rich Musa, you interviewed with Rich as well?

11:49:35 A. Yes.

11:49:36 Q. Do you remember anything from that?

11:49:37 A. Vaguely.

11:49:42 Q. Gaurav Patel?

11:49:45 A. Yes.

11:49:46 Q. Do you remember anything from that interview?

11:49:52 A. Not at this time.

11:49:53 Q. You also interviewed with Monica Amonica?

11:49:57 A. Yes.

11:49:57 Q. Do you remember anything from that particular interview?

11:49:59 A. No.

11:50:00 Q. Did you consider this position a promotion?

11:50:10 A. Yes.

11:50:13 Q. Why?

11:50:13 A. There was going to be a level change from what I understand involved.

11:50:21 Q. When you say level change, that's the salary level?

11:50:24 A. Right.

11:50:24 Q. Do you know what the salary level for this position was?

11:50:27 A. I can't recall.

11:50:28 Q. Is there any other reason why you viewed it as a promotion?

11:50:39 A. Opportunity, another area.

11:50:44 Q. Do you know who else bid on this particular --

11:50:50 A. No.

11:50:50 Q. -- position? Do you know who was hired for this particular position?

11:50:53 A. I remember -- I remember a name Martinez. I don't remember anything other than that.

11:51:02 Q. Do you know anyone by the

name of Angel Montanez?

A. No, not that I can recall.

Q. So you thought someone by the name of Martinez may have --

A. I thought that's what it was but I don't know.

Q. But you don't know, as you sit here today you don't know who was hired for this position?

A. Without a shadow of a doubt, no.

Q. Who do you think might be hired for this position?

A. I don't know. With all due respect, I don't know.

Q. So you don't know who was hired for the position, you don't know who applied for the position all you know is that you, yourself applied for this position, correct?

A. Yes.

Q. Do you believe that you were qualified for this position?

A. Yes.

Q. How so?

A. Based on the posting I had the qualifications. They requested an engineering background and some of the descriptions that were -- that they described met some of the qualifications that I had.

Q. Had you ever worked in the vaccine division at Wyeth before?

A. No.

Q. Do you believe that it would have been an advantage to hire someone who had been working in that division?

A. Yes.

Q. Why?

A. Exposure and experience sometimes defeats some of the things that you may think a person may have, so. A proven track record helps.

Q. And had you ever worked with any of the individuals in this division that you interviewed with?

A. Yes.

Q. And who was that?

A. Rich Musa.

Q. Other than Rich?

A. No.

Q. And what is your basis for believing that you were denied this particular position because of your race?

A. Well, I didn't -- I didn't express that I was denied this particular position because of my race.

Q. Do you believe that as we sit here today?

A. No.

Q. So you don't believe -- okay.

Can you tell me what the next position you applied for and were denied?

A. Staff engineer.

Q. And do you know when that was?

A. Same time, around January, February 2004.

Q. And in what division was

that position?

A. I think it was bioprocess.

Q. And where does bioprocess fit in?

A. In the research aspect of Wyeth.

Q. It's a different department separate from the departments in which the production coordinator and project engineer positions?

A. Yes.

Q. And how did you apply for this position?

A. Through the bidding process.

Q. And what happened after you submitted your bid?

A. I think I received confirmation that I got the -- that my application was received.

Q. Anything else happen?

A. No. That I could recall, no.

Q. Did you ever interview for this position?

11:55:27 A. No.

11:55:28 Q. Did you apply for -- did you submit just one bid?

11:55:31 A. There was two jobs opening and I think I submitted one bid. I may have submitted two.

11:55:40 Q. When you said there were two jobs opening, is that --

11:55:43 A. There were two jobs with two different posting numbers, so that means there were two positions available.

11:55:48 Q. They were both staff engineer positions?

11:55:51 A. Yes.

11:55:52 Q. And you know you submitted a bid for one of these positions; is that correct?

11:55:58 A. Yes.

11:55:58 Q. But you're not sure if you submitted two bids?

11:56:01 A. Right. I may have, but I don't remember.

11:56:04 Q. Do you know who -- how

this -- or I should say how these staff engineer positions came to be opened?

A. They were posted on the website, the Wyeth job listing website.

Q. Who held these positions previously?

A. I don't know. I don't know if they were newly recreated. I don't know.

Q. What does a staff engineer do?

A. From what I recall, they dealt with the staging of reactions, the taking care of equipment associated with bioprocesses. They were basically going to oversee other engineers that were of lower seniority than they were and schedule their work and schedule some of their duty, from what I understand. I don't remember all of the information with the posting. But it was familiar to me the duties.

Q. And do you remember who the supervisor would be for each of these

HOWARD A. HENRY

two openings as a staff engineer?

A.     I know -- I think it said the position reported to a gentleman by the name of John Simpson.

Q.     Who is John Simpson?

A.     I think he was a director at the time for that particular area.

Q.     Did you have any prior relationship with Mr. Simpson?

A.     We interacted.

Q.     How did you interact?

A.     Well when I was in research sometimes there was a period where I was working for the division and there was some -- they needed help in that area and I worked with some of the engineers over in that area, and John Simpson and some other individuals were the head -- were heads in that area.

Q.     Do you know who was ultimately selected for the position, these two positions as staff engineer?

A.     I was told Andrew Safernack and David Anderson were the two

gentlemen.

Q. Who told you that?

A. When I went down to the area I inquired and there were certain individuals who explained to me that those were individuals chosen.

Q. Who did you inquire with about this and who told you this?

A. A gentleman by the name of Gary Forrest.

Q. Who is Gary Forrest?

A. He is a director over there at the time. He may have been an associate director. He was over there at the time.

Q. Did he tell you anything else about Mr. Safernack or Mr. Anderson?

A. No.

Q. Did you ask him anything else about these positions?

A. I think I asked him will there be any more openings. He said he wasn't sure.

Q. Do you know -- well, you said it's your understanding that Mr. Simpson made the decision?

A. Right. When I had my resume I gave it to him personally, so yes.

Q. What did you tell him when you gave him your resume?

A. I said I'm very interested in this position, I would like to be interviewed for it. He said well then we're taking our time in the review process, but hopefully somebody will contact you regarding it.

Q. Anything else that you recall?

A. Not that I can recall.

Q. With Mr. Simpson? Did you have any other discussions with Mr. Simpson about these positions?

A. Not that I can recall.

Q. So you don't know how the decision was made?

A. No.

Q. You don't know who was

13:45:11 A. They changed the structure from time to time. They changed the criteria from time to time, how they did it. But you got appraised every year.

13:45:19 Q. And how did that appraisal process work?

13:45:22 A. Depending on the year, your supervisor would discuss your achievements and goals at the end of a particular year. So in this case, it went from January 2000 to December of 2000.

13:45:46 Q. And did you typically meet with the manager or supervisor who completed the performance evaluation for you?

13:45:53 A. Yes.

13:45:54 Q. And who was the supervisor that performed this performance evaluation?

13:46:00 A. Walter Wardrop.

13:46:03 Q. And did you meet with Mr. Wardrop regarding this performance

13:46:07 evaluation?

13:46:07 A. Yes.

13:46:08 Q. Do you recall anything about
13:46:11 that meeting in particular, what he
13:46:15 said, what you said, what was
13:46:16 discussed?

13:46:17 A. He asked, he said that he
13:46:22 got feedback from my previous
13:46:24 supervisor based on my performance in
13:46:27 that area, because I was new to the
13:46:29 area. So basically he only had a few
13:46:32 months to evaluate me.

13:46:38 So we discussed my role in
13:46:40 the area, how he saw the role and how I
13:46:46 can -- I told him about my desires to
13:46:49 grow within the area, learn my duties
13:46:52 and do them well, and to just continue
13:46:56 to grow as an engineer, as an
13:46:59 individual in the organization.

13:47:01 Q. If you'd turn to Page 4 of
13:47:05 this performance review, it provides a
13:47:08 summary of the performance and there's
13:47:11 an overall rating that is provided. Do
13:47:14 you see that?

HOWARD A. HENRY

13:47:14 A. Yes.

13:47:15 Q. And what is your overall rating for this year?

13:47:19 A. It said solid performer, which is a three.

13:47:22 Q. And there are four different rating categories -- I'm sorry, five different rating categories on this particular form; is that correct?

13:47:29 A. Correct.

13:47:30 Q. A solid performer falling right in the middle, correct?

13:47:36 A. Correct.

13:47:37 Q. If you turn the page to Page 5, you see under section 5 there's a section for employee comments?

13:47:47 A. Right.

13:47:47 Q. You didn't provide any comment, did you?

13:47:50 A. No.

13:47:51 Q. And you signed this agreement. Is that your signature there?

13:47:55 A. Yes.

Q. And then under yours is Walter Wardrop's signature?

A. Yes.

Q. And then do you recognize the signature under Mr. Wardrop's signature?

A. I believe that's Jack Riley's.

Q. And who is Jack Riley?

A. He was the director in the area at that time.

Q. Did you have any disagreement with anything written in this performance evaluation? I'll rephrase the question for you. Do you recall having any disagreement with this performance review?

A. No.

Q. Okay. Do you recall thinking whether it was a -- whether you thought it was a good review?

A. No.

Q. You have no recollection?

A. I felt -- I felt that I was

new to the area so there was not much I could have, you know -- at that time, I was rather green to the area, so. Just getting -- I was getting to know just some of the duties in the area, so. I was -- I was -- at that time I was accepting of it.

Q. Had you received ratings of -- well strike that.

(Henry Exhibit 11 for identification, Bates stamped 4020 through 4025.)

Q. I'm going to hand you another document which has been marked Exhibit 11. Do you recognize this document?

A. Yes.

Q. And what is this?

A. My performance evaluation for 2001.

Q. And who completed this evaluation for you?

A. Walter Wardrop.

Q. Did you meet with Mr.

HOWARD A. HENRY

Wardrop about this evaluation?

A.    Yes.

Q.    And what did you discuss?

A.    He was pleased with my performance.  He was happy of the strides that I made.  He liked the fact that I got along with people, my leadership qualities, the type of individual I was, how I was a leader in my department when it came to a lot of issues, and how I've grown as a person, as an engineer, my respect for people, how I collaborate well, the quality of work I produced, my integrity.

Q.    Did Mr. Wardrop have any criticism that you recall of your performance, constructive or otherwise?

A.    I can't recall.

Q.    How was your relationship with Mr. Wardrop at this time?

A.    I felt it was good, very good I felt at the time.

Q.    Again I notice that on Page 5 employee comments there's -- you

didn't provide any comments, did you?

A. Sometimes when you do the review he -- it's read to you, and a lot of times you forget about the employee comment page. So at that -- you know, sometimes you may -- you may think -- you may discuss certain things you want to have added to your experience, certain things you want to do, certain ideas you may have and just your growth. I do remember discussing at most of these reviews that I want to grow within the company, I wanted to learn more skills, I desired to go on to become a manager.

So I may not have put it down here, but we would discuss it.

Q. Was it Mr. -- do you recall whether Mr. Wardrop, when you sat down with him with this performance review or any other performance review, did he read it to you?

A. Sometimes he would, yes. He would read it.

Q. And he'd give you -- in addition, he'd give you a copy?

A. Sometimes you'd get the copy afterwards. Like I didn't get a copy of this until I requested it later on. So I didn't have a copy.

Q. Do you recall having -- do you recall disagreeing with anything written in this particular performance review?

A. No, I don't recall I disagreed with anything.

(Henry Exhibit 12 for identification, Bates stamped 4015 through 4019.)

Q. I'm handing you a document that's been marked Henry Exhibit 12. Do you recognize this?

A. Yes.

Q. And what is it?

A. My performance evaluation for 2002.

Q. And at this time Mr. Wardrop was still your supervisor?

A. Yes.

Q. Do you recall your meeting -- did you have a meeting with Mr. Wardrop --

A. Yes.

Q. -- about this performance review?

A. Yes.

Q. Do you remember anything from that meeting?

A. I remember that I felt that I should have been rated higher for some of the things I was able to accomplish that were critical in the group. I remember when he gave me the line item 2 for the special project that I told him that I did do it, but I didn't have a chance to give it to him and he understood that.

But other than that, I told him that, you know, I want to continue to grow, and I asked him what would it take for me to be a five because I was a four twice, I always want to improve,

and he said that I was very, you know, close to doing that, I wasn't, you know, far from accomplishing that, you know, and he would try to create mechanisms that he felt would get me to that particular tier.

Q. Going back to the first page, you mentioned the special project. The review states "Howard never identified or completed a special project as assigned."

A. Well, I identified one, but there was a -- there was a situation where I couldn't give it to him. So I gave it to him, showed it to him afterward. But this had already been -- this had already been written, so based on that he couldn't change anything, but we discussed it.

Q. Did he remind you several times about getting the special project from you?

A. I don't recall. I think he may have made mention to it -- of it in

13:56:07 a meeting, but I don't recall.

13:56:09 Q. What was the special

13:56:11 project?

13:56:11 A. We were all told to just

13:56:14 make up a curriculum for the employees

13:56:17 to follow about something that you do

13:56:20 at the job, and I decided that I would

13:56:22 do -- since most people never wrote

13:56:26 SOPs, that I would write a special

13:56:28 project about SOPs to create Microsoft

13:56:34 Project -- not Microsoft Project, but a

13:56:37 PowerPoint presentation of a particular

13:56:40 project, and it wasn't -- it wasn't

13:56:44 something that had to be presented, but

13:56:47 it was just something he wanted, he

13:56:49 felt he wanted done.

13:56:51 Q. And did you ever get it

13:56:52 done?

A. Yes.

13:57:03 Q. Did you -- do you recall

13:57:03 disagreeing with anything in this

13:57:04 review?

13:57:09 A. Just that I felt I should

13:57:10 have been rated higher. I thought I

did -- I did things that warranted a five. He understood.

Q. What did you do -- what had you done that you believed warranted a five?

A. Well, stayed, worked different shifts, worked three to 11 shift when he asked me to, worked midnight shift when he asked me to, came in on weekends, stayed late, trained the operators, trained the management staff, troubleshoot the equipment, came in on off hours when I needed to, paged -- no matter what time I was paged, answered the page, walk them through problems, if they didn't get through it went there myself and showed them how it was done. Because this was a highly recognizable project that corporate definitely wanted us to complete, and I was pinnacle and I was key in terms of it being completed and being successful.

Q. These actions you've just

13:58:14 described for me, aren't they part of your job duties?

13:58:18 A. Not going on different shifts. He asked me if I would do that. I didn't have to do that, but he said he would really appreciate if I could -- if I would consider doing that. It was not something that I had to do. The other engineers weren't asked to do that. I was. And I did it.

13:58:35 Q. So other than the staying late, doing different shifts, coming in different hours, the other actions you described are part of your normal job duties? Yes or no.

13:58:52 A. Referring to this -- referring to the continuous coater project, this project in particular?

13:58:57 Q. What you were just describing. If we could back up, I asked you what you thought you had done in the past year that warranted a five rating, and you listed several items

13:59:08 for me.

13:59:08 A. Right.

13:59:09 Q. Some of those items included staying late, working different shifts, coming in odd hours, and then you listed several other actions that you -- that you took over the course of the year. I'm asking you if those actions you listed, aren't those part of your normal job duties?

13:59:31 A. Some of these functions was outside my normal duties. My normal duties would be to optimize the current equipment that we had, okay. Troubleshooting it, optimizing it, seeking ways to enhance the process. Outside of that would be helping the operator, teaching him, you know, taking off -- putting on your lab coat, putting on your jeans and going in there and cleaning the equipment -- the equipment itself. I did that. That's outside of my job function.

14:00:02 I would -- when they were

doing inspections I would be down there. That's a supervisory function. I would supervise the operators and the supervisors and tell them exactly what they should do. That's outside of my job function. So there's a lot of things that are not captured here that are outside of my job function that I performed.

Q. Did you explain these items to Mr. Wardrop at the time of the performance review?

A. I did. I did.

Q. What was his response?

A. He shook his head, he understood, he respected the fact. I said to him, you know, as far as I'm concerned, next year I'm going to do everything I can to be rated five. He said okay.

(Henry Exhibit 13 for identification, Bates stamped D 00176 and 177.)

Q. I hand you a document that's

14:00:50 been marked Exhibit 13. Can you tell
14:01:05 me what this document is?
14:01:07 MR. MORELLI: Do you have
14:01:08 another one?
14:01:10 MR. McQUADE: Oh, sorry,
14:01:11 yes.
14:01:13 MR. MORELLI: Thank you.
14:01:19 A. This is a midyear review.
14:01:22 Q. Have you seen this document
14:01:24 before?
14:01:24 A. Yes.
14:01:25 Q. Did you meet with Mr.
14:01:31 Wardrop regarding this document?
14:01:33 A. Yes.
14:01:33 Q. Was that in September 2003?
14:01:36 A. This was not in September
14:01:37 2003. Well, I mean -- this -- this was
14:01:43 not, from what I recall, this did not
14:01:46 occur on September 3rd, 2003. From
14:01:52 what I -- from what I recall. I don't
14:01:54 remember -- I don't remember it being
14:01:55 that time.
14:01:58 Q. Okay. Other than the timing
14:02:01 of this document, do you recall seeing

14:02:05 this document in --

14:02:08 A. I recall some of the things on this document.

14:02:10 Q. Okay. And did you sit down -- did you sit down with Mr. Wardrop and discuss this document as part of a midyear review?

14:02:17 A. Yes.

14:02:18 Q. Okay. So you're telling me you're not sure --

14:02:22 A. Of the exact date. I don't think it was conducted on September 3rd.

14:02:25 Q. Okay. When do you think it was conducted?

14:02:28 A. I remember something around April/May, around that time, something closer to that range. I don't remember anything like this happening in September. We were too busy.

14:02:50 Q. Okay. So I'd like you to take a close look at the document and tell me -- well let me focus you -- under the heading "Areas to focus for

14:03:04 remainder of 2003"?

14:03:12 A. Right.

14:03:13 Q. It lists a number of projects that are in process, establishing goals that need to be completed by year's end. Goals is capitalized. Do you know what that is referring to?

14:03:24 A. These are things that he -- that we discussed, that he would like to see if possible completed by the end of the year.

14:03:42 Q. Okay. The second bullet point there talks about improved attendance. Did you discuss attendance with Mr. Wardrop?

14:03:50 A. Briefly.

14:03:53 Q. What did he say about attendance?

14:03:56 A. I don't recall exact, his exact words. I don't recall his exact words.

14:04:06 Q. Does that appear to be accurate? This indicates that as of

the date of this memo you had 11 absences for the year?

A. I mean it could be true. I'm not -- I'm not certain.

Q. The memo also lists reestablishing a formal tracking sheet for performing and documenting work performed. Did you discuss that?

A. I don't remember discussing that.

Q. How about continuing to focus on delivering projects, tasks, action items, change controls, commitments, on or ahead of schedule, do you remember discussing that?

A. I don't remember. I don't remember discussing it.

Q. If you'd turn the page it says at the top there "As discussed, when preparing the end of the year, final 2003 goals, quantify and be specific on accomplishments, i.e. financial impact, labor saved, costs reduced, safety upgrades. The goals

need to be result-driven, cause and effect summary of work performed and value added to the business." Again it's talking about 2003 goals. What is this?

A. He wanted to mimic what he was being -- what corporate gave him and he wanted us to mimic those results.

Q. He was --

A. Go ahead.

Q. Was he asking you to provide some type of goals for 2003 to him?

A. I don't recall. I don't -- I don't recall.

Q. Do you recall discussing with Mr. Wardrop during this meeting his desire to get some type of self-appraisal or goals for the year from you?

A. I told -- we had a discussion about the self-appraisal, and I gave in a midyear appraisal. He sent me an email saying it was a good

job, you know, I appreciate it, and I put some points in, he added feedback. That was during 2003.

During this time when I started to really, you know, express my desire to be afforded opportunities within the organization he starts -- he starts getting more formalized with this type of document here.

Now, when he would give me a document like this he would read certain things to me, but I wasn't really scrutinizing it as you're scrutinizing it and as we're scrutinizing it now.

I mean during the -- over the course of our relationship we would discuss things formally and informally. Sometimes he would make things poignant, sometimes he wouldn't. But as this document goes, I did not scrutinize it the way you are. I didn't receive a copy or anything like that to look at it later on, so.

Q. Well can you tell me what you recall from your discussion with Mr. Wardrop with this document?

A. I remember him asking me about why I haven't responded to my pages and I said, you know, I don't know, because everybody is having a problem with the paging system. He also asked me about some shot I had in the nurse's office, that I spent some time over there. I said well sometimes I bring work, sometimes I may read an article that deals with something we have an idea on and I may read it. I mean I've taken tens of -- plenty of shots over there in the course of five to seven years and sometimes I would go weekly and sometimes I would go biweekly. I don't remember every incident over there, but I've taken plenty of shots over there. And he -- it was kind of like he was trying to build, you know, in hindsight he was building something on me and I didn't

see it at the time. So I looked at this as innocuous. I didn't see anything in it. I didn't scrutinize it.

And, you know, there were times where goals may not have been met. I would provide for him reasons why, whether I need collaboration from other people or we need to focus on these things in order to get these, implement certain things. So with this document I did not scrutinize it, I did not pay total attention to the -- to the, you know, the details of the conversation.

Q. Okay. Is there anything else you remember from the conversation with Mr. Wardrop?

A. I definitely remember those two things, but at this time nothing else.

Q. You don't remember anything else he said to you or that you said to him?

14:08:58 A. At this time, no.

14:09:01 Q. Do you remember being asked to sign the document?

14:09:06 A. Yes.

14:09:06 Q. Did you sign the document?

14:09:11 A. I think I did.

14:09:13 Q. During this -- strike that.

(Henry Exhibit 14 for identification, Bates stamped EEOC 51 through 54.)

14:09:51 Q. I'm giving you a document that's been marked Henry Exhibit 14. Do you recognize this document?

14:10:47 A. Yes.

14:10:51 Q. Do you remember meeting with Mr. Wardrop regarding this performance appraisal?

14:11:07 A. Yes.

14:11:08 Q. Do you recall when that occurred?

14:11:09 A. It occurred with Ms. Joanne Rose I think sometime in February or March of 2004, with this document.

14:11:14 Q. When you say this document?

HOWARD A. HENRY

Q. Can you tell me in your own words what this Exhibit 16 is, the goals and self-appraisal?

A. The whole thing is a tracking system that's used to determine whether or not you're achieving goals set forth at the beginning of the year. We use it to determine whether or not we should continue in a certain direction, whether we should concentrate on one particular item and leave another item for a later date.

Q. Don't you think it would be helpful to have this document for a manager in preparing a performance review?

MR. MORELLI: If you can answer. Objection. Can you answer that?

A. I felt that the relationship Walter and -- Walter and I had and what we were corresponding to throughout the year was sufficient. In other words,

14:22:37 there were two supervisors, not in the area, and I'm not a supervisor, I'm an engineer. So I volunteered without anybody asking me to pay attention to an area that was crucial to the organization. So in order for me to prepare a document like this for Mr. Wardrop would have taken me from that particular duty.

So if he really -- I mean when I went to him and explained to him the first time about the performance evaluation, he didn't seem like he needed it.

Now he sent out this email and he knew exactly every day we spoke and he knew exactly what I was doing. He would correspond with me in emails. He knew that I was responsible for, you know, having an area taken care of 24 hours, 24 hours. So he knew what he was doing.

So did he need this in terms of, you know, if he had no idea what I

14:23:36 was doing, yes. But he knew what I was
14:23:39 doing. We corresponded by email, we
14:23:41 spoke. So it wasn't as critical as he
14:23:47 may allude one to believe.
14:23:54 Q. Do you remember any other --
14:23:57 going back to your December meeting
14:23:58 with Mr. Wardrop, when you met with him
14:24:01 regarding your performance review, do
14:24:05 you remember anything else that you two
14:24:06 discussed regarding your performance
14:24:08 review?
14:24:09 A. Not at this time.
14:24:14 Q. Okay. You mentioned the
14:24:15 organizational cascade?
14:24:18 A. Yes.
14:24:18 Q. You discussed that with Mr.
14:24:19 Wardrop during this meeting as well?
14:24:22 A. Yes.
14:24:23 Q. And what did --
14:24:24 A. And prior.
14:24:25 Q. What did he tell you about
14:24:26 the organizational cascade?
14:24:28 A. He said there's a difference
14:24:29 between perception and reality and

that, you know, just remember that, just remember that at the first time we spoke about it. Then at the performance evaluation he stated that the reason why you received the job assignment at this -- during the organizational cascade is because of your performance.

Q. Do you remember him telling you anything else?

A. At this time, no.

Q. Did he explain to you how the organizational cascade, how those decisions were made as part of the process?

A. He just basically stated that it affected -- this influenced people's decision on how they viewed me and that's how I got -- that's why I was selected for that particular area. But it influenced people's decision.

Q. What influenced people's decision?

A. The perception that was

created by Mr. Wardrop.

Q. And what perception is that?

A. That I was late, that I don't -- that I'm -- that I'm not a person that would be -- one could consider to rely on.

Q. How did he create that perception?

A. By making it seem that I was absent from my job assignments. He would ask certain people have they seen me when I distinctly told him that I may not be in the office that day, he would distinctly ask people have they seen me, have they heard from me. He was creating the perception. And I didn't know this until after the fact when my employees -- when my fellow colleagues came to me and said he would do this. He would be on the floor saying have you seen Mr. Henry. And me and him -- as if he were coming to me and telling me oh, do this, oh, that's fine, no problem. But on the floor he

14:26:42 would tell people have you seen Howard, do you know where he is. That's how he was creating this perception. And I didn't know this until afterwards.

Q. So you believe he created a perception that you were not available by asking other employees about where you were?

A. Exactly.

Q. And that this somehow affected the organizational cascade and the selections made as part of the organizational cascade process?

A. Yes.

Q. You said you viewed the packaging supervisor position as a demotion; is that right?

A. Yes.

Q. Why do you consider it a demotion?

A. Most of the people who hold those positions are packaging operators. The educational level is a high school diploma. I have two

degrees. And we interact with each other a lot, you know, and I see what they do. Other engineers from that area told me what they do. So we interact a lot. So we know what the job requires. So I know the capacity one has to have to perform those functions. And the requirement itself tells one that this is a -- this is a position for someone who's possibly getting their foot in the door but not somebody at that time who had seven, eight, nine years of experience that I had, and the track record I had.

Q. The position had the same, carried the same salary grade level?

A. Yes, for me, yes.

Q. So you would not, presumably not, if you had been put in this position you would not have received any change in salary or level, correct?

A. No.

Q. Did Mr. Wardrop tell you it was a demotion?

A. Not in those words.

Q. Did anyone tell you it was a demotion?

A. Yes.

Q. Who told you it was a demotion?

A. Not -- not to use the exact words, but individuals who work at the site know what it means to go from an engineer to a packaging supervisor. They know what it implies, they know what it means. Everyone knows that that means that this person really doesn't know what he's doing, he's incompetent.

Q. You were never in fact placed in that position? You never assumed those job responsibilities or that position?

A. No.

Q. Okay. Going back to Exhibit -- I don't have the exhibit number, but it's the performance evaluation, Bates number EEOC 0051 in

the lower right-hand corner.

A. Okay.

MR. MORELLI: It's 14.

Q. Fourteen, thank you. You didn't sign this document, did you?

A. No.

Q. Did you refuse to sign it?

A. I wouldn't -- I wouldn't say I refused. I just went for a walk. But I'm not sure if this is the original document.

Q. I understand. I understand.

A. But I went for a walk. I didn't --

Q. Okay.

A. He didn't ask me to sign it.

Q. So how did this meeting with Mr. Wardrop end?

A. I left and I said I have to go for a walk.

Q. So what happened next?

A. Well, I mean I continued to -- everyone -- everyone was told to stay -- to stay in their job currently,

14:31:41 that they're currently doing, and I
14:31:43 decided that I need to meet with him
14:31:46 regarding this decision. I didn't
14:31:47 agree with this decision. I didn't
14:31:49 agree with being appointed to this
14:31:53 area. I didn't agree how I was
14:31:55 evaluated. And I felt that I needed to
14:31:59 let him know that out of respect
14:32:02 because at this point I was saying to
14:32:04 myself perhaps we miscommunicated,
14:32:06 perhaps we didn't really talk to each
14:32:10 other the way we should have and
14:32:11 expressed everything we should have.
14:32:13 So I said let me just talk to him, and
14:32:16 I did. And that was on January 5th.
14:32:22 Q. Who requested that meeting?
14:32:23 Was that you?
14:32:24 A. It wasn't a request. It was
14:32:25 just that, you know, we interacted and
14:32:27 I said Walter, I need to speak to you,
14:32:29 and he said well, I have interviews
14:32:31 throughout the day. I said whenever
14:32:33 you have some time I really would like
14:32:35 to. So there was some time available.

I went to his office and we spoke.

Q. And what did you tell him?

A. I said you -- the reason why -- I said I don't understand this decision, I don't -- I don't really respect the fact that I'm being evaluated the way I was evaluated and I need for you to give me some clarification. He said that, you know, he's not going to give me anything. I said I need to be reconsidered, I need to be reevaluated because I don't think the procedure was fair, I don't believe that I was evaluated fairly.

He said -- and I said I have these documents here, you didn't -- you said you didn't need them, you said you didn't want them, but I have them here, and I presented them with the engineering status report, with another document that tracks the goals, with -- I think with another document. I can't remember the three that I gave him, but...

HOWARD A. HENRY

Q. Is that Exhibit 16 or some portion of Exhibit 16?

A. Yes, right.

Q. Okay.

A. And I told him I followed the company values, I did achieve the goals that we discussed. If there was any goal that couldn't be achieved I explained to him what I did in the past. Nothing changed to me from what we had in the past. The relationship I thought we had was if I didn't achieve something I told him why, I told him that it probably is going to take a collaboration, a collaborative effort between technology or QA and other people, they have to be pulled off their projects in order for us to get this done, what would you like for me to do. So I let him know, he said he wasn't going to do anything.

He said at this point he's not going to reevaluate me. He's not going to take my documents. As a

taken an objective approach. She was very subjective in how she conducted the discussion.

Q. At this point in time you still had not told anyone that you believed that any of these decisions had --

A. No, I think I really didn't want to believe that. I kind of was feeling it but I kind of felt that, you know, if I wasn't going to get opportunity here and that if I wasn't going to get heard fairly that I would have to keep on going up and use whatever means to make sure that I was fairly evaluated and fairly heard.

Q. So what was your next step? What did you do next?

A. I went to Mike McDermott. I met with Mike McDermott the first time.

Q. Okay. Can you tell me about your meetings with Mike McDermott?

A. You know, at first glance it was amicable. He felt -- I felt like

he was approachable. And I honestly felt that he would do something because he had the power to do something. He explained that he couldn't get everybody's role right but that he would get back to me, he would look at things, he doesn't know all the details, and he would get the details and he would -- he would give me a call back and set up a meeting with him.

Q. And did he do that? Did he set up a meeting with you?

A. No, I had to call him back.

Q. Okay. And did you set up a meeting?

A. I think so. I think either he set it up, I don't remember who set it up, but we did meet.

Q. And what happened at that meeting?

A. He said that, you know, he can't give an executive order to change my evaluation and that my role remains a packaging role, and that, you know --

14:52:49 and I said, listen, I said, if you're trying to create an atmosphere of diversity, one of the things you would like to do is promote African Americans, especially African American men because none of us are managers, none of us are afforded these opportunities.

And he went on to say, I'm all for diversity. And I looked at him and he said well as far as, you know, the way you're -- the way you're looking at me, I'm not going to get into that silly discussion with you. And I said to him, you know, it's an important discussion because we're trying to build a family of different people with different opinions to help grow the organization, and I think I can be utilized in that -- in that decisionmaking, I really do, I provide a lot for the company, I've done a lot of great things for the organization, and I think I should be afforded this

opportunity.

Q. Was there anything further said about this diversity point, either by you or him?

A. Not that I can -- not that I can recall.

Q. Is there anything else you remember from this meeting with Mr. McDermott?

A. Well, I told him, I said listen, with all due respect, I still must continue until I'm evaluated fairly, until I get a real -- until I get a reason why this is -- this is happening because everyone's reason is changing. No one reasons -- no one -- it's not aligned. Everyone has -- seems to be thinking that this could be the reason or this other thing could be the reason. So I said I must go above your head.

Q. So what did you do next?

A. I contacted Mr. Peter Bigelow.

14:54:30 Q. Who's Mr. Bigelow?

14:54:32 A. He was the site director, so

14:54:34 Mr. McDermott reported to him.

14:54:41 Q. And you set up a meeting

14:54:42 with Mr. Bigelow?

14:54:43 A. I believe I did. I'm not

14:54:45 sure whether it was me or his

14:54:46 secretary.

14:54:47 Q. Did you know Mr. Bigelow

14:54:48 before this meeting?

14:54:49 A. I met him one time during a

14:54:51 tour, but it wasn't a sit-down meeting.

14:54:55 It was a hello, this is Howard Henry,

14:54:58 the engineer, this is Mr. Bigelow.

14:54:59 Q. Do you recall when you first

14:55:04 met with him?

14:55:05 A. As far as first introduction

14:55:09 or meeting him at --

14:55:11 Q. Meeting him --

14:55:12 A. Regarding this issue?

14:55:13 Q. Regarding this issue,

14:55:14 correct.

14:55:14 A. I don't remember the exact

14:55:16 date, but I do recall meeting with him,

and he said that, you know, I really -- he said I don't know everything that's going on, I'm going to the FDA, but I will get back to you and I will find out what's going on. I know you don't know me, but I'll look and see what's going on.

I asked him to read my reviews, I asked him to look into the situation because I have a track record, and based on that track record I feel I wasn't evaluated fairly and I would ask for him to step in and look at the situation from an objective point of view to evaluate me.

Q. Did you tell Mr. Bigelow that you believed that you had been treated unfairly because of your race?

A. Not at that first meeting. It wasn't until the first meeting that I told him that.

Q. Do you know the date of that second meeting?

A. I can't recall the date. I

14:56:17 would have to -- it had to be sometime
14:56:19 January/February of 2004.
14:57:05 MR. McQUADE: Would you mark
14:57:06 this as Exhibit 18, please.

14:57:11 (Henry Exhibit 18 for
14:57:11 identification, Bates stamped 1438.)
14:57:27 Q. Mr. Henry, I've handed you a
14:57:28 document marked Exhibit 18. Do you
14:57:30 recognize this document?
14:57:31 A. Yes.
14:57:34 Q. It's an email that you sent
14:57:37 to Mr. Bigelow on February 16th, 2004;
14:57:37 is that correct?
14:57:38 A. Yes.
14:57:42 Q. The first sentence says
14:57:43 "After stating during our meeting on
14:57:46 February 11th, 2004 that Walter
14:57:50 Wardrop, Andy Schaschl sell and Michael
14:57:53 McDermott engaged in racial
14:57:54 discrimination and should be held
14:57:56 accountable," etcetera, etcetera. Does
14:57:58 this refresh your recollection as to
14:58:01 when you met with Mr. Bigelow and told
him that you believed that you had been

14:58:03 discriminated against?

14:58:11 A. Yes.

14:58:11 Q. Do you believe that meeting occurred on February 11th, 2004?

14:58:14 A. Yes.

14:58:15 Q. Do you think -- can you tell me is this the first time you told anyone at Wyeth that you had been discriminated or retaliated against?

14:58:23 A. This is the first time I'm officially stating it. I think that I started to feel that once certain answers started to come to light and they didn't make sense.

14:58:41 Q. Okay. So before this time you hadn't -- you hadn't told anyone else at Wyeth?

14:58:46 A. I can't say I didn't. I can -- I can't really say that I didn't. I mean this was -- I didn't -- I think I was in denial and I didn't want to believe it, so I --

14:58:58 Q. I understand. I'm not asking you what you believed. I'm

asking you what you actually told another individual at Wyeth, a manager, a supervisor, an HR person, anyone at Wyeth --

A. I think.

Q. Was this the first time --

A. I think this was the first time.

Q. Okay. And what was Mr. Bigelow's response when you told him this?

A. He looked at me and he said wow, I mean, you know, I seriously hope it's not the case, because I -- because he presented to me a document that supposedly shows certain goals that I didn't meet and the document was totally -- just did not genuinely reflect the truth and I told him that. And I said based on this, since each person I went to answers changed I feel and I must state this wholeheartedly, that I'm being racially discriminated against.

Q. Whose answers changed?

A. Each individual I spoke to had a different reason as to the reason why I was placed.

Q. You're not saying that the individual's own individual answers changed, you're saying that each of the individual answers were inconsistent? Does that question make sense?

A. Well, Mr. Wardrop's answer changed three times. Mr. Schaschl's answer was different and reasoning was different from Mr. Wardrop's. Ms. Joanne Rose's reasoning was different from that of Mr. Schaschl and Mr. Wardrop. Mr. McDermott's reasoning and answer was different from that of Ms. Joanne Rose, Mr. Schaschl and Mr. Wardrop. They were not consistent with the reason why I was placed in packaging and why I was rated a three.

Q. What were Mr. Wardrop's three reasons?

A. The first was the perception

versus reality reason, that there was a perception of me being late. The second is that and I didn't meet certain -- the second was I didn't meet certain goals, he wasn't going to reevaluate me. The third was I was chosen by someone and he tried his best for me not to be chosen. He tried to interact on my behalf and not have me put on a midnight shift.

Q. Okay.

A. Those were his three changes.

Q. Okay. Now those three changes those are explanations for --

A. Why I was given a three and why I was placed in packaging.

Q. The three explanations explained why you were given a three?

A. And why I was placed in packaging.

Q. All right. Mr. Schaschl?

A. Mr. Schaschl stated that even if I was given a five I was still

moving -- I still was being moved or could have been moved to packaging. He said that I don't have supervisory experience, that's why I'm not afforded these managerial experiences -- opportunities, okay. So his answer was different from that of Mr. Wardrop. Mr. Wardrop didn't mention anything about supervisory experience and the lack thereof.

Q. How about Ms. Rose?

A. Ms. Rose said the bar may have been raised, you know, she was there when the people made choices, and she didn't divulge everything that happened.

Q. She probably didn't know what happened, why decisions were made, did she?

A. I can't say that, sir, with all due respect. That would be speculating, I don't know.

Q. Mr. McDermott, what was his reason?

15:02:55 A. Mr. McDermott said that he's
15:02:57 opposed to people staying in the same
15:02:59 position for a long period of time. He
15:03:01 said that people should have diverse
15:03:04 experience. I explained to him that by
15:03:06 the time somebody's trained and meet --
15:03:08 and get the proper training to be in a
15:03:11 certain position you're not sure
15:03:13 whether they can actually handle the
15:03:15 position. And, you know, by that time
15:03:19 a lot of mistakes occur and that's what
15:03:21 got us into the position we were in
15:03:23 consent -- we got into a lot of
15:03:26 compliance issues because individuals
15:03:27 who weren't properly trained, who
15:03:30 wasn't properly qualified kept on
15:03:32 moving in different positions. And he
15:03:34 said that was a long time ago. I said
15:03:39 that's not a long time ago.

(Henry Exhibit 19 for
15:04:04 identification, Bates stamped 1432.)

15:04:04 Q. Mr. Henry, I've handed you a
15:04:11 document marked Henry Exhibit 19. It's
15:04:14 a February 25th, 2004 email from Mr.

Bigelow to Howard Henry. Do you recognize this document?

A. Yes.

Q. Did you receive this email?

A. Yes.

Q. It states "I have reviewed the performance appraisal documents from the past years. In general, they seem to be clear and objective." Did you have any further discussion with Mr. Bigelow about this after receiving this email?

A. Not that I can recall.

Q. Okay. Is there anyone else you met with or discussed your dissatisfaction with the organizational cascade or your 2003 performance review that you haven't already mentioned?

A. Not that I can recall at this time.

Q. Now did Mr. Bigelow ever follow up with you regarding your allegation about discrimination?

A. I think about a month, month

and a half later.

Q. And what happened?

A. He said he wanted to conduct an investigation.

Q. Were you involved in any sort of investigation?

A. Yes.

Q. How so?

A. I was asked by a gentleman by the name of Gene Sackett a series of questions regarding my statement.

Q. This was a meeting between you and Mr. Sackett?

A. Yes.

Q. Do you remember when this meeting occurred?

A. It could have been April of 2004, April.

Q. Was there anyone else present during this meeting?

A. Not at that meeting, no.

Q. And can you tell me what you remember telling Mr. Sackett at this meeting?

HOWARD A. HENRY

A.      I told him that I felt that -- (telephone interruption) excuse me, I beg your pardon. My apologies.

Q.      That's okay.

A.      Basically we discussed the organizational cascade and I presented him with the documents, my goals and objectives for 2003. We discussed my feelings of why I felt that I was allege -- I was talking about racial discrimination. And I don't recall everything that was said at that kind -- that kind of thing, but that was the general gist of the conversation.

Q.      What did he tell you, if anything? Do you remember him telling you anything, or did he just ask questions?

A.      He asked questions. He did tell me that there are packages available, you know. He mentioned something about a package, about something about three months or some kind of salary based on for every

15:08:09 year's service you get two weeks so in
15:08:13 my case it could be about six months.
15:08:17 He mentioned -- he read some
15:08:19 of the reviews, these are good reviews,
15:08:22 he said these are -- these are very,
15:08:25 very good, the past reviews. I didn't
15:08:28 have -- I don't think I had a 2003 at
15:08:31 the time. I think he made copies of
15:08:33 everything and said he would get back
15:08:35 to me.
15:08:36 Q. And what happened next?
15:08:44 A. That was it. And I didn't
15:08:46 hear from him from the date he said he
15:08:47 would get back to me. So I emailed him
15:08:50 and said you said you were going to get
15:08:52 back to me at a certain date, you never
15:08:54 did. And he emailed me back stating
15:08:57 sorry for any confusion that he may
15:08:59 have caused, but basically he's still
15:09:03 summing up -- summarizing his findings
15:09:06 and he'll give them over to Mr.
15:09:09 Bigelow. And I think at the time it
15:09:10 was Donna Grantland and they would
15:09:12 discuss with me my options.

15:09:20 Q. When were you advised that you would not have to move into the packaging supervisor position?

15:09:33 A. It had to be April/May of 2004 I was -- I was -- I was sent an email -- I sent the email -- after I spent -- after I met with Mr. Bigelow and Ms. Grantland I was given an email -- I responded to an email what was discussed and what was discussed is that there was a vaccines position they was going to give me and that there was the packaging supervisor position that they were going to give me. And at that time I emailed him and said these weren't viable options that I mentioned earlier and there was a project engineer position that was available that was a viable option.

15:10:21 THE VIDEO OPERATOR: Mr. McQuade, I need to change the tape.

15:10:24 MR. McQUADE: Okay. We'll go off the record.

15:10:27 THE VIDEO OPERATOR: Going

off the record at 3:10. This is the end of tape number 2.

(A recess was taken.)

THE VIDEO OPERATOR: Beginning tape number 3 and returning to the record at 3:21 from 3:10.

(Henry Exhibit 20 for identification, Bates stamped 3996.)

Q. Mr. Henry, before the break you were describing an email that you had written to Mr. Bigelow. I put in front of you a document marked Exhibit 20. There's an email here and then there's a response to that email. If you look to the email on the lower half of the page, does this appear to be the email that you were referring to before the break?

A. Yes.

Q. It refers to the senior validation specialist role. What position was that? That was the position within the vaccine organization?

15:22:38 A. Yes.

15:22:39 Q. Okay. If you'd look at the top of the page, is this the email you received and were informed that you would in fact remain in the position that you were in and would not change to the packaging supervisor position?

15:23:03 A. Yes.

15:23:04 Q. In the packaging supervisor position you would be managing people, wouldn't you?

15:23:18 A. Operators.

15:23:19 Q. But you'd be supervising people?

15:23:22 A. I'd -- yes.

15:23:23 Q. So it would be an opportunity to get some experience managing people?

15:23:28 A. I did that as an engineer though.

15:23:31 Q. But this would give you additional experience doing that; is that correct?

15:23:35 A. Perhaps.

15:23:37 Q. Did Mr. McDermott tell you that that would be one of the advantages in taking this position, is that it would enable you to get some management experience?

15:23:54 A. He said he started there.

15:23:56 Q. He started in the packaging department himself?

15:23:59 A. Right.

(Henry Exhibit 21 for identification, Bates stamped D 00296 and 297.)

15:24:18 Q. I'm handing you a document marked Exhibit 21. Do you recognize this document?

15:24:42 A. No.

15:24:43 Q. Had you seen this document before today?

15:24:47 A. I can't recall a hundred percent.

15:25:00 Q. Do you remember discussing this incident -- this document refers to an incident in which you couldn't be found on March 12th, 2004, by Andrew

Espejo?

A. Right.

Q. Do you recall discussing this matter with Mr. Espejo?

A. Yes.

Q. Can you tell me what you recall about that discussion?

A. I reminded him that on March 4th I came to his office and asked him if I can work from four to 12 because I had something to do on Friday. He said no problem. He said only this once, no problem. I said I don't know if I'll need the whole day, I'll get back to you, but he said no problem.

So that morning I told him -- I think it was Thursday or that morning I told him I said I don't need the whole day, I just need part of the day, but whatever time that I do leave and come back I'll make up the time later on. He said no problem.

So I didn't -- I never -- he never showed me this document. We

discussed it and he said it was no problem.

So this is something that is not true at all. I didn't go AWOL. I spoke to him. We had a conversation on, I remember it was March 4th he and I, so this is not true.

Q. Well it is true, isn't it, that he approached you and discussed this unofficial leave with you?

A. It wasn't unofficial because I spoke to him about it.

Q. And you're telling me he had cleared it in advance?

A. He cleared it, hundred percent, without a shadow of a doubt.

Q. Did you tell him that when he discussed this?

A. Yes, he said oh, that's right. That's right, he said that's right, that's right, that's right, all right, no problem. That was it.

Q. Did you have any other discussions with Mr. Espejo about this?

A. About this, no.

(Henry Exhibit 22 for identification, Bates stamped 1494 and 1495.)

Q. Handing you a document that's marked Henry Exhibit 22. Can you tell me what this document is?

A. It's a midyear review.

Q. And who put this midyear review together?

A. Andrew Espejo.

Q. Did you meet with him?

A. Yes.

Q. At about July 9th, 2004 about this review?

A. I think so, yes.

Q. What do you recall from that meeting?

A. I recall that he was trying to allege and trying to develop an ideology that I was not doing things on time. So he developed what I -- and I explained to him, I said, you know, it seems to me that all of a sudden

there's a pattern here that people are accusing me of being late. All of a sudden now. I said, you know, I've been working for this company almost nine, ten years at this juncture and I've never been accused of any of these things, now all of a sudden I want to move up and everybody seems to accuse me, there seems to be a pattern going on. He said no, no, no, no, these are just things that I feel that -- I said I'm not signing this, it does not reflect the truth. So I didn't sign it.

Q. If you look at the first solid bullet point at the top there are two bullet points under that. One of them says "Missed target date of June 25th, 2004, to schedule meeting with maintenance." Is that true?

A. He didn't make himself clear as to exactly what he wanted.

Q. Did you miss the target date of June 25, 2004?

HOWARD A. HENRY

A.    He didn't make himself clear about the target date on any of this, that's why I didn't sign it. He didn't make it clear.

Q.    But did you miss a date of June 25th, 2004, to schedule the meeting?

A.    He didn't make it clear this date of June 25th, 2004. That's why I didn't sign it.

Q.    So it's your position --

A.    I can't say I missed the date because he didn't make it clear of any date like that.

Q.    You're telling me you weren't aware of the fact that June 25th, 2004 was --

A.    I'm telling you that when we had discussions about these maintenance plans, he came from a maintenance area, he wanted me to focus on maintenance things. I said I don't understand because as engineers we're not -- we're not responsible for the actual

15:29:57 maintenance. We contact -- we contact maintenance for them to take care of the equipment. We tell them what's wrong and they take care of it, but we're not responsible for no maintenance plan and no all these plans, that maintenance takes care of all the planning. I told him that.

And you know, when I got -- when I got to this midyear review I explained to him, I said you didn't really make it clear, he said you didn't really ask. I said well I didn't understand and I asked you, hey, you didn't make this clear to me. So that's why I said I can't sign this because this isn't going to reflect exactly how you disseminated the information.

Q. So you had no knowledge, you're telling me you had no knowledge that your supervisor, Mr. Espejo, had asked you to meet certain, this June 25th, 2004 target date with respect to

the maintenance plans, is that what you're telling me?

A. All -- I mean this June 25th date, no, no.

Q. Never heard of that before?

A. I can't say definitively. I mean I don't recall.

Q. Did you know -- did you know that you had to -- okay, so you don't recall. You don't recall this June 25th, 2004 date?

A. No.

Q. Okay. A few bullet points down, "SOP review timeline," it says "3 SOPs completed on time, 8 SOPs not completed on time." Is that accurate, or was that accurate as of this date?

A. No.

Q. Why do you not think that was accurate?

A. He asked me to come up with an SOP timeline. I explained to him these SOPs the way they're written cannot be conducted the way you'd like

them to be conducted. He was new to the area and I was trying to explain to him what it takes to make sure these SOPs were accurate and correct. So for him to say completed on time, not completed on time is not necessarily -- is not true, it's not a hundred percent true.

Q. So you had a difference of opinion on this, I suppose?

A. That's right. The whole document we had a difference of opinion.

Q. Going down to the bottom, "Areas of improvement," first bullet, "Improvement on follow-up on pending issues. Manage completion of tasks to meet due dates." Did Mr. Espejo discuss that with you?

A. I can't recall.

Q. How about the final bullet point, "Developing and implementing project timelines," do you remember any discussion about that?

A. I remember we discussed about Microsoft Project and I said I would take it, I took the course.

Q. Do you remember anything else that you discussed with Mr. Espejo about this?

A. I told him that I couldn't sign the document because I didn't agree with it.

Q. What was his response?

A. Okay.

(Henry Exhibit 23 for identification, Bates stamped D 00170 through 173.)

Q. I pass you a document that's been marked Henry Exhibit 23. This document is a performance appraisal, it looks like it's covering the time January 1, 2004 through December 31st, 2004; is that correct?

A. Yes.

Q. And this was prepared by your supervisor, Andrew Espejo; is that correct?

HOWARD A. HENRY

15:34:31 A. Yes.

15:34:32 Q. Did you meet with Mr.
15:34:34 Espejo --

15:34:35 A. Yes.

15:34:35 Q. -- in connection with this
15:34:36 performance review?

15:34:38 Were you provided a copy of
15:34:39 the performance review during that
15:34:40 meeting?

15:34:41 A. I don't recall.

15:34:42 Q. Did you discuss -- did Mr.
15:34:46 Espejo read this performance review to
15:34:48 you?

15:34:48 A. I think so.

15:34:52 Q. Did you have any discussion
15:34:55 with him about any of the information
15:34:58 provided in this performance review?

15:35:00 A. Can you repeat that for me,
15:35:06 I'm sorry. I was just focusing on
15:35:09 something.

15:35:09 Q. Did you have any discussions
15:35:10 with him about any of the information
15:35:12 provided in this performance review?

15:35:14 A. Yes.

15:35:15 Q. What did you discuss?

15:35:17 A. I said that he didn't capture a key element, something that occurred during that year.

15:35:25 Q. And what was that?

15:35:26 A. The continuous coater single pass project leadership that I provided that year.

15:35:37 Q. And what was that?

15:35:38 A. They couldn't -- they had a tremendous amount of trouble getting Centrum to -- how shall I say? -- to be coated in a single pass application. They had tremendous amount of trouble. They couldn't get it done for approximately nine or ten months. Our technical service department tried and they had vendors try and no one can do it. And corporate was looking specifically at us because part of the reason why they approved this instrument is to have it perform this particular function, and I was instrumental on making that happen.

15:36:28 Q. And you felt it should have been reflected or stated in this review?

15:36:31 A. Yes.

15:36:32 Q. And it wasn't?

15:36:33 A. Not to the level that it needed to be, no.

15:36:38 Q. Do you recall Mr. Espejo discussing anything about you needing to improve setting objective dates for commitments and meeting those commitments on a consistent basis?

15:36:57 A. Yes.

15:37:00 Q. What did he tell you about that?

15:37:01 A. He just said that, you know, as far as he's concerned that, you know, I need to firm up certain dates, and I told him, I said when you collaborate with people there are a lot of issues that occur for one not to -- to have -- to afford an extension, and he said, you're right, I have extensions myself and, you know, but I

15:37:29 would like for you -- do your best to
15:37:31 firm up certain dates. I said I'll do
15:37:34 my best.

15:37:35 Q. Did you have any
15:37:36 disagreement with this review?

15:37:37 A. Yes.

15:37:37 Q. What were your
15:37:39 disagreements?

15:37:40 A. He didn't capture a lot of
15:37:41 the things that I did during the course
15:37:43 of that year.

15:37:44 Q. Anything else you disagreed
15:37:46 about?

15:37:48 A. I mean I told him that I
15:37:50 couldn't sign it because, you know, I
15:37:53 just didn't agree. You know, I felt
15:37:57 that the work that I did was critical
15:37:59 to the organization and that it
15:38:01 warranted a five because if it didn't
15:38:03 get done we couldn't coat Centrum at
15:38:09 the rate, at the speed that we were
15:38:11 coating Centrum and probably we would
15:38:13 be held, you know, accountable for that
15:38:15 as a site. So I was key to making sure

15:38:19 that that occurred, that it happened.

15:38:21 Q. Is there anything else you recall about your conversation with Mr. Espejo in connection with this review?

15:38:34 A. Not at this time.

15:38:35 Q. Okay.

(Henry Exhibit 24 for identification, Bates stamped 3765 through 3768.)

15:39:37 Q. Mr. Henry, I've handed you a document that's marked Henry Exhibit 24. Have you seen this document before?

15:39:43 A. Yes.

15:39:46 Q. What is it?

15:39:47 A. It's some feedback that I got, the performance, 2005 performance feedback.

15:39:58 Q. And who provided you this feedback?

15:40:03 A. Max Katz.

15:40:04 Q. Who was Max Katz, can you tell me again?

15:40:06 A. He was the person I reported

to at the time.

Q. So at this point your reporting line had changed, you were no longer reporting to Mr. Espejo, but instead at this time, May 31st, 2005, you're reporting to Mr. Katz?

A. Right.

Q. How long had you been reporting to Mr. Katz as of this date?

A. A full five -- according to this, a full five months.

Q. Okay. So that's the January 3, 2005 through June 14th, 2005 review period?

A. Rights.

Q. Did you meet with Mr. Katz in connection with this review?

A. Yes.

Q. Did he give you a copy of the review at the meeting?

A. I don't recall.

Q. Did he read the review to you?

A. I believe so.

HOWARD A. HENRY

Q. Did he give you a copy at the end of the meeting?

A. I don't recall. He may have. I don't remember.

Q. Well I can represent to you that your attorney produced this document to us.

A. Right.

Q. If that --

A. He may not have given it to me at the meeting, he may have given it to me later on. I don't remember the exact way I got it.

Q. Okay. This review form appears a little different than the other ones we have reviewed today.

A. Yes.

Q. Do you have any idea -- do you know why this performance feedback document is slightly different than the others?

A. I guess they just changed the structure of it.

Q. Okay. What was your general

15:42:11 impression of this feedback contained
15:42:12 in this performance feedback document?
15:42:15 A. It just tried -- it tried to
15:42:19 paint me as a person who didn't do
15:42:20 things in a timely fashion, didn't do
15:42:22 things on time.
15:42:25 Q. And you believed that was
15:42:28 not accurate?
15:42:29 A. Not a hundred percent.
15:42:31 Q. Not a hundred percent. So
15:42:32 you believe it's somewhat accurate?
15:42:34 A. I mean I wouldn't say -- I
15:42:37 don't think it was accurate. That's
15:42:39 why I didn't sign it.
15:42:40 Q. Well let's go through item
15:42:42 by item.
15:42:42 A. Sure.
15:42:43 Q. The first item, "Provide the
15:42:49 necessary support to the conversion
15:42:50 cost reduction project to ensure an 8
15:42:54 percent reduction." The "Behind pace
15:42:59 needs improvement" box is checked
15:43:01 there. And there's a comment "Provide
15:43:03 a project timeline for improvement

15:43:08 projects to manager by July 29th, 2005." Did you do that, did you submit the project timeline for improvement projects by July 29th, 2005?

A. Yes.

Q. Okay. Manufacture variances in the left-hand column, the review indicates that you had unacceptable results and that corrective action is required. Do you remember discussing this with Mr. Katz?

A. No.

Q. A few lines down under the box "Quality mindset," to the far right there's the comment "PMO turnaround as discussed earlier on March 30th, 2005. PMOs from November and December were not signed off on until March." Is that accurate, that the PMOs from November and December were not signed off on until March?

A. Right.

Q. And would you agree with the statement that this put the department

at serious compliance risk with conformance standard 12-4-3-1?

A. I didn't understand that statement a hundred percent at the time.

Q. What did you think it meant at the time, or now?

A. Well he explained to me that PMOs not being signed off put the department at compliance risk and I said well part of the reason why they're not signed off is because I'm given them late or they're not given to me in my box at a certain time, and I find errors on the documents that need to be reviewed with the individual who gave them to me, and sometimes these people are not available. He said okay, what we're going to do, we're going to create a spreadsheet so that we can track when you get them, who gives them to you and when they're signed. I said okay.

Because I told him in the

past this is something that occurs, has occurred in the past and that usually, you know, to help maintenance I wouldn't say anything, but I would review them as quickly as I could so that we could, you know, have the documents back to them.

So in essence, I created the spreadsheet and we were able to track it better.

Q. A couple of boxes down, "Weekly zone checklists were not submitted in a timely fashion. No follow-up on missing zone checklists, resulting in ERF." What does ERF stand for?

A. Error -- error reduction form or error recording form, I think.

Q. Is that accurate, that the weekly zone checklists were not being submitted in a timely fashion?

A. Right.

Q. That is accurate?

A. Yes.

16:21:29 don't know how soon thereafter, maybe Newton Paul. That's who I can recall at this point.

16:21:40 Q. So what happened at your -- you had a July 6th, 2005 PIP review meeting, correct?

16:21:59 A. I don't know the date.

16:22:00 Q. But you did have a meeting, a review meeting, correct?

16:22:14 A. Yes.

16:22:15 Q. Who was at that meeting?

16:22:16 A. The second one I think it was just Max Katz and Stacey Marasco again.

16:22:23 Q. Now you say the second, you mean the first was the delivery of the document?

16:22:27 A. First the delivery and the second one was a follow-up one.

16:22:39 Q. And what was discussed at the follow-up meeting?

16:22:41 A. To the best of my recollection, we discussed about the zone checklist, whether I got them to

16:22:50 Andrew in a specific time, I told them yes. Max said he would set up a meeting between maintenance about how to best handle the PMOs because he wanted to stamp them and I told him you can't stamp an official company document like that without the first approval of maintenance. He said he would -- he would make up -- he would make sure he would set up a meeting.

16:23:13 And it was a very brief meeting. I expressed again that this PIP was unwarranted.

16:23:20 And that was about all I could remember at this time.

16:23:25 Q. Did Ms. Marasco tell you that the PIP was not a disciplinary tool, but instead a tool for corrective action?

16:23:42 A. She did say that.

16:23:44 Q. When was -- and then you had another meeting, correct, regarding the PIP, in this PIP review process?

16:23:57 A. Yes.

Q. And who was at the next meeting?

A. I believe that was the final meeting. I could be wrong, but I think that was Andrew Espejo, Max Katz and Stacey Marasco.

Q. Okay. And what happened at that meeting?

A. Basically they said that they wanted to get my opinion as to what an engineer should do, what's an engineer -- what is -- what is an engineer's role and what do I think an engineer's role should be within the organization.

And I asked them, I'm -- you know, I'm confused, I don't know what this has to do with the PIP. And he said, well, basically, I just want to get your understanding as to what you feel an engineer's role should be.

And we discussed opportunities, you know, opportunities for engineers and the function of an

16:24:53 engineer and the role of an engineer,
16:24:58 and I discussed with them that, you
16:25:00 know, I wished that they would have
16:25:03 come to me and told me that these are
16:25:05 some of the things they were looking
16:25:07 for in their management style and it
16:25:10 wouldn't have to resort to something
16:25:12 like this.

16:25:15 And Max insisted that he
16:25:17 tried to come to me, but I told him, I
16:25:19 said I don't recall you coming to me in
16:25:21 an amicable way, you know, I recall you
16:25:25 coming to me in front of colleagues and
16:25:28 kind of expressing what you felt and I
16:25:31 had to ask you to let's talk in the
16:25:33 office about certain things.

16:25:43 But there was a situation
16:25:44 where I mentioned, you know, I wish
16:25:46 these gentlemen would come to me man to
16:25:48 man, because they were men, Stacey was
16:25:51 offended by it and I apologized for it,
16:25:53 I said it wasn't offensive to you, you
16:25:56 being a woman, but I apologize if I
16:25:59 upset you. And I'll say person to

16:26:02 person from now on.

16:26:04 Q. Were you told at this
16:26:05 meeting that you'd satisfied the
16:26:07 requirements of the PIP?

16:26:07 A. Yes.

16:26:08 Q. Were you told that you'd be
16:26:09 removed from the PIP?

16:26:10 A. Yes.

16:26:10 Q. Were you told that -- do you
16:26:21 remember being told anything else?

16:26:22 A. That I'd have to sustain a
16:26:25 certain level of compliance, if you
16:26:28 will, certain level of performance or I
16:26:33 can be placed back on it, and it can
16:26:36 lead to termination.

(Henry Exhibit 29 for
16:27:15 identification, Bates stamped 3727.)

16:27:15 Q. Mr. Henry, I've put in front
16:27:17 of you a document that's been marked
16:27:19 Henry Exhibit 29. It appears to be a
16:27:25 letter from Mr. Katz dated July 28th,
16:27:27 2005. Do you recall receiving this
16:27:29 letter?

16:27:29 A. Yes.

16:27:30 Q. And this letter notified you that you'd been removed from the PIP?

16:27:33 A. Yes.

16:27:34 Q. Did you have any further discussions with Mr. Katz, Mr. Espejo or Mr. -- or Ms. Marasco regarding the PIP?

16:27:53 A. Not that I can recall.

16:27:54 Q. Did you have any discussions with anyone else other than your counsel regarding the PIP?

16:27:59 A. I mentioned two individuals before.

16:28:04 Q. Right. Other than those individuals?

16:28:06 A. Not that I can recall.

16:28:07 Q. Okay.

16:28:12 A. If you wouldn't mind, may I use the bathroom, is that all right?

16:28:20 MR. McQUADE: Sure, we'll take a break.

16:28:23 THE VIDEO OPERATOR: Going off the record at 4:28.

16:28:25 (A recess was taken.)

THE VIDEO OPERATOR: Returning to the record at 4:40 from 4:28.

(Henry Exhibit 30 for identification, Bates stamped D 00584 through 586.)

Q. Mr. Henry, I put in front of you a document that we have marked Henry Exhibit 30. Is this a document you've seen before?

A. Yes.

Q. If you'd look at the final page it's signed by a Dr. Henson.

A. Yes.

Q. And it indicates his type of -- immediately to the right of his signature it indicates his type of practice is internal medicine. Who is Dr. Henson?

A. He's a medical doctor that I --

Q. What type of doctor is he?

A. I guess internal medicine. I thought he did general. I didn't know he specifically did internal

16:41:10 medicine, so based on this.

16:41:12 Q. Is he a general practitioner

16:41:14 document?

16:41:15 A. Yes, primary care.

16:41:16 Q. And why did you see Mr.

16:41:18 Henson?

16:41:19 A. Well, in the past I was

16:41:20 complaining of chest pains, stress, and

16:41:30 I was going through this at the job and

16:41:34 I had to -- I was really getting sick

16:41:37 from it, really getting sick from it.

16:41:39 Q. How were you getting sick?

16:41:46 A. I suffered from depression,

16:41:48 insomnia, I didn't have any drive to do

16:41:53 anything. I used to like to exercise

16:41:56 and workout. I didn't have any desire

16:41:58 for that anymore.

16:42:00 Q. When did these symptoms

16:42:02 first appear?

16:42:04 A. They started to appear for

16:42:08 the most part in the early -- around

16:42:13 2004, I would say, you know --

16:42:19 Q. 2004 what symptoms did you

16:42:22 have? Were you having trouble sleeping?

16:42:24 A. That. I had irritable bowel syndrome. I couldn't hold anything down for awhile at certain points, severe insomnia.

16:42:37 Q. During what time period was this?

16:42:39 A. Various times throughout this whole process.

16:42:44 Q. Can you give me dates or at least approximations?

16:42:48 A. I know that -- I know that I was having heart palpitations and I went to see him I think in July of 2004. My heart was in -- it just -- it felt like it was beating irregularly, it didn't feel right. I ignored it for awhile. And I finally went to go see him about it.

16:43:07 Q. Okay. So in July, or shall we say in 2004 is it fair to say that --

16:43:20 A. That's when things started to physically take its toll.

16:43:26 Q. Were there any other

physical symptoms that you had?

A. Extreme fatigue, I didn't eat much, I didn't really eat that much. I mean, and I really had, like I told you, just nervous, nervous stomach in terms of my bowels and everything. That's about it I could remember at this time.

Q. This was in 2004?

A. Yes.

Q. Did it prevent you from performing any activities you normally --

A. I didn't work out, I didn't do things with my wife that we normally would do.

Q. You continued showing up to work?

A. Best I could.

Q. In 2004?

A. Best I could.

Q. I think you told me before you were working long hours?

A. Yes.

Q. Working weekends?

16:44:35 A. At times.

16:44:37 Q. And I think you told me in 2004 you believed that you should have received a five rating?

16:44:46 A. In 2004, yes.

16:44:50 Q. So these symptoms you were experiencing didn't affect your work performance in any way, did they?

16:44:57 A. It affected, you know, what I felt was my comfort level and my ability but I worked through them, I worked through it.

16:45:14 Q. 2005, what type of symptoms were you experiencing?

16:45:21 A. Just real depressed, you know, I just felt like there was nothing -- no matter what I did it wasn't good -- it wouldn't be good enough. So it just got real, real bad after that.

16:45:37 Q. Anything else in 2005?

16:45:39 A. Everything just escalated. Everything just got --

16:45:43 Q. When did you -- when was

HOWARD A. HENRY

your last day at work at Wyeth?

A. August 2005.

Q. And --

A. I believe it was the 5th of August actual physical work.

Q. At that time you submitted a request for disability benefits?

A. Right, for leave.

Q. And why did you want to take a leave?

A. Because things had taken its toll.

Q. What had taken its toll?

A. What I had been going through at Wyeth.

Q. And what was the toll? Can you be more specific?

A. The overall physical condition -- condition I was in. I mean I didn't -- I just was severely depressed. I had irritable bowel syndrome. My heart at sometimes I felt like it was racing, you know, uncontrollably at times. I mean I

16:46:44 would sit at my desk and my palms would get all sweaty, I would just break out in sweats and chills. I mean there was -- there was a lot of things that started happening to me that didn't happen before.

Q. Is there anything else, any other symptoms?

A. I had severe anxiety, like it was like I wanted to do everything perfect and I -- and I didn't want to fail at anything, so I got hyper just in terms of just preparing documents and getting this done and trying to do -- being three places at one time and I couldn't keep up with that pace and it took its toll.

Q. So you decided to take a disability leave?

A. Well, it was recommended by, you know, the individual, the doctor was talking to me and the health care provider was talking to me, I told them what I was going through. I explained

16:47:37 to them what I was going through. I was seeing a psychotherapist too and based on what I was going through they were like you need to take some time off, see, you know, how -- just to get to a point where you feel you can function the way you want to function. So that was the decision that was made.

Q. Who were the medical and care providers that you discussed this with?

A. Dr. Elliott Henson and Robert Hickman. He's a psychotherapist.

Q. When did you begin seeing Hickman, Dr. Hickman?

A. For this particular problem I want to say December-ish 2004, January 2005.

Q. How long had you been seeing Dr. Henson?

A. For this particular problem?

Q. No, in general.

A. He'd been my doctor ever since '94, '95 I think.

16:48:36 Q. And had you seen Dr. Hickman before?

16:48:39 A. Yes.

16:48:42 Q. Okay. When was that?

16:48:43 A. That was in 2000 -- for a different reason, obviously, it wasn't for the same reason. So it was for something different.

16:48:59 Q. When was that?

16:48:59 A. That was in 2003.

16:49:03 Q. Why did you see Dr. Hickman before?

16:49:05 A. Marriage counseling.

16:49:08 Q. Did you suggest to either of these doctors that you should take a leave of absence?

16:49:17 A. I can't say I suggested it. I could say I mentioned to them how I was feeling and based on that the conclusion was drawn that it was time to take some time.

16:49:59 Q. If you'd look at Exhibit 30 under section 4 it says "State the approximate date the condition

commenced and the probable duration of the condition and also the problem duration of the patient's present incapacity if different." It indicates that the date it commenced was February 18th, 2005, earliest reportable symptoms. This would suggest to me that you told Dr. Henson that symptoms first appeared on February 18th, 2005.

A. I didn't -- I didn't tell him that.

Q. Do you know how he came to this February 18th, 2005 date?

A. No.

Q. Do you know whether Dr. Henson is qualified to diagnose a patient with something like anxiety disorder?

A. He's a medical doctor, so I would -- I would say that he was qualified.

Q. Okay.

(Henry Exhibit 31 for identification, Bates stamped D 00582 and 583.)