Henry
Affidavit

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
HOWARD HENRY,                                    :

                                      Plaintiff,    :           05-cv-8106 (RCC)(DFE)

                                                  :           **AFFIDAVIT OF HOWARD**
     -against-                                    :           **HENRY IN OPPOSITION TO**
                                                  :           **DEFENDANTS' MOTION FOR**
WYETH PHARMACEUTICALS, INC., WALTER :           **SUMMARY JUDGMENT**
WARDROP, ANDREW SCHASCHL, and       :
MICHAEL McDERMOTT,                       :

                                                  :
                                      Defendants.    :
---------------------------------------------------------------x

STATE OF NEW YORK        )
                                     ) ss.:
COUNTY OF NASSAU         )

        **Howard Henry,** being duly sworn, deposes and says as follows:

1.      I am the plaintiff in the above-captioned action and as such I am fully familiar with the

facts and circumstances herein. I was an employee of Wyeth and its predecessors for

twelve years, and as such I can attest to the matters herein based upon my personal

knowledge. I make this affidavit in opposition to Defendants' Motion for Summary

Judgment made pursuant to FRCP 56.

2.      My attorneys inform me that on this type of motion, as the non-moving party, I am to be

given the benefit of the most favorable inferences. As such, the facts of this case from my

perspective are what follows accompanied by a number of exhibits.

        *Background Information and My Performance Prior to 2003*

3.      I began working for American Cyanamid before the company ultimately became Wyeth

Pharmaceuticals, Inc. ("Wyeth" or "Company") in 1992 on a temporary basis. In 1993,

1

based upon my B.S. in Physical Science and my work performance as a temporary

employee, Wyeth hired me permanently as a Chemist in its Chemical Process Research &

Development Department. I hoped to work my way up through the Company and

eventually obtain a management position.

4.    As a chemist, I was working extremely hard, and my performance was above-average to

high. I felt this was an especially good accomplishment considering my coworkers were

mostly chemists and engineers with either Doctoral or Masters degrees. In both 1993 and

1994 my reviews were good and I did not "need improvement" as evidenced by a C rating

in any area of my reviews. (Exs. 1, 2). In fact, up until my 2003 performance appraisal, I

never received a review suggesting that I needed improvement. However, to continue, in

the fall of 1994 I began taking classes to obtain an additional degree in chemical

engineering at the City College of New York ("CCNY"). Because management had

concerns regarding the fact that my classes were during the day, I agreed to use all my

vacation days and to come in at 5:00 am, sometimes 4:00 am, so I could begin chemical

reactions; I would then go to school to take my classes; and I would return to work the

finish out the remainder of the working day, and some of those days ended between 9:00

pm and 10:00 pm. I sacrificed and used all my vacation days during most semesters and

volunteered to work weekends in order to meet the needs of the department.

5.    My performance review in 1995 was average, and I disagreed with it because I felt that

the amount of work I accomplished and dedication I gave while attending CCNY

deserved more recognition than what I received. This lead me to write on the review itself

that I did not feel the review fully captured the "time, effort, and dedication I truly gave to

2

achieve the goals set." (Ex. 3). In 1996 I still strove to do better work and grow in a way which would lead to future advancement opportunities, as I wrote on my review for that year. (Ex. 4). My 1997 review reflected that I had earned a Special Recognition Award that year as a result of my hard work and dedication. (Exs. 5; 18, Bates 4335). Also in the 1997 review period, I obtained my B.E. in Chemical Engineering from CCNY and received a merit promotion along with a corresponding five percent raise for my work in the Kilo Lab.

6.    In 1998 I received my first rating of "exceeds expectations" and I was excited to see that my supervisor recognized on my review that I always completed my tasks in a timely manner. (Ex. 6). In 1999 I was given the opportunity to work outside my normal area, the Kilo Lab, by working in the Bioprocess Group, which I was delighted to do because I felt the experience would lead to increased levels of responsibility in the years to come.

7.    In 2000, I received a promotion to Production Engineer in Wyeth's LCH (Lederle Consumer Health) Division, the position I held for the remainder of my time at Wyeth. As a result of this move, Defendant Walter Wardrop ("Wardrop") became my supervisor, and the review he gave me stated that I was a quick learner and "innovative" in my new position. (Ex. 8). He noted that I always completed my work in a timely fashion and saw the jobs through to completion. (*Id.*). Generally, Wardrop and I had a good working relationship. This relationship continued through 2001 and 2002, and Wardrop gave me positive reviews for those years. (Exs. 9, 10). This relationship would also deteriorate in the years to come.

3

### *My Application For the Project Engineer Position*

8.    There are typically two ways to obtain a new position or a promotion at Wyeth. The first

way is to simply be appointed into a vacant or newly-created job position. The second is

to apply for the position if it happened to be posted on designated bulletin boards

throughout the plant or on Wyeth's internal intranet website. The latter process is known

as "bidding" on a job. Only some positions were opened up to employees to bid on as

many were simply filled by appointment.

9.    From July 2001 to December of 2002, I was given the opportunity to "fill in" as a Project

Engineer on an interim basis. (Ex. 27). Kevin Costello was the manager of the group that

the Project Engineer reported into, and our working relationship was such that I felt

comfortable enough to go and speak to him about becoming a permanent Project

Engineer. I "bid" on the position through Wyeth's bidding process, but the position was

given to Cara Muscolo, a white employee who was returning to Wyeth. I felt that the

position should have been given to me since the common practice at the time was to give

employees an opportunity to fill in on a temporary basis and then promote them to a

permanent position when one became available. However, at that time, I respected

Costello's decision and felt that another opportunity would arise for me down the road. It

was not until later that I suspected this decision was based upon my race. I realize this

now in part because I was never even interviewed for the position, and partly because of

what I see Costello has stated in his Declaration—that I had not gained his confidence as

Muscolo had. This is simply untrue because Costello told me directly and in front of other

employees that he had "complete confidence" in my work and was not concerned that I

4

could complete the assignments he gave me on time.

### *My Application For the Production Coordinator Position*

10.    The Production Coordinator position initially reported to Robert Bracco, and in

approximately April or May of 2001, Bracco offered to give the position to me upon the

resignation of Michael Todd Davenport. Admittedly, I was the second choice behind

Chris DeFeciani at this time, but DeFeciani had made it known that he was not interested

in the position even though he had been filling in for Davenport on a temporary basis

when Davenport was out. Defendant Wardrop encouraged me to take this position should

it have been offered to me. However, Davenport never resigned at that time.

11.    Sometime during the year between June 2001 and June 2002, the Production Coordinator

position began reporting to Defendant Schaschl. Davenport was given the opportunity to

become a Senior Supervisor in Compression Operations, which he took, and the

Production Coordinator position became available. Since I already knew that DeFeciani

was not interested in the position, I applied for it through the internal bidding process in

approximately July 2002. DeFeciani apparently changed his mind and decided to also

apply for the position, which he ultimately received. While DeFeciani was qualified for

the position, so was I, and my skills matched the job description for the position. (Ex. 19).

My performance reviews for the preceding nine years showed that I could "multitask" as

the position called for. Specifically, my 2001 review stated that I "found ways to

minimize downtime through creative scheduling and multi-tasking" and email messages

thanked me for my "dedication and attitude" critical to completing projects on time. (Ex.

9). Schaschl stated in one message that my commitment was something he wanted "to

spread like wildfire," so I cannot believe the statements he makes now in his Declaration that say he chose DeFeciani over me because I had problems multitasking. (Defendants' 56.1 Statement at ¶ 21).

12.   Defendants also make much of the fact that DeFeciani had received "5" ratings on his reviews in 2000-01; however, his reviewer was Defendant Walrdrop who was one of DeFeciani's closest friends. Perhaps it was my own naiveté, but I did not think at that time that cronyism would play a role in the decision-making process.

13.   In any event, I asked Schaschl why I had not been given the position, and he told me that DeFeciani was awarded it because he had previously filled in for Davenport while he was out. I asked him why I did not receive the same opportunity, to which he could not provide an answer. I made these inquiries to make it known that I would be interested in similar opportunities in the future should they arise. The opportunity did arise, but Richard Morgan was given it instead of me despite my requests. Schaschl never even asked me if I would be interested.

14.   I was disappointed because executing interim duties in another's absence is a good stepping-stone to advancement in that it offers the managers the opportunity to watch an employee fulfill the functions of the job, and management can then see how that employee performs. For example, Chris DeFeciani, and Wardrop both previously performed the Production Coordinator duties on an interim basis at some point in their careers, they both were later given the position on a permanent basis, and both were later promoted to management positions within the company. (*Id.*). I had tried to obtain the Project Engineer position this way under Costello, but was denied, and was now

6

attempting to obtain the Production Coordinator position this way, but was being denied.

15.    Even though Morgan was filling in here and there, it was around April of 2003 when

Richard Morgan was given his first "real" opportunity to perform DeFeciani's functions

as Production Coordinator on an interim basis while DeFeciani was out on medical leave.

I was again disappointed at not being asked to perform these duties since I had already

made it known to Schaschl that I was interested. Despite that he signed my 2002

performance appraisal which said I "exceed expectations," Schaschl never even

approached me and asked if I was interested in taking on DeFeciani's responsibilities.

### I Finally Realize I Am Being Discriminated Against

16.    Almost immediately after I began asking Wardrop, my direct supervisor, for reasons as to

why I was not being given any opportunities to advance, he asked me to sit down with

him for an informal mid-year review. This occurred sometime in March or April of 2003.

I was surprised because I had never been given a mid-year review throughout my entire

career at Wyeth up until this point, and have never known there to be a policy urging

managers to conduct mid-year reviews as Defendants claim. If there was a policy, it was

being ignored since I had never been given a mid-year review prior to when I complained

to Wardrop. He asked me to email him my goals and objectives for the year in

preparation of this meeting, which I did. (Ex. 29). On March 17, 2003, he accepted them

and emailed me back with brief comments about those goals. (Ex. 28, Bates 1954). Soon

thereafter, we met to discuss some other items, which were documented in writing and

constituted my mid-year review. I signed the review, but was never given a copy of it for

my records.

7

17.     Defendants now contend that a document dated September 3, 2003 is the document which reflects my mid-year review. (Ex. 11). This document is unsigned by myself. Despite the date on this document, I do not remember any review taking place in September 2003, but some of the items contained therein we did discuss in my review in the spring of 2003. ·Others have been added after.

18.     Despite when the document is dated, its contents are what I believe was the beginning of a series of events which when put together constitute Defendants' attempt to begin falsely documenting my performance after I complained for the purpose of limiting my future career growth. For example, Defendants state that Schaschl had to ask my supervisor, Wardrop, to intervene and help me complete some projects. This is completely untrue, and the timing of this alleged request is in complete accord with when I first began asking Wardrop and Schaschl why I was not receiving advancement opportunities. The document (Ex. 11) contains vague references to late projects or complaints by other managers, but I am not aware of any single project that went overdue which could be attributed to me, or any complaints from other managers about my performance.

19.     The document specifically references two projects, which I believe were the CTC Cleaning Verification and the CTC Weigh Belt projects.

20.     With regard to the CTC Cleaning Verification project, it was given to me after I returned from my own medical leave in January 2003. In or about late February/early March 2003, Wardrop asked me to take charge of this project because there were problems with most of the CTC (Continuous Tablet Coater) equipment passing the Quality Assurance ("QA") cleaning verification requirements. Prior to this time, pharmaceutical supervisors oversaw

these activities and I only occasionally provided assistance. I immediately sent out an email enclosing a detailed flow chart which showed the steps that would be taken from that point forward to ensure that the CTC Cleaning Verifications were successful. (Ex. 28, Bates 1965-67). Wardrop replied by email thanking me for my work and wrote "I know you will lead the way and hold the torch high." (Ex. 28, Bates 1964). The only time the project was "behind schedule" as Defendants claim was prior to when I became responsible for it. Once I became involved, the CTC passed inspection three straight times (which was the criteria set forth by QA) and the project was considered 100% successful. At no time did Wardrop or Schaschl ever inform me that the project was behind schedule or that my work was deficient, late, or lacking. I did not even know there was a schedule. I was never told that any problems associated with the Cleaning Verification project were attributed to me until I began to investigate my demotion later on in January 2004.

21.     With regard to the CTC Weigh Belt project, the Weigh Belt is a piece of equipment that is part of the CTC system which weighs the Centrum® tablets prior to them being conveyed into, and coated by, the CTC. In approximately July 2001, as stated above, I became the Project Engineer on an interim basis specifically to successfully install the CTC by March 2002. As I and other CTC team members began to research and investigate CTC peripheral equipment (Weigh Belt, conveyor belts, bins, etc.), we found that the Weigh Belt was inherently flawed for use in this type of process. We reported our findings to upper management and were told that due to the limited time frame given for the project's execution, the Weigh Belt had to be used despite its flaws. All of the duties

9

associated with the project were completed and the CTC was successfully installed by its March 2002 deadline; however, the Weigh Belt, among other things, continued to be a problem. As the project progressed, we researched and finally found a piece of equipment (the Check Weigher) that could possibly replace the Weigh Belt. We were told by Kevin Costello that the Weigh Belt would not be replaced because of a lack of familiarity and potential QA verification and qualification issues. Accordingly, I was forced to come up with ideas on how the CTC could continue to function effectively with the Weigh Belt and its associated problems; however, once equipment (like the CTC) is permanently installed and qualified for production use, the Maintenance Department is primarily responsible for the equipment's performance, and an engineer's job is limited to ensuring that the equipment remains functional. I eventually found a solution to the Weigh Belt problems in the spring of 2005, but all the problems associated with it during 2003 were inherent problems that we had warned upper management about previously. Defendants' contention now that I was somehow responsible for any delay in the completion of this project is untrue. (*See* Ex. 28, Bates 1936, 1938 (email correspondence regarding the Weigh Belt project)). At no time did Wardrop or Schaschl inform me that the project was behind schedule or that my work was deficient, late, or lacking. I was never told that any problems associated with the Weigh Belt project were attributed to me until I began to investigate my demotion in January 2004.

22.    The document that Defendants contend constitutes my 2003 mid-year review also references problems with the pager system at Wyeth, but Defendants have attempted to skew the situation by making it seem like I was intentionally ignoring or otherwise not

10

responding to my pages. There was a period of time when the pagers were not working properly, and to say that I was ignoring my pages is some excuse to try to justify Schaschl's oppressive actions. Regarding Jean Colas's complaint that he was getting pages for me, I also got pages for areas that were his responsibility. This was normal because the engineers worked as a team and had to back each other up, especially since the pager system was inherently unreliable. Wardrop even documented the pager problem on my alleged mid-year review. (Ex. 11).

23.    The document also states that Wardrop received reports that I was observed doing nothing at work (Ex. 11), yet Wardrop himself authored emails in which he states: "Thanks for your diligence in covering issues on all three shifts," addressed to me (Ex. 28, Bates 1934), and again on August 22, 2003 in which he states: "I am well aware of our recent 'challenges,' so we need a move-forward plan. Howard can not [sic] be here 24-hours a day to keep the unit running," (Ex. 28, Bates 1932). Even to date, Wardrop has never revealed who he allegedly "received reports" from.

24.    After I received this review, I began to suspect that Schaschl, through Wardrop, was trying to find reasons not to promote me since I saw that the review completely mischaracterized certain incidents or falsely attributed problems to me. The timing was such that I believed he was starting to document "problems" with my performance in order to justify his discriminatory denials of my promotions. My 2003 year-end review later confirmed these suspicions. (*See infra*).

### *I Keep On Trying and Apply For the Process Engineer Position*

25.    Once I realized that my verbal requests were falling on deaf ears, and Schaschl was trying

11

to block my advancement, I was relegated to applying for positions outside of my department and only through the internal bidding process. I applied for the Process Engineer position in the Vaccines department in December 2003 or January 2004. The person hiring for the position was Kirit Rokad. The job description for the position is annexed hereto as Exhibit 20.

26.    While I was interviewed for the position, it was awarded to Angel Montanez. I had the requisite educational level for the position since I had two Bachelor's degrees, as compared to Montanez's one. I had also taken two masters level courses in chemical and environmental engineering which would have been relevant for the position. In contrast, Montanez was only pursuing his masters course work.

27.    Rokad states now that he believed it was important for the person he hired to have had experience in the Vaccines Department; however, the overall atmosphere at Wyeth is inconsistent with this logic since many people are given positions in departments outside their own on a regular basis. For example, Michael McDermott was transferred to the Vaccines Department as part of the Organizational Cascade in 2003/04 without having any experience in that department to the best of my knowledge.

### My 2003 Performance Appraisal and Demotion

28.    My original 2003 performance appraisal has been lost or is otherwise not in my possession. The document that Defendants contend constitutes my 2003 performance appraisal is annexed hereto as Exhibit 12, but this is not the document I reviewed at my performance review meeting with Wardrop on December 17, 2003. Regardless, I completely disagreed with the contents of it, got upset, and left the meeting to go and take

12

a walk. I was upset because not only did I do the same amount of work in 2003 than I had

in prior years, but I did more. I filled in vacancies left by two other employees and

covered their responsibilities on three different shifts. Despite my work, I received a "3"

rating instead of a "4" as I had in prior years. In the Manager's Comments section of the

review, there is a reference to the fact that "the timeliness of completing projects still

needs improvement," yet the only example given is that my Self-Appraisal for 2003 was

not submitted for consideration. (Ex. 12). The Self-Appraisal is not a mandatory

document in the first place. Some managers do not require it, and in some instances the

manager actually writes the Self-Appraisal for the employee. Regardless, I had asked

Wardrop about the necessity of submitting my Self-Appraisal when I returned from my

honeymoon on October 8, 2003, which was two days before Wardrop's meeting with

other managers to discuss my rating on October 10, 2003. I asked him if he still needed it,

and he responded by saying "don't worry about it." I assumed that he said this because we

communicated on an almost-daily basis regarding the work I had been doing, and he

already had my 2003 goals and objectives from earlier in the year, which is referenced in

the review itself. (Exs. 29, 12). Additionally, my 2003 Engineering Status Report shows

all the work I did during the year. (Ex. 32). I also disagreed with the review because it

contained references to the two projects I spoke to above, the CTC Cleaning Verification

and CTC Weigh Belt projects (*supra*, at ¶¶ 20, 21). To reiterate, Wardrop never had to

"intervene" in order to complete the projects.

29.    It was at this meeting on December 17, 2003 that I was told I would be transferred to the

position of Packaging Supervisor as part of the Organizational Cascade. This move was

13

when I became extremely frustrated at the whole situation and when my prior beliefs that I was being discriminated against were finally confirmed. I am a chemist with two degrees and was responsible for synthesizing complex chemical reactions. I was an engineer responsible for extremely complicated machinery. The move to Packaging Supervisor would have required me to do nothing more than sit on an assembly line and watch hourly employees fill bottles with vitamins. The position required no more education than a high school diploma. (Ex. 30). It was a position for someone who was just starting their career at Wyeth, not someone who had been there for nine years. Moreover, other employees at Wyeth know that when an engineer is transferred to this position, it is a sign that they cannot perform their engineering functions. They look upon you with disdain. Needless to say, I was humiliated and demoralized.

### *I Complain About Discrimination*

30.    On January 5, 2004, I took the first step in trying to get a resolution for myself and met with Wardrop to discuss why I was moved to packaging. I truly wanted to understand what he felt I did wrong so that I could ascertain his reasoning and possibly use his suggestions for future growth. He stated that there were no other positions left and I was not chosen during the 2003 Organizational Cascade. This was not the same reason he gave to me on December 17, 2003 during my year-end review. We met again on January 7, 2004, and Wardrop stated that he wanted to "tell me the truth," which was that someone else had insisted on putting me in the Packaging Supervisor position. Since I felt he was not being truly honest, I scheduled to meet with Schaschl. On January 9, 2004, I met with Schaschl personally to discuss my 2003 review and my transfer, and I told him

14

exactly why I disagreed with the review. We talked about the CTC projects and the

Packaging Supervisor position, and I told him that this was the first time I had ever heard

of any complaints regarding my performance on the CTC projects.

31.    I received conflicting reasons from Wardrop and Schaschl, so I scheduled a meeting with

Joanne Rose from the Human Resources department which took place on January 12,

2004. While I was on my way to my meeting with Rose, Wardrop asked me to join him in

his office and he stated: "I'm sorry for the way things turned out. You did work hard. You

did a good job. I don't want to see you unhappy." (paraphrasing). I was confused by these

comments considering it was Wardrop's own reviews which implied that I did not work

hard.

32.    At my meeting with Rose, she told me that I lacked supervisory experience, that I had

"missed the bar" on certain items, and that my actual rating could not be changed because

it had already been entered in the system, though the wording was changed. I was again

confused because I see no reason why a rating cannot be changed once it is disputed and

agreed that it is undeserving. For example, if someone who should be rated a 5 is

accidentally rated a 2, I do not see why the rating cannot simply be switched, especially

considering that the review would become part of someone's permanent record. In any

event, I told Rose that I was going to take my complaints higher and I scheduled a

meeting with Defendant McDermott.

33.    I met with McDermott first on January 13, 2004. At this meeting, McDermott merely said

that he would look into the situation, but that he was generally opposed to one person

remaining in a position for too long and that was why I was being transferred. This was

15

the first I heard of this reason, and it is completely different from what Rose had said the day before, and what Wardrop and Schaschl had previously said. I had a second meeting with McDermott on January 22, 2004. He was considerably less congenial and more stern than he was at our prior meeting, and seemed to be very adamant in his position. He said he had to "trust his direct reports" and that he could not issue an executive order directing Wardrop or Schaschl to change my 2003 review. I asked McDermott at this meeting if he had read my performance appraisals from the previous years. He simply said, "No. I don't care about them."

34.    At this meeting was the first time I had spoken about race to any of the managers, but I had complained to Richard Gaskins, the Head of the Cultural Diversity Program, on January 16, 2004 that I was being discriminated against. Nevertheless, I told McDermott that as an African American it would be hard for me to explain on my resume why I had been transferred from an engineering position to a packaging position. McDermott said nothing in return as Defendants state. (Defs. 56.1 Statement at ¶ 75). His only response to my concern was, "I am all for diversity [pause] but I'm not going to get into that silly discussion with you."

35.    I suppose my complaints had some effect because on January 16, 2004 I again met with Wardrop and Rose who presented me with a revised 2003 performance appraisal which did not contain some of the language in the Manager's Comments section which previously related to certain items being missing or late. (Ex. 13). I still was unhappy with the review, though, and decided that I would take my complaints even higher. On January 26, 2004, I went to see Peter Bigelow and told him that I was unhappy with my review

16

and my demotion. I did not tell him that I wanted to remain in my position as Production

Engineer as Defendants state. (Defs. 56.1 Statement at ¶ 80). I simply told him that I did

not wish to become a Packaging Supervisor for all the reasons already stated herein. I also

told him that the reason I went to see him was that I was not receiving honest answers

from anybody else, to which he responded in agreement and said, "you deserve an honest

answer."

36.    On February 11, 2004 I had a follow-up meeting with Bigelow. He told me that he was in

partial agreement with me and that he was not comfortable with me becoming a

Packaging Supervisor because it was not a "good use of resources." I took personal notes

of this meeting and followed up with Bigelow in an email dated February 16, 2004

thanking him for his comments. (Ex. 33). Nevertheless, Bigelow emailed me on February

25, 2004 and stated that he had reviewed my past performance appraisals and documents,

and that he found them to be clear and objective. I do not recall hearing from Bigelow

after that until March 29, 2004 when he informed me that Eugene Sackett would be

conducting an investigation into my discrimination complaints.  Eugene Sackett's

findings are annexed hereto as Exhibit 35, wherein it states that McDermott

acknowledged that the move to packaging carried with it an "entry level perception" and

that it was not viewed as a good place to work. (Ex. 35, Bates D 000683).

### *My Application For the Staff Engineer I Position*

37.    Despite my complaints and unhappiness, I strove to advance, and in January 2004 I

applied for the position of Staff Engineer I in the Bioprocess Department, a department I

had previously worked in for about six months. I thought this might be a good solution

17

since I knew that Wyeth liked to promote people that already had experience working in a certain area, even if on an interim basis, and in those six months I had become familiar with the operations and needs of the department. I also had experience working with John Simpson from my previous exposure to his department. I was denied again though, and the position ultimately went to James Patch, a white employee, after Beeling Cheang rejected it.

### The Results of My Complaints and the Investigation

38.    On April 21, 2004, Bigelow emailed me with an alternative to the Packaging Supervisor position, which was to become a Senior Validation Specialist in the Vaccines Division. I now find this ironic since Rokad stated in his Declaration that I would not be a good fit in the Vaccines Division since I had no experience there. With respect to this alternative, I was concerned about taking the position because it would have reported into McDermott's organization, who I believed was part of the problem. On April 26, 2004, I responded to Bigelow's email and suggested that another alternative would be the position of Consumer Health Project Engineer which was vacant at the time. It was not posted on the Wyeth intranet site for anyone to bid on it, so I considered my email to Bigelow to be my "application." The position was agreeable to me because I successfully fulfilled the duties of this role on an interim basis in the past, and it would have offered me more future opportunities for advancement than the Packaging Supervisor position would have despite there being no present change in salary or grade. Despite my efforts, Bigelow never responded to my suggestion and I found out later that the position was given to another employee, Honorio "Jun" Ordonez. To my knowledge, he never applied

18

for the position. Had Bigelow told me that my email application was not sufficient, I would have done everything in my power to properly apply for it.

39.    I should point out here that throughout this entire period of time, my reporting structure had changed as if I was the Packaging Supervisor instead of the Production Engineer. Derek Burt and Monte Bradford, two packaging department managers, handled my paperwork and my expense reports. My curriculum was even changed to match that of a Packaging Supervisor despite the stay of my transfer pending an outcome or resolution to my complaints. (Ex. 34).

### *I Remain a Production Engineer and Begin Reporting To Andrew Espejo*

40.    On May 6, 2004, I was finally told that despite all my efforts, I would remain in my position as Production Engineer and that I would report to Andrew Espejo, who had become my supervisor as part of the Organizational Cascade process.

### *My 2004 Mid-Year Review*

41.    On July 9, 2004, Espejo met with me to give me a mid-year review. This review was no different than the 2003 review in that it contained vague references implying that I was somehow responsible for delays on projects that had little to do with me, or that were not even subject to a deadline in the first place. (Ex. 14). The review was completely unwarranted and baseless, and I viewed it as just another attempt to load my permanent file with biased documentation that would keep from advancing. For example, the review references the Predictive and Preventative Maintenance Plans and the SOP (Standard Operating Procedure) Review Timeline.

42.    With respect to the Predictive and Preventative Maintenance Plans, prior to the time that

19

Espejo took the position as the Manager of PPU#1 (Primary Processing Unit), Production Engineers were not even responsible for maintenance engineering operations as our training curriculums and job descriptions did not support such responsibilities. 1 was not responsible for the maintenance plans as a Production Engineer, and it should have been the maintenance department that Espejo targeted. When Espejo assumed the role of Manager of PPU#1, he insisted that I assume dual roles as a maintenance/production engineer. Despite my lack of training as a maintenance engineer, I agreed to make an attempt to try and complete the tasks as assigned by Espejo so as not to "throw fuel on the fire"; however, I was not informed of a specific date when this project was due and Espejo never made himself clear that there was a hard deadline for this project. Of course, it later somehow showed up in my mid-year review with a hard deadline that was never clearly set.

43.    With respect to the SOP Review Timeline project, Espejo was new to the area and had no idea what it took to complete SOPs that relate to production area equipment, and to say that SOPs were late was inaccurate because SOPs could not be completed according to any timeline proposed by Espejo as he believed they could.

44.    Nevertheless, I told Espejo that I would begin documenting my work so that he could see that the projects were, in fact, on time and that his assertions to the contrary in my review were unwarranted. I did begin documenting my work and emailed him my outlines on a monthly basis. (Ex. 36). After Espejo saw that I was standing up for myself and would not be subjected to baseless reviews, he asked me to stop emailing him my monthly updates.

### *I Persist and Apply For the Manager Manufacturing Support Position*

45.    In September 2004, an opening for the Manager Manufacturing Support arose, which was

just a new name for the old position of Senior Supervisor of Compression. The duties

were substantially the same. For this position, I was extremely qualified. I had four full

years of experience working in the Centrum® Production area; I had assisted all of the

former people who held the position when it was entitled "Senior Supervisor of

Compression," Joe Torres, Michael Collorafi, and Todd Davenport; I was familiar with

the compression operations as the job description required (Ex. 31); I was familiar with

the staff I would be managing should I have gotten the position; I had already

collaborated with all the departments that the position would have required me to, and I

personally knew the individuals in those departments; and I had the requisite educational

level.

46.    My interview was conducted by a panel consisting of four managers, Cara Muscolo,

Andrew Espejo, Derek Burt, and Chris DeFeciani. Almost immediately I knew this was

going to be a sham because three of those individuals were people who had been given

promotions over me already and were presumably aware of my complaints of

discrimination. I went on the interview anyway, and as I expected, my scores were low. It

was not a surprise to see Max Katz get higher scores because I knew that Espejo had been

pushing for Katz to get the position. He had been asking others to interview so that he

could make it look like an objective process. Katz himself had no direct production

experience in the area where he would be expected to oversee compared to my four years

of experience in the area, yet he was the one who the position was offered to.

21

### *My 2004 Performance Review*

47.    My 2004 performance review is annexed hereto as Exhibit 15. Espejo completely ignored

the single biggest project I had been working on for the entire year, for what I believe was

his attempt to continue making me look bad. The CTC Single Pass Project was finished

as a direct result of my leadership, yet it was not mentioned in my review, and I still

received a "3". The project allowed the company to coat Centrum® at a much higher rate

than it was being coated before because, as the name suggests, the tablets would only go

through the coating machine in one single pass instead of two passes as they previously

did. The solution to effectuate this change had eluded the technical service department

and outside contractors for approximately nine or ten months, and it was my leadership,

assessment, and parameter adjustments which brought resolution.

48.    I again refused to sign the review. It left off the CTC Single Pass Project, and it again

stated that I had trouble missing deadlines which were non-existent. I told Espejo that

since we were working as a team as part of a collaborative effort, we should have been

granted certain extensions. He even agreed and admitted that he had been given

extensions himself, but yet he refused to change my review.

### *Harassment By Espejo and Katz*

49.    It is not surprising to see now that Katz is making statements in his Declaration against

me since he was the person promoted over me at Espejo's urging. However, his assertions

are completely belied by emails that he sent to me. For example, he says that he had

difficulties with me from the outset, yet Espejo and Katz both authored emails which

recognized my hard work and late hours. (Ex. 37). Katz says he received complaints

22

about me missing deadlines, but has failed to name one single person who has made such complaints. He says that I was often absent from work without adequate notice, yet Espejo and Katz did the exact same thing, sometimes taking off the next day by simply emailing his employees at 4:00 pm saying he would be out. Regardless, there were times when I did provide notice of my illness, but I went into work anyway in order to continue or complete projects. With respect to his assertions that I was non-responsive to him or his emails, I communicated with Katz verbally on practically a daily basis regarding the projects I was working on and responded to his emails in that manner. Since we worked in close proximity, it was oftentimes much easier for me to respond verbally than to go to my computer and sit down to write a one-line email.

50.    However, I refer the Court to Exhibits 22, 23, and 24, which are emails recognizing how busy I was while working for Espejo and Katz, and shows that any lateness regarding the Weekly Zone Checklists (*See* Defs. 56.1 Statement at ¶ 109) was attributable to others and not to me. Espejo attempts to use this as ammunition against me now, and Katz used it in my 2005 mid-year review, yet Espejo himself responded to my email informing him of these problems with his own email which said that he would work with those supervisors to ensure that they were properly following the procedures regarding the Weekly Zone Checklists. (Ex. 23). Espejo himself had one checklist that he was given on December 6, 2004, yet he did not give it to me until March 2, 2005. Therein lied the exact problem I was complaining about. There was a similar situation with the PMOs not being completed in a timely manner, which I also informed Katz about by email. (Ex. 24). He responded by saying that he would work with me to track the source of the problem,

23

which implies that he agreed that I was not the source.

51. Katz also refers to a meeting that was scheduled in February 2005 with outside vendors. (Defs. 56.1 Statement at ¶ 111). With regard to that day, there was an extremely bad snow storm and I arrived to work as soon as the weather permitted me to. I still arrived in time to conduct the meeting and the meeting was completely successful. My lateness that day had no effect on my work, on Wyeth's goals, nor did it reflect anything about my integrity as a worker or my timeliness.

52. With regard to the assertions contained in paragraph "116" of Defendants' 56.1 Statement, I believe that the project referred to is the Water System Management Project. A few meetings were held and all the engineers agreed that the workload was heavy, especially for the Production Engineers. Everyone agreed that whichever engineers took their time to work on the project would be losing time from working on the production floor. I did spend time working on the project and, as expected, the workload was heavy. No schedule was given to me for this project, and I completed all the necessary training for this project by reading the relevant SOPs. Until now, I was unaware of any complaint made by Cara Muscolo about me.

53. Another "high priority" issue that Defendants attempt to use against me is an email dated May 19, 2005 which contained a project with a June 3, 2005 commitment date. (Defs. 56.1 Statement at ¶ 118). The assignment referred to was originally given to Kevin Costello's group by QA because his group used the equipment in question. That group had approximately one month to complete the assignment, and it was already open for 13 days before it was given to me, giving me only two weeks to complete it. (Ex. 38, Bates

24

1687). I had already "responded" to the email of May 19, 2005 the day before on May 18, 2005 by informing Espejo that I realized they were due, but since I just received the assignment, completing it by the June 3, 2005 target date was not feasible. (Ex. 38, Bates 1685). In regard to Defendants' contention that many people had to stay late to work on the assignment, staying late was commonplace and I have also had to stay late to help complete the assignments of others many times in the past.

### *I Get Placed on a Performance Improvement Plan ("the PIP")*

54.    On June 24, 2005, I met with Stacey Marroso and Max Katz at their request. I found out the purpose of this meeting was to discuss a mid-year review regarding my work. Other employees told me that they did not receive mid-year reviews, so to my knowledge I am the only one of Katz's employees who received a mid-year review at that time. At this meeting, Marroso and Katz informed me that I was being placed on a PIP (Ex. 16). Marroso told me that if I did not complete the plan outlined in the PIP, then I would become subject to discipline, "up to and including termination." She also told me that because I was being placed on a PIP, I could not apply for any promotions for the next year. I completely disagreed with the PIP and I wrote a formal rebuttal to it. (Ex. 16).

55.    With regard to the 2005 mid-year review (Ex. 17), I again disagreed with it because I realized that many of the negative portions of it were being arbitrarily attributed to me. It seemed like it was just another attempt to document some kind of justification for treating me the way they were. For example, two of the nine areas that were "behind pace" were departmental areas ("Batch Record Errors" and "Cycle Time") in which every employee received the same rating. (*See* Ex. 17) However, I was not even responsible for Batch

25

Record Errors. Three of the nine areas which were "behind pace" were based upon Katz's subjective opinion, which was biased against me in the first place as my claims state. Those three areas ("Respect for People," "Leadership," and "Collaboration") are areas in which my prior reviews showed that I excelled in. (Exs. 1-10). Of the remaining four areas which were "behind pace," three of them repeat themselves, and the project referred to therein was in progress. Katz's statement that it was "behind pace" was nothing more than his own subjective opinion. The other project, the Drag Finisher and Polisher Project, was never even initiated. Of the five areas that were "unacceptable," one of them was departmental ("Mfg. Variance"), and the remaining four repeat themselves and have already been addressed herein (Weekly Zone Checklists and PMO Turnaround).

56.     On July 6, 2005, I again met with Marroso and Katz. Marroso tried to tell me that the PIP was not a "disciplinary tool" but was a tool to used to help employees improve their performance. My performance did not need improvement though, as my 2005 Engineering Status Report makes clear (Ex. 39). I recognized the PIP for what it was, an unnecessary document that was being used to ensure that I could not apply for a promotion for another year. Marroso also made the rather comical comment that she wanted to see me succeed.

57.     On July 25, 2005, I again met with Espejo, Marroso and Katz. They informed me that the PIP was being closed out since I had completed it. It was actually ridiculous to say the least, since my "completion" of the PIP in less than a month was evidence enough that the PIP's institution was unnecessary, yet now I could not apply for another promotion until June of 2006 because of it. The entire situation was extremely stressful, and I began

26

experiencing anxiety, sleepless nights, and feelings of depression. I sought treatment from

both my doctor and a psychotherapist, who both suggested that I take a break from work

and go on a leave of absence. I did so in or about October 2005, but Espejo never told me

that he wanted me to feel better as Defendants' state. (Defs. 56.1 Statement at ¶ 128).

### *My Realizations and the End of My Career at Wyeth*

58.     Wyeth periodically sends out "promotional announcements" via email. As of the time I

left for my medical leave in October 2005, I had been able to review 53 of these

announcements. Of the 53 announcements that I reviewed, which cover the time period

March 2004 through October 2005, only three promotions were given to black employees

and one promotion was given to an Hispanic employee, and of those three given to black

employees, none were into upper management. All the other promotions were awarded to

white employees. Exhibit 40 shows the organizational chart for the Wyeth Consumer

Health Division for both the 2003 and 2005 corporate reorganizations. During the

Organizational Cascade that took place in January 2004, there were four main

management positions created for each Primary Processing Unit ("PPU") in the

Consumer Health Division, the division in where I worked. There were two PPUs, and

not one of the eight management positions was awarded to a black employee. During

another corporate reorganization which took place in October 2005, there were 17

management positions in the Consumer Health Division including Joe Vitanza'a

directorship. (Ex. 40). Not one of the 17 management positions was awarded to a black

employee.

59.     Around February of 2006, my medical leave was coming to a close, but because of the

27

entire situation, my realizations after I looked at the promotion statistics I retained, and my feeling that the discrimination I was experiencing was simply going to continue, I decided not to return to work. I believe that February 6 or 7 was technically my last day of work, but I had been out on leave for a number of months.

60.    Because of all that I have stated herein, I firmly believe that if a jury gets to hear my side of the story, they will truly see what the situation was for me. Defendants present all these documents and all this testimony from my superiors which attempts to show that I was a bad, incompetent employee. But those documents and that testimony are exactly the sort of things that Wyeth and my managers would do in order to put together a record which showed I was unworthy of advancement. They are doing the exact same thing now as they did then, and it this exact behavior that my complaints are based upon. My evidence and my testimony tell a different story, and that is that I was worthy of advancement opportunities during my twelve-year career at Wyeth, and was unworthy of having my head butted up against the glass ceiling that Wyeth installed at its site in Pearl River.

61.    **WHEREFORE**, I respectfully request that the Court deny Defendants' motion in its entirety.

Howard Henry

Sworn to before me this
27th day of November, 2006

Notary Public

JENNIFER A. WYNNE
NOTARY PUBLIC STATE OF NEW YORK
REG #: 02WY6095166
QUALIFIED IN SUFFOLK COUNTY
COMMISSION EXPIRES 07 / 07 / 0 7

28