```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/07
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

HOWARD HENRY,

       Plaintiff,

    -against-                     05 Civ. 8106 (CM)

WYETH PHARMACEUTICALS, INC., WALTER
WARDROP, ANDREW SCHASCHL, AND
MICHAEL MCDERMOTT,

       Defendants.

———————————————————————————x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REASSIGNING THE ACTION TO WHITE PLAINS PURSUANT TO LOCAL RULE 22.

McMahon, J:

    Plaintiff Howard Henry ("Henry"), an African-American, brings this action against his

former employer Wyeth Pharmaceuticals, Inc. ("Wyeth") and two of its individual employees,[1]

alleging that he suffered discrimination on account of his race on several occasions between

December 2001 and June 2005 when he was denied promotions, given negative performance

evaluations, and transferred to a position he alleges was so materially inferior to the one he

presently occupied as to constitute an effective "demotion." He also alleges that he suffered

retaliation for complaining to his supervisor of the discriminatory treatment he experienced and

for filing a charge of discrimination with the Equal Employment Opportunity Commission

———————————————————————————

    [1]The complaint against Defendant Andrew Schaschl was dismissed by stipulation and
order, dated February 8, 2006.

1

("EEOC.")

For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part.

In addition, while the court is deciding the present motion as a matter of courtesy, it is obliged to reassign the action *sua sponte* to White Plains pursuant to Local Rule 22. The plaintiff is a resident of Rockland County, New York and all of the allegedly discriminatory acts that gave rise to the plaintiff's claims took place at Wyeth's Pearl River facility in Rockland County. This case was subject to mandatory designation to White Plains, and is hereby reassigned to White Plains for all further proceedings.

### Facts[2]

Defendant Wyeth is a company engaged in the development and manufacture of pharmaceutical consumer healthcare, and animal healthcare products. (Katz. Decl. ¶ 2). Wyeth operates a pharmaceutical manufacturing facility in Pearl River, New York. (Id.) As a pharmaceutical manufacturing facility, Wyeth must comply with certain Good Manufacturing Practices ("GMPs"), which are set forth in regulations issued by the Food and Drug Administration ("FDA"). (Id.)

Defendant Michael McDermott ("McDermott") was the Managing Director of Wyeth's Pearl River facility from 2002 through February 2004. (July 24, 2006 McDermott Dep. at 26-27).

---

[2] Plaintiff's contention that the declarations submitted in support of defendants' motion are inadmissible because they are not affidavits sworn under oath is incorrect. It is well established that unsworn declarations that are subscribed as true under penalty of perjury are admissible on a motion for summary judgment. See 28 U.S.C. 1746; LeBoeuf, Lamb, Green & MacRae, LLP v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999). The court therefore deems admitted those facts drawn by the defendants from declarations that plaintiff has not disputed on any other grounds.

2

In February 2004, McDermott moved to Wyeth's Vaccine Division and therefore no longer had responsibility over the division in which the plaintiff worked. (Id. at 59-60). McDermott never directly supervised Henry's work and never directly participated in the preparation of Henry's performance reviews. (Id. at 31-32).

Plaintiff Henry is an African-American male. He received a Bachelor's Degree in Physical Science in 1990, and a second Bachelor's Degree in Chemical Engineering in 1997. (June 12, 2006 Henry Dep. at 17-18; Henry Dep. Exs. 1 and 2). In 1993, Henry began working for one of Wyeth's predecessors as a Chemist at a salary level of 4. (June 12, 2006 Henry Dep. at 24-25, 30; Henry Dep. Ex. 3). In 1997, Henry was promoted to the position of Science II Chemist at a salary level of 7. (June 12, 2006 Henry Dep. at 30-31; Henry Dep. Ex. 3).

In all but one of his year-end performance reviews from 1993 through 2000, Henry's overall performance rating was "at expectations" or its equivalent, and therefore "fell directly in the middle of the rating scale." (Rose Decl. ¶ 9; McQuade Decl. Exs. 10-17). On one occasion, in 1998, plaintiff received an overall rating of "exceeds expectations." (McQuade Decl. Ex. 15). Plaintiff contests defendants' characterization of his performance during those years as average by arguing that "his comparators and colleagues were mostly Ph.D. and Master's Degree recipients;" that the overall performance ratings failed to reflect the individual areas in which the reviewers assessed his performance more positively; and that the reviews as a whole did not fully capture his contributions to Wyeth during this period. (Henry Aff. at ¶¶ 4-6; Pl. Rule 56.1 Stmt. ¶¶ 6.1-6.8). The court notes the plaintiff's subjective disagreement with the extent to which the performance reviews he received took into account his various contributions to Wyeth, but deems the actual performance ratings undisputed. Moreover, plaintiff has adduced no evidence to

demonstrate that his performance reviews were actually being deflated by any unfair comparisons to employees with more advanced degrees.

In August of 2000, Henry was promoted to the position of Production Engineer at a salary level of 9 in Wyeth's Lederle Consumer Health Division and began reporting to Walter Wardrop ("Wardrop"). (June 12, 2006 Henry Dep at 32-33; Henry Aff. ¶ 7; July 25, 2006 Wardrop Dep. at 14-16, 19). Wardrop made the decision to hire the plaintiff after interviewing him for the position. (June 12, 2006 Henry Dep at 32-33; July 25, 2006 Wardrop Dep. at 19-20, 67-68).

Henry's job responsibilities included maintaining the equipment, conducting Preventive Maintenance Orders ("PMOs"), responding to maintenance concerns, and acting as a liaison between the operating department and maintenance department. (July 25, 2006 Wardrop Dep. at 20). Henry continued to hold the position of Production Engineer for the remainder of his time at Wyeth. (Henry Aff. ⁋ 7).

Wardrop prepared Henry's performance review for 2000 and gave him an overall performance rating of 3 out of 5 (June 12, 2006 Henry Dep. at 130-34, McQuade Decl., Ex. 10). Henry testified at his deposition that he was "accepting" of the review because he was new to the area and just getting to know what duties were involved. In 2001 and 2002, Wardrop gave Henry an overall performance rating of 4. (June 12, 2006 Henry Dep. at 135, 138-39; McQuade Decl., Exs. 11 and 12). Plaintiff testified that he did not disagree with the 2001 review, but that he felt he should have been given a higher rating because of certain contributions he believed were critical to the operation of the group. (June 12, 2006 Henry Dep. at 138-140.) The plaintiff testified that, at the time of the 2001 performance review, he and Wardrop got along and worked well together. (June 12, 2006 Henry Dep at 136; July 25, 2006 Wardrop Dep. at 24-25). In his

4

EEOC complaint, the plaintiff characterized Wardrop's 2000, 2001, and 2002 year-end reviews of his performance as "extremely positive." (McQuade Decl., Ex. 6 at 4).

In order to fill vacant job positions, Wyeth may post job openings on a bulletin board and on its intranet site, and employees who are interested in a posted position may submit their resumes, or "bid" on the position, (June 12, 2006 Henry Dep. at 35-36). It was also a common practice at Wyeth for employees simply to be appointed into vacant or newly-created job positions without a formal application process. (Henry Aff. ¶ 8).

**Project Engineer Position**

From July 2001 until December of 2002, the plaintiff was given an opportunity to fill in as a Project Engineer on an interim basis, in which capacity he reported to Kevin Costello ("Costello"). (Henry Aff. ¶ 9). In December 2001, the plaintiff applied for a permanent position as a Project Engineer through Wyeth'd bid process. (June 12, 2006 Henry Dep. at 42-45). Several other individuals applied for the position. (Costello Decl. ¶ 3). According to Costello, the hiring manager for this position, he ultimately hired Cara Muscolo ("Muscolo"), a white female employee, because he felt that she was the best candidate for the position. (Id.). Based on Costello's prior experience with Muscolo, he had confidence that she would perform the job well. (Id.) In particular, Costello believed that Muscolo had significant experience in the packaging area, which he felt was important for the position. (Id.). Muscolo had previously held positions as a Packaging and Manufacturing Supervisor at Wyeth. (Id.)

Costello stated that Henry had no packaging experience and had not gained Costello's confidence as Muscolo had. (Id. ¶ 4). Costello believed that Henry had difficulties multi-tasking and was not impressed with his overall job performance. (Id.) The plaintiff testified that he had

5

no reason to believe that Muscolo was not qualified for the position, but took issue with

Costello's explanation of his reasons for rejecting the plaintiff because Costello had told him

directly and in front of other employees that he had "complete confidence" in the plaintiff's work

and was not concerned about the timeliness of plaintiff's assignments. (June 12, 2006 Henry

Dep. at 42-45; Henry Aff. ¶ 9). The plaintiff testified that he could state no basis for believing

that he was not selected for this position because of his race or color, other than the fact that he

was denied promotions on future occasions, involving different decision-makers, at Wyeth. (June

12, 2006 Henry Dep. at 52-57).

**Production Coordinator Position**

In July 2002, a vacancy for a Production Coordinator position was posted at Wyeth.

(Schaschl Decl. ¶ 2; June 12, 2006 Henry Dep. at 58-59). The Production Coordinator was to

report to Andrew Schaschl ("Schaschl"), a Director, who was responsible for making the hiring

decision for this position. (Schaschl Decl. ¶ 2; June 12, 2006 Henry Dep. at 59-60). The

Production Coordinator was responsible for planning the manufacturing process for three

different departments as the product passed through four primary production areas. ((Schaschl

Decl. ¶ 2 and Ex. 1). Schaschl believed that it was extremely important that the Production

Coordinator have strong multi-tasking skills and a good cross-functional background. (Schaschl

Decl. ¶ 2).

Several people bid on this position, including Chris DeFeciani ("DeFeciani") and the

plaintiff. (Id. at ¶ 3). Schaschl decided to hire DeFeciani, a white male, for the position

purportedly because he believed that DeFeciani was the most qualified candidate. Shaschl cited

DeFeciani's excellent multi-tasking skills, his receipt of the highest overall rating of 5 at each of

6

his performance reviews for 2000 through 2002, and the fact that DeFeciani had intermittently filled in as the Production Coordinator in the past and had performed the job well among the reasons for his decision. (Schaschl Decl. ¶ 3; Rose Decl. ⁶ 7 and Exs. 4-6; June 12, 2006 Henry Dep. at 64, 69-70).

Schaschl averred that he was familiar with Henry's performance and did not believe that Henry had a full breadth of knowledge and experience in the manufacturing operations, as DeFeciani had. (Schaschl Decl. ¶ 4). In addition, he stated that based on his experiences with Henry, he believed that Henry had problems multi-tasking, which would have made it difficult for him to succeed as a Production Coordinator. (Id.)

Henry testified that he had no reason to believe that DeFeciani was unqualified for the Production Coordinator position. (June 12, 2006 Henry Dep. at 77). Nevertheless, he disputes the reasons given by Schaschl for his decision. Plaintiff stated that Robert Bracco ("Bracco"), who had been in charge of the Production Coordinator position before Schaschl, was aware of plaintiff's interest in the position and even offered to give plaintiff the position when it became available because DeFeciani, who had been filling in on a temporary basis and who was admittedly Bracco's first choice at the time, made it known at that time that he was not interested in the job. (Id.) Wardrop encouraged the plaintiff to take the position if it should be offered to him. (Id.) Plaintiff testified that the only reason Schaschl gave him when asked why DeFeciani was chosen for the position was that he had already filled in for the position on an interim basis. (June 12, 2006 Henry Dep. at 69-78). Yet plaintiff testified that he had made it clear he was interested in the position but was never given the same opportunity to fill in as Production Coordinator. (Id.) Thus, plaintiff was denied the opportunity to develop a full knowledge of the

position and gain the relevant experience that purportedly made DeFeciani a superior candidate. (Id.)

Plaintiff also averred that DeFeciani's high performance ratings were not a legitimate reason for the hiring decision because they were a product of the close friendship between DeFeciani and Wardrop, who was responsible for DeFeciani's performance reviews. (Henry Aff ¶ 12). Finally, plaintiff disputes Schaschl's assessment that he had trouble multi-tasking because his performance reviews indicate otherwise. For instance, the 2001 performance review stated that plaintiff "found ways to minimize downtime through creative scheduling and multitasking," and the 2002 performance review - which bore Schaschl's signature – stated that "Howard collaborated very well with a variety of disciplines to start up and optimize the CTC." (Morelli Decl. Exs. 9 and 10).

Plaintiff testified that he believed he was denied the Production Coordinator position on account of his race because DeFeciani "appeared truculent" when asked by plaintiff why he didn't get the job and could offer no answer other than to repeat that DeFeciani was awarded the position "because he did it for a little while." (June 12, 2006 Henry Dep. at 78).

In April 2003, DeFeciani took a medical leave of absence, and Schaschl asked another employee, Richard Morgan ("Morgan"), to perform the Production Coordinator job responsibilities on a temporary basis during DeFeciani's absence. (Schaschl Decl. ¶ 5; June 12, 2006 Henry Dep. at 70-73, 76, 81-82). Prior to DeFeciani's medical leave, Morgan had been filling in for DeFeciani and performing the Production Coordinator job responsibilities during DeFeciani's routine absences from work. (Schaschl Decl. ¶ 5). Morgan had performed this job well in the past, had a good breadth of knoweldge of the manufacturing operations, and, in

8

general was an excellent performer. (Id.). Indeed, Morgan received the highest overall rating of 5 in each of his performance reviews from 2002 through 2004. (Rose Decl. ¶ 8 and Exs. 7-9). Schaschl averred that he asked Morgan to perform the Production Coordinator job responsibilities while DeFeciani was on his medical leave for the reasons described above. (Schaschl Decl. ¶ 5).

Henry never explicitly asked Schaschl if he could take on the Production Coordinator duties during DeFeciani's medical leave. (Schaschl Decl. ¶ 6; June 12, 2006 Henry Dep. at 73-74). Nevertheless, Schaschl was aware of plaintiff's interest in the position from Henry's prior application for the job and from conversations with the plaintiff. (Henry Aff. ¶ 13). Despite his knowledge of plaintiff's interest in the position and the fact that he signed off on plaintiff's 2002 review, which stated that plaintiff "exceeds expectations," Schaschl never approached the plaintiff to perform the Production Coordinator duties during DeFeciani's routine absences and never gave him the opportunity to do so while DeFeciani was on leave. (Id. at 15) Schaschl stated that even if Henry had specifically requested to perform the Production Coordinator duties during DeFeciani's absence, he still would have selected Morgan because the latter was a better fit for the job. (Schaschl Decl. ¶ 6).

DeFeciani's medical leave did not create an opening for the Production Coordinator position, and Morgan was not formally placed into the position during DeFeciani's medical leave. (Schaschl Decl. ¶ 6; June 12, 2006 Henry Dep. at 79-80). However, filling in for a position on an interim basis increases the likelihood that they will be selected for that position on a permanent basis and generally affords Wyeth employees future career advancement opportunities and . (Henry Aff ¶ 14). Both DeFeciani and Wardrop had followed this trajectory and were

9

ultimately given management-level positions. (Id.)

Plaintiff testified that he believed he was not asked to fill in for DeFeciani during the latter's absence on account of his race because the "position is used as a stepping stone toward management" and he had "made it known . . . that [he] wanted to improve, acquire more knowledge and sought management positions, a management position within the organization." (June 12, 2006 Henry Dep. at 81).

**Process Engineer Position**

In November 2003, Kirit Rokad ("Rokad"), then an Associate Director, Manufacturing Engineering, sought to hire an individual for a Process Engineer position through Wyeth's job posting system. (Rokad Decl. ¶ 2; June 12, 2006 Henry Dep. 83-88, Ex. 5). The position was in the Vaccine Division, which is a separate division from the one in which Henry had applied for the Project Engineer and Production Coordinator positions. (June 12, 2006 Henry Dep. at 83-84). The job responsibilities for the position included providing prompt and essential engineering and technical support through the Wyeth Vaccine Manufacturing Engineer Group for Wyeth's Vaccine Division and Quality Control Departments. (Rokad Decl. ¶ 3 and Ex. 1). In hiring for this position, Rokad was seeking an individual who had, among other things, a degree in chemical engineering and who had significant relevant experience, including experience in aseptic processing. (Id. at ¶ 4).

Several individuals, including Henry and Angel Montanez ("Montanez"), applied for this position. (Id. at ¶ 5; June 12, 2006 Henry Dep. 84-87, Ex. 5). Rokad and three other individuals interviewed the candidates for the position, including Henry. Rokad stated that they ultimately selected Montanez for the position because they believed that he was the most qualified

candidate. (Rokad Decl. ¶ 5). First, Montanez had worked for Wyeth's Vaccine Division in the past, and Rokad felt that there was a benefit to selecting someone who had worked in that division and was familiar with the manufacturing processes employed. (Id. at ¶ 6). At his deposition, Henry testified that he believed that hiring an individual with experience in the division would be an advantage, and that he did not possess such experience. (June 12, 2006 Henry Dep. at 90). Second, Montanez had significant experience with aseptic processing, as he had worked for Pfizer as an Aseptic Manufacturing Technical Specialist. (Rokad Decl. ¶ 6). Finally, Montanez had a Bachelor of Engineering in Chemical Engineering and was working toward a Master's of Science in Chemical Engineering. (Id.).

By contrast, Henry did not have the same experience in aseptic processing, had not worked in the Vaccines Division, and had not begun course work for his Master's Degree in Chemical Engineering. (Id.)

In an attempt to undermine the reasons proffered by Rokad for the decision, Henry cites his two baccalaureates, his completion of two graduate courses in chemical and environmental engineering, and the fact that McDermott was later transferred to the Vaccines Division without any prior experience in the Division. (Henry Aff. at 26-27). Nevertheless, Henry explicitly testified at his deposition that he did not believe that he was denied the Process Engineer position because of his race. (June 12, 2006 Henry Dep. at 91).

**Staff Engineer I**

In January 2004, Henry applied through the formal bidding process for a Staff Engineer I position in the Bioprocess Department, a different department from the ones in which he had applied for the Production Coordinator and Project Engineer Position. (Id. at 91-92). Henry chose

to apply for this position mainly because he had previously worked in the department for a six-month period and had become acquainted with the operation and needs of the department. (Henry Aff. at 37).

John Simpson ("Simpson") was the hiring manager for this position. (June 12, 2006 Henry Dep. at 94-95, 97; Simpson Decl. ¶ 2). In hiring for this position, Simpson was seeking an individual who had a Ph.D. in chemical engineering or a B.S. or M.S. in chemical engineering and substantial relevant experience, including experience in bioprocess downstream operations. (Simpson Decl. ¶ 3). A number of individuals, in addition to Henry, applied for the position. (Simpson Decl. ¶ 4). Simpson stated that he selected Beelin Cheang ("Cheang") for the position because he felt she was the best qualified. (Id.) Unlike Henry who only had a B.S. in Chemical Engineering and who did not have heavy bioprocess development experience, Cheang had a Ph.D. in Chemical Engineering. Cheang ultimately rejected the offer of employment in or about June 2004. (Id.) Thereafter, Simpson decided to hire James Patch ("Patch"), a white male, who Simpson felt was also was more qualified than Henry because he had a Ph.D. in Chemical and Biological Engineering. (Id.) Patch accepted the offer of employment in December 2004. (Id.) The plaintiff never applied for any other Staff Engineer position in Simpson's area of responsibility. (Id. at ¶ 5; Rose Decl. ¶ 6).

When asked at his deposition whether he believed that he was denied the Staff Engineer I position because of his race, plaintiff stated: "I can't say a hundred percent. There's a small . . . probability because I wasn't given an interview. But, I mean, I have to say no." (June 12, 2006 Henry Dep. at 99).

**2003 Mid-Year Performance Review**

12

The facts surrounding the plaintiff's performance reviews for 2003 are disputed in almost every particular. It is therefore appropriate to set out each party's version in full.

Defendants' Version

Wardrop testified that the plaintiff's performance began to slide in 2003. (July 25, 2006 Wardrop Dep. at 26). According to Wardrop's testimony, during the priod addressed in the 2003 mid-year performance review plaintiff often completed tasks and projects on the last day they were due or completely missed the deadline for the task or project. On other occasions, he would simply fail to complete projects or tasks altogether. (Id.; Wardrop Decl. ¶ 2). These alleged performance deficiencies were a major concern for Wardrop and the other managers who depended on Henry's work. (Id.)

Wardrop stated that throughout 2003, he received complaints from Henry's co-workers and other managers that Henry was not getting work done on a timely basis, was missing deadlines, required a great deal of follow-up in order to complete tasks, and needed intervention from managers to accomplish tasks. (Wardrop Decl. ¶ 3). On at least two occasions in 1993, Wardrop's boss, Schaschl, instructed Wardrop to intervene on two projects that Henry was leading because they were falling behind schedule and instructed Wardrop to get involved with the projects to make sure that they were completed on time. (July 25, 2006 Wardrop Dep. at 26-27; Wardrop Decl. ¶ 4). Other managers had also advised Wardrop in 2003 that they were concerned that Henry was not responding to his pager. (July 25, 2006 Wardrop Dep. at 27-28). In addition, another engineer, Jean Colas ("Colas"), had complained that he was getting paged for areas within Henry's responsibility because the plaintiff was not responding to pages. (Id.; Wardrop Decl. ¶ 6).

13

Wyeth encouraged all managers to provide employees with mid-year reviews, which could take the form of formal written reviews or informal discussions. (July 25, 2005 McDermott Dep. at 45-46; July 25, 2006 Rose Dep. at 45). On September 3, 2003, Wardrop gave Henry a mid-year review and discussed with Henry the performance issues identified in the review. (June 12, 2006 Henry Dep. at 145-48 and Ex. 13; July 25, 2006 Wardrop Dep. 30, 33, 39; Wardrop Decl. 5). The mid-year review for 2003 identified a number of "positives" and several areas to focus on for the remainder of 2003, including completing certain project by year-end and improving attendance. (McQuade Decl. Ex.13). The mid-year review also directed that Henry should quantify with specific his accomplishments and provide a summary of work performed and value-added to the business whe he was preparing his Self-Appraisal and Goals and Objectives (the "Self Appraisal"). (Id.; Wardrop Decl. ¶ 7). The review additionally urged that Henry take a leadership role in the special project he was working on. (McQuade Decl. Ex.13). The review states that Wardrop had received reports that Henry was observed spending excessive amounts of time in the Medical Department where he went for allergy shots, and that he had failed on some occasions to respond to pages. (Id.; Wardrop Decl. ¶ 6). Despite some of the issues identified, the review stated that "overall, Howard is a 'Solid Performer.'" (Id.).

On September 8, 2003, Henry received an email from Wardrop advising him that his Self-Appraisal must be turned in by October 1, 2003. (June 12, 2006 Henry Dep. at 162-63 & Ex. 15). The Self Appraisal is a tracking system that is used to determine whether an individual is achieving his goals that are established at the beginning of the year. (June 12, 2006 Henry Dep. at 164). Wardrop needed to receive the Self Appraisal form for each employee he supervised before October 1, 2003 so that he would have sufficient time to review the documents and determine the

employees' performance ratings for their annual performance reviews before October 10, 2003, the date that managers conducted their rating review meeting. (Wardrop Decl. ¶ 7). At these meetings, the managers discussed the performance of all the employees they supervise and assigned performance ratings to each. (Id.) Once assigned, the ratings cannot be changed. (Id.)

On October 2, 2003, Henry received another email from Wardrop advising him that his Self Appraisal must be turned in and stressing that "it is important that you complete this and submit it on time." (June 12, 2006 Henry Dep. at 163 and Ex. 15). This reminder email was sent to all of the employees Wardrop supervised and indicated the status of each employee's submission of the Self Appraisal. (Id.) On October 10, 2003, as part of a Rating Review Meeting, Wardrop received input from other managers, and Henry had his overall 2003 performance review assigned to him. (Wardrop Decl. ¶¶ 7-8). Henry did not turn in his Self Appraisal to Wardrop until January 5, 2004. (June 12, 2006 Henry Dep. at 163).

Plaintiff's Version

Plaintiff contends that the mid-year review took place in March or April 2003 rather than September 2003. (Henry Aff. ¶ 16). The timing is significant because plaintiff's key contention is that Wardrop asked him to sit down for the mid-year review almost immediately after he began asking Wardrop why he was not being given any opportunities to advance. (Id.) Plaintiff stated that the review came as a surprise because he had never been given a mid-year review at Wyeth prior to this point, and he did not know of a policy urging managers to conduct mid-years review. (Id.)

According to the plaintiff, the process was initiated when Wardrop asked plaintiff to email him his goals and objectives for the year in preparation for the meeting, and he complied.

(Morelli Decl. Ex. 29). On March 17, 2003, Wardrop responded with brief comments. (Id. Ex. 28, Bates 1954). Soon thereafter, Wardrop and the plaintiff met to discuss some other items, which were documented in writing and, according to the plaintiff, constituted his mid-year review. (Henry Aff. ¶ 16). Plaintiff signed this document in April/May 2003, but was not given a copy for his records. (Id.)

Plaintiff does not recall any performance review taking place in September 2003 and does not remember discussing many of the items contained in the September 3 document with Wardrop. (Id. at ¶ 17; June 12, 2006 Henry Dep. at 145-54). Thus, while some of the items contained in the September 3, 2003 review were discussed with the plaintiff during the spring review, others were added after the fact. (Henry Aff. at ¶ 17) In other words, the document defendants contend constitutes Henry's 2003 mid-year review (Morelli Decl. Ex. 11) is not the same document that plaintiff contends he reviewed and signed in April/May 2003. (Henry Aff. at ¶¶ 16-17).

Plaintiff's core contention is that the September 3, 2003 document marked the beginning of defendants' attempts – in the wake of his complaints to Wardrop and Schaschl that he was being denied opportunities to advance – to document nonexistent deficiencies in his performance in order to limit his career growth. (Id. at ¶ 18). Plaintiff is not aware of any tasks or projects for which he "completely missed the deadline" or any complaints made by other managers to Wardrop concerning the plaintiff's performance in 2003. (Id.)

With respect to the two projects that plaintiff allegedly allowed to fall behind schedule, the plaintiff avers as follows. The Continuous Tablet Coater ("CTC") Cleaning Qualification/Verification project was only behind schedule before plaintiff was made

responsible for it in late February or early March of 2003. (Henry Aff. at ¶ 20). Once the plaintiff became involved, the CTC passed the requisite inspection three times in a row, and the project was considered a success. (Id.) In response to Henry's first initiative on the project, Wardrop thanked the plaintiff for his work and wrote, "I know you will lead the way and hold the torch high." (Morelli Decl. Ex. 28, Bates 1964). At no time did Wardrop or Schaschl inform Henry that the project was behind schedule or that his work was deficient, late, or lacking. (Id. ) He was never told that any problems associated with the project were attributed to him until he began to investigate his alleged "demotion" in January of 2004. (Id.)

Similarly, the CTC Weigh Belt project was plagued with problems in 2003 that were inherent in the nature of the equipment and that plaintiff and others had communicated to upper management. (Henry Aff. at ¶ 21.) Plaintiff contends that he bore no responsibility for any delays in the completion of the project, and indeed was later responsible for finding a solution to the Weigh Belt problems. (Id.) He was never informed that the project was behind schedule or that his work was deficient, late, or lacking in any way. (Id.). He was never told that any problems associated with the Weigh Belt project were attributed to him until he began to investigate his alleged "demotion" in January of 2004. (Id.)

Plaintiff also disputes the validity of any complaints that he was not answering his pager or that it was inappropriate to expect Jean Colas to handle pages in plaintiff's area of responsibility. Plaintiff's testimony indicated that there was a company-wide problem with the paging system at the time of the alleged complaints. (June 12, 2006 Henry Dep. at 152). At his deposition, Wardrop confirmed that there was a period of time when the pagers were not working. (July 25, 2006 Wardrop Dep. at 28-29). The September 3 document also makes it clear

that Wardrop received a message that the pager system was encountering problems and "Since the system is not working, it is likely that Howard did not receive the pages." (Morelli Decl. Ex. 11). Henry also stated that he occasionally handled pages that were Colas's responsibility, and it was normal to expect reciprocity in this regard because engineers worked as a team and often served as back up for aone another. (Henry Aff. at ¶ 22). Plaintiff also contends that defendants' implication that plaintiff was observed doing nothing at work is belied by Wardrop's emails of August 20, 2003 and August 22, 2003 in which the latter praised the plaintiff's willingness to cover multiple shifts. (See Morelli Decl. Ex. 28, Bates 1934 and 1932).

Finally, with regard to the Self Appraisal that plaintiff allegedly submitted three months late, plaintiff stated that the document is not mandatory, that some managers do not require it or write the Self Appraisal for the employee, and that he specifically asked Wardrop whether he still needed to submit the Self Appraisal when he returned from his honeymoon on October 8, 2003 and Wardrop responded, "Don't worry about it." (Henry Aff. ¶ 28).

**The Organizational Cascade**

In 2003, Wyeth's Pearl River facility initiated a massive corporate restructuring referred to as the Organizational Cascade. (Schaschl Decl. ¶ 7; July 25, 2006 McDermott Dep. at 32-33). As part of the Organizational Cascade, the highest level managers at the Pearl River facility, created a new corporate structure and a new organizational chart. (Id.) At this stage in the Organizational Cascade, no individuals were assigned to positions in the new organizational structure. (Id.) In essence, every employee was removed from their position and placed in a pool of people available for hire for a position in the new organizational structure. (Id.) Positions in the new organizational structure were then filled from the top down, in a cascading manner. (Id.)

First, McDermott, the Managing Director, selected individuals to fill the Director level positions and the positions that reported directly to him. (Schaschl Decl. ¶ 8). Next, those that had been selected for these Director level positions in the new organizational structure selected individuals to fill the positions that were the next level down and that reported directly to them. – Associate Directors and Managers. (Id.) Those that had been selected for these positions, in turn, filled the remainder of the positions in the new organizational structure by selecting the individuals who would report to them. (Id.) This was done as part of a group meeting of Associate Directors and Managers, who utilized a collaborative approach and reached a consensus of opinion. (Id.) The primary considerations in placing these individuals were matching an individual's skills to the skills required by the position, potential for a developmental opportunity for the individual, and an individual's performance. (Id.)

The Organizational Cascade affected everyone in the organization. (Schaschl Decl. ¶ 9). One of the purposes behind it, and the job rotation that it produced, was to ensure that employees develop a well-rounded and diverse background in the manufacturing process. (Id.) McDermott's only involvement with the Organizational Cascade was final, administrative approval over all of the assignments made. (July 25, 2006 McDermott Dep. at 33-34). He had no direct involvement in the plaintiff's assignment as part of the Cascade. (Id.)

As part of the Organizational Cascade, Wardrop was assigned to a new position and had the opportunity to select an individual for an engineer position reporting to him. (July 25, 2006 Wardrop Dep. at 68). Wardrop selected Colas, a black male, because Wardrop believed he was a very qualified engineer and a high performer. (Id. at 69). In addition, as part of the Organizational Cascade, Andrew Espejo was selected for a new position as Associate Director of Manufacturing

19

for Centrum operations and had an opportunity to hire the engineer who would report to him. (Espejo Decl. ¶ 2). Espejo selected Honario Ordenez ("Ordenez") based on the recommendation of the other Associate Directors and Managers participating in this process, who believevd that Mr. Ordenez would perform well in the position. The plaintiff was selected to fill a position as Packaging Supervisor. (July 25, 2006 Bigelow Dep. at 44).

Defendants contend that plaintiff's assignment to the Packaging Supervisor position was a lateral transfer. (Id. at 43). Wyeth's managers apparently believed that the Packaging Supervisor position would have been an excellent opportunity for the plaintiff because he would be a team leader; he would have direct supervisory responsibilities for a number of employees, which could lead to future management opportunities; he would gain exposure to the packaging operations, which could help him obtain other positions in the future; he could learn new skills; and he could use his engineering background to make improvements in the packaging area. (Rose Decl. ¶ 2; Espejo Decl. ¶ 3; Schaschl Decl. ¶ 10; July 25, 2006 McDermott Dep. at 56-57; Wardrop Decl. 13). Defendants also point to a number of other chemical engineers who had held the Packaging Supervisor position in the past, including Muscolo and Heidi Zeck ("Zeck"). (Id. at 58; July 25, 2006 Rose Dep. at 42-43).

Plaintiff responds that although the assignment carried with it no change in salary or grade, he considered the assignment a demotion because the position of Packaging Supervisor was normally held by former Packaging Operators and required merely a high school diploma. (June 12, 2006 Henry Dep. at 169). Although the plaintiff submitted a formal job description that included such responsibilities as performing safety audits, submitting required paperwork for the unit, and conducting investigations of customer complaints, the plaintiff stated that the position

20

would have required him to do little more than sit on an assembly line and watch hourly employees pack vitamins into a bottle. (Henry Aff. at ¶ 29 and Ex. 30). According to plaintiff's testimony, the position is one for someone who is "possibly getting their foot in the door but not somebody at that time who had seven, eight, nine years of experience that I had, and the track record I had." (June 12, 2006 Henry Dep. at 170). The plaintiff further testified that employees at the site consider a transfer from an engineer position to a Packaging Supervisor position to be an indication that the transferee is incompetent. (Id. at 171).

## Meeting with Wardrop Regarding the Performance Review and Organizational Cascade

On December 17, 2003, Wardrop met with Henry to give him his 2003 performance review and to advise him of his assignment as part of the Organizational Cascade. (Wardrop Decl. at ¶ 12). The 2003 review submitted by the defendants gave Henry an overall rating of 3 or "solid performer" and pointed out some of the strengths and weaknesses of his work. (June 12, 2006 Henry Dep. Ex. 14). The review pointed out that "The timeliness of completing assignments still needs improvement. For example, [Henry] did not submit his Self-Appraisal or 2003 Goals for consideration in this review – even after 2 written requests. Howard was a 'Solid Performer' who is a valued member of my team and would benefit from better reporting, attention to deadlines." (Id.)

The document proffered by the defendants as Henry's 2003 year-end review does not contain any of the parties' signatures, and Henry avers that it is not the same document that he was given at the December 17, 2003 meeting. In any case, plaintiff testified that he disputed the review and ultimately left the meeting to take a walk because he was upset. (June 12, 2006 Henry Dep. at 172-73). Plaintiff believed that it was particularly unfair that his review for the entire year

stated that "the timeliness of completing assignments still needs improvement" when the only example of his failure to meet a deadline was the Self Appraisal that he was explicitly told by Wardrop he did not need to submit. (Id. at 174-75; Henry Aff. ¶ 28). He was also upset because he received an overall performance rating of 3 rather than the 4 he had received in the prior two years despite the fact that he felt he did more work in 2003 than he had before. (Id.) Finally, plaintiff disagreed with the review because it contained references to the need for Wardrop to "intervene" in the two CTC projects Henry was handling. Plaintiff maintains that no intervention was ever required. (Id.) Plaintiff was also informed at the December 17, 2003 meeting that he would be transferred to the position of Packaging Supervisor as part of the Organizational Cascade. (Id. at ¶ 29). Plaintiff stated that it was at this point that his prior beliefs that he was being discriminated against were finally confirmed. (Id.)

On or about January 6, 2004, Henry had another meeting with Wardrop regarding his performance review and his reassignment. (June 12, 2006 Henry Dep. at 173-74). Wardrop stated that Henry brought his completed Self Appraisal to the meeting, that he reviewed the Self Appraisal, and told Henry that he wished that Henry had submitted the document on time so that he could have considered it in preparing the 2003 review. (Wardrop Decl. ¶ 14). Nevertheless, Wardrop stated that the Self Appraisal would not have changed the overall performance rating he gave Henry for the year. (Wardrop Decl. ¶ 14). Henry testified that Wardrop told him at this point that he was not going to reevaluate Henry and that he was not going to take his documents, including the Self Appraisal. (June 12, 2006 Henry Dep. at 174-75). Nevertheless, Wardrop stated that, after this meeting, he decided to revise some of the language in the 2003 review because he felt that he had already communicated Henry's performance issue to him, and it was

not necessary for the references to those issues to become part of his permanent record. (Wardrop Decl. ¶ 14).

**Henry's January 9 Meeting With Schaschl**

On January 9, 2004, Henry met with Schaschl to express his opposition to his assignment to the Packaging Supervisor position and his overall rating on his 2003 Performance Review. (Schaschl Decl. ¶ 10). Schaschl explained to Henry that the Packaging Supervisor position would be a good developmental opportunity for him because it would provide him with direct supervisory experience and would give him exposure to the packaging operation, which could help him obtain other positions in the future. (Id.) The plaintiff disagreed. (Henry Aff. ¶ 29).

Henry also complained that he should have been rated a 5 or at least a 4 in his 2003 performance review. (Schaschl Decl. ¶ 11). Schaschl explained to Henry that he felt that he had problems with overall project management and completing cross-functional projects that require multi-tasking. (Id.) Schaschl gave Henry two examples of projects (the CTC Verification and the CTC Weigh Belt) that were completed well beyond an acceptable time frame (Id.) Schaschl explained to Henry that he required too much attention from his managers to ensure tasks like these were completed. (Id.)

**Henry's January 12 Meeting With Rose**

On January 12, 2004, Henry met with Joanne Rose ("Rose"). Associate Director of Human Resources, about his assignment to the Packaging Supervisor position and his 2003 performance review. (Rose Decl. ¶¶ 1-2). Rose advised Henry that she thought the Packaging Supervisor position would be a good option for him substantially for the same reasons as those cited by Schaschl. (Rose Decl. ¶ 2 and Ex. 1). Rose recommended that she and Henry meet with

Wardrop to discuss the review and see if its language could be changed, but she explained that the overall rating in the review could not be changed because it had already been entered into the HR system. (Rose Decl. ¶ 2). Prior to plaintiff's meeting with Rose, Wardrop called plaintiff into his office where he stated: (1) that plaintiff did work hard on projects; (2) "I'm sorry for the way things turned out;" and (3) that he did not like to see the plaintiff unhappy. (Henry Aff. ¶ 31).

After her meeting with Henry, Rose looked for other job vacancies that would match his qualifications. (Rose Decl. ¶ 3). In addition, McDermott asked her to look into other vacancies that might exist and that might be an appropriate match for Henry. (Id.)

**January 13 and 22 Meetings with McDermott**

On January 13, 2004, Henry met with McDermott about his assignment to the Packaging Supervisor position and his 2003 performance evaluation. (Cplt. ¶ 37; July 25, 2006 McDermott Dep. at 36-37). According to his own testimony, McDermott told Henry that the Packaging Supervisor position would be an important part of his development at Wyeth because it would enable him to obtain more formal supervisory experience than he had had in his capacity as a Production Engineer, including employee performance management, employee development plans, and salary. (Id. at 56-57). By contrast, Henry stated that McDermott told him that he would "look into" the situation, but that he was opposed to one person remaining in a position for too long, and that was why Henry had been transferred. (Henry Aff. ¶ 33). McDermott told Henry that if he disagreed with the performance rating, he could document his disagreements in writing. (Id. at 48).

Henry and McDermott met again on January 22, 2004. Henry stated at this meeting

24

McDermott was considerably less congenial and more stern than he was on January 13, and was insistent that he had to "trust his direct reports" and that he could not issue an executinve order directing Wardrop and/or Schaschl to change the 2003 review. (Henry Aff. ¶ 33). Plaintiff asked McDermott at this meeting if he had read plaintiff's performance appraisals from the previous years, to which McDermott replied, "No. I don't care about them." (Id.)

During the January 22, 2004 meeting, Henry stated that he believed that, as an African-American, he would have a difficult time explaining the transfer on his resume. McDermott testified that he told Henry that Wyeth is a very diverse site, that he would be concerned if race was an issue, and that if Henry had an issue regarding race, he should share it. (July 25, 2006 McDermott Dep. 40-42). Henry denies that McDermott made these statements. Instead, Henry stated that McDermott's only response was, "I am all for diversity [pause] but I'm not going to get into that silly discussion with you." (Henry Aff. ¶ 34). McDermott testified that he did not interpret Henry's comment as a complaint about race discrimination. (July 25, 2006 McDermott Dep. 40).

At Henry's request, McDermott reviewed Henry's recent performance evaluations and concluded that Henry's performance review was fair and reasonable given the fact that Henry had received a mid-year review identifying projects that needed to be completed by year-end and that Henry had not completed those projects or satisfied his supervisor's expectations from the mid-year review. (Id. at 43-44). Henry again disagrees with the premises for this conclusion: the genuineness of the September 3, 2003 mid-year review, the purported inadequacy of his performance on the two CTC projects, and Wardrop's supposed disappointment with his performance when days earlier Wardrop told plaintiff that he had done a good job.

25

### Henry's January 16 Meeting with Rose and Wardrop

Wardrop decided to remove some of the language from Henry's 2003 performance review because he felt that Henry had already heard about the areas that needed improvement, and they did not need to become a part of the plaintiff's permanent record. (July 25, 2006 Wardrop Dep. at 54-55). Once an overall performance rating is assigned, however, that rating cannot be changed. (July 25, 2006 Rose Dep. at 32-33; July 25, 2006 McDermott Dep. at 50; Wardrop Decl. ¶ 15).

On January 16, 2004, at a meeting with Rose, Wardrop, and Henry, Wardrop presented Henry with an amended 2003 performance review. (Rose Decl. ¶ 5; June 12, 2006 Henry Dep. 178-81 and Ex. 17; July 25, 2006 Wardrop Dep. at 54). After Henry refused to sign the review, Rose advised him that if he was still unhappy with the review, he could write a rebuttal to it, which would be attached to and incorporated in the review. (Rose Decl. ¶ 5). Rose also asked Henry for his resume so she could use it to try to place him in other positions as vacancies arose, and she told Henry she could provide him with a list of job vacancies. (Id.) Henry, however, refused Rose's help, explaining that he could handle it himself. (Id.) Rose asked Henry what he wanted done, and Henry replied that he would pray on it. (July 25, 2006 Rose Dep. at 31-32). Prior to January 16, 2004, Wardrop was not aware of the fact that Henry had complained of discrimination, and no mention of discrimination was made at the January 16 meeting. (July 25, 2006 Wardrop Dep. at 45).

### Meetings with Peter Bigelow

On January 26, 2004, Henry met with Peter Bigelow ("Bigelow") to speak about the rating he received on his 2003 performance evaluation and about his assignment to a Packaging

26

Supervisor position as part of the Organizational Cascade. (Bigelow Decl. ¶ 2; July 25, 2006 Bigelow Dep. 22, 25-26). Henry advised Bigelow that he wished to be re-evaluated and that he did not want to move to the Packaging Supervisor position. (Bigelow Decl. ¶ 2). Henry disputes, however, defendants' contention that he also told Bigelow that he wished to remain in his current position after the Organizational Cascade. (Henry Aff. ¶ 35). Plaintiff told Bigelow that the reason he approached Bigelow was that he was not receiving honest answers from others, to which Bigelow responded, "you deserve an honest answer." (Id.). Bigelow told Henry he would look into the matter and speak with Henry's supervisors. (July 25, 2006 Bigelow Dep. at 30).

Bigelow then spoke to McDermott and Schaschl who informed Bigelow that Henry's performance was "not stellar," and that he had done well in some areas, and not as well in others. (Id. at 32).

Bigelow decided to delay Henry's transfer to the Packaging Supervisor position until after he could review his performance evaluations for the previous few years and until after he could speak to Henry again. (Bigelow Decl. ¶ 3). Bigelow advised Henry of this decision in an email dated January 27, 2003. (Bigelow Decl. ¶ 3 and Ex. 1). On February 11, 2004, plaintiff had another meeting with Bigelow, at which Bigelow told the plaintiff that he was not comfortable transferring the plaintiff to the position of Packaging Supervisor because it was not a good use of resources. (Henry Aff. ¶ 36; Ex. 33).

On February 25, 2004, Bigelow advised Henry by email that he had reviewed Henry's performance documents, and he found them to be clear and objective. (McQuade Decl. Ex. 1, Ex. 19). Bigelow invited Henry to follow up if we wanted to discuss the matter further. (Id.) Bigelow stated that he communicated with Henry on several occasions in the weeks that followed, and

that Henry continued to insist that he should be re-evaluated and that he should remain in his current position instead of transferring to the Packaging Supervisor position. (Bigelow Decl. ¶ 4). Plaintiff stated that he does not recall any communications with Bigelow between February 25 and March 29, 2004 when Bigelow informed the plaintiff that Eugene Sackett would be conducting an investigation into plaintiff's claims of discrimination. (Henry Aff. ¶ 36).

On April 21, 2004, Bigelow met with Henry and presented him with two options for different positions within the Company: (1) the Packaging Supervisor position that he had been assigned to as part of the Organizational Cascade; or (2) a Senior Validation Specialist position within the Vaccines Division. (Bigelow Decl. 5; June 12, 2006 Henry Dep. 123-26, 209 and Ex. 9). In an email dated April 26, 2006, Henry rejected the Packaging Supervisor position. stated that he would be uncomfortable with taking a position in the Vaccines Division because the division was to be led by McDermott, and suggested that assuming the role of a Consumer Health Project Engineer would be a "viable option." (Bigelow Decl. ¶ 5; June 12, 2006 Henry Dep. 123-128, 209 and Ex. 9). In conclusion, Henry wrote, inter alia, "I await your decision regarding the Project Engineer role." (Id.) While the Project Engineer position offered no present change in grade or salary, Henry felt it would have offered more future opportunities for advancement than the Packaging Supervisor position. (Henry Aff. ¶ 38).

Plaintiff never bid on the Project Engineer position because it was not posted on Wyeth's intranet, and he considered the email to Bigelow his application for the job. (Id.) He could not recall whether he ever spoke to anyone else about the position. (June 12, 2006 Henry Dep. at 125-27). Henry received no response to his April 26 email, and the Project Engineer position was later given to another employee who, upon information and belief, also never bid on the job.

28

(Henry Aff. ¶ 38).

Bigelow characterized his decision to permit Henry to remain in his Production Engineer position as "grant[ing] Henry's wish" because "Henry had been insisting all along that he wished to remain in his position as a Production Engineer." (Bigelow Decl. ¶ 6). Ultimately, Bigelow felt that it did not make sense to transfer an employee to a position he so emphatically did not want to have, i.e. the Packaging Supervisor position, but he also felt that the Production Engineer position was a better option than the Project Engineer position Henry had suggested because Henry had difficulty completing projects on time. (Id.) Once again, Henry vigorously disputes that remaining in the Production Engineer position was his wish all along (Henry Aff. ¶ 35) or that any of the performance concerns raised by defendants were a legitimate basis for denying him the Project Engineer position he requested.

Henry first "officially" complained that he believed that he had been treated unfairly because of his race in an email to Bigelow dated February 16, 2004. (June 12, 2006 Henry Dep. at 198-99 and Ex. 18, July 25, 2006 Bigelow Dep. at 28-29, 32-33). Henry originally raised concerns about race discrimination one month prior, on January 16, 2006, to Richard Gaskins ("Gaskins"), the head of the Diversity Program, but it is unclear from the record if anyone else was made aware of plaintiff's complaint at that time. (Henry Aff. ¶ 34).

After receiving Henry's February 16, 2004 email, Bigelow contacted members of the human resources department to conduct an investigation of Henry's claims. (July 25, 2006 Bigelow Dep. at 33-37). Eugene Sackett ("Sackett"), who worked for the human resources department at Wyeth's corporate headquarters, conducted the investigation. (Id.) Sackett spoke to a number of individuals, including Henry, and concluded that there was no evidence of

29

discrimination. (June 12, 2006 Henry Dep. at 206-08; July 25, 2006 Wardrop Dep. at 35-37; July 25, 2006 Bigelow Dep. at 38-39).

In May 2004, Henry began reporting to Espejo, who was assigned as part of the Organizational Cascade to the position that Wardrop had held. (June 12, 2006 Henry Dep. at 39-41). On May 6, 2004, Henry was advised that he would remain in his position as the Production Engineer in Centrum production and would continue to report to Espejo. (Id. at 210-11 and Ex. 20). Henry was never ultimately placed in the Packaging Supervisor position; nor did he perform the duties of a Packaging Supervisor. (Id. at 171). However, while plaintiff's transfer was stayed pending resolution of his complaints, his reporting structure was changed so that Packaging Department managers handled his paperwork, his curriculum changed to match that of a Packaging Supervisor, and he had to get his expense reports approved through the Packaging Department. (Henry Aff. ¶ 39, Ex. 34).

**Henry's 2004 Mid-Year Review**

According to Espejo, plaintiff's new supervisor, the plaintiff again missed several deadlines for projects he was working on during the first half of 2004. (Espejo Decl. ¶ 5). Espejo felt that Henry needed to improve his follow-up on pending issues, better manage completion of tasks to meet due dates, expand his breadth of knowledge of department equipment, and better develop and implement project timelines. (Id.) On July 9, 2004, Espejo met with Henry and gave him his mid-year performance review. (Id.; June 12, 2006 Henry Dep. at 215-18 and Ex. 22). The one-page review listed three items: (a) the projects Henry was working on and the progress Espejo felt Henry had made on those projects; (b) Henry's areas of strength; and (c) areas in which Henry needed improvement. (Espejo Dec. ¶ 5 and Ex. 1). The purpose of this mid-year

review was to help Henry meet the expectations of his position and to continue to improve and develop as an employee. (Espejo Decl. ¶ 5). Henry told Espejo that he disagreed with the areas identified in the mid-year review as needing improvement, and he refused to sign the review. (June 12, 2006 Henry Dep. at 218).

Henry specifically disputes the legitimacy of three timeliness issues identified by Espejo in his review. With respect to the Predictive and Preventative Maintenance Plans, Henry stated that Production Engineers were not responsible for maintenance engineering operations prior to the time Espejo became the Manager. (Henry Aff. ¶ 42). Plaintiff testified that he was not responsible for the maintenance plans as a Production Engineer, and that he only agreed to make an attempt to try and complete the tasks as assigned by Espejo when the latter insisted that plaintiff assume the dual roles of a Maintenance/Production Engineer. (Id.; June 12, 2006 Henry Dep. at 217-18) Plaintiff was never informed of a specific date when this project was due, and Espejo never made it clear that there was a hard deadline for completion. (Id. at 216-19). Similarly, plaintiff testified that as someone new to the department, Espejo did not know how long it took to complete the Standard Operating Procedures, and that Henry had tried to explain to Espejo that his timeline was unrealistic. (Id.)

Plaintiff also told Espejo that he would begin providing monthly reports to him so that he could show him that he was, in fact, on schedule for his projects. (Henry Aff. ¶ 44, Ex. 36). Plaintiff contends that Espejo asked him to stop sending him monthly email updates once he realized that plaintiff was standing up for himself. (Id.)

**Manager Manufacturing Support Position**

In September 2004, a new position, Manager Manufacturing Support, was created to

handle, among other things, production engineering, compliance, and training issues in the Centrum unit. (Espejo Decl. ¶ 7 and Ex. 2). This position was three salary grade levels above Henry's position. (Espejo Decl. ¶ 9; June 12, 2006 Henry Dep. at 116-117 and Ex. 8). The person in this position would report directly to Espejo. (Espejo Decl. ¶ 7, June 12, 2006 Henry Dep. at 102-03). Plaintiff averred that the duties associated with this position were substantially the same as those for the former Senior Supervisor of Compression position, and that only the title was new. (Henry Aff. ¶ 45). Thus, plaintiff stated that he was extremely qualified for the position. He had four years of experience working in the Centrum Production area; he had assisted all of the individuals who had held the position of Senior Supervisor of Compression; he was familiar with the compression operations and the staff he would be managing; he had collaborated with all the departments that the position would be required to collaborate with and knew the individuals in those departments; and he had the requisite educational level. (Id.; see Ex. 31.)

Nearly thirty people applied for this position, and Espejo selected ten individuals to be interviewed, including Max Katz ("Katz") and Henry. (Espejo Decl. ¶ 8) According to Espejo, these ten applicants were then each individually interviewed by a panel of five managers. (Id.) The plaintiff points to the interview tally, which indicates that the panel consisted of only four managers and that eleven candidates were interviewed. (Henry Aff. Ex. 21). The panel asked each of the ten candidates the exact same pre-determined questions and gave them a numerical score in eight different categories based on their responses. (Id. and Ex. 3; June 12, 2006 Henry Dep. at 104-06). These questions were designed to assess the candidates' core competencies and skills so that the panelists could select the most qualified candidate for the position. (Id. 8).

Katz received the highest overall score in this competence-based interview process, and

the panel unanimously selected Katz for the position. (Espejo Decl. ¶ 8 and Ex. 4). Katz particularly stood out in Espejo's view because of his significant project management experience, which Espejo felt was very important for the position. Katz had both a Bachelor of Science degree in Computer-based Management Systems and a Master of Engineering degree in Environmental Engineering. (Katz Decl. ¶ 3) Espejo also felt that Katz was an individual with a diverse background who had held a number of different positions within Wyeth. (Espejo Decl. ¶ 9 and Ex. 5; Katz Decl. ¶ 4). Espejo stated decided to hire Katz for the position because he felt that Katz was the best candidate for the job. (Espejo Decl. ¶ 9).

According to Espejo, Henry did not distinguish himself in any way during the interviewing process and ended up with one of the lower scores from the panel. (Espejo Decl. ¶ 9, Henry Aff. Ex 21).

Henry avers that he knew from the start that the interview process for this position would be "a sham" because three of the panelists were individuals who had been promoted over him already - Espejo, Muscolo, and DeFeciani. (Henry Aff. ⁴ 46). He presumed they were aware of his complaints of discrimination and was not surprised to see that his scores were low. (Id.) He also expected that Katz would receive a high score because Espejo had been "pushing" for Katz to get the position and, according to plaintiff, only asked others to serve on the panel to make it look like an objective process. (Id.) Unlike Henry, Katz also had no direct production experience in the area covered by the position. (Id.)

**Henry's 2004 Performance Review**

According to Espejo, Henry continued to have difficulty setting commitment dates and meeting them in 2004. (Espejo Decl. ¶ 11). On January 12, 2005, Espejo met with Henry and

gave him his 2004 performance review. Henry received an overall rating of 3, which indicated that Henry met the objectives, responsibilities, and expectations of his position. (Espejo Decl. ¶ 11, June 12, 2005 Henry Dep. at 221-25 and Ex. 23). The review noted a number of strengths and accomplishments as well as areas that needed improvement. (Id.) Once again, Henry disagreed with Espejo's assessment that he had fallen behind on his projects. He felt that the emails documenting his progress showed that he was not falling behind, and that he should have been granted certain extensions when he had to collaborate with a wide array of colleagues in the course of his work. (Henry Aff. Ex. 36, June 12, 2006 Henry Dep. at 224). He also testified that the review did not "capture a key element" that plaintiff believed should have been included and may have affected his rating – his leadership role on the Continuous Coater Single Pass Project. (Id. at 122-23). Plaintiff refused to sign the 2004 performance review because he disagreed with the comments and the rating. (Id. at 225-26).

**Henry's Performance in 2005**

After receiving his 2004 performance review, Henry continued to miss a number of deadlines, and Espejo began to receive complaints from others about Henry's delay in completing assignments. (Espejo Decl. ¶ 12). Katz, who became Henry's direct supervisor in January 2005, stated that he had difficulties with Henry from the outset. (Katz Decl. ¶¶ 5-6). Henry disputes these assertions by relying on two single-line emails in which Espejo and Katz, respectively, thanked him for his work. (Henry Aff. ¶ 37).

On a number of occasions, Katz received complaints from others that Henry had failed to meet a deadline or complete a task in a timely manner. (Katz Decl. ¶ 6). In addition, Katz felt that Henry frequently failed to communicate with him, often failing to return his phone calls or his

34

emails or taking days to respond. (Katz Decl. ¶¶ 6, 15). Henry was also frequently absent from work or failed to provide adequate notice. (Id. at 6). The plaintiff counters that both Espejo and Katz were often absent without providing what might be considered adequate notice, and there were other times when the plaintiff came into work even after notifying Espejo and/or Katz that he would be out sick. (Henry Aff. ¶ 49).

For example, in an email dated February 3, 2005, Grant Livermore ("Livermore"), a Computer Validation Consultant, asked Espejo to intervene to try to get Henry to complete a long delayed project. (Espejo Decl. ¶ 12). On that same day, Katz asked Henry to prepare a timeline for the completion of the project and to forward the timeline to Livermore. (Id.) On February 16, 2005, Livermore advised Espejo that he still had not received a timeline for the completion of the requested work. Espejo once again asked Henry to provide a timeline or date of completion to Livermore "ASAP" on this "critical item." (Id.) Katz never received a response or timeline from Henry. (Katz Decl. ¶ 7).

Similarly, on February 9, 2005, Katz sent Henry an email requesting that, by February 16, 2005, he prepare a timeline of the steps he was taking to resolve issues regarding certain Maintenance Investigation Reports ("MIRs"). (Katz Decl. ¶ 8). According to Katz, Henry did not provide Katz with a response or timeline. (Id. ¶ 8 and Ex. 3).

Plaintiff disputes defendants' assertion that he was unresponsive to emails from his supervisor during this time period. He avers that he was communicating verbally with Katz on an almost daily basis, and that this mode of responding to Katz's emails was often quicker and more appropriate. (Henry Aff. ¶ 49).

On another occasion in February 2005, Henry arrived late, without giving any notice, for

an important meeting he had scheduled with outside vendors and managers from another Wyeth facility. (Katz Decl. ¶ 9). Katz went to speak with Henry in his office to let him know that, if he was going to be significantly late to an important meeting in the future, he must contact him and give him notice. (Id.) Henry interrupted Katz and told him that they should go to a nearby empty conference room. (Id.) When they reached the room, Henry told Katz to sit down and proceeded to pace back and forth telling Katz that he was not a child and that Katz was treating him like a child by discussing the issue. (Id.) Henry told Katz that he might not be able to contact him all the time. (Id.)

With respect to this incident, the plaintiff stated that he was unavoidably delayed by a snowstorm on the date in question and that he arrived at soon as the weather permitted. (Henry Aff. ¶ 51). Furthermore, the plaintiff averred that he still arrived in time to conduct the meeting and that the meeting was a success. (Id.)

As part of the effort to comply with Wyeth's SOPs and with GMPs required by the FDA, Espejo established certain procedures for supervisors to conduct maintenance audits of their assigned zones. (Espejo Decl. ¶ 13). As part of this plan, Espejo assigned to Henry the responsibility of reviewing and signing the Weekly Maintenance Zone Checklists prepared by the supervisors. (Id.) Espejo advised Henry and other employees of this procedure on February 18, 2005. (Id. ¶ 13 and Ex. 7). According to Espejo, Henry fell behind on this project almost immediately by failing to review and approve the Weekly Maintenance Zone Checklists in a timely manner. (Espejo Decl. ¶ 13).

Concerned that Henry's failure to timely process these Weekly Maintenance Zone Checklists could lead to compliance issues, on March 15, 2005, Espejo advised Henry that he

needed to address the Checklist issue. (Espejo Decl. ¶ 13 and Ex. 7). The following day, Henry purportedly advised Espejo that the overdue Weekly Maintenance Zone Checklists would be submitted by March 25, 2005 or sooner. (Id.)

In late March 2005, Espejo was informed that Henry had fallen far behind schedule in completing PMOs. (Espejo Decl. ¶ 14). Concerned that Henry's failure to complete the PMOs could lead to serious regulatory compliance issues and concerned about Henry's failure to complete the Weekly Maintenance Zone Checklists in a timely manner, Espejo suggested initiating a formal Performance Improvement Plan ("PIP"). (Espejo Decl. ¶ 14 and Ex. 8).

On March 30, 2005, Katz spoke to Henry about his failure to sign off on PMOs in a timely manner. (Katz Decl. ¶ 12). Henry responded that he felt it was petty that someone had notified Katz of the problem, and was annoyed at being singled out. (Katz Decl. ¶ 12 and Ex. 5).

Although Henry had promised to provide Espejo with the overdue Weekly Maintenance Zone Checklists by March 25, 2005 or sooner, Henry did not provide them to Espejo until April 5, 2005. (Espejo Decl. ¶ 16). A review of these Checklists revealed that certain areas had not been completed since February 5, 2005, in violation of Wyeth's SOPs and GMPs, which gave rise to serious compliance concerns. (Id.) As a result of this lapse, a formal compliance investigation was intitiated and formal Event Report Form ("ERF") was prepared. (Id.) Wyeth is obligated to make such ERFs available to the FDA for review, if requested. (Id.)

On May 19, 2005, Katz sent Henry a "red" high priority email with three high priority items. (Katz Decl. ¶ 16 and Ex. 7). Henry did not open the email until the following day, after Katz went to talk to him about the email. (Id. 6). One of the tasks assigned to Henry in the email had a June 3, 2005 commitment date, and several people, including Espejo had to stay late on

June 3, 2005 to complete this assignment on time. (Id.)

Finally, in March 2005, Muscolo, a Wyeth manager, complained to Katz that Henry failed to fulfill many of his responsibilities on a project with her. (Katz Decl. ¶ 13).

Plaintiff disputes that he bore any personal responsibility for the late submission of Weekly Maintenance Zone Checklists or PMOs or the compliance concerns that arose as a result. Henry testified that he had explained to Espejo that the problem did not lie with him but with supervisors who needed to complete the Checklists more quickly and more clearly to enable him to review them and sign off on them in a timely manner. (June 12, 2006 Henry Dep. at 232-33). It was thus a departmental problem that Henry claims cannot be attributed solely to him. (Id.) Henry's concerns were documented in a March 16, 2005 email to Espejo, who responded that if, indeed, supervisors were inadequately completing the Checklists, that issue needed to be addressed. (Henry Aff. Ex. 23). Henry specifically refutes defendants' contention that he "promised" to submit Checklists by March 25, 2005. Instead, he cites the language of his email to Espejo: "the goal is to have all to you by the end of next week or sooner if feasible." (Id.) Moreover, Henry stated that Espejo exacerbated the problem by failing to provide plaintiff with a Checklist dated December 6, 2004 until March 2, 2005.

With regard to the late completion of PMOs, plaintiff informed Katz that there were several reasons for the problem – the PMOs not being turned in to plaintiff on time by others; mistakes made by others that required correction; and the December holiday season that caused a general backlog of work – and Katz documented those concerns in an email to Espejo, dated March 30, 2005. (Id. Ex 24). According to Henry, Katz agreed to work with the plaintiff to track the source of the problem by creating a spreadsheet, which would reflect when the plaintiff

38

himself received the PMOs. (Henry Aff. ¶ 50, June 12, 2006 Henry Dep. at 231.)

Plaintiff likewise disputes the legitimacy of any concerns raised by Muscolo about his performance. He averred that although he was never made aware of any complaints by Muscolo, he believed that the project in question was the Water System Management Project, which imposed an unusually heavy workload on the engineers involved. (Henry Aff. ¶ 52). Plaintiff additionally stated that no schedule was ever communicated to him for completing tasks related to this project. (Id.)

Finally, with respect to Katz's high priority assignment, plaintiff stated that he did not receive the assignment until it was too late to be able to complete it by the June 3 target date, that he communicated this issue verbally to Espejo, and that there was nothing unusual about employees at Wyeth staying late to meet a deadline. (Henry Aff. ¶ 53).

**The PIP**

Because Henry's performance had not been improving, Katz decided to place him on a PIP. (Katz Decl. ¶ 17). On June 24, 2005, Stacey Marroso ("Marroso"), a Human Resources employee, as well as Katz met with Henry to give him his mid-year performance review and to give him a copy of his PIP. (Katz Decl. ¶ 18; June 12, 2006 Henry Dep. 226-36, 248-52 and Ex. 24-26). According to Katz, all of the full-time employees reporting to him received mid-year performance reviews in 2005, (Katz Decl. ¶ 19). Plaintiff averred, however, that some of Katz's subordinates informed him that they were not given a mid-year review; and none received goals or objectives for the year. (Henry Aff. ¶54).

Defendants state that at the June 24 meeting, Marroso advised Henry that the PIP was not a disciplinary tool, but rather a tool to help an employee take corrective action and improve his

performance. (June 12, 2006 Henry Dep. at 261). Henry averred that she made this statement on July 6, 2005 rather than June 24. Instead, according to the plaintiff, Marroso told him on June 24 that as a result of being placed on a PIP, he would be unable to apply for any other position within the company for one year thereafter, and if the program was not completed successfully, disciplinary action would be taken "up to and including termination." (Henry Aff. ¶ 54).

The PIP purportedly reflected Katz's concern that Henry had repeatedly failed to meet deadlines and complete tasks in a timely manner and provided seven examples. (McQuade Decl. Ex. 1, Ex. 26). The PIP also stated that Henry had an unacceptable number of absences – quadruple the number of absences (not including vacation days) of any other employee in the department – and would often call out with little notice. (Id.) Henry vehemently disputed the need for a PIP, (June 12, 2006 Henry Dep. at 260-64) and submitted a formal rebuttal to the PIP as well as a number of corroborating exhibits on July 1, 2005.

The 2005 mid-year review provided feedback on Henry's progress in 25 categories and once again reflected management's dissatisfaction with his performance. (McQuade Decl. Ex. 1, Ex. 24). The review noted a number of specific instances when Henry missed important deadlines or failed to complete a project. (Id.) Plaintiff painstakingly disputes the assessment of his performance reflected in the mid-year review, taking issue with Katz's "subjective opinions;" defendants' reliance on purportedly unacceptable performance by the plaintiff when, in fact, the problems noted were department-wide; and lack of recognition for the overwhelming amount of work done by the plaintiff on time in 2005 as reflected in his Engineer Status Report. (Henry Aff. Ex. 39).

On July 6, 2005, Katz and Marroso met with Henry to coach him on his performance.

40

(Katz Decl. ¶ 20). The parties dispute whether it was Katz or Marroso who told Henry that they wanted him to be successful and to remain with the company. (Id.) According to Katz, Henry's work performance improved after he was issued the PIP. (Id.) The plaintiff denies that his work was in need of any improvement.

On July 25, 2005, Espejo, Marroso, and Katz met with Henry for his final PIP status discussion. (Katz Decl. ¶ 21). At this meeting, Henry was advised that the PIP was being closed out and that he had successfully completed the program. (Id.) Espejo told Henry that he respected him and that he wanted to see him succeed in his job. (Espejo Decl. ¶ 17). On July 28, 2005, Henry was advised in writing that he had satisfied the requirements of the PIP and that the PIP had therefore been terminated. (June 12, 2006 Henry Dep at 264-65 and Ex. 29).

Plaintiff took a medical leave of absence beginning on August 5, 2005. (Id. at 270-72). Plaintiff denies Espejo's assertion that upon learning of plaintiff's leave, he wished him well and told Henry that he hoped he returned to work soon. (Espejo Decl. ¶ 18; Henry Aff. ¶ 57). Plaintiff testified that he took the leave of absence on account of the anxiety and depression he felt as a result of the discrimination he was being subjected to at Wyeth, and that he was following recommendations from his doctor and psychotherapist. (June 12, 2006 Henry Dep. at 271-72).

The individual that Katz hired to replace Henry is an African-American. (Katz Decl. ¶ 22).

On January 10, 2006, Wyeth advised Henry that if he wished to remain employed by Wyeth, he needed to submit appropriate medical documentation indicating his ability to return to work within a reasonable time. (Id. at 279-80). Henry chose not to submit the requisite documentation because he did not wish to return to work at Wyeth, and his employment was

41

terminated accordingly on February 6, 2006. (Id. at 280-81 and Ex. 35).

During his employment at Wyeth, Henry had reviewed and signed the company's unlawful harassment policies. (Id. at 301-04 and Exs. 39 and 40).

**Procedural History**

On or about September 24, 2004, Henry filed a charge of discrimination with the New York State Division of Human Rights, alleging that he had been denied certain promotions and had received a transfer to the Packaging Department because of his race. (McQuade Decl. Ex. 6). On or about October 15, 2005, Henry filed a second charge of discrimination with the EEOC, alleging that he had been retaliated against for filing his first charge of discrimination. (McQuade Decl. Ex 7). On September 20, 2005, Henry filed his complaint in this action. (McQuade Decl. Ex. 1, Ex. 4).

**Management's Alleged Discriminatory Animus**

In support of his discrimination claims, Henry cites a number of incidents involving alleged racially discriminatory remarks made by several Wyeth employees.

In the spring of 2001, Daisy Early ("Early") a black female employee complained to Bracco, her supervisor, that her request for a shift change was denied unfairly, and he responded: "So sue me. All my supervisors are black so you can't prove discrimination." (Early Aff. ¶ 3.) A few weeks after this incident, Mr. Bracco became ill and made several comments to other employees, suggesting that "Daisy tried to put voodoo on [him]." (Id.)

On another morning after this incident, Defendant Wardrop stopped Early on her way to work and said: "Daisy, what are you doing at home? Sticking pins in a doll? What have I ever done to you?" (Early Aff. ¶ 5). Early complained about this comment to Michael Todd

Davenport ("Davenport"), Centrum Production Coordinator, who suggested that if she knew all the things that had gone wrong the night before, she "would understand the statement." (Id.)

In February 2004, Newton Paul ("Paul"), a Haitian American, witnessed Joe Vitanza (then-current Managing Director of plaintiff's division and Wardrop's immediate supervisor) refer to a malfunctioning alarm system as a "tar baby that I just can't get off my back." (Paul Aff. ¶ 3). Mr. Paul was deeply offended by the comment. (Id.)

In the winter of 2004, Paul witnessed defendant Wardrop making fun of Manny Rivera ("Rivera"), a Hispanic Wyeth employee. (Id. at 5) Wardrop pulled his pants down so that the waistband was around his thighs, supposedly imitating the dress "hip-hop youth culture." (Id.) Wardrop proceeded to make other gestures reflecting his perception of the behavior of Hispanic youth and said, "Is Manny the kind of guy to wear his pants hanging down like this?" (Id.)

In May 2005, Paul applied for the position of Compliance Manager by sending his resume and a cover letter to Maura Corcoran ("Corcoran") in the Vaccine Group. (Paul Aff. ¶ 6). He was qualified for the position and felt it would be a greaty opportunity for him but never received a response to his application despite sending repeated emails to Corcoran. (Id.) He was never interviewed for the position, and it was eventually given to Mike Curry ("Curry"), a white employee, who purportedly had less experience and less impressive qualifications. (Id.)

**Plaintiff's Statistical Evidence**

Wyeth makes an announcement by email whenever an individual is promoted. (Henry Aff ¶ 58). Based on the 53 announcements between March 2004 and October 2005 that plaintiff has been able to retain in his records and tabulate to date, three promotions were given to black employees, and one promotion was given to a Hispanic employee amounting to 7.54% of

43

promotions. (Id.) None of the promotions given to black employees were promotions into upper management. (Id.)

During the Organizational Cascade that took place in January 2004, none of the new management positions created in plaintiff's division was awarded to a black employee. (Id.) Similarly, none of the 17 management positions made available by a corporate reorganization in October 2005 was given to a black employee. (Id.)

## Standard of Review

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1986).

The moving party has the initial burden of showing that there are no material facts in dispute. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(c), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Summary judgment for the moving party is appropriate "where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative." Travelers Ins. Co. v.

Broadway W. Street Assoc's., 164 F.R.D. 154, 160 (S.D.N.Y. 1995) (citing Anderson, 477 U.S. at 248. 106 S. Ct. at 2510). Before a district court grants summary judgment, however, "the record must clearly establish both 'the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" Pangburn v. Culbertson, 200 F.3d 65. 69 (2d Cir. 1999) (citing Ramsey v. Coughlin, 94 F.3d 71. 74 (2d Cir. 1996)).

Summary judgment is improper if there is any evidence in the record that would allow a reasonable fact-finder to find in favor of the non-moving party. On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. See United States v. Diebold, Inc., 369 U.S. 654, 655. 82 S. Ct. 993, 994 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).


### Discussion

As a general matter, employment discrimination claims brought pursuant to the Human Rights Law and § 1981 are evaluated under the same standards that apply to Title VII cases. Edwards v. Town of Huntington, 2007 WL 2027913, *3 (E.D.N.Y. July 11, 2007); See also Schiano v. Quality Payroll Systems. Inc., 445 F.3d 597, 609 (2d Cir.2006); Whidbee v. Garzarelli Food Specialties. Inc., 223 F.3d 62, 69 (2d Cir.2000).

Under the familiar McDonnell Douglas burden-shifting framework, a plaintiff claiming that he was subjected to race discrimination in violation of Title VII must first establish a prima facie case by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the

adverse employment action occurred under circumstances that give rise to an inference of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); James v. New York Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000).

Similarly, to establish a prima facie case of a discriminatory failure to promote, a plaintiff must show the following: (1) he is a member of a protected category, (2) he applied for an available position, (3) he was qualified for the position, and (4) he was rejected under circumstances that give rise to an inference of discrimination. Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir.2000); de la Cruz v. N.Y. City Human Resources Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir.1996). "An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [ ] or if the position was filled by someone not a member of plaintiff's protected class." Gomez v. Pellicone, 986 F.Supp. 220, 228 (S.D.N.Y.1997) (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; de la Cruz, 82 F.3d at 20). However, to satisfy the third element, a plaintiff must show that he "applied for a specific position or positions and was rejected therefrom, rather than merely asserting that . . . he generally requested promotion." Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir.1998).

The courts have made clear that the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion "at the prima facie stage is de minimis." Dister v. Continental Group, Inc., 859 F.2d 1114, 115 (affirming summary judgment, but rejecting district court's rationale that prima facie case had not been established). Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its

46

determination of whether the circumstances "giv[e] rise to an inference" of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. See McDonnell Douglas, 411 U.S. 792, 802-03; St. Mary's Honor Ctr., 609 U.S. at 506-07; James, 233 F.3d at 154. The employer's burden is one of production, not persuasion; it "can involve no credibility assessment." St. Mary's Honor Ctr., 609 U.S. at 509.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Thus, once the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out and the plaintiff has the opportunity to demonstrate that the proffered reason was a pretext for discrimination. Burdine, 450 U.S. at 254-56; see Darrell v. Consol. Edison Co. of New York, Inc., 2004 WL 1117889, at *8 (S.D.N.Y. May 18, 2004). While "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515, under appropriate circumstances, a trier of fact can reasonably infer from the falsity of the explanation that the employer is "dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147. Thus "the factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity)

may, together with the elements of the prima facie case, suffice to show intentional discrimination." Id. at 147. However, as the Supreme Court has noted, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's reason, or if the plaintiff only created a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred. Id. at 148.

The Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." James, 233 F.3d at 156 (quoting Reeves, 530 U.S. at 148-49). Although summary judgment must be granted with caution in employment discrimination actions "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir.1994); see also Darrell, 2004 WL 1117889, at *8; Alston v. New York City Transit Auth., 2003 WL 22871917, at *4-5 (S.D.N.Y. Dec. 3, 2003). Thus "even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997). see also Goenaga v. March of Dimes Birth Found., 51 F.3d 14, 18 (2d Cir.1995) (non-moving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Title VII also forbids an employer to retaliate against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII. See 42 U.S.C. § 2000e-3(a):

Kessler v. Westchester County Dept. of Social Servs., 461 F.3d 199, 205 (2d Cir. 2006). To establish a prima facie case of retaliation, a plaintiff must present evidence sufficient to permit a rational trier of fact to find that: (1) she engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action. See Burlington Northern & Santa Fe Ry. v. White, 126 S.Ct. 2405 (2006); Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir.2001).

The anti-retaliation provision of Title VII protects an individual only from retaliation that produces an injury or harm. White, 126 S.Ct. at 2414 (2006). In White, the Supreme Court changed the prevailing standard that governs retaliation actions under Title VII by expanding the notion of an adverse employment action. The Court held that the anti-retaliation provision of Title VII, unlike its substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. 126 S.Ct. at 2412-13. Rather, to prevail on a claim for retaliation under Title VII, "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted). Whether a particular action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 2417 (internal quotation marks omitted).

Finally, a plaintiff can either show direct evidence of retaliatory intent or can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the

protected activity was closely followed in time by the adverse employment action." Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001) (internal quotation marks omitted).

## 1. Timeliness of Claims

For a claim to be timely in "dual filing" states such as New York, a plaintiff must file the charge with the EEOC within 300 days of the allegedly unlawful employment practice. 42 U.S.C. 2000e-5(e)(1); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). Failure to file a timely EEOC charge results in dismissal of the claim. See Butts v. N.Y. Dept. of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993) *superceded by statute on other grounds as recognized in* Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir.1998). Defendants argue that a number of the plaintiff's claims are time-barred under Morgan, in which the Supreme Court held that under Title VII "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or refusal to hire are not actionable if time-barred, even if they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 111-12. Defendants contend that the plaintiff can only recover for acts that occurred within the 300-day time period prior to the September 24, 2004 filing of her administrative charge, i.e., on or after November 24, 2003. The plaintiff agrees that, in the wake of Morgan, the continuing violation doctrine no longer applies to discrete discriminatory acts. Nevertheless, the plaintiff argues that statute of limitations should be equitably tolled for the employment decisions underlying his time-barred claims because the plaintiff "only belatedly recognized their unlawfulness." (Pl. Br. at 5). The plaintiff's contention is unavailing.

The filing deadline for the formal complaint is not jurisdictional and, like a statute of

limitations, is subject to equitable tolling. Morgan, 536 U.S. at 113; see also Bruce v. United States Dep't of Justice, 314 F.3d 71, 74 (2d Cir.2002); Briones v. Runyon, 101 F.3d 287, 290 (2d Cir.1996). However, equitable tolling is only appropriate "in [ ] rare and exceptional circumstance[s]" in which a party is "prevented in some extraordinary way from exercising his rights." Zerilli-Edelglass v. New York City Transit Authority, 333 F.3d 74, *80 -81 (2d Cir. 2003)(citing Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir.2000) and Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996)(internal quotation marks and alteration omitted).

Equitable tolling is not warranted merely because the plaintiff was unaware of his cause of action; it requires some extraordinary set of circumstances such as actively misleading or fraudulent conduct on the part of the defendant that prevents the plaintiff from exercising his rights. See Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir.1985). Here, the plaintiff has not alleged that the defendants have actively concealed from him any facts concerning employment decisions made prior to November 24, 2003 that would have enabled him to discover defendants' discriminatory animus. Instead, he argues that in light of later events, he viewed the constellation of circumstances surrounding the earlier employment decisions differently. These are not extraordinary circumstances that warrant the application of equitable tolling.

The court further notes that plaintiff's conclusory allegations that "A culture of discrimination pervades Wyeth's Pearl River facility" and that "Minorities remain in lower-level positions and are routinely denied opportunities for advancement," (Cplt. ¶ 10), do not suffice to convert plaintiff's allegations of discrete discriminatory acts into a "pattern or practice" claim for statute of limitations purposes, and the plaintiff does not appear to so argue. See Timothy v. Our

Lady of Mercy Medical Center, 2004 WL 503760, *3-4 (S.D.N.Y. March 12, 2004); see also Idrees v. City of New York Dept. of Parks and Recreation, 2005 WL 1026027, *7 (S.D.N.Y. May 3, 2005).

Accordingly, the following Title VII claims based on alleged individual instances of discrimination that occurred before November 24, 2003 are dismissed as time-barred: (1) failure to promote plaintiff to the Project Engineer position in December 2001; (2) failure to promote the plaintiff to the Production Engineer position in July 2002; (3) failure to afford plaintiff the opportunity to take on the Production Coordinator responsibilities on an interim basis; (4) negative mid-year 2003 performance review;[3] and (5) failure to promote plaintiff to the position of Process Engineer in November 2003.

As plaintiff properly notes, this time-barred conduct may still be offered as background evidence of discriminatory intent to support his timely Title VII claims. See Morgan, 536 U.S. at 102.

Plaintiff is also correct, however, that claims brought under 42 U.S.C. § 1981 and § 296 need not be asserted within the 300-day period applicable to Title VII claims. The applicable statute of limitations for § 296 claims is three years. See Forsyth v. Fed'n Employment & Guidance Serv., 409 F.3d 565, 572 (2d Cir. 2005) abrogated on other grounds by Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S.Ct. 2162 (2007). The plaintiff filed his complaint in the present action on September 20, 2005, and may therefore assert HRL claims based on events that occurred on or after September 20, 2002.

---

[3] It should be noted that this Title VII claim is time-barred regardless of whether the mid-year performance took place in April/May of 2003 as plaintiff alleges, or in September 2003 as defendants allege.

Until recently, § 1981 actions were subject to the three-year statute of limitations for personal injury actions in New York. See Tadros v. Coleman, 898 F.2d 10, 12 (2d Cir. 1990). In Jones v. R.R. Donnelley & Sons Company, 541 U.S. 369 (2004), however, the Supreme Court held that claims arising under the 1991 amendments to § 1981 are governed by the "catchall" four-year statute of limitations prescribed by 28 U.S.C. § 1658. The 1991 amendments to Section 1981 "'enlarged the category of conduct that is subject to § 1981 liability'" by adding § 101 of the Civil Rights Act of 1991, which states: "[f]or purposes of this section, the term, 'make and enforce contracts' includes the making, performance, modification, and termination of all benefits, privileges, and conditions of the contractual relationship." Pub.L. 102-166, 105 Stat. 1071, codified in 42 U.S.C. § 1981(b).

Here, as in Donnelley, the plaintiff's § 1981 claims of discriminatory treatment in the conditions of his employment are "made possible" by the 1991 amendments. Id. at 370. They are therefore subject to the § 1658 "catchall" four-year statute of limitations. Under this rubric, all of the plaintiff's § 1981 claims are timely.

2. *The Title VII Claims are Dismissed Against the Individual Defendants*

Before reaching the substance of the plaintiff's claims, the court is obliged to note that "individuals are not subject to liability under Title VII." Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir.2000) (per curiam); see, e.g., Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir.1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by* Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). The plaintiff's Title VII claims against Wardrop and McDermott are therefore dismissed.

53

3. *Race Discrimination and Retaliation Claims*

With the foregoing substantive standards in mind, it is clear that nearly all of the plaintiff's discrimination and retaliation claims must be presented to a jury. The record before the court is rife with innumerable disputed issues of material fact concerning the plaintiff's qualifications for the positions he applied for, the quality of the plaintiff's job performance in his capacity as a Production Engineer, and the truthfulness of the defendants' representations concerning the plaintiff's job performance in his evaluations as well as the affidavits filed in support of the defendants' motion. Summary judgment is therefore inappropriate.

First, plaintiff has established a prima facie case with respect to his failure to promote claims by showing that he was a member of a protected class who applied for and was rejected from positions for which he possessed the basic necessary skills, and that the persons hired in his stead were not members of his protected class. Gregory v. Daly, 243 F.3d 687, 696. (2d Cir. 2001); Gomez, 986 F.Supp. at 228. There is also evidence in the record tending to show that the lowered performance evaluations the plaintiff received had "actual negative ramifications for [the plaintiff's] job conditions." Carmellino, 2006 WL 2583019, *28. Wardrop's own testimony supports the plaintiff's contention that the performance reviews immediately became a part of his permanent record. Moreover, the gravamen of plaintiff's claim is that the lowered performance appraisals were concocted in order to sabotage his prospects for advancement at Wyeth and did, in fact, have that effect. Given the plaintiff's inability to advance during the time period in question and the numerous setbacks he suffered, including his transfer to the Packaging Supervisor position and his placement on the PIP, the court declines to find, as a matter of law, that the performance evaluations did not change the conditions of the plaintiff's employment. See

Treglia v. Town of Manlius, 313 F.3d 713, 720. There is also no question that Henry's placement on the PIP materially altered the terms and conditions of the plaintiff's employment since it rendered him ineligible for a promotion for a year following its initiation.

Finally, viewing the evidence in the light most favorable to the plaintiff, the Packaging Supervisor position was materially less prestigious, materially less suited to Henry's skills and expertise, and materially less conducive to his career advancement than the Production Coordinator job that he held, to say nothing of the promotions that he sought. Galabya v. New York City Bd. of Educ. 202 F.3d 636, 641 (2d Cir. 2000). While the transfer would have entailed no change in grade or salary, the Packaging Supervisor position required only a high school diploma and was widely perceived as an assignment for engineers who were incompetent. Over the course of nearly five months, plaintiff reported to packaging department management and wondered if his ostensible "demotion" was to become permanent. Drawing all inferences in the plaintiff's favor, there is no indication that the stigma associated with defendants' decision to transfer him to the Packaging Supervisor position was ever dispelled or that the records of the allegedly discriminatory decision were ever expunged. Cf. Lumhoo v. Home Depot, 229 F. Supp. 2d 121, 139. (E.D.N.Y. 2002). In light of the record as a whole, the court therefore finds that the plaintiff has made out a prima facie case of discrimination with regard to his "demotion" claim.

Furthermore, contrary to the defendants' contentions, the plaintiff's response to the defendants' proffered non-discriminatory reasons for their actions comprises more than mere conclusory, self-serving allegations. He has adduced specific facts from which a reasonable jury could infer that the reasons propounded by the defendants were not their true reasons, and from this, that the defendants are "dissembling to cover up a discriminatory purpose." Reeves, 530

U.S. at 147. In particular, plaintiff has pointed to divergences between defendants' laudatory appraisals of his performance in various comments and emails and the paper trail they have produced in support of their adverse decisions. The plaintiff has also highlighted inconsistencies in the reasons the defendants gave when pressed to explain their actions.

The additional evidence plaintiff propounds on the issue of pretext is admittedly thin. His statistical analysis and anecdotal evidence suffer from a lack of comparative data, and the racially insensitive – and allegedly discriminatory – behavior he recites is more akin to "stray" remarks than to the types of comments that have been found to be indicia of intentional discrimination. See Ostrowski v. Atlantic Mut. Ins. Companies, 968 F.2d 171, 182 (2d Cir.1992). Nevertheless, under Reeves, a plaintiff who establishes a prima facie case of discrimination and provides a meaningful basis for disbelieving the reasons proffered by the employer is entitled to have his claims decided by a jury. Since the jury may infer the ultimate fact of intentional discrimination if it finds that Wyeth's purported concerns about the plaintiff's performance were disingenuous, the plaintiff is not required to provide additional substantiating evidence. Moreover, while it is sparse, the evidence plaintiff did provide of racially offensive remarks and gestures by individuals including Wardrop – Henry's direct supervisor – is not wholly lacking in probative value. Thus, viewing the facts in the light most favorable to Henry and drawing all inferences in his favor, the court cannot say that the evidence of non-discrimination is so overwhelming and conclusive as to overcome the plaintiff's showing of pretext.

It may well be that the plaintiff cannot carry his ultimate burden at trial, but it is not for this court to weigh the evidence on both sides or to assess the strengths of competing inferences. Those tasks must be left to the sound discretion of a jury.

Since the same evidence must be presented to the jury on Henry's retaliation claims as would be required to prove his claims of disparate treatment race discrimination, the court finds that the proper course of action is to have a jury decide whether defendant's articulated reasons were pretextual, and if so, whether their real reasons for refusing to promote Henry to the Manager Manufacturing Support position, giving him a negative 2005 mid-year performance evaluation, and placing on the PIP were retaliatory or discriminatory.

Nevertheless, there are two promotions the plaintiff explicitly testified that he did not believe he was denied because of his race – the Process Engineer position and the Staff Engineer I position. As such, his discrimination claims based on these incidents must be dismissed. The plaintiff cannot rescue these claims by implying in his affidavit that the employment decisions at issue were illicitly motivated or by so arguing in his briefs. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research and Dev. Co. v. Singer Co., 410 F.2d 571, 578 (2d Cir.1969); see also Chavez v. Iberia Foods Corp. 2007 WL 1959028, *4 (E.D.N.Y. June 29, 2007).

Plaintiff's disparate treatment claims based on defendants' failure to promote him to the Process Engineer position and the Staff Engineer I position are dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part. This case is hereby reassigned to White Plains.

This constitutes the decision and order of the Court.

Dated: July 26, 2007

_____
U.S.D.J.

BY FAX TO ALL COUNSEL.

58