Michael Delikat
James H. McQuade
Heather Glatter
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals,
a Division of Wyeth, Walter Wardrop, and
Michael McDermott

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

HOWARD HENRY,

                Plaintiff,

        -- v. --

WYETH PHARMACEUTICALS, INC.,
WALTER WARDROP, ANDREW SCHASCHL,
and MICHAEL MCDERMOTT,

                Defendants.

-------------------------------------------------------------x

Case No. 05-CV-8106 (WCC) (LMS)

## DEFENDANTS' CONSOLIDATED REPLY MEMORANDUM
## IN SUPPORT OF THEIR MOTIONS IN LIMINE 1 THROUGH 5

Michael Delikat
James H. McQuade
Heather Glatter
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals, a Division
of Wyeth, Walter Wardrop and Michael McDermott

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT. ................................................................................. 1

II.  DEFENDANTS' MOTIONS SHOULD BE GRANTED. ............................................... 4

    A.   Motion No. 1 – stray remarks. ............................................................ 4

    B.   Motion No. 2 – "me-too" claims......................................................... 11

    C.   Motion No. 3 – statistics. ................................................................... 16

    D.   Motion No. 4 – affidavit, declaration and deposition testimony. ......................... 18

    E.   Motion No. 5 – claim for constructive discharge. ............................................. 19

III. CONCLUSION.................................................................................................... 21

I.    **PRELIMINARY STATEMENT**.

Defendants Wyeth Pharmaceuticals, a Division of Wyeth ("Wyeth"), Walter Wardrop ("Wardrop") and Michael McDermott ("McDermott") (referred to collectively as "Defendants") hereby reply to the opposition memorandum of plaintiff Howard Henry ("Plaintiff" or "Henry") to Defendants' motions in limine 1 through 5.[1]

Plaintiff is African-American.  This case is about Plaintiff's beliefs that he was denied several promotions because of his race, was discriminated against in certain performance evaluations because of his race, was asked to take another position which he considered to be a demotion in a Company reorganization because of his race and was retaliated against because he complained about racial discrimination against him.  Of the promotion claims asserted in the complaint, two have been dismissed because Plaintiff conceded at his deposition that he did not believe he was denied those two promotions because of his race.

Specific individuals are identified as the decision-makers with respect to each of the discrete events Plaintiff claims were racially discriminatory or retaliatory.  The essential focus of the trial will be whether the events Plaintiff challenges were motivated by discriminatory or retaliatory animus on the part of Defendants.  Significantly, there is no claim in this case that Defendants maintained a pattern or practice of racial discrimination.  Those fundamental considerations determine the relevance of evidence and the balance between probative value and undue prejudice addressed by Federal Rules of Evidence 401, 402 and 403.

---

[1] Defendants approached the Court in limine in five separate motions.  Because Plaintiff has submitted a consolidated response to all five motions, and in an effort to streamline Defendants' response, Defendants will reply in this one consolidated Reply Memorandum.  We note that the sections of the Defendants' Consolidated Reply Memorandum, each addressing one of the five motions in limine, are all less than ten pages, and therefore do not exceed the individual page limit for reply briefs.

Defendants' motion 1 addresses Plaintiff's intention to introduce evidence of potentially prejudicial alleged comments made in the workplace, including stray remarks of persons who were not the decision-makers with respect to the events described in Plaintiff's Complaint, remarks remote in time from the decisions taken concerning Plaintiff, and a remark allegedly directed against a Hispanic employee, a class to which Plaintiff does not belong and one that is not implicated in the claimed discrimination here. Defendants' motion 2 addresses Plaintiff's intention to introduce testimony of two or more "me-too" witnesses about their individual and personal claims, observations or speculation about racial discrimination that do not involve Plaintiff or any of the persons claimed to have discriminated against him, as to which none of these purported "witnesses" has any personal knowledge. Defendants' motion 3 addresses Plaintiff's intention to place before the jury certain misleading, unrepresentative and speculative information about promotions over a limited period of time that Plaintiff claims to be "statistical", but which, in reality, is nothing more than an *ad hoc* series of promotional announcements that Plaintiff "kept", while acknowledging that there were other promotion announcements during the same period of time that Plaintiff did not keep.

In opposing these three motions, Plaintiff argues that, regardless of the marginal, if any, probative value any of these items of "evidence" might have standing alone, the jury should be entitled to consider all of them alongside Plaintiff's competent evidence specifically addressing the incidents he claims were discriminatory or retaliatory. First, some of this "evidence" is clearly not relevant by the standards of Fed. R. Evid. 401 under the circumstances here (the proposed Newton Paul testimony about supposed remarks by Defendant Wardrop at some unspecified time in 2004 about the dress of an employee who was Hispanic), and the Court itself has already observed that all of the remainder of it is "thin" and "sparse" as evidence of

2

discrimination.[2]  Moreover, even if the challenged evidence were marginally relevant for the purposes of assisting Plaintiff in surmounting a motion for summary judgment, its introduction would still be impermissibly prejudicial under Fed. R. Evid. 403.

In this regard, Plaintiff's contextual argument is a double-edged sword.  As to the discrete events Plaintiff claims were discriminatory or retaliatory, there simply is no direct evidence of racial discrimination or retaliation.  As such, Plaintiff's case turns upon facially neutral events occurring between Plaintiff and his supervisors, as to which Plaintiff asks the jury to draw discriminatory and retaliatory inferences.  Defendants deny all of the discriminatory and retaliatory inferences, as well as many of the alleged facts, or Plaintiff's characterizations, of the events themselves.  Given the complete absence of direct evidence, the Court can reasonably expect Plaintiff, in his opening statement and presentation of evidence, to focus upon a barrage of irrelevant or marginally relevant matter designed to prejudice the jury against Defendants. The "context" in which the evidence will be presented, therefore, will focus not upon disputed material issues of fact, but rather will call upon the jury to make improper and irrelevant inferences based upon the suggestions (i) that some of Defendants' agents, with no apparent nexus to Plaintiff's claims, allegedly made racially insensitive remarks (not even confined to African-Americans), (ii) that other African-Americans not similarly situated to Plaintiff believe that they were discriminated against at diverse times by diverse supervisors on the basis of race, and (iii) that self-serving, unreliable "statistics" concocted by Plaintiff's selective and incomplete

---

[2]  See Opinion and Order, dated December 19, 2007, denying Defendants' motion for reconsideration ("Opinion and Order"), pp. 9-10.  The ruling authority in this Circuit at this time on marginally relevant evidence in discrimination cases is *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111 (2d Cir. 2007).  As this Court has summarized that case, the probative value of evidence "will depend on how clearly it demonstrates a discriminatory state of mind and how closely it is related to the employment decision at issue."  Opinion and Order, p. 9. Considering that none of the "evidence" addressed by Defendants' motions in limine 1 through 3 is related to the employment decisions concerning Plaintiff or tends to demonstrate any discriminatory state of mind directed toward Plaintiff by anyone involved in the decisions he claims were discriminatory or retaliatory, the "evidence" addressed by motions in limine 1 through 3 flunks the *Tomassi* test.

3

document-retention practices demonstrate that African-Americans do not get promoted by Defendants (notwithstanding that there is no effort to maintain or support a legitimate pattern or practice claim of racial discrimination here).

The Court has already observed that this "evidence" is, at best, "thin" and "sparse" as probative of discriminatory intent. Under these circumstances, conferring a license to use it at will, and without restriction, is pure prejudice. For that reason, even if it has marginal probative value, given the danger of biasing the jury against the Defendants from the outset of opening statements, it must be excluded under Rule 403.

As for Defendants' motion in limine 4, it appears now, given Plaintiff's representations in his response, that the issues raised by this motion have largely been resolved, and that the motion can simply be granted.

As for Defendants' motion in limine 5, Defendants respectfully submit that Plaintiff has had more than ample opportunity, pursuant to the Court's scheduling order, to seek amendment of his Complaint to include a claim of constructive discharge and has failed to do so. This case has been litigated through summary judgment and prepared for trial on the basis that there is no such claim. Plaintiff should not be permitted to raise it, and the attendant mitigation issues that go with it, at this late date.

For these reasons and those advanced more particularly below, Defendants' motions should be granted.

## II.    DEFENDANTS' MOTIONS SHOULD BE GRANTED.

### A.    Motion No. 1 – stray remarks.

In their motion no. 1, Defendants seek to exclude testimony by Daisy Early and Newton Paul or anyone else about purported remarks made by Defendant Wardrop and non-parties

Robert Bracco and Joe Vitanza.[3]   As Defendants have pointed out, the remarks Daisy Early attributes to Bracco were allegedly made in the spring of 2001; Bracco was not at the time in any line of supervision over Plaintiff; Bracco did not make any of the employment decisions Plaintiff challenges in any period remotely proximate to these alleged remarks; the remarks themselves are ambiguous banter arising directly out of an encounter between Bracco and Early; and the remarks were not made to or about Plaintiff and had nothing to do with him or any employment action affecting him.  Plaintiff disputes none of this, arguing only that Bracco was "in charge" of the Production Coordinator position he applied for in July 2002, more than a year after these remarks are supposed to have been made.  That is the only claimed connection between Plaintiff and these alleged ambiguous remarks.

The remarks Early attributes to Wardrop were supposedly made by Wardrop immediately after the Early-Bracco encounter and with clear reference to it.  This places the remarks six to nine months before the first of the incidents Plaintiff claims to have been discriminatory (which, in any event, did not involve Wardrop, but an application for a promotion to Kevin Costello), and two years before the performance review issues arising in 2003 (the first events involving Wardrop that Plaintiff claims were discriminatory).  These remarks, which have been denied, are entirely ambiguous banter, are even less race-focused than those supposedly uttered by Bracco, were not made to or about Plaintiff, and had nothing to do with any employment action concerning him.  The only connection between these remarks and Plaintiff is that Wardrop

---

[3] Plaintiff erroneously argues that Defendants seek to exclude testimony about remarks attributed to Defendant McDermott on January 22, 2004.  See Plaintiff's Memorandum of Law in Opposition to Defendants' Motions in Limine, Nos. 1 through 5, dated Jan. 11, 2008 ("Pl. Opp."), pp. 5-6.  Plaintiff is mistaken and has misread Defendants' papers.  These remarks, if they were made, were allegedly made by McDermott to Plaintiff in the course of their dealings with each other.  Defendants nowhere attempt to exclude this testimony.  Hence, Plaintiff's arguments about such remarks are irrelevant to these motions.

allegedly gave Plaintiff, more than two years later, less favorable performance reviews than he thought he deserved, but the claimed remarks have nothing to do with the performance reviews.

The remarks Paul attributes to Vitanza were supposedly made in February 2004 and consisted entirely of a reference by Vitanza to a malfunctioning alarm system as a "tar baby that I just can't get off my back." Aside from the fact that this expression, albeit often unthinkingly used, has long been widely employed in all manner of non-racially-focused events, there is no evidence that Vitanza ever uttered any other remark on any other occasion that was construed by anyone as being racially insensitive, and this remark was not made to or about Plaintiff, or with reference to any employment decision affecting him, or indeed with reference to any employment decision at all. Its only purported connection to Plaintiff is that, at the time, Vitanza was a manager in Plaintiff's division, but Plaintiff does not claim that Vitanza participated in any discriminatory or retaliatory action toward or concerning Plaintiff.

The remarks Paul attributes to Wardrop were supposedly made sometime in 2004. From the record, it is not possible to ascertain whether they were made at the beginning of 2004, when Wardrop had just come off being Plaintiff's immediate supervisor, or at the end of 2004, when Wardrop had not been Plaintiff's supervisor for more than a year. In any event, the claimed remarks are solely and exclusively about Wardrop's supposed attitude toward the dress of Hispanic youth and were directed to Manny Rivera, a Hispanic employee. They are utterly irrelevant to any issue in this action, which concerns Plaintiff's claims that he was discriminated against because he is African-American. Plaintiff does not claim to be Hispanic, does not claim he was discriminated or retaliated against because of Hispanic race or ethnicity, and does not claim to have been subjected to any criticism of his manner of dress. *See Welzel v. Bernstein*, 2005 U.S. Dist. LEXIS 16771, at *6 (D.D.C. Aug. 16, 2005) ("only discrimination or retaliation

of the same character and type as that is alleged is probative"). Moreover, the remarks were not made to or about Plaintiff, nor do they have any connection to any employment action concerning Plaintiff. Their only connection to Plaintiff is that Wardrop was, in an earlier time, his direct supervisor and is claimed to have discriminated against him during that period -- but not because he was Hispanic.

Contrary to Plaintiff's argument, Defendants do not seek to have this testimony excluded because it is categorized as "stray remarks". This testimony does indeed consist of "stray remarks", but that is not the reason for its exclusion. The rule in this Circuit concerning such remarks is that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. For example, remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi*, 478 F.3d at 115. "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Id.* In *Tomassi*, for example, the remarks claimed to be excludable because they were "stray" were explicitly about, or were thinly-veiled references to, the plaintiff's age, were made directly to her, were made by the supervisor who made the decision to terminate her employment, and were made to her by that supervisor not only frequently and throughout the course of her employment, but also at the time he informed the plaintiff of her termination. *Id.* at 112-14. Hence, the Second Circuit ruled that they could not be excluded simply because they might be categorized as "stray". *Id.* at 116. They were admissible because, after considering the speaker, timing, content, and context of the

remarks, the court concluded they were related to the decision-making process challenged by the plaintiff.[4]

On the other hand, a remark may be "'so oblique' in relation to [an employment action against plaintiff] that it could not reasonably be considered evidence of a discriminatory animus." *Brady v. Calyon Securities (USA)*, 2007 WL 4440926, at *18 (S.D.N.Y. Dec. 17, 2007). For verbal comments to constitute evidence of discriminatory motivation, there must be "a nexus * * * between the allegedly discriminatory statements and a defendant's decision." *Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*, 356 F. Supp. 2d 288, 295 (S.D.N.Y. 2005); *see Maqsood v. Bell Security, Inc.*, 2006 WL 1380259, at *7 (S.D.N.Y. May 22, 2006) (isolated and ambiguous remarks not evidence of an inference of discrimination where no causal connection between the remarks and the adverse employment action), *aff'd*, 2007 WL 2886735 (2d Cir. Sept. 28, 2007) (summary order).

Nothing like the facts in *Tomassi* obtains here. In *Carras v. MGS 782 Lex, Inc.*, 2007 WL 2710108, at *6 (S.D.N.Y. Sept. 12, 2007), Judge Griesa recently distilled the required implementation of *Tomassi* as follows:

> To determine whether a comment is a probative statement evidencing an intent to discriminate, the court considers a number of factors: (1) who made the remark, *i.e.*, whether he was a decisionmaker; (2) when the

---

[4] Plaintiff takes Defendants to task for purportedly misquoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50 (2d Cir. 1998). Defendants cite *Danzer* to say "[s]tray remarks [alone], even if made by a decisionmaker, do not constitute sufficient evidence [to support] a case of employment discrimination." Defendants' Memorandum of Law in Support of Their Motion in Limine No. 1 to Exclude Evidence of Stray Remarks, p. 8. Actually, as the Court has pointed out, the quotation should say not, "to support", but "to make out" a case of discrimination. *See Danzer*, 151 F.3d at 56. Plaintiff then contends that *Danzer* holds that "where other indicia [besides the 'stray remarks'] of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Pl. Opp., p. 5 (internal quotations and emphasis omitted). This may be what *Danzer* goes on to say, but it is clear under the later decision in *Tomassi* that categorization of the remarks as "stray" or "not stray" is not the dispositive issue, and that what truly matters is the relation the remarks have to the alleged discriminatory behavior. *Tomassi*, 478 F.3d at 115. Remarks must have a relationship to the decision-making process being challenged. *See Carras v. MGS 82 Lex, Inc.*, 2007 WL 2710108, at *6 (S.D.N.Y. Sept. 12, 2007). The abstract argument raised by Plaintiff from *Danzer* has no application to the testimony of Early and Paul, which is wholly collateral to and has no relationship to the decision-making processes Henry attacks.

remark was made in relation to the termination; (3) the content of the remark; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.

When those factors are applied to the remarks advanced as evidence here, it is clear that there is no basis for according any probative value to those remarks. None of them was made by a decision-maker to or about the Plaintiff or about, in connection with or proximate to any decision made by such a decision-maker concerning the Plaintiff. They simply have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. They are therefore irrelevant and inadmissible.[5]

Even if these remarks had some marginal relevance at trial (a question apart from their impact, when joined with other evidence, in meeting the burden to surmount summary judgment[6]), Plaintiff cannot overcome the severe and distracting prejudice they would create in the jury's deliberations. We have already demonstrated above that, in combination with the other evidence Defendants seek to exclude, the distracting and prejudicial impact upon the jury

---

[5] Plaintiff's reliance upon *Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) and *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81 (2d Cir. 1996) for the proposition that "actions or remarks by decision-makers that tend to show a 'discriminatory animus' may lend support to the inference of a discriminatory motive" is misplaced here. *See* Pl. Opp., p. 4. *Gregory* arose on a motion to dismiss, so there were no evidentiary issues in the case, and it was a case where the remarks were made continuously, with escalating intensity, directly to the plaintiff, in the context of the supervisor-employee relationship, and by the supervisor who took the challenged employment actions against her and fired her. *Gregory*, 243 F.3d at 697. In *Chertkova* the discriminatory animus the court was talking about was clearly discriminatory animus by the decision-making supervisor reflected in hostile remarks directed to the plaintiff. *Chertkova*, 92 F.3d at 89-91. These cases are simply inapposite to the facts of the proffered testimony of Early and Paul.

[6] At summary judgment, the plaintiff is "entitled to every reasonable inference in [his] favor." *Hamilton v. Mount Sinai Hosp.*, 2007 WL 4545865, at *14 (S.D.N.Y. Dec. 20, 2007). "Summary judgment must be denied where * * * there is a 'factual issue as to which the nonmovant's (plausible) interpretation must, at summary judgment, be accepted.'" *Quinby v. WestLB AG*, 2007 WL 1153994, at *10 (S.D.N.Y. Apr. 19, 2007) (quoting *Danzer*, 151 F.3d at 54). Such a presumption in favor of the plaintiff obviously does not apply to the balancing exercise required under Rule 403.

would be devastating and completely unwarranted given the material facts Plaintiff must actually prove to support his specific promotion and retaliation claims.[7]

Here, the remarks to be testified to by Early and Paul contribute nothing in making it more or less probable that Plaintiff was denied the specific promotions he sought, received the specific performance evaluations he objects to, or was subjected to an alleged "demotion" and unwarranted discipline because of his race. Their probative value concerning the material issues of fact in this case is, if not nil, utterly marginal. They have nothing to do with the employment actions Plaintiff complains about. Their only purpose is to smear the Company, and in the case of two widely-separated instances (one of which has nothing to do with African-Americans) concerning Defendant Wardrop, they would impute to him and the Company undifferentiated discriminatory animus against indefinite targets. In the context of this case, such tactics are the essence of unfair prejudice, confusion of the legitimate issues before the jury, and distraction from the material facts.

Since that is the only purpose for which these remarks can be offered, there is no question that the prejudice to be occasioned by their submission to the jury far outweighs any probative value they might have.[8]

---

[7] Plaintiff objects to Defendants' reliance in their Rule 403 argument upon *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir. 1984), on the ground that the decision is old. Plaintiff cites no authority to indicate that it does not remain good law. Plaintiff further objects that the facts in *Haskell* involved only four statements over a fifteen-year period and that the case does not address Rule 403 considerations. Plaintiff simply misreads *Haskell*. In fact, the case involved arguably age-related comments (it was an age case), made by the decision-maker at the time the termination was communicated to the plaintiff, which the court found "ambiguous" in the context of the other facts of the case. *Id.* at 120. More importantly, while there was no attempt to exclude the pejorative statements that were contemporaneous with the termination, as to the older statements, which the Second Circuit held it was error to admit, that court, after holding those older remarks not relevant to the issue of whether the plaintiff was terminated because of his age, went on to say: "Moreover, there is a substantial likelihood that they prejudiced the jury against the Company in Haskell's favor. Accordingly, we agree that it was error to have admitted them." *Id.* Hence, contrary to the Plaintiff's representation, the Second Circuit did rely upon a Rule 403 analysis in *Haskell*. Furthermore, it is obvious that the remoteness in time of the original utterance of the remarks does not address the prejudice that the presentation of those remarks to the jury would create at the time they are submitted in evidence. *Haskell*, therefore, is good authority for Defendants' motion.

**B.    Motion No. 2 – "me-too" claims.**

Defendants' motion no. 2 seeks to exclude evidence of the personal discrimination claims of Daisy Early, Newton Paul and other individuals on Plaintiff's witness list who may be called to testify about their own complaints of discrimination. None of these individuals has personal knowledge of the employment actions or decisions concerning Plaintiff, none of them is or was similarly situated to him, and the events they complain about are discrete employment actions specific to them.

In opposing this motion, Plaintiff does not deny any of the facts advanced by Defendants in their moving papers demonstrating that these witnesses were not similarly situated to Plaintiff. In addition, Plaintiff does not dispute that none of these witnesses has any personal knowledge of the employment actions taken toward Plaintiff. *See* Fed. R. of Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") Instead, Plaintiff argues only that "me-too" evidence is not subject to categorical or blanket exclusion, and that Defendants are contending for an improper "same supervisor" limitation on the introduction of "me-too" evidence. The first of these arguments does nothing to advance the resolution of the anticipated testimony of the

---

[8] Plaintiff also challenges Defendants' reliance upon Fed. R. Evid. 404 with respect to the comments that Early and Paul attribute to Wardrop. Plaintiff argues that evidence of character is admissible to prove intent or motive. While Plaintiff is correct in this general proposition, the intent of Wardrop in making the two comments attributed to him, one in the spring of 2001, and one, about the dress of an employee who was Hispanic, at some indefinite time in 2004, has no relevance to his actions or intent toward Plaintiff. Wardrop's actions that Plaintiff complains about were confined almost entirely to 2003 and concerned only specific performance reviews in that period. Because they have no relevance to Wardrop's intent with respect to his actions impacting Plaintiff, the remarks are simply a collateral attack on Wardrop's character, and, as such, they are inadmissible under Rule 404. *See Welzel,* 2005 U.S. Dist. LEXIS 16771, at *5 ("Evidence of other 'bad acts' is never admissible simply to establish a propensity to engage in similar acts") (internal citations omitted).

11

witnesses Defendants is addressing here.  The second is a misapprehension of Defendants' argument.[9]

Defendants do not argue for a categorical "same supervisor" limitation.  Indeed, witness Early claims to have had Defendant Wardrop as one of her managers.  But Early was a Pharmaceutical Operator, and her complaints are about interactions in early 2001 with Robert Bracco, not Wardrop, concerning a requested shift change and downstream events from that incident in her own department, as a result of which, she claims, she ultimately quit.  *See* Early Aff. ¶¶ 3-6; Early Complaint ¶¶ 9-51.

Paul was a Senior Compliance Coordinator in the Compliance and Investigations Department, and his complaints are about his observation of Joe Vitanza's reaction to an alarm system malfunction and about his failure to obtain a promotion in May 2005 to the position of Compliance Manager, a decision made by Maura Corcoran, a director in the Compliance Department of the Vaccines Group.  *See* Paul Aff. ¶¶ 3-7; Paul Complaint ¶¶ 5-36.

Both Paul and Early can be expected to give testimony heavily reliant upon their subjective impressions of being discriminated against.  While Early may at one point have been working in an organization where Wardrop served as a manager, neither she nor Paul ever reported to Wardrop, complained about performance evaluations by Wardrop, ever sought the promotions Plaintiff sought (or, in Early's case, sought any promotions), had the qualifications for any of those promotions, claimed any discrimination in the Organizational Cascade, or was placed on a Performance Improvement Program.  Indeed, in Early's case, as revealed by her civil

---

[9] Plaintiff also argues that "the Defendants have absolutely no idea what the witnesses they identified in their memorandum of law will testify to," as a basis for deferring decision on the issues presented by this motion. Pl. Opp., p. 10. This argument is a cheeky indulgence in the advantages of trial by ambush, which the entire structure of the Federal Rules is designed to prevent. Defendants respectfully submit that, at this late date, it is Plaintiff's obligation not to engage in shadow-boxing when an issue has been raised, but to put his evidentiary cards on the table so that the issue can be resolved.

complaint, there are disciplinary issues, arising in connection with a supposed incident of physical violence between her and a co-worker, of a type that is completely absent from Plaintiff's claims. *See* Early Complaint ¶ 48. Nor did Plaintiff work in Paul's Department or seek the promotion Paul sought, or any promotion, from Maura Corcoran. In short, the only things that Plaintiff, Early and Paul have in common are that they are all Black (Paul is Haitian-American) and they all worked for Wyeth.

The cases cited by Plaintiff that admit "me-too" testimony generally allow such testimony from individuals claiming to be affected by the same employment event, such as a wide-ranging reduction in force, or a demonstrated policy, pattern or practice of discrimination.[10] *See, e.g., Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 94-95 (7th Cir. 1985) (plaintiff claimed responsibilities were reduced in an attempt to impel him to retire and was allowed to bring on testimony of two other employees claiming they retired because their job duties were reduced as part of a practice to encourage older employees to retire); *Spulak v. K-Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990) (testimony allowed from two former employees of another of defendant's stores in the same state where their terminations were temporally proximate to the plaintiff's, the plaintiff's forced retirement was invoked by the other employees' supervisor in an attempt to encourage them to retire, and the circumstances of the terminations of all three were so similar as to be probative of a practice of easing out older workers); *Kneisley v. Hercules*,

---

[10] Plaintiff's argument that the testimony about Bracco and Vitanza is relevant to show "management's general discriminatory animus" (Pl. Opp., pp. 6-7) is non-specific to either the basis of the purported "animus" or the arena in which it supposedly operated. It cannot meet the requirements of *Tomassi*. Such attempts to evoke a general "corporate culture of discrimination" from purportedly inappropriate comments by non-decision-makers without evidence of any relevant discriminatory policy or practice must fail. *See Honeck v. Nicolock Paving Stones of New England*, 2006 WL 2474950, at *9 (D. Conn. Aug. 25, 2006), *aff'd*, 2007 WL 2719058 (2d Cir. Sept. 19, 2007) (summary order). There is no claim or evidence of a policy, pattern or practice of race discrimination in this case. *Cf.* Opinion and Order, dated July 26, 2007, granting in part and denying in part Defendants' motion for summary judgment, pp. 51-52 ("plaintiff's conclusory allegations that 'A culture of discrimination pervades Wyeth's Pearl River facility' * * * do not suffice to convert plaintiff's allegations of discrete discriminatory acts into a 'pattern or practice' claim for statute of limitations purposes, and the plaintiff does not appear to so argue.").

*Inc.*, 577 F. Supp. 726, 731 (D.Del. 1983) (plaintiff forced to retire in early retirement plan/reduction in force permitted to bring on testimony of four other employees forced to retire at same time in same reduction in force plan); *see also Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223, 1228 (10th Cir. 2006) (age discrimination – five other employees terminated in same company-wide reduction in force), *cert. granted*, 127 S.Ct. 2937 (2007).[11]

Where the proffered witnesses are not similarly situated, however, the view of the cases is different. In *Haskell*, where the material issue was the reason for the individual plaintiff's termination and whether it was motivated by his age, the Second Circuit held that the testimony of six other former employees of the company about their own terminations at different times was inadmissible because it was insufficient to show a pattern or practice of discrimination and thus was not relevant to whether the plaintiff was terminated because of his age. *Haskell*, 743 F.2d at 122. In this case, as noted above, there has been no effort by Plaintiff to demonstrate a pattern or practice of race discrimination. Moreover, the *Haskell* Court held it error to allow the other employees to give subjective evaluations of their own and their former colleagues' job performance without furnishing any basis for the evaluations. *Id.* at 121.

In *Weir v. Litton Bionetics, Inc.*, 1987 WL 12354, at *1 (D.Md. Mar. 16, 1987) each of two former employees claiming age discrimination in their terminations sought to testify in the other's trial. The court noted that they were employed at separate divisions, were terminated several months apart, and the termination decisions were independently made by different supervisors. *Id.* The court, in severing the claims for trial, held:

> It would be prejudicial to defendant were the claims of plaintiff Weir and the claims of plaintiff Sibinovic to be tried at the same time. The work history of each plaintiff was quite different, and the claims and defenses of

---

[11] *Mendelsohn* is on review before the Supreme Court of the United States, has been argued, and a decision is expected this term.

each can be fairly considered only in the light of the separate work history of each.

*Id.* at \*2. The court then continued, relying, in part, upon the Second Circuit decision in *Haskell*:

> For these same reasons, it is equally clear that Weir and Sibinovic should not be allowed to testify at the other's trial concerning the circumstances surrounding his or her own termination. Were Weir and Sibinovic allowed to give such testimony, there would likely arise the same potential dangers of jury confusion and prejudice to the defendant that caused the Court previously to sever the trial of each plaintiff's claims.

> \* \* \* \* \*

> [T]here would arise the very strong likelihood that the jury would confuse the issues and facts which relate to the Weir termination with those which relate to the Sibinovic termination. The work history of each was quite different. If Sibinovic testifies at the Weir trial, the jury could very well be misled in deciding the issues in that case.

> Considerations of delay and waste of time also apply here. Once it had come to the attention of the jury at the Weir trial that Sibinovic herself had been terminated, it would be necessary for defendant to present at that trial the evidence relied upon by way of defense in the Sibinovic trial.

> \* \* \* \* \*

> When this marginally relevant evidence is compared to that which defendant would necessarily have to produce to rebut the resulting prejudicial inferences, it is apparent that the probative value of such evidence is substantially outweighed by other considerations. \* \* \* Moreover, if the evidence were admitted, the inference would be that other older and senior employees had at or about the time of Weir's termination been likewise laid off. To rebut the prejudicial inferences which the jury might derive from the evidence in question, defendant would be required to present to the jury the details of all terminations of senior employees at or about the time of the Weir and Sibinovic layoffs. In each instance, defendant would necessarily have to present evidence to show that each such layoff was not for discriminatory reasons. The additional evidence thus presented would tend to divert the jury's attention from the much narrower issue before it in the Weir trial, namely whether plaintiff Weir had been terminated in 1984 because of his age.

*Id.* at 3.

The same considerations apply to the disparate circumstances of Plaintiff and his proffered witnesses, and similar considerations led the court to exclude "me-too" evidence in *Moorhouse v. Boeing Co.*, 501 F. Supp. 390 (E.D.Pa.), *aff'd*, 639 F.2d 774 (3d Cir. 1980). There, the plaintiff attempted to bring in five additional employees to testify about their claims that they were terminated on the basis of age. The court refused to allow the testimony, saying:

> Had the Court permitted each of the proposed witnesses to testify about the circumstances surrounding his own lay off, each, in essence, would have presented a prima facie case of age discrimination. Defendants then would have been placed in the position of either presenting the justification for each witnesses' lay off, or of allowing the testimony to stand unrebutted. This latter alternative, of course, would have had an obvious prejudicial impact on the jury's consideration of Moorhouse's case. To have pursued the former option, defendants would have been forced, in effect, to try all six cases together with the attendant confusion and prejudice inherent in that situation.

*Id.* at 393. The court added: "even the strongest jury instructions could not have dulled the impact of a parade of witnesses, each recounting his contention that defendant had laid him off because of his age." *Id.* at 393, n.4. Moreover, the *Moorhouse* court rejected the plaintiff's attempt to establish a discriminatory pattern or practice solely by having a collection of individual claimants "recount the isolated actions taken against them individually." *Id.* at 394.

The same considerations apply to the disparate circumstances of Plaintiff and his proffered witnesses here, and Plaintiff's collateral witnesses should not be allowed to testify about their own individualized claims of discrimination. The testimonial interludes Plaintiff intends from these witnesses can only result in spawning trials within the trial.

C.    <u>Motion No. 3 – statistics</u>.

Defendants' motion no. 3 seeks to exclude self-serving, selectively-retained information Plaintiff puts forth as purported "statistics" of the relationship between race and promotions at Wyeth. As Defendants have demonstrated, really without any dispute as to the facts, the

fundamental problem with these so-called "statistics" is that the sample is invalid, there is nothing systematic about this information, and nothing to indicate it has any relationship to the available promotions Plaintiff was qualified for, sought or expressed interested in. Plaintiff responds to the demonstrated deficiencies in his "statistics" merely with general propositions that statistical evidence may be considered in conjunction with other evidence. Again, while true as a general proposition, the statistics must have some integrity as such and be relevant to the issues to be determined. The Defendants have demonstrated that Plaintiff's "statistics" do not meet these requirements and could only prejudice the jury by the introduction of distracting irrelevancies.

The cases Plaintiff relies upon do not help his cause or rehabilitate his deficient "statistics". In *Sorlucco v. New York City Police Dep't*, 971 F.2d 864 (2d Cir. 1992), the issue, first of all, was whether there was a "policy" or "custom" under 42 U.S.C. § 1983 sufficient to meet the requirements of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Sorlucco*, 971 F.2d at 870. The issue, as the decision reveals, is simply not the same as whether there is a pattern or practice of discrimination under Title VII. In addition, in *Sorlucco*, evidence of how the plaintiff's own claims were repeatedly handled (or not handled) provided compelling supporting evidence of the defendant's custom of mishandling claims of sexual violence and sexual harassment from women officers. Moreover, the study introduced in *Sorlucco* involved a systematic review of all of the pertinent data from a five year period. *Id.* at 871-73. The case is simply inapposite to Plaintiff's fragmentary, avocational and unsystematic collection of information here. Likewise, in *Ingram v. Madison Square Garden Center, Inc.*, 709 F.2d 807 (2d Cir.), *cert. denied*, 464 U.S. 937 (1983), the statistics were a complete analysis of the available data, and the comparison, since the jobs at issue were unskilled, was to the racial

17

composition of the general, available workforce. *Id.* at 810-11. Again, the facts are inapposite to Plaintiff's *ad hoc* efforts here. Finally, *Watson v. Kansas City*, 857 F.2d 690 (10th Cir. 1988) raises issues similar to those in *Sorlucco* and is similarly inapposite.[12]

For the reasons Defendants have already demonstrated, Plaintiff's "statistics" have no integrity as such. They can only be used in an attempt to mislead and confuse the jury with "statistical" speculation predicated upon an invalid sample. Plaintiff has never attempted to allege, discover or develop a proper statistical pattern or practice case based upon race and promotions at Defendant Wyeth. He should not now be allowed to attempt to assert any statistical disparities by the backdoor appeal to a self-selected, incomplete and totally misleading sample of promotion announcements.

### D.   Motion No. 4 – affidavit, declaration and deposition testimony.

It appears from Plaintiff's response that the parties are now in agreement on the issues raised by this motion, and that it can be granted in the terms in which it is made. Defendants would only note that this motion was made because Plaintiff, in response to a directive from Judge McMahon that Plaintiff identify the evidence he intended to put on as part of his case in chief, listed the deposition transcripts, declarations and affidavits of sixteen people as trial exhibits. Plaintiff's unambiguous concession now that he will seek to use these documents only within the Rules of Evidence obviates most of Defendants' objection. However, it is difficult to see any circumstances other than impeachment or the occasion for prior consistent statements that would allow the use as former testimony of Plaintiff's own deposition or affidavit, or the

---

[12] Plaintiff contends that Defendants "heavily rely" upon *Haskell*, 743 F.2d at 113, for their argument against Plaintiff's "statistics". Pl. Opp., p. 12. Interestingly, Defendants did not cite *Haskell* in connection with their motion no. 3, although they certainly could have. *Haskell* rejects a collection of anecdotes as valid and probative statistical evidence because, "[f]or such statistical evidence to be probative * * * the sample must be large enough to permit an inference that age was a determinative factor in the employer's decision." *Haskell*, 743 F.2d at 121; *see Weir*, 1987 WL 12354, at *4-5 (sample much too small to yield meaningful generalizations).

depositions, declarations or affidavits of any of the other persons he has identified except for the depositions of McDermott and Wardrop who are adverse parties. If, indeed, Plaintiff intends to call those witnesses to testify by their depositions, then Defendants respectfully submit that Plaintiff should be required to identify in advance the specific passages of testimony he may seek to introduce so that Defendants may have the opportunity to assert objections in advance of the use of the testimony.

### E.    Motion No. 5 – claim for constructive discharge.

Defendants motion no. 5 is addressed to Plaintiff's apparent attempt, at this late date, to inject a claim for constructive discharge into this action. Plaintiff has countered none of Defendants arguments asserted in furtherance of this motion, arguing only in generic terms that amendment of pleadings is liberally permitted.[13] Notwithstanding anything else he says, Plaintiff simply ignores the fact that the Court's Civil Case Management Plan and Order of February 10, 2006, set an absolute deadline for the amendment of pleadings by February 10, 2006, and for the close of discovery by August 10, 2006. Plaintiff never sought to extend those deadlines. Plaintiff never sought to amend his complaint by the applicable deadline, even though, by February 10, 2006, he was clearly aware of all of the facts that might support a claim of constructive discharge. Defendants relied upon Plaintiff's complaint in the form it was in making their motion for summary judgment, as to which Plaintiff raised no issue of constructive

---

[13] Plaintiff further contends that his belated attempt to raise a constructive discharge claim is governed by Fed. R. Civ. P. 15(d) (supplemental pleadings) and not Fed. R. Civ. P. 15(a)-(b) (amended pleadings). Regardless of the merits of this contention, courts have concluded that the inquiry is essentially the same in both cases. *See, e.g., Novak v. Nat'l Broad. Co.*, 724 F. Supp. 141, 145 (S.D.N.Y. 1989). Moreover, just as leave of the court is required for the amendment of any pleading after a responsive pleading has been served, a party seeking to file a supplemental pleading covering a transaction occurring subsequent to the filing of the original pleading must do so "[o]n motion and [with] reasonable notice" and on such terms that are "just". Fed. R. Civ. P. 15(d).

discharge.[14]   It is well past time to attempt to inject this claim, with its attendant issues of mitigation and related consequential emotional distress, now, after discovery has long-since been completed and closed.

The grant or denial of leave to amend is within the discretion of the district court. *Ross v. Global Business Sch., Inc.*, 2001 U.S. Dist. LEXIS 13400, at *23 (S.D.N.Y. Aug. 30, 2001). "'[T]he district court plainly has discretion to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant.'" *Id.* at *23-24 (citation omitted).   A court is entitled to enforce its prescribed motion schedule. *Id.* at *11-15.   Scheduling orders "are not to be modified except upon a showing of good cause." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) (citing Fed. R. Civ. P. 16(b)).   The purpose of Rule 16 is "to offer a measure of certainty in pretrial proceedings, ensuring that 'at some point both the parties and the pleadings will be fixed.'" *Id.* at 340 (citations omitted).   "Disregard of the [scheduling] order would undermine the court's ability to control its docket." *Id.*   "[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Id.*   Plaintiff has never made any attempt to demonstrate good cause for his failure to make a timely attempt to amend the complaint to assert a claim for constructive discharge after his

---

[14] Plaintiff attempts to salvage his tardy claim by arguing that Defendants' counsel was put on notice of the basis of his claim for constructive discharge by virtue of Plaintiff's deposition testimony. *See* Pl. Opp., p. 14. In *McCarthy v. The Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007), the Second Circuit considered, and rejected, this very argument. In upholding the trial court's denial of leave to amend, the court concluded that the plaintiffs' raising of the basis of the new claim in the context of declarations and deposition testimony was insufficient to deprive defendants' of their right to prepare for trial based upon the contours of the complaint. *Id.* at 201-202. Thus, the question is not what a "well-versed lawyer" may deduce from Plaintiff's deposition testimony, *see* Pl. Opp., p. 14, but rather whether Plaintiff's pleadings provide adequate notice of his claims.

employment ended on February 2, 2006. Nor is such a demonstration possible now. From his papers, Plaintiff's only argument could only be that he just never got around to it.

Finally, on a point which goes to the burden on Defendants and the Court in allowing this claim to be belatedly asserted, Plaintiff relies upon *Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003), for the proposition that his only burden on a constructive discharge claim is to demonstrate that his decision not to return to work "was objectively reasonable under the circumstances." Pl. Opp., p. 14. This misstates *Terry* and improperly minimizes his burden. What *Terry* really says is that, to make out such a claim, the employee must prove that "his employer, rather than discharging him directly, *intentionally* creates a work atmosphere so intolerable that he is *forced* to quit involuntarily." *Id.* at 151-152 (emphasis added). Indeed, in *Terry* the plaintiff introduced evidence to show that his employer purposefully harassed him continuously and on a nearly daily basis. *Id.* at 149. The Plaintiff's burden, as given exposition in *Terry*, is no different from the formulary of *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (constructive discharge requires that plaintiff show employer "deliberately" made employee's working conditions so intolerable "that a reasonable person in the employee's shoes would have felt compelled to resign"). Plaintiff admittedly abandoned his employment at Wyeth after a six-month medical leave because he did not want to submit medical justification for his continued absence. As such, the attempt to amend the complaint to assert a claim for constructive discharge under the governing law would, in any event, be a futility.

## III.  **CONCLUSION.**

For the foregoing reasons, Defendants respectfully request that the Court enter orders granting their motions in limine 1 through 5.

DATED:     New York, New York
                January 22, 2008

                            Respectfully submitted,

                            Michael Delikat
                            James H. McQuade
                            Heather Glatter
                            ORRICK, HERRINGTON & SUTCLIFFE LLP
                            666 Fifth Avenue
                            New York, New York  10103
                            Telephone:  (212) 506-5000

                            By _____
                               James H. McQuade

                            Attorneys for Defendants Wyeth Pharmaceuticals, a
                            Division of Wyeth, Walter Wardrop and Michael