# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
---------------------------------------------------------------x   Index No. 394/07
DAISY EARLY,

                Plaintiff,

      -against-                                  COMPLAINT

WYETH PHARMACEUTICALS, INC.
WALTER WARDROP, and ROBERT BRACCO,         FILED MC

                Defendants.                         JAN 1 2 2007
---------------------------------------------------------------x   ROCKLAND COUNTY
                                                                                 CLERK'S OFFICE

Plaintiff, DAISY EARLY, by and through her attorneys, The Law Office of Steven A. Morelli, complaining of the Defendants herein, alleges as follows:

## PRELIMINARY STATEMENT

1. Approximately 90% of upper management at the Wyeth Pharmaceuticals facility in Pearl River, New York is white. Fraternization, characterized by discriminatory favoritism, has created an environment at Wyeth whereby black employees are excluded from promotion into upper management, paid less, harassed, and retaliated against due to nothing more than the color of their skin, and their complaints go unanswered.

2. This is a civil action for violation of state protected rights brought pursuant to New York Executive Law § 296 and 42 U.S.C. § 1981, and contains any other causes of action that can reasonably be inferred from the facts set forth herein. Plaintiff is seeking damages based upon Defendants' unlawful discrimination causing Plaintiff to suffer financial, physical, emotional, and psychological damages.

## PARTIES

3. Plaintiff DAISY EARLY, at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Rockland.

4. Upon information and belief, Defendant WYETH PHARMACEUTICALS, INC. ("Wyeth") was and still is a foreign corporation duly authorized to do business in New York, with an office located in Pearl River, County of Rockland, State of New York.

5. Defendant ROBERT BRACCO ("Bracco") is an individual who is, upon information and belief, a resident and domiciliary of the State of New York.

6. Bracco, at all times hereinafter mentioned, was, and upon information and belief still is, an employee of Wyeth. Bracco is a white male.

7. Defendant WALTER WARDROP ("Wardrop") is an individual who is, upon information and belief, a resident and domiciliary of the State of New York.

8. Wardrop, at all times hereinafter mentioned, was, and upon information and belief still is, an employee of Wyeth. Wardrop is a white male.

## ALLEGATIONS COMMON TO ALL CLAIMS

9. American Cyanamid, a corporation, was taken over by American Home Products, a corporation, in 1996.

10. American Home Products became Wyeth in or about 2003.

11. All references to "Wyeth" in this Complaint are to be construed as also referring to American Cyanamid or American Home Products to the extent that any allegations refer to events that occurred before 2003.

12. Plaintiff is a 55 year-old black female.

2

13. Wyeth hired Plaintiff on October 19, 1976 as an Inspector.

14. In 1982, Plaintiff was hired as a Pharmaceutical Operator through the Wyeth "bidding" process.

15. All of Plaintiff's supervisors, with one exception, were white.

16. In or about the spring of 2001, the Operators were forced to work overtime on a Saturday.

17. The Operators were supposed to be scheduled to work the Saturday shift that mirrored their normal shift.

18. Plaintiff normally worked the day shift as an Operator.

19. Plaintiff requested that her Saturday shift be switched with the midnight shift because Plaintiff had just received custody of her grandchildren and needed to accompany them to certain programs during the day designed to ease their custody transition.

20. A social worker faxed Defendant Bracco a letter to this effect in support of Plaintiff's request to switch her forced overtime shift.

21. Plaintiff's request for a shift change was granted. However, upon arriving to work the midnight shift, Plaintiff discovered that she was not being assigned to her normal production line (Train #2), but was being assigned to work on Train #1 despite that she had the highest seniority on the shift.

22. While Plaintiff was working on Train #1, she discovered that the product (Centrum®) was not flowing properly. Plaintiff examined the screen above the machine and discovered pieces of wire and string which contributed to the poor flow of the product.

3

23. Plaintiff removed the debris and took it to her supervisor, Renardz Sylvan. Plaintiff reported the poor product flow to Mr. Sylvan twice during the shift.

24. The following week, Plaintiff was denied a request for a shift change, and the shift change paperwork given to Plaintiff by her supervisor stated that the reason for her denial was "overall poor work performance."

25. Plaintiff never had one incident of "poor" work performance in her 29-year career with Wyeth.

26. Plaintiff called Jerry Gass, a union shop steward, to report the incident.

27. Mr. Gass requested the paperwork for the stated reason that he wished to make a photocopy of it.

28. Mr. Gass took the paperwork and never returned it to Plaintiff.

29. Plaintiff approached Mr. Gass the next day regarding the document, and Mr. Gass said, "Let it go. There's nothing in your folder so what difference does it make?"

30. Plaintiff was extremely upset about the handling of this situation because she believed the denial of her shift change was due to a discriminatory reason; and Mr. Gass's retention of the document that Plaintiff was complaining about denied Plaintiff the opportunity to lodge a complaint.

31. Plaintiff approached Defendant Bracco with a different union shop steward, Jeff Gathers, to inquire about the denial of her shift change.

32. Defendant Bracco then suddenly changed his reason for a denial from "overall poor work performance" to "supervisory harassment," stating "You harassed Renardz all night."

4

33. Plaintiff stated that that reason was false and that she believed she was being discriminated against since other white similarly situated employees were granted their requests for shift changes. For example, one employee, Sue Tompkin (white) was granted a shift change for a month so that she could sunbathe during the daytime hours.

34. When Plaintiff gave this example to Defendant Bracco, he stated, "So sue me. All my supervisors are black so you can't prove discrimination."

35. Defendant Bracco then yelled to Mr. Gathers, "Get her out of my office."

36. Immediately after this incident occurred, Plaintiff began to experience physical symptoms of stress and anxiety, including shortness of breath, heart palpitations, and irritable bowel syndrome, requiring the care of a doctor. The doctor explained that since all her stressful situations at work remained unresolved, they were being internalized and now coming out as physical symptoms.

37. The doctor gave Plaintiff medication for the anxiety, and Plaintiff took a two-week medical leave from work.

38. During the medical leave, Plaintiff updated Ms. Sheila Burke, a Wyeth Medical Department employee, of her condition, and Ms. Burke stated that she would inform the Wyeth Labor Relations Department about the incident with Defendant Bracco and Plaintiff's subsequent medical problems.

39. It is unknown at this time whether Ms. Burke followed up on her representation.

40. A few weeks after Plaintiff returned to work, Defendant Bracco was ill, and he stated to another employee, "Daisy tried to put voodoo on me but it didn't work."

5

41. Upon Defendant Bracco's return to work, he visited Crystal Bullock's inspection area and again stated, "Daisy tried to put voodoo on me."

42. Defendant Bracco then began to show Ms. Bullock certain parts of his body where Plaintiff supposedly inflicted voodoo on him.

43. One morning when Plaintiff was coming into the Wyeth building, Defendant Wardrop, the head of Train #1 production department, stopped Plaintiff in the hallway and said, "Daisy, what are you doing at home? Sticking pins in a doll? What have I ever done to you?"

44. Plaintiff reported this incident to Michael Todd Davenport, Centrum® Production Coordinator, whose only response was, "If you knew all of the things that had gone wrong that night, you would understand the statement," implying that such a statement was acceptable to make based upon the events of the night before.

45. Plaintiff then retorted, "The only way I would be able to understand that statement is if he stopped everyone who was coming into work that morning and told them the same thing."

46. Plaintiff then told Mr. Davenport that, "If anyone else approaches me and says anything about voodoo, I am going to go see a lawyer."

47. Mr. Davenport then stated that he would go and speak to Defendant Bracco about what Plaintiff had said.

48. Since this incident, Plaintiff has been the subject of retaliatory behavior by Defendant Bracco who uses his supervisors to target Plaintiff. For example:

   a. In or about the spring of 2004, Ken Flowers, a white day shift supervisor with no college degree, stated that Plaintiff had intentionally hit him with a door while

6

working on the production floor. Fred Abatangelo (a white compression shop supervisor with no college degree) supposedly witnessed the incident. This incident never occurred and these allegations were completely false. Plaintiff was supposed to be suspended, but the situation was abated when Plaintiff threatened to produce witnesses who would testify that the incident was entirely fabricated.

b. From the time that Plaintiff complained to Mr. Davenport about the "voodoo" incidents until the day she was forced to quit her job, Plaintiff was assigned to work in rooms by herself on a regular basis that would normally be operated by two operators.

c. Various supervisors would target Plaintiff and ask her to give them whatever was in her pockets without a warning.

d. Various supervisors would threaten her with suspension from work due to production paperwork errors while other white similarly situated employees would not be disciplined and would be given the opportunity to correct any paperwork errors.

e. Various supervisors would actually hide behind machinery and scrutinize Plaintiff's work, looking for something wrong with it. Plaintiff was, however, aware of the supervisors' presence, and it made her work environment extremely uncomfortable knowing that she was being watched.

f. At the end of Plaintiff's shifts, she was told that she could not leave until another employee relieved her while other white similarly situated employees were permitted to leave without being relieved. Plaintiff was aware that the supervisors would watch her from afar to ensure that she did not leave without being relieved,

7

which increased Plaintiff's level of anxiety and contributed to an uncomfortable working environment.

g. Plaintiff was denied the opportunity to work overtime. Plaintiff spoke to Wardrop on several occasions regarding this situation to no avail. Plaintiff also tried to complain to Joseph Vitanza about the unjustness of overtime allotments, which also resulted in no corrective action being taken. The denial of overtime opportunities continued for months until Plaintiff was told to go to the Labor Relations Department by Jennifer Hallock (white female supervisor), who was acting on behalf of Wardrop. While she was there, Wardrop informed her that Jose Torres was being investigated for, *inter alia*, his unfair allocation of Plaintiff's overtime and workload.

49. Plaintiff told certain individuals in Labor Relations about the unfair allocation of overtime, work assignments, and her attempts to correct the situation. After meeting with Labor Relations employees, an investigation of Mr. Torres ensued. After several weeks, Plaintiff was summoned to Wardrop's office and was told that Mr. Torres had been terminated, and that Plaintiff should not feel guilty about this outcome because he had "brought it upon himself."

50. On October 7, 2005, Plaintiff terminated her employment with Wyeth because of the excessively stressful environment there and because she felt like Defendants Bracco, Wardrop and their supervisors were discriminating against her due to her race and ethnicity.

51. As a result of the aforementioned conduct, Defendants caused Plaintiff to suffer loss of earnings and accrued benefits, in addition to great pain and humiliation, as well as

8

physical and emotional damages. She was forced to take early retirement and forfeited 30% of her pension. In fact, Wyeth Management threatened Plaintiff upon her resignation that she would be forced to retire 1 day before her 55th birthday, which would have disqualified her for Medicaid benefits. Luckily, Wyeth did not follow through on this threat.

## CLAIMS FOR RELIEF

### *As Against Defendant Wyeth*

52. By reason of the foregoing, Defendant has unlawfully discriminated against Plaintiff in her compensation, terms, and/or privileges of employment, and has denied her the same rights to contract and employment as enjoyed by white persons, because of her race, in that she was subjected to adverse employment actions; and a hostile working environment and an ongoing atmosphere of adverse acts which went unabated in violation of N.Y. Exec. Law § 296 and 42 U.S.C. § 1981.

53. By reason of the foregoing, Defendant has unlawfully discriminated against Plaintiff in her compensation, terms, and/or privileges of employment, and has denied her the same rights to contract and employment as enjoyed by white persons, in retaliation for making a complaint of discrimination, in that she was subjected to adverse employment actions; and a hostile working environment and an ongoing atmosphere of adverse acts which went unabated in violation of N.Y. Exec. Law § 296 and 42 U.S.C. § 1981.

### *As Against the Individual Defendants*

54. As set forth above, Defendants aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of N.Y. Exec. Law § 296(6).

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a) Awarding money damages in the sum of $1,000,000.00 (One Million Dollars);

b) Awarding punitive damages to Plaintiff in an amount to be determined by a jury;

c) Granting a permanent injunction enjoining Wyeth from any further actions abridging the Plaintiff's rights, including but not limited to, an injunction preventing Wyeth or any of its agents or employees from providing negative, misleading, or disparaging references pertaining to Plaintiff's employment; and,

d) Awarding reasonable attorneys fees; and further,

e) Granting such other and further relief that to the Court seems just and proper.

Dated: Carle Place, New York
January 5, 2007

THE LAW OFFICE OF
STEVEN A. MORELLI
Attorneys for Plaintiff

One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 873-9550

By: Steven A. Morelli, Esq.